UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CORE CAPITAL PARTNERS, LTD., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KÖRNER, DIXIT JOSHI, THOMAS GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO HORTA-OSÓRIO, and PRICEWATERHOUSECOOPERS AG, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION COMPLAINT</u> <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Core Capital Partners, Ltd. ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Credit Suisse Group AG ("Credit Suisse" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Credit Suisse additional tier-one bonds ("AT1 Bonds") in a domestic transaction in the U.S. between February 18, 2021 and March 20, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers wealth management solutions, including investment advice and discretionary asset management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services.

3.     Prior to its eventual takeover by UBS Group AG ("UBS"), Credit Suisse's securities offerings included, among other types of investments, AT1 Bonds, also known as "contingent convertibles" or "CoCo" bonds, which act as shock absorbers if a bank's capital levels fall below a certain threshold.  AT1 Bonds can be converted into equity or written off, and they make up part of the capital cushion that regulators require banks to hold to provide support in times of market turmoil.  According to the Swiss Financial Market Supervisory Authority ("FINMA"), in a press release dated March 23, 2023, entitled "FINMA provides information about the basis for writing down AT1 capital instruments" (the "AT1 Bond Advisory"), Credit Suisse's AT1 Bonds "contractually provide that they will be completely written down in a 'Viability Event', in particular if extraordinary government support is granted."

4.     As reported to the Financial Industry Regulatory Authority ("FINRA") via FINRA's Trade Reporting and Compliance Engine ("TRACE"), which helps FINRA track domestic trading in certain securities, including AT1 Bonds, during the Class Period, the total U.S. trading volume of the series of Credit Suisse AT1 Bonds that Plaintiff purchased (ISINs: USH3698DDD33 ("Series DD33"), USH3698DBZ62 ("Series BZ62"), and USH3698DCV40 ("Series CV40")) exceeded *$1.2 billion*.[1]  This represents merely a subset of the various Credit Suisse AT1 Bonds that were traded by the Class during the Class Period, meaning that the total domestic trading volume for all AT1 Bonds traded during the Class Period is even larger.

5.     Before the start of the Class Period, Credit Suisse's financial condition and reputation had been negatively impacted by a variety of high-profile scandals.  More recently, the failure of Credit Suisse's funds structured in collaboration with U.K.-based financier Lex Greensill ("Greensill Funds") and the collapse of Archegos Capital Management ("Archegos"), a hedge fund for which Credit Suisse had significant, undisclosed exposure, forced Credit Suisse to incur substantial losses and reveal critical risk management and control governance failures in March 2021.  During the Class Period, Defendants assured investors and the market that the Company would remediate deficiencies in its risk management and/or control governance procedures and/or policies.

6.     In October 2022, Credit Suisse began experiencing a sharp increase in customer outflows, or withdrawals of client funds, after a series of quarterly losses and risk and compliance failures.  In the months following these outflows, Defendants reassured investors that the rate of customer outflows had either reversed or else completely stopped.

---

[1] *See* Financial Industry Regulatory Authority (FINRA) Trade Reporting and Compliance Engine (TRACE), via Bloomberg Finance L.P.

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the sharp increase in customer outflows that Credit Suisse began experiencing in October 2022 remained ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds; (iii) the Company maintained deficient disclosure controls and procedures, and there were material weaknesses in the Company's internal controls over financial reporting; (iv) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; (v) contrary to Defendants' representations, Credit Suisse failed to implement meaningful changes to its risk management and/or control governance procedures and/or policies, which were severely lacking throughout and prior to the Class Period; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.     On November 23, 2022, Credit Suisse issued a media release announcing its preliminary financial results for the fourth quarter of 2022, which it filed with the SEC on a Form 6-K the same day, announcing, *inter alia*, that customers had withdrawn approximately 10% of all assets under management as of the end of the third quarter of 2022, and that the Company expected to incur a substantial loss of approximately CHF[2] 1.5 billion in the fourth quarter of 2022.  The Company also issued a media release the same day announcing shareholder approval of proposed capital increases announced on October 27, 2022.

---

[2] All references to "CHF" herein are to the Swiss franc, which is the currency and legal tender of Switzerland and Liechtenstein

9.     In response, *Reuters* published an article entitled "Credit Suisse flags hefty loss as rich clients pull out", reporting that "shareholders and analysts were disturbed by the bank's sobering assessment of the scale of its problems, as well as the pace at which rich clients pulled out savings and investments."

10.     Likewise, in an article entitled "Credit Suisse Warns of $1.6 Billion Loss After Clients Pull Money," published the same day, the *Wall Street Journal* reported that "Credit Suisse Group AG warned it would lose around $1.6 billion in the fourth quarter after customers pulled their investments and deposits over concerns about the bank's financial health," that "Switzerland's No. 2 bank by assets said outflows were around 6% of its total $1.47 trillion assets, or around $88.3 billion, between Sept. 30 and Nov. 11," and that "the fast pace of withdrawals meant the bank's liquidity fell below some local-level requirements.

11.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $1.408, or 2.45%, to close at $56.00 on November 23, 2022; Credit Suisse's Series BZ62 AT1 Bond price fell $2.235, or 2.87%, to close at $75.693 on November 23, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $1.872, or 3.17%, to close at $57.162 on November 23, 2022.

12.     On December 1, 2022, Credit Suisse's Chairman, Defendant Axel P. Lehmann ("Lehmann"), stated in an interview with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

13.     The following day, in an interview with *Bloomberg Television*, Defendant Lehmann reiterated his previous statements, reassuring investors that as of November 11, 2022, customer outflows had "basically stopped".

14.     On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results.   The press release revealed that, contrary to Defendant Lehmann's prior

statements, large customer outflows had continued through year-end 2022. Specifically, the press release reported customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

15.     On February 20, 2023, *Reuters* reported that FINMA was reviewing Defendant Lehmann's previous comments regarding customer outflows.

16.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $2.517, or 4.09%, to close at $58.978 on February 21, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $3.616, or 4.67%, to close at $73.876 on February 21, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.454, or 3.79%, to close at $62.214 on February 21, 2023.

17.     On March 14, 2023, during pre-market hours, Credit Suisse filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 20-F"), which identified material weaknesses in the Company's internal controls and procedures.

18.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $2.29, or 4.75%, to close at $45.924 on March 14, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $4.679, or 7.46%, to close at $58.014 on March 14, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.824, or 5.43%, to close at $49.167 on March 14, 2023.

19.     On March 15, 2023, during pre-market hours, *Reuters* published an article entitled "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth" citing Saudi National Bank ("SNB") would not buy any more of the Company's shares on regulatory grounds.

20.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $18.262, or 39.77%, to close at $27.662 on March 15, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell

$30.232, or 52.11%, to close at $27.782 on March 15, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.712, or 44.16%, to close at $27.455 on March 15, 2023.

21.     On Sunday, March 19, 2023, FINMA revealed, *inter alia*, that it had approved a takeover of Credit Suisse by UBS via a merger (the "Merger"), and that "[t]he extraordinary [Swiss] government support [for the Merger] will trigger a complete write-down of the nominal value of all AT1 debt of Credit Suisse in the amount of around CHF 16 billion[.]"  FINMA would later defend its decision to completely write down the AT1 Bonds in its AT1 Bond Advisory on the basis that "Credit Suisse was granted extraordinary liquidity assistance loans secured by a federal default guarantee on 19 March 2023" and, therefore, the AT1 Bonds' "contractual conditions [for being written down] were met[.]"

22.     Then, on March 20, 2023, before market hours, Credit Suisse issued an *ad hoc* announcement on Form 6-K confirming the Merger.  As reported by *CNBC* that day, the Company's AT1 Bondholders would "see investments worth 16 billion Swiss francs ($17 billion) become worthless" as a result of AT1 Bonds being written down to zero in connection with the Merger.  *CNBC* also quoted Goldman Sachs' credit strategists as advising that the decision "can be interpreted as an effective subordination of AT1 bondholders to shareholders" and "represents the largest loss ever inflicted to AT1 investors since the birth of the asset class post-global financial crisis[.]"

23.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $20.530, or 83.21%, to close at $4.143 on March 20, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $25.468, or 88.1%, to close at $3.441 on March 20, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.422, or 86.15%, to close at $3.443 on March 20, 2023.

24.     All the foregoing disclosures caused a sharp decline in the market value of Credit Suisse's AT1 Bonds, ultimately culminating in the eventual write-down of all Credit Suisse AT1 bonds to a value of *zero*, damaging investors in these bonds.

25.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's AT1 Bonds, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

26.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

28.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Credit Suisse's AT1 Bonds were traded in the U.S. throughout the Class Period, as FINRA's TRACE data reflects.  Accordingly, there are investors in Credit Suisse's AT1 Bonds located within the U.S., some of whom undoubtedly reside in this Judicial District.

29.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

30.     Plaintiff, as set forth in the attached Certification, acquired Credit Suisse AT1 Bonds in domestic transactions in the U.S. at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

31.     Defendant Credit Suisse was organized under the laws of Switzerland with principal executive offices located at Paradeplatz 8, 8001 Zurich, Switzerland.  Prior to the Merger and Credit Suisse's subsequent delisting, the Company's AT1 Bonds traded in an efficient market in the U.S.

32.     Defendant Lehmann served as Credit Suisse's Chairman of the Board of Directors from January 2022 until June 2023.

33.     Defendant Ulrich Körner ("Körner") served as Credit Suisse's Chief Executive Officer ("CEO") from August 2022 until June 2023.

34.     Defendant Dixit Joshi ("Joshi") served as Credit Suisse's Chief Financial Officer ("CFO") from October 2022 until June 2023.

35.     Defendant António Horta-Osório ("Horta-Osório") served as Credit Suisse's Chairman of the Board of Directors from April 2021 until his "resignation" in January 2022.

36.     Defendant Thomas Gottstein ("Gottstein") served as Credit Suisse's CEO from before the start of the Class Period until his "resignation" in July 2022.

37.     Defendant David R. Mathers ("Mathers") served as Credit Suisse's CFO from before the start of the Class Period until his "resignation" in August 2022.

38.     Defendants Lehmann, Körner, Joshi, Horta-Osório, Gottstein, and Mathers are collectively referred to herein as the "Individual Defendants".  The Individual Defendants and Credit Suisse are collectively referred to herein as the "Credit Suisse Defendants".

39.     The Individual Defendants possessed the power and authority to control the contents of Credit Suisse's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Credit Suisse's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Credit Suisse, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

40.     Defendant PricewaterhouseCoopers AG ("PwC") is an international accounting and consulting firm.  PwC was engaged by Credit Suisse to provide "independent" auditing, accounting, and management consulting services, tax services, examination and review of filings with the SEC, audits and/or reviews of financial statements which were included in Credit Suisse's SEC filings, including audited and unaudited information, and annual reports, since 2020.

41.     The Credit Suisse Defendants and PwC are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

42.     Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific.  The Company offers wealth management solutions, including investment advice and discretionary asset

management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services.

43.     Prior to its eventual takeover by UBS, Credit Suisse's securities offerings included, among other types of investments, AT1 Bonds, also known as "contingent convertibles" or "CoCo" bonds, which act as shock absorbers if a bank's capital levels fall below a certain threshold. AT1 Bonds can be converted into equity or written off, and they make up part of the capital cushion that regulators require banks to hold to provide support in times of market turmoil. AT1 Bonds are the riskiest type of bond a bank can issue and, accordingly, carry a higher coupon. If AT1 Bonds are converted into equity, this supports a bank's balance sheet and helps it to stay afloat. They also pave the way for a "bail-in", or a way for banks to transfer risks to investors and away from taxpayers if they get into trouble. According to FINMA's AT1 Bond Advisory, Credit Suisse's AT1 Bonds "contractually provide that they will be completely written down in a 'Viability Event', in particular if extraordinary government support is granted."

44.     According to the TRACE system, which helps FINRA track domestic trading in certain securities, including AT1 Bonds, during the Class Period, the total U.S. trading volume of the Series DD33, BZ62, and CV40 Credit Suisse AT1 Bonds that Plaintiff purchased exceeded *$1.2 billion*. This represents merely a subset of the AT1 Bonds that were traded by the Class during the Class Period, meaning that the total domestic trading volume for all AT1 Bonds during the Class Period is even larger.

45.     Before the start of the Class Period, Credit Suisse's financial condition and reputation had been negatively impacted by a variety of high-profile scandals, including, *inter alia*, when, in 2017, Credit Suisse agreed to pay USD $5.28 billion to resolve a probe by the U.S. Department of Justice relating to its conduct in the packaging, securitization, issuance, marketing,

and sale of residential mortgage-backed securities between 2005 and 2007.  More recently, the failure of the Greensill Funds and the collapse of Archegos, a hedge fund for which Credit Suisse had significant, undisclosed exposure, forced Credit Suisse to incur substantial losses and reveal critical risk management and control governance failures in March 2021.  During the Class Period, Defendants assured investors and the market that the Company would remediate deficiencies in its risk management and/or control governance procedures and/or policies.

**Materially False and Misleading Statements Issued During the Class Period**

46.     The Class Period begins on February 18, 2021, when Credit Suisse issued a press release announcing the Company's fourth quarter and full year 2020 results.  The press release quoted Defendant Gottstein, stating, in relevant part:

> Despite a challenging environment for societies and economies in 2020, we saw a strong underlying performance across Wealth Management and Investment Banking, while addressing historic issues. We remained focused on serving our clients around the globe and on delivering value to our shareholders. The steady execution of the strategic initiatives we announced last July supports our growth agenda and allows for further investment in our businesses. Looking forward into 2021 and beyond, we aim to further accelerate growth in Wealth Management and deliver sustainable returns in Investment Banking. We remain strongly committed to positioning Credit Suisse as a leader in sustainability and driving digitalization and automation to generate positive operating leverage. I would like to thank all our employees for their outstanding commitment and loyalty.

47.     On April 6, 2021, Credit Suisse filed a Form 6-K with the SEC, appended to which as exhibits were an update to the Company's 2020 compensation report (the "2020 Compensation Update"), a media release regarding Board of Directors announcements (the "Board of Directors Update"), and another media release regarding preliminary first quarter 2021 earnings (the "Preliminary 1Q21 Earnings Update").  The Preliminary 1Q21 Earnings Update stated, in relevant part:

> While our financial results are still subject to detailed finalization and review, **we** would expect to report a pre-tax loss for 1Q 2021 of approximately CHF 900

million. This includes a charge of CHF 4.4 billion in respect of the failure by a US-based hedge fund to meet its margin commitments as we announced on March 29, 2021.

* * *

With regard to the four supply chain finance funds, where we continue to see cash inflows, we will distribute a separate update on further repayments within the next few days.

We acknowledge that both the US hedge fund and the supply chain finance fund matters require substantial further review and scrutiny. The Board of Directors has launched investigations into both of these matters which will not only focus on the direct issues arising from each of them, but also reflect on the broader consequences and lessons learned. We have also undertaken senior management changes within the Investment Bank division and within the Risk and Compliance organization as separately announced today.

[Defendant] Gottstein, CEO of Credit Suisse Group said: "The significant loss in our Prime Services business relating to the failure of a US-based hedge fund is unacceptable. In combination with the recent issues around the supply chain finance funds, I recognize that these cases have caused significant concern amongst all our stakeholders. Together with the Board of Directors, we are fully committed to addressing these situations. Serious lessons will be learned. Credit Suisse remains a formidable institution with a rich history."

48.     The Board of Directors Update stated, in relevant part:

Following the significant US-based hedge fund matter, Brian Chin, CEO of the Investment Bank is stepping down from his role on the Executive Board, effective April 30, 2021. Lara Warner, Chief Risk and Compliance Officer, is stepping down from her role on the Executive Board, effective April 6. Both of them will leave the bank.

* * *

In March 2021, the tactical crisis committee of the Board of Directors consisting of the Chairman, the Chairs of the Audit Committee and Risk Committee and the Chair of the Conduct and Financial Crime Control Committee was activated to exercise close oversight and ensure timely decision making with respect to the resolution of the issues in connection with the Credit Suisse Asset Management managed supply chain finance funds. The mandate of this committee has in the meanwhile been expanded to include the significant US-based hedge fund matter. The tactical crisis committee works closely with the CEO and the rest of the management team.

The Board of Directors has launched two investigations, to be carried out by external parties, into the supply chain finance funds matter and into the significant US-based hedge fund matter. These investigations will be supervised by a special committee of the Board of Directors and will not only focus on the direct issues arising from those matters, but also reflect on the broader consequences and lessons learned.

49.     The 2020 Compensation Update stated, in relevant part:

**Recent developments**
Since the publication of the Compensation Report on March 18, 2021, the Board of Directors (Board) has assessed the recent significant developments in connection with the US-based hedge fund.

**Withdrawal of the previously proposed Executive Board variable compensation amounts and other actions**
Under the current circumstances, the Board has resolved to withdraw its proposals regarding the variable compensation for the Executive Board, comprising the 2020 short-term incentive compensation (STI), which was determined based on 2020 performance, and the 2021 long-term incentive opportunities (LTI), for which payout would have been determined based on prospective performance over the three-year period 2021– 2023.

Overall, the previously proposed Executive Board compensation will be reduced by the entire previously proposed variable compensation amount of CHF 40.8 million. Of this reduction, CHF 15.7 million will relate to the withdrawn 2020 STI and CHF 25.1 million to the withdrawn 2021 LTI.

\* \* \*

The Compensation Committee will continue to monitor developments closely and will determine, based on the results of any investigation, any appropriate actions to be applied, including the application of the Group's existing malus and clawback provisions on variable compensation awards to any applicable employees.

50.     Also on April 6, 2021, Defendant Gottstein was interviewed by the Swiss, German-language newspaper *Neue Zürcher Zeitung*.  *Reuters* summarized the interview in an article published that day, entitled "Credit Suisse's investment banking to be scrutinized by new chairman: CEO."  The article stated, in relevant part:

The structure of Credit Suisse's investment bank will be scrutinised closely by incoming chairman Antonio Horta-Osorio, CEO Thomas Gottstein told a

newspaper, as the bank aims to boost risk management after billions in losses on U.S. fund Archegos.

"That is with certainty one of the core strategic themes that the board under the new chairman, together with the bank's executive leadership, will be focusing on," Gottstein told Neue Zuercher Zeitung on Tuesday.

* * *

"There are no sacred cows," Gottstein added in the interview. "What we can already say is, we will be taking risks out of certain parts of investment banking. That certainly includes the Prime Services business" that serves hedge funds like Archegos.

* * *

In the NZZ interview, Gottstein blamed Credit Suisse's failings to adequately manage risks at least partly on the lack of face-to-face meetings with clients during the COVID-19 pandemic.

"It's a challenge to manage a global bank during a pandemic over Zoom," Gottstein told the newspaper. "I'm convinced that in the era of COVID-19 the scrutiny of risk business, whether for banks or insurers, has grown more difficult."

51. On April 22, 2021, Credit Suisse issued a press release announcing the Company's first quarter 2021 financial results. The press release quoted Defendant Gottstein, stating, in relevant part:

Our results for the first quarter of 2021 have been significantly impacted by a CHF 4.4 bn charge related to a US-based hedge fund. The loss we report this quarter, because of this matter, is unacceptable. Together with the Board of Directors, we have taken significant steps to address this situation as well as the supply chain finance funds matter. Among other decisive actions, we have made changes in our senior business and control functions; we have enhanced our risk review across the bank; we have launched independent investigations into these matters by external advisors, supervised by a special committee of the Board; and we have taken several capital-related actions. We will work to ensure Credit Suisse emerges stronger. However, it is also important to recognize that our underlying 1Q21 financial performance[], across all divisions, was strong, supported by solid results in Switzerland, and strong growth in APAC and investment banking. We expect that our successful MCN placement today will further strengthen our balance sheet and enable us to support the momentum in our core franchises. Our underlying result is a testament to the earnings power of Credit Suisse and to the commitment

15

of our employees. And it makes it all the more important that we quickly and decisively resolve the issues we are currently dealing with.

52.    On April 30, 2021, Credit Suisse held its Annual General Meeting of Shareholders

in Zurich, Switzerland, during which  Defendant Gottstein stated, in relevant part:

> I recognize that Credit Suisse is currently surrounded by negative events, news and commentary. These events have caused great anxiety among employees, clients and shareholders alike, and they substantially weakened our share price. Let me address this directly. The significant loss in our prime services business relating to the failure of a U.S. prime brokerage client is unacceptable. We deeply regret that these cases, in combination with the supply finance funds matter, have caused significant and understandable concerns among our stakeholders, including you, our valued shareholders.
>
> We have taken decisive actions, which include the following: first, significant personnel and organizational changes at the Executive Board level and the echelons directly below them; second, the withdrawal of proposals for the Executive Board variable compensation comprising both their short-term incentive awards based on 2020 performance and their 2021 long-term incentive awards. At the same time, variable compensation from previous years that has not yet been paid out will be retained for relevant employees. This measure will ensure that we are able to reevaluate variable compensation for 2020 and apply malus or clawbacks where appropriate.
>
> Third, the strengthening of risk controls, including forensic analysis of the 2 incidents. In addition, we are conducting an overall review of risk systems, processes and culture across the bank and are significantly reducing our risk positions in the prime services business. Fourth, we have further strengthened our balance sheet by means of a capital increase, as recently announced, in which we raised a total of CHF 1.7 billion. Fifth, the Board of Directors has launched 2 independent investigations carried out by external parties. These will also reflect on the broader consequences and lessons learned. We will work closely with the relevant regulators, including our domestic supervisor, FINMA, which has opened enforcement proceedings in both cases.
>
> These events represent real setbacks. I'm confident that we will draw the right conclusions with the aim of making sure that events of this kind never happen again. We are dedicated to ensuring that Credit Suisse will emerge stronger from the situation. However, I would like to reassure you that even as we diligently address these issues, we remain well positioned to support our clients globally.

* * *

Ladies and gentlemen, Credit Suisse remains a formidable institution. We have thrived for 165 years through external crises and our own challenges. I've been at Credit Suisse for 22 years now through many ups and downs, and I am self-critical with regard to the recent developments which have left their mark on me as well. I see my role now, together with the new Chairman and the rest of the Board of Directors and my colleagues of the Executive Board, is to steer Credit Suisse back into calmer waters. I'm proud to lead this bank, and I am confident about the future. At the heart of this confidence are the close relationships that we have with our clients, our earnings power and the dedication of our employees around the world. I therefore assure you that my management team and I, together with our employees, will do everything we can to bring back the best of the bank to you, our valued shareholders, ladies and gentlemen.

53.      At the same meeting, Defendant Horta-Osório then stated, in relevant part:

Any company that has been around as long as this company will have experienced its fair share of ups and downs. Indeed, over 3.5 decades, I have personally worked at and led several banks in different countries and have lived through many crises. What has happened with Credit Suisse over the last 8 weeks with the U.S.- based hedge funds and the supply chain finance funds matters certainly goes beyond that. Important lessons have to be learned and decisions taken accordingly in a transparent, thoughtful and decisive way. In the months to come, my focus will be on 3 areas.

First, risk management. The current and potential risk of Credit Suisse need to be a matter of immediate and close scrutiny. I firmly believe that any banker should be, at heart, a risk manager. Together with the Board and management, I will have a thorough look at how risks are being assessed, managed and controlled. Second, strategy. Credit Suisse has an outstanding franchise and client base and has outstanding people. I see it as my duty as Chairman to ensure that Credit Suisse continues to excel where it has its strengths and competitive advantages. We will take the time required for an in-depth assessment of the bank's strategic options. This will be done with a long-term perspective not losing sight of the short-term needs. Then we will decide on a course of action and closely oversee the execution. Third, culture. Credit Suisse's rich heritage has been built by women and men over many decades. The bank is associated with excellency, creativity and an entrepreneurial spirit as well as long-standing commitment to its customers, the economy and society at large. However, a series of setbacks has been holding us back, and we need to reflect on what led us to the issues we face today.

It is my firm ambition and determination to listen into the organization and to engage in dialogue with all relevant stakeholders in order to get a deep understanding of our strengths and weaknesses. We need to foster a culture that reinforces the importance of risk management, ensures that we have the right incentives in place including on remuneration and focuses on personal responsibility and accountability, a culture where every single employee can be

proud of what we stand for and how we act. The Board and I will do this together with the management team led by Thomas Gottstein. Thomas has the Board's confidence, and I'm looking forward to working with him and the Executive Team.

54.     On May 6, 2021, Credit Suisse filed its first quarter 2021 Quarterly Report on a Form 6-K with the SEC, signed by Defendants Gottstein and Mathers.  Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG."  The letter stated, *inter alia*:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of March 31, 2021 . . . . Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Group as of December 31, 2020 . . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, **is** fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

> \* \* \*

> We conducted our review in accordance with the standards of the PCAOB.

55.     On July 1, 2021, Defendant Horta-Osório was interviewed by *Neue Zürcher Zeitung*.  *Reuters* summarized the interview in an article published that day, entitled "Credit Suisse to realign strategy this year, chairman says."  The article stated, in relevant part:

> Credit Suisse (CSGN.S) expects to decide on a new strategy by the end of the year, Chairman Antonio Horta-Osorio said in his first interview since assuming the role at the troubled lender.

> \* \* \*

> Describing his first seven weeks in the job – during which he met with employees, as well as Swiss politicians and Swiss, U.S. and British regulators – as "intensive,"

Horta-Osorio said the bank needed a realignment that would clear up short-term crises but also position it for the long term.

"I have a clear picture of the direction the bank must take," he said in the interview with Swiss newspaper Neue Zuercher Zeitung published on Thursday. "For me the question isn't, 'what do we need to do to ensure it works this time?' The question is much more, 'why isn't the bank making progress, despite having a fantastic group of wealth management clients in Switzerland, Europe and high-growth Asia?'" he said, adding the bank's major strength lay in serving entrepreneurs and wealthy families.

"We need to agree on how we can best serve these customers and on where we are most competitive – on what that means for the bank as a whole," he said. To ensure success, the bank would need not only the right strategic direction, but also "the right people in the right place," he added.

Describing the recent failings at Switzerland's second-largest bank as unacceptable, Horta-Osorio compared the 165-year-old lender to a racecar driving on a highway with its wheels on wrong and promised no quick fixes, saying cultural shifts take time.

\* \* \*

Asked about the future of the investment bank, Horta-Osorio said it was too soon to anticipate the outcome of the board's discussions. "We're in the beginning phase of a new strategic positioning," he said.

(Emphases added.)

56.     On July 29, 2021, Credit Suisse issued a press release announcing the Company's

second quarter 2021 financial results.  The press release quoted Defendant Gottstein, stating, in

relevant part:

Credit Suisse delivered resilient underlying second quarter results and strong capital ratios as we are benefitting from having taken decisive actions to address the challenges raised by the Archegos and Supply Chain Finance Funds matters. We take these two events very seriously and we are determined to learn all the right lessons. We have significantly reduced our RWA and leverage exposure and improved the risk profile of our Prime Services business in the Investment Bank, as well as strengthened the overall risk capabilities across the bank. Our underlying business performance remains solid with a record level of assets under management in our Wealth Management and Asset Management businesses, supporting strong growth in recurring commissions and fees. Together with our more conservative approach to risk and a less favorable trading environment compared to the second

quarter of 2020, we delivered a resilient underlying performance in the Investment Bank. We continue to invest in people and technology across Wealth Management, notably in APAC, as well as Asset Management and the Investment Bank. Over the coming months, we will continue to develop our long-term vision for the bank that will serve as our compass for the years ahead. Our objectives are clear: whilst we aim to further strengthen our risk culture, we remain committed to serving all our private, corporate and institutional clients with best-in-class service and advice and to creating value for our shareholders.

57.     Also on July 29, 2021, Credit Suisse filed its second quarter 2021 Quarterly Report on a Form 6-K with the SEC, signed by Defendants Gottstein and Mathers.  Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG."  The letter stated, *inter alia*:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of June 30, 2021 . . . . Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Group as of December 31, 2020 . . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

*  *  *

> We conducted our review in accordance with the standards of the PCAOB.

(Emphases added.)

58.     On November 4, 2021, Credit Suisse issued a press release announcing the Company's third quarter 2021 financial results.  The press release quoted Defendant Gottstein, stating, in relevant part:

> Credit Suisse reported strong third quarter pre-tax income and a CET1 ratio of 14.4 percent.

Wealth Management businesses returned to robust net new assets and higher transaction revenues sequentially, while recurring commissions & fees and client business volumes demonstrated strong year on year momentum. Our Swiss Universal Bank had a record third quarter performance. Our Asia Pacific business had a resilient performance notwithstanding deleveraging by clients and we continue to invest in the region, including in relationship managers and building-out our mainland China presence. Our Investment Bank delivered solid profitability driven by strong performance across Advisory, Capital Markets, Securitized Products and Equity Derivatives. Asset Management reported a further improved underlying performance driven across all revenues lines.

We have also taken decisive actions to strengthen our overall risk & controls foundation, continued our remediation efforts on the Supply Chain Finance Funds matter, with our priority to return cash to investors, and made significant progress in resolving legacy issues. Our objectives are clear: we want to become a stronger, more customer-centric bank that puts risk management at the very core of its DNA to deliver sustainable growth for investors, clients and colleagues.

59.     On March 10, 2022, Credit Suisse filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 20-F").  With respect to the Company's controls and procedures, the 2021 20-F stated, in relevant part:

**Evaluation of disclosure controls and procedures**

The CEO and CFO concluded that, as of December 31, 2021, the design and operation of the Group's ***disclosure controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in reports filed and submitted under the Exchange Act is recorded, processed, summarized and reported as and when required***.

\* \* \*

Based upon its review and evaluation, management, including the Group CEO and CFO, ***has concluded that the Group's internal control over financial reporting is effective as of December 31, 2021***.

The Group's independent registered public accounting firm, PricewaterhouseCoopers AG, has issued an unqualified opinion on the effectiveness of the Group's internal control over financial reporting as of December 31, 2021, as stated in their report.

**Changes in internal control over financial reporting**

> ***There were no changes in the Group's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Group's internal control over financial reporting***.

(Emphases in bold and italics added.)

60.     Attached to the 2021 20-F was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG" (the "2021 Audit Letter").  The 2021 Audit Letter stated, *inter alia*:

> We have audited the accompanying consolidated balance sheets of Credit Suisse Group AG and its subsidiaries (the "Group") as of December 31, 2021 and 2020 . . . . We also have audited the Group's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> In our opinion, the consolidated financial statements referred to above ***present fairly, in all material respects***, the financial position the Group as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. ***Also in our opinion, the Group maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the COSO.***
>
> * * *
>
> The Group's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's report on internal control over financial reporting. ***Our responsibility is to express opinions on the Group's consolidated financial statements and on the Group's internal control over financial reporting based on our audits.***
>
> ***We conducted our audits in accordance with the standards of the PCAOB.*** Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. ***We believe that our audits provide a reasonable basis for our opinions.***

(Emphases added.)

61.     The 2021 Audit Letter also listed several "Critical Audit Matters," defined as matters which "(i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments."  These Critical Audit Matters included "Fair value of Certain Level 3 Financial Instruments"; "Allowance for Credit Losses – Collectively Evaluated Corporate and Institutional Loans – Investment Bank"; "Litigation provisions"; and "Income Taxes – Realization of the tax benefit of the loss related to Archegos."   The identified cash flow issue, which required a "revision" of the prior years' statements, however, was not listed as a "Critical Audit Matter."  AS No. 5 explains, "A direct relationship exists between the degree of risk that a material weakness could exist in a particular area of the company's internal control over financial reporting and the amount of audit attention that should be devoted to that area."  As such, failure to give particular attention to the cash flow issues further indicated that PwC's audit was not "in accordance" with PCAOB standards.

62.     Appended as an exhibit to the 2021 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Gottstein and Mathers certified that "[t]he [2021 20-F] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange

Act] and the information contained in th[e 2021 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Compan[y] for such period presented."

63.     On April 27, 2022, Credit Suisse issued a press release announcing the Company's first quarter 2022 results.  The press release quoted Defendant Gottstein, stating, in relevant part:

> The first quarter of 2022 has been marked by volatile market conditions and client risk aversion. These conditions, together with the impact from our reduction in risk appetite in 2021 as we took decisive actions to strengthen our overall risk and controls foundation, had an adverse impact on our net revenues. Our operating expenses were higher year on year, driven in particular by higher previously reported litigation expenses of CHF 703 mn for the quarter as we continued our proactive approach to resolving litigation matters. Against this backdrop, we reported a pre-tax loss for the quarter; however, on an adjusted* basis, we reported a pre-tax income of CHF 300 mn, including the adverse impact of CHF 206 mn of losses related to Russia's invasion of Ukraine. 2022 is a transition year, and our clear focus remains on the disciplined execution of our new Group strategy as announced in November 2021: strengthening our core, simplifying our organization and investing for growth. We went live with our new structure in January; have reduced the allocated capital in the IB by USD 2.5 bn, 82% of our ambition of more than USD 3.0 bn; and have made significant progress on various other strategic priorities. I am confident that we are well positioned to build a stronger and client-centric bank that puts risk management at the core to deliver sustainable growth and value for investors, clients and colleagues.

64.     On July 27, 2022, Credit Suisse issued a press release announcing the Company's second quarter 2022 results.  The press release quoted Defendant Gottstein, stating, in relevant part:

> Our results for the second quarter of 2022 are disappointing, especially in the Investment Bank, and were also impacted by higher litigation provisions and other adjusting items. The bank's performance was significantly affected by a number of external factors, including geopolitical, macroeconomic and market headwinds. These challenging circumstances led to results which overshadow the strength of our leading client franchises in all four divisions of the bank. ***The urgency for decisive action is clear and a comprehensive review to strengthen our pivot to the Wealth Management, Swiss Bank and Asset Management businesses, supported by a fundamental transformation of our Investment Bank, is underway. Further, we have now launched a broader cost efficiency and digital transformation program to reduce our absolute cost base to less than CHF 15.5 bn in the medium term***.

(Emphasis added.)

65.     On October 27, 2022, Credit Suisse issued a press release announcing the

Company's third quarter 2022 results.  The press release quoted Defendant Körner, stating, in

relevant part:

> The third quarter, and more broadly 2022 so far, have been significantly impacted
> by the continued challenging market and macroeconomic conditions, leading to a
> weaker performance for our Investment Bank in particular. Our recent Group level
> performance has been disappointing for our stakeholders. From today, we are
> taking a series of decisive actions to re-focus Credit Suisse around the needs of our
> clients and stakeholders. Our new, integrated model will be focused on Wealth
> Management, the Swiss Bank, as well as Asset Management, and we will radically
> restructure the Investment Bank, strengthen capital, and accelerate our cost
> transformation. We believe these actions will lead Credit Suisse to a more stable
> performance and generate lasting value for our shareholders.

66.     Also on October 27, 2022, Credit Suisse held a conference call with analysts and

investors to discuss the Company's third quarter 2022 results.  During the conference call,

Defendant Joshi began by stating, in relevant part:

> As you all know, challenging conditions continue during the third quarter with
> heightened market volatility, weak customer flows, and ongoing client
> deleveraging. And our financial performance reflects these challenges . . . . I would
> like to provide some additional context and commentary on asset flows at the start
> of the fourth quarter. *We did see a significant level of deposit in AUM outflows*
> *during the first two weeks of October. Whilst these outflows have stabilized since*
> *this period, they have not yet reversed. We have plans to address these matters*
> *after 27th of October through, among other things, accessing capital markets and*
> *executing the strategic initiatives we have announced today. We would note that*
> *the execution of these measures is also expected to generate liquidity and reduce*
> *the funding requirements of the group.*

(Emphasis added.)

67.     When questioned by an analyst on the call regarding "what drove" the customer

outflows, Defendant Joshi responded:

> You know, as you know, the negative social media news around our name at the
> beginning of October, you know, did lead to outflows, you know, across our
> franchise. You know, it's something that we're looking to address today through

the strategic announcements that we're making, including the 4 billion capital raise and ensuring that, you know, we're well capitalized through this transformation period, while we make the transformational announcements and restructuring across our investment bank and other business areas.

68.     When questioned by another analyst on the call regarding "what actually happened during the quarter" regarding the outflows in order "for us to be able to assess . . . how to look at them going forward," Defendant Körner responded:

So, if we look at the wealth management situation, you've seen the outflows of 6.4 billion for the quarter. And you rightly put it, which you then see reflected in the transaction-based income line as well, our wealth management business is very strong, as you know, in APAC and emerging markets. That has impacted that clearly, as we said. ***If you look at the 6.4 billion, it's a combination in the third quarter of, you know, deleveraging and derisking, if you want to. So, about 3 billion comes from deleveraging and other like 2 billion is proactive, call it derisking, and then some additional deposit outflows. I think that's the right way to think about that one.***

(Emphasis added.)

69.     When questioned by another analyst on the call regarding whether Defendants "could give us a sense of scale of a similar run rate to" the outflows seen in the third quarter of 2022, Defendant Körner responded:

What we have seen – and thanks for the question, what we have seen, particularly at the beginning of October, certainly, a heightened level of outflows, which was very much based on what you have seen in the media and the press rumors. ***And let me say here very clearly, to the largest extent possible, factually incorrect rumors. But, obviously, that, you know, the overall situation that has come in and down very significantly in the last couple of weeks, actually.***

(Emphasis added.)

70.     On November 2, 2022, Credit Suisse filed its 3Q22 Quarterly Report on Form 6-K with the SEC, signed by Defendants Körner and Joshi.  Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and

shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG."  The

letter stated, *inter alia*:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of September 30, 2022 . . . . Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Group as of December 31, 2020 . . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2021, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

* * *

> We conducted our review in accordance with the standards of the PCAOB.

71.    The statements referenced in ¶¶ 46-70 were materially false and misleading because

Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operations, and compliance policies.    Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) the sharp

increase in customer outflows that Credit Suisse began experiencing in October 2022 remained

ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series

of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds;

(iii) the Company maintained deficient disclosure controls and procedures, and there were material

weaknesses in the Company's internal controls over financial reporting; (iv) as a result, Credit

Suisse had overstated the Company's financial position and/or prospects; (v) contrary to

Defendants' representations, Credit Suisse failed to implement meaningful changes to its risk

management and/or control governance procedures and/or policies, which were severely lacking

throughout and prior to the Class Period; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

72.     On November 23, 2022, Credit Suisse issued a media release announcing its preliminary financial results for the fourth quarter of 2022, which it filed with the SEC on a Form 6-K the same day, announcing, *inter alia*, that customers had withdrawn approximately 10% of all assets under management as of the end of the third quarter of 2022, and that the Company expected to incur a substantial loss of approximately CHF 1.5 billion in the fourth quarter of 2022.  The Company also issued a media release the same day announcing shareholder approval of proposed capital increases announced on October 27, 2022.  In response, *Reuters* published an article entitled "Credit Suisse flags hefty loss as rich clients pull out", reporting that "shareholders and analysts were disturbed by the bank's sobering assessment of the scale of its problems, as well as the pace at which rich clients pulled out savings and investments."

73.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $1.408, or 2.45%, to close at $56.00 on November 23, 2022; Credit Suisse's Series BZ62 AT1 Bond price fell $2.235, or 2.87%, to close at $75.693 on November 23, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $1.872, or 3.17%, to close at $57.162 on November 23, 2022.  Despite these declines in Credit Suisse's AT1 Bond prices, the Company's AT1 Bonds continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the significance and impact of customer and asset outflows the Company was experiencing.

74.    For example, on December 1, 2022, Credit Suisse's Chairman, Defendant Lehmann, stated in an interview streamed online with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

75.    That same day, *Financial Times* published an article entitled "Credit Suisse chair says outflows have reversed since 'social media storm.'"  The article, which quoted Defendant Lehmann, stated, in relevant part:

> The chair of Credit Suisse said clients had started to return to the bank after pulling tens of billions of dollars of assets following a "social media storm" at the start of October.
>
> Axel Lehmann said withdrawals had flattened across the group and had started to reverse in the Swiss domestic business, but the scale of the outflows had caught the Swiss lender off-guard.
>
> "It was a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It was a storm in the retail and partially in the wealth management segment, in particular in Asia, where we had really massive outflows for two to three weeks.
>
> "The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."
>
> He said clients had been taking up to a third of the assets they held with the bank and transferring them to rivals. "I have anecdotes from clients and I know that the money will certainly come back over time."
>
> Credit Suisse revealed last month that rich clients had withdrawn about SFr63.5bn ($67.4bn) since the start of October — equivalent to 10 per cent of wealth management assets — following a spate of social media rumours about its financial health.
>
> Spreads on the group's credit default swaps surged in early October, which indicated investors were becoming increasingly bearish on the group, after a stream of rumours were posted on social media and web forums about the bank's imminent collapse.
>
> * * *
>
> Lehmann and Körner, who worked as senior executives at UBS, have since set about devising a radical plan for Credit Suisse that will involve the bank cutting

SFr2.5bn of costs, jettisoning 9,000 jobs and retreating from investment banking over the next three years.

\* \* \*

Lehmann added that the company had several "offers on the table" from companies that were willing to back the new venture and was in discussions with the US Federal Reserve over its balance sheet, structure and governance.

Credit Suisse had previously said an unnamed investor had pledged $500mn.

76.     On December 2, 2022, in an interview with *Bloomberg Television*, Lehmann reiterated his statements from the previous day, reassuring investors that as of November 11, 2022, customer outflows had "basically stopped".  In the same interview, Lehmann characterized the October increase in customer outflows as simply a "two-to-three-week event."

77.     On December 8, 2022, Credit Suisse issued a press release "announc[ing] [a] successful rights offering."  The press release quoted Defendant Ulner, stating, in relevant part:

Over recent weeks we have made important strides towards implementing the strategic actions outlined at our October 27 strategic review. The successful completion of the capital increase is a key milestone for the new Credit Suisse. It will allow us to further support our strategic priorities from a position of capital strength and create a simpler, more stable and more focused bank built around client needs, and generating value for shareholders.

78.     In response to this announcement, several market analysts published articles reporting on the impact of the successful rights offering.  For example, *Bloomberg* published an article entitled "Credit Suisse Offering Set to Sail Through After Wild Ride," which stated, in relevant part:

Banks handling Credit Suisse Group AG's rights offer expect nearly all of those rights to be exercised, spelling success for a capital raise that looked shaky as recently as last week.

Lenders arranging the deal currently expect investors to take up well above 90% of the stock on offer, the people said, asking not to be identified because the information is private. The banks don't currently anticipate needing to hold a

sizeable amount of Credit Suisse stock on their books afterwards, according to the people.

Any remaining amount is expected to be small enough that banks will be able to slowly sell the shares in the market, the people said. If needed, they will also be able to lean on sub-underwriters, major investors that have agreed to snap up a certain amount of unsold stock.

* * *

The bank is raising 4 billion francs in two steps to shore up its balance sheet as it seeks to put to rest concerns about its financial position after billions in losses over the past two years, recent client defections and asset outflows. The Saudi National Bank was an anchor investor in the capital raise, committing to invest about 1.5 billion francs, mostly through a private placement last month.

* * *

Credit Suisse needs the funds to help pay for the exit of large parts of its investment bank and 9,000 job cuts. The bank has warned that it will have a fifth straight quarter of losses as it reels from years of scandals and missteps that have eroded investor confidence and sent clients fleeing.

* * *

A successful rights offer spells the end of a wild ride for the troubled Swiss bank's stock over the past weeks, when at one point a 13-day losing streak took the shares down to near the price of what had supposed to be a heavily-discounted offer. ***Comments by Chairman Axel Lehmann on Friday that the bank had stopped massive outflows provided some relief, only for the stock to resume its downward slide on Tuesday***.

* * *

***Investors late last week took comfort from comments by Chairman Axel Lehmann that the main indicators of the bank's financial stability were strong and that its level of liquidity was improving after declines in recent weeks. The Zurich-based bank's liquidity coverage ratio, which measures the quantity of easily-sold assets available to meet obligations, is currently at 140%, Lehmann said***.

(Emphases added.)

79.    The statements referenced in ¶¶ 74-77 were materially false and misleading because

Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the sharp increase in customer outflows that Credit Suisse began experiencing in October 2022 remained ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds; (iii) the Company maintained deficient disclosure controls and procedures, and there were material weaknesses in the Company's internal controls over financial reporting; (iv) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; (v) contrary to Defendants' representations, Credit Suisse failed to implement meaningful changes to its risk management and/or control governance procedures and/or policies, which were severely lacking throughout and prior to the Class Period; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

80.    On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results and which revealed large customer outflows through year-end 2022.  The press release reported customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

81.    On February 20, 2023, during post-market hours, *Reuters* published an article entitled "Exclusive-Credit Suisse chairman's comments draw scrutiny from financial watchdog - sources".  The article stated, in relevant part:

> The Swiss financial regulator is reviewing remarks made by Credit Suisse Group [] Chairman Axel Lehmann about outflows from the lender having 32tabilizin in early December, two people with knowledge of the matter have told Reuters.
>
> Finma is seeking to establish the extent to which Lehmann, and other Credit Suisse representatives, were aware that clients were still withdrawing funds when he said

in media interviews that outflows had stopped, said the two people, who asked to remain anonymous because the matter was not public.

The development sent the embattled bank's shares down as much as 5% on Tuesday. The bank's stock, at roughly 2.62 Swiss francs, is around its lowest in decades. The cost of insuring exposure to the bank also rose following the news.

A spokesperson for Finma declined to comment. A Credit Suisse spokesperson said the bank did "not comment on speculation." Lehmann did not reply to an email seeking comment.

Lehmann told the Financial Times in an interview streamed online on Dec. 1 that after strong outflows in October, they had "completely flattened out" and "partially reversed".

The following day he told Bloomberg Television that outflows had "basically stopped."

Credit Suisse shares rose 9.3% on Dec. 2.

The regulator is reviewing whether Lehmann's statements were potentially misleading, said the people, with one adding that Lehmann may not have been briefed correctly before he made those comments.

Luzerner Kantonalbank described the inquiry, although not a formal investigation, as another blow for Credit Suisse.

"Was Axel Lehmann insufficiently informed or did he consciously or did he deliberately gloss over the matter?" said analyst Daniel Bosshard.

"Whatever the case, this is yet another inglorious chapter in the history of Credit Suisse."

Credit Suisse said on Feb. 9, when it reported its annual results, that clients withdrew 110.5 billion Swiss francs ($119.65 billion) from Switzerland's second-largest bank in the last three months of 2022.

Those outflows exceeded market expectations and rounded off a weak set of results that led to the stock falling about 15% on the day.

In response to a question on the distribution of withdrawals in the period, Chief Executive Ulrich Koerner told analysts that day that more than 85% of the outflows in the last quarter were in October and November, according to a transcript of the call.

That led analysts at Citigroup to conclude in a note to clients that management effectively indicated 15% of the outflows happened in December. Finma's scrutiny adds to the challenges faced by Credit Suisse, which has been rocked by scandals in recent years. The lender has embarked on a sweeping overhaul to restore profitability by exiting certain investment banking activities and focusing on managing money for the wealthy. In early October a social media storm triggered by an unsubstantiated report about the bank's financial health prompted wealthy customers to move deposits elsewhere. The bank said at the time it was pushing ahead with its restructuring and remained close to its clients.

Responding to a Reuters request for comment on the Feb. 9 results, Finma said in a statement that while Credit Suisse's liquidity buffers had a 34tabilizing effect, the regulator "monitors banks very closely during such situations," referring to the outflows, which "were indeed significant" in the fourth quarter. It did not elaborate further.

82.    On this news, Credit Suisse's Series DD33 AT1 Bond price fell $2.517, or 4.09%, to close at $58.978 on February 21, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $3.616, or 4.67%, to close at $73.876 on February 21, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.454, or 3.79%, to close at $62.214 on February 21, 2023.

83.    On March 14, 2023, during pre-market hours, Credit Suisse filed the 2022 20-F with the SEC.  With respect to the Company's controls and procedures, the 2022 20-F stated, in relevant part:

**We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021**

Management has identified certain material weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, *the Group's internal control over financial reporting was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report. Management has also accordingly concluded that our disclosure controls and procedures were not effective*.

*The material weaknesses that have been identified relate to the failure to design and maintain an effective risk assessment process to identify and analyze the risk of material misstatements in its financial statements and the failure to design and maintain effective monitoring activities relating to (i) providing sufficient management oversight over the internal control evaluation process to support the*

***Group's internal control objectives; (ii) involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives; and (iii) assessing and communicating the severity of deficiencies in a timely manner to those parties responsible for taking corrective action. These material weaknesses contributed to an additional material weakness, as management did not design and maintain effective controls over the classification and presentation of the consolidated statement of cash flows. This material weakness resulted in the revisions contained in our previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report***.

Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date. ***While we are taking steps to address these material weaknesses, which could require us to expend significant resources to correct the material weaknesses or deficiencies, any gaps or deficiencies in our internal control over financing reporting may result in us being unable to provide required financial information in a timely and reliable manner and/or incorrectly reporting financial information, which could reduce confidence in our published information, impact access to capital markets, impact the trading price of our securities or subject us to potential regulatory investigations and sanctions. In addition, there can be no assurance that these measures will remediate the material weaknesses in our internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Any of the foregoing could materially and adversely affect our business, results of operations and financial condition***.

(Emphases added.)

84.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $2.29, or 4.75%, to close at $45.924 on March 14, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $4.679, or 7.46%, to close at $58.014 on March 14, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.824, or 5.43%, to close at $49.167 on March 14, 2023.

85. On March 15, 2023, during pre-market hours, *Reuters* published an article entitled "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth" citing SNB would not buy any more of the Company's shares on regulatory grounds.

86. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $18.262, or 39.77%, to close at $27.662 on March 15, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $30.232, or 52.11%, to close at $27.782 on March 15, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.712, or 44.16%, to close at $27.455 on March 15, 2023.

87. On Sunday, March 19, 2023, FINMA revealed, *inter alia*, that it had approved a takeover of Credit Suisse by UBS via a merger, and that "[t]he extraordinary [Swiss] government support [for the Merger] will trigger a complete write-down of the nominal value of all AT1 debt of Credit Suisse in the amount of around CHF 16 billion[.]"  As FINMA would later assert in its AT1 Bond Advisory, "Credit Suisse was granted extraordinary liquidity assistance loans secured by a federal default guarantee on 19 March 2023" and, therefore, the AT1 Bonds' "contractual conditions [for being written down] were met[.]"  Indeed, according to FINMA, "[o]n 19 March 2023, the [Swiss] Federal Council enacted the Emergency Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans by the Swiss National Bank to Systemically Important Banks", which authorized FINMA to, *inter alia*, order Credit Suisse to write down its AT1 Bonds and, "[b]ased on the [AT1 Bonds'] contractual agreements and the Emergency Ordinance, FINMA instructed Credit Suisse to write down the AT1 bonds."

88. Then, on March 20, 2023, during pre-market hours, Credit Suisse issued an *ad hoc* announcement on Form 6-K confirming the Merger with UBS.  The announcement stated, in relevant part:

Credit Suisse and UBS have entered into a merger agreement on Sunday following the intervention of the Swiss Federal Department of Finance, the Swiss National Bank and the Swiss Financial Market Supervisory Authority FINMA ("FINMA"). UBS will be the surviving entity upon closing of the merger transaction. Under the terms of the merger agreement all shareholders of Credit Suisse will receive 1 share in UBS for 22.48 shares in Credit Suisse. Until consummation of the merger, Credit Suisse will continue to conduct its business in the ordinary course and implement its restructuring measures in collaboration with UBS.

\* \* \*

Axel P. Lehmann said: "Given recent extraordinary and unprecedented circumstances, the announced merger represents the best available outcome. This has been an extremely challenging time for Credit Suisse and while the team has worked tirelessly to address many significant legacy issues and execute on its new strategy, we are forced to reach a solution today that provides a durable outcome."

89.     As reported by *CNBC* that day, Credit Suisse AT1 Bondholders would "see investments worth 16 billion Swiss francs ($17 billion) become worthless" as a result of AT1 Bonds being written down to zero in connection with the Merger.  *CNBC* also quoted Goldman Sachs' credit strategists as advising that the decision "can be interpreted as an effective subordination of AT1 bondholders to shareholders" and "represents the largest loss ever inflicted to AT1 investors since the birth of the asset class post-global financial crisis[.]"

90.     On this news, Credit Suisse's Series DD33 AT1 Bond price fell $20.530, or 83.21%, to close at $4.143 on March 20, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $25.468, or 88.1%, to close at $3.441 on March 20, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.422, or 86.15%, to close at $3.443 on March 20, 2023.

91.     The disclosures of Defendants' fraud alleged herein caused a sharp decline in the market value of Credit Suisse's AT1 Bonds, ultimately culminating in the eventual write-down of all  Credit Suisse AT1 Bonds to a value of *zero*, damaging investors in these bonds.

92.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's AT1 Bonds, Plaintiff and other Class members have suffered significant losses and damages.

## PwC's Participation in the Fraud

93.     After an evaluation and selection process beginning in 2018, Credit Suisse shareholders at the Annual General Meeting of Shareholders on April 30, 2020 voted to approve the Board of Directors' proposal that PwC should succeed the Company's prior auditor, KPMG AG ("KPMG"), and PwC's appointment became effective for the fiscal year ended December 31, 2020.

94.     SOX requires publicly traded companies, like Credit Suisse, to file audited financial statements.  Independent auditors like PwC audit public companies to determine whether the companies' financial statements were prepared in accordance with GAAP.  Although some auditor's reports are referred to as "opinions," these reports are not subjective opinions in the ordinary sense of the word, but rather a specific type of attestation about whether financial statements do or do not comply with U.S. generally accepted accounting principles ("GAAP").  If it is determined that financial statements do not comply with GAAP, the company may be required to restate its financial statements.

95.     While independent auditors are paid for their services, their obligation is not to their client(s).  Rather, independent auditors serve the important function of "public watchdog," with a "public responsibility transcending any employment relationship with the client."[3]   "The independent auditor's obligation to serve the public interest assures that the integrity of the

---

[3] *United States v. Marino*, 654 F.3d 310, 323 (2d Cir. 2011) (citing *United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984)).

securities markets will be preserved." *Id.* The Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation created by SOX to oversee the audits of public companies, is responsible for establishing generally accepted auditing standards, professional standards to which auditors are required to adhere.

96.     The PCAOB also inspects a number of registered accounting firms each year in order to assess, drive improvement in, and communicate audit quality. The lists of which firms, areas, and/or audits will be inspected are not public information, as this would allow firms to take additional measures to shore-up their audits for that year, and potentially minimize work in other, non-inspection years.

97.     In 2018, the year Credit Suisse initially made the decision to switch auditors, the SEC charged six public accountants with leaking confidential PCAOB data to KPMG from 2015-2017. The Co-Director of the SEC's Enforcement Decision Division likened this misconduct to "stealing the exam . . . in an effort to interfere with the PCAOB's ability to detect audit deficiencies at KPMG." The U.S. Attorney's Office for the Southern District of New York also brought criminal charges against the six accountants. Court filings in that case revealed that Credit Suisse was on the list of KPMG clients to be inspected in 2016.[4] Though it was eventually dropped from the inspection roster, court filings showed KPMG was concerned that issues found in previous investigations of Credit Suisse, specifically related to cash flows, still existed, and performed a series of "stealth reviews" of the bank's 2016 audit to ensure that, if these issues came up, the audit would be clean. *Id.* These statements indicated that such care was not taken during those years

---

[4] Francine McKenna, "Anatomy of a failure: Credit Suisse, PwC, and KPMG, too," *The Dig*, May 28, 2023, available at https://thedig.substack.com/p/anatomy-of-a-failure-credit-suisse.

for which KPMG did not expect a PCAOB inspection.  As such, when PwC took on the mantle of Credit Suisse's auditor, it inherited several known issues, signaling the need to take special care.

98.     Nevertheless, PwC stated, in letters attached to each of Credit Suisse's Interim Reports on Form 6-K during the Class Period, that it was "not aware of any material modifications that should be made" to bring the interim report in conformity with GAAP; that the information included from the previous year's balance sheet "is fairly stated, in all material respects"; and that it had conducted its review in accordance with PCAOB standards.  PwC also stated, in a letter attached to the 2021 20-F, that the financial statement "present[ed] fairly, in all material respects, the financial position the Group as of December 31, 2021 and 2020" and that Credit Suisse had maintained "effective internal control over financial reporting as of December 31, 2021."

99.     In the same 2021 20-F, however, Credit Suisse stated that it had "identified accounting issues" that required it to revise (not restate) its financial statements for the years ending December 31, 2020, and December 31, 2019, but that these issues were "not material individually or in aggregate," a determination Credit Suisse later represented was blessed by PwC. Specifically, the Company stated that the issues were with the "netting treatment relating to the presentation of a limited population of certain securities lending and borrowing activities" resulting in the "balance sheet and cash flow positions for both assets and liabilities relating to these activities were understated."  Separately, the Company identified issues with "consolidated statements of cash flows share-based compensation expenses, net"; "expanded the elimination of non-cash exchange rate movements related to certain operating, investing and financing activities"; and "the presentation of certain cash flow hedges were reclassified."

## SCIENTER ALLEGATIONS

100.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  The sheer scale of Credit Suisse's internal control and compliance failures and resulting withdrawals of client funds, including the intense alarm this raised among investors and the market, were a forefront and critical concern for Defendants during the Class Period.  This is exhibited by the fact that Defendants—all top Company management (apart from PwC which, nonetheless, had intimate knowledge of and access to Credit Suisse's financial condition)— assured investors through various statements in multiple interviews and public filings that these compliance and internal control failures were being scrutinized and remediated, that customer outflows had either stopped or reversed, and that the Company was mitigating the resulting liquidity crisis through a capital raise of billions of francs.  All these statements were made even as Defendants knew that they had failed to implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, and that large customer outflows had not in fact stopped or reversed, but had actually continued through year-end 2022, with Credit Suisse experiencing customer outflows of *110.5 billion Swiss francs* in the final three months of 2022, a figure which far exceeded market expectations.

101.    Accordingly, Defendants, including PwC, which purported to audit Credit Suisse's financial statements and reports during the Class Period, had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on the Company's AT1 Bond investors during the Class Period, ultimately culminating in Credit Suisse's takeover by UBS and the subsequent write-down in those bonds to a value of zero.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Credit Suisse AT1 Bonds in a domestic transaction in the U.S. during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

103.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Credit Suisse AT1 Bonds were actively traded in the U.S., as FINRA's TRACE data reflects.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

106.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Credit Suisse;

- whether the Individual Defendants caused Credit Suisse to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Credit Suisse's AT1 Bonds during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

107.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

108.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Credit Suisse's AT1 Bonds were traded in an efficient market in the U.S.;

- Credit Suisse's AT1 Bonds were liquid and traded with moderate to heavy volume in domestic transactions in the U.S. during the Class Period, as evidenced by, *inter alia*, FINRA's TRACE data;[5]

- the Company was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's AT1 Bonds; and

- Plaintiff and members of the Class purchased, acquired, and/or sold Credit Suisse AT1 Bonds in domestic transactions in the U.S. between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

109.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

110.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

111.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

---

[5] As discussed further at ¶¶ 4 and 44, *supra*, the TRACE system indicates that, during the Class Period, the total U.S. trading volume of the Series DD33, BZ62, and CV40 AT1 Bonds that Plaintiff purchased exceeded ***$1.2 billion***.  *See* Financial Industry Regulatory Authority (FINRA) Trade Reporting and Compliance Engine (TRACE), via Bloomberg Finance L.P.  This represents merely a subset of the various AT1 Bonds that were traded by the Class during the Class Period, meaning that the total domestic trading volume for all AT1 Bonds during the Class Period is even larger.

112.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

113.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Suisse AT1 Bonds; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse AT1 Bonds at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

114.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Credit Suisse AT1 Bonds.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Credit Suisse's finances and business prospects.

115.     By virtue of their positions at Credit Suisse, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

116.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Credit Suisse, the Individual Defendants had knowledge of the details of Credit Suisse's internal affairs.

117.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Credit Suisse.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Credit Suisse's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Credit Suisse AT1 Bonds was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Credit Suisse's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Credit Suisse AT1 Bonds in domestic transactions in the U.S. at artificially

inflated prices and relied upon the price of the AT1 Bonds, the integrity of the market for the AT1 Bonds, and/or upon statements disseminated by Defendants, and were damaged thereby.

118.    During the Class Period, Credit Suisse AT1 Bonds were traded in an active and efficient market in the U.S.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Credit Suisse AT1 Bonds in domestic transactions in the U.S. at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said AT1 Bonds, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Credit Suisse AT1 Bonds was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Credit Suisse AT1 Bonds declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

119.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

120.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and/or sales of the Company's AT1 Bonds in domestic transactions in the U.S. during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

121.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

122.    During the Class Period, the Individual Defendants participated in the operation and management of Credit Suisse, and conducted and participated, directly and indirectly, in the conduct of Credit Suisse's business affairs.  Because of their senior positions, they knew the adverse non-public information about Credit Suisse's misstatement of income and expenses and false financial statements.

123.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Credit Suisse's financial condition and results of operations, and to correct promptly any public statements issued by Credit Suisse which had become materially false or misleading.

124.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Credit Suisse disseminated in the marketplace during the Class Period concerning Credit Suisse's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Credit Suisse to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Credit Suisse within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Credit Suisse AT1 Bonds.

125.    Each of the Individual Defendants, therefore, acted as a controlling person of Credit Suisse.  By reason of their senior management positions and/or being directors of Credit Suisse, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Credit Suisse to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Credit Suisse and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

126.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Credit Suisse.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 20, 2023                    Respectfully submitted,

                                            POMERANTZ LLP

                                            */s/ Jeremy A. Lieberman*
                                            Jeremy A. Lieberman
                                            J. Alexander Hood II

Thomas H. Przybylowski
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com
jlopiano@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: D45A6D9E-785B-443D-B9C5-764D11891F73

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, Christian Quege, on behalf of Core Capital Partners, Ltd. ("Core Capital"), as Director, with authority to bind Core Capital and enter into litigation on its behalf, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint on behalf of investors in Credit Suisse Group AG ("Credit Suisse") additional tier-one bonds ("AT1 Bonds") and authorize the filing of a comparable complaint on behalf of Core Capital.

3.    Core Capital did not purchase or acquire Credit Suisse securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    Core Capital is willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Credit Suisse AT1 Bonds in a domestic transaction in the United States during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of Core Capital's transactions in Credit Suisse AT1 Bonds in domestic transactions in the United States during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, Core Capital has sought to serve as a representative party and/or filed a complaint on behalf of a class under the federal securities laws in the following action:

- *Calhoun v. Credit Suisse Group AG et al.*, 1:23-cv-01297 (D.N.J.).[1]

---

[1] Subsequently transferred to the U.S. District Court for the Southern District of New York under style of *Calhoun v. Credit Suisse Group AG et al.*, 1:23-cv-06023 (S.D.N.Y.).

7.      Core Capital agrees not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond its pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


**Executed** __October 9, 2023_____
                **(Date)**

DocuSigned by:

_Christian Quege_____
D69130319BDC48D...   **(Signature)**


Christian Quege
Director
Core Capital Partners, Ltd.

**Credit Suisse Group AG (CS)**                                              **Core Capital Partners, Ltd.**

**List of Purchases and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit/FV | Price Per Share/Unit |
|---|---|---|---|---|
| _Account 1_ | | | | |
| Purchase | H3698DDD3 | 4/7/2021 | 1,800,000 | $95.4000 |
| Purchase | H3698DDD3 | 4/8/2021 | 2,000,000 | $95.5000 |
| Purchase | H3698DDD3 | 2/3/2022 | 1,000,000 | $92.6000 |
| Purchase | H3698DDD3 | 2/4/2022 | 1,000,000 | $91.6500 |
| Purchase | H3698DDD3 | 2/8/2022 | 1,000,000 | $90.9000 |
| Purchase | H3698DDD3 | 12/14/2022 | 500,000 | $62.1000 |
| Purchase | H3698DDD3 | 12/14/2022 | 1,700,000 | $62.1000 |
| Purchase | H3698DDD3 | 12/15/2022 | 2,600,000 | $62.0000 |
| Purchase | H3698DDD3 | 12/19/2022 | 1,300,000 | $60.7500 |
| Purchase | H3698DDD3 | 12/19/2022 | 1,300,000 | $60.0000 |
| Purchase | H3698DDD3 | 12/21/2022 | 1,000,000 | $60.8000 |
| Purchase | H3698DDD3 | 1/19/2023 | 800,000 | $66.5000 |
| Purchase | H3698DDD3 | 1/24/2023 | 500,000 | $67.9000 |
| Sale | H3698DDD3 | 9/21/2021 | (2,000,000) | $99.5500 |
| Sale | H3698DDD3 | 11/30/2021 | (1,000,000) | $95.9500 |
| | | | | |
| _Account 2_ | | | | |
| Purchase | H3698DDD3 | 12/19/2022 | 500,000 | $60.0000 |
| Purchase | H3698DDD3 | 12/30/2022 | 200,000 | $60.5000 |
| Purchase | H3698DDD3 | 1/24/2023 | 800,000 | $67.9000 |
| Purchase | H3698DDD3 | 1/23/2023 | 1,000,000 | $67.5000 |
| Sale | H3698DDD3 | 2/27/2023 | (1,200,000) | $58.0000 |
| Sale | H3698DBZ6 | 4/9/2021 | (1,200,000) | $110.4000 |
| Sale | H3698DBZ6 | 4/13/2021 | (1,000,000) | $110.4000 |
| | | | | |
| _Account 3_ | | | | |
| Purchase | H3698DDD3 | 5/13/2021 | 200,000 | $97.0850 |
| Purchase | H3698DDD3 | 5/19/2021 | 1,500,000 | $96.6000 |
| Purchase | H3698DDD3 | 5/27/2021 | 250,000 | $97.8500 |
| Sale | H3698DDD3 | 10/19/2022 | (250,000) | $58.2750 |
| Sale | H3698DDD3 | 10/21/2022 | (200,000) | $58.2750 |
| Sale | H3698DDD3 | 10/20/2022 | (1,500,000) | $59.0000 |
| | | | | |
| Purchase | H3698DCV4 | 5/10/2021 | 200,000 | $100.8500 |
| Purchase | H3698DCV4 | 6/29/2021 | 300,000 | $103.6000 |
| Sale | H3698DCV4 | 10/21/2022 | (500,000) | $60.9000 |
| | | | | |
| Purchase | H3698DBZ6 | 8/3/2022 | 200,000 | $88.9600 |
| Sale | H3698DBZ6 | 5/27/2021 | (200,000) | $111.4000 |
| Sale | H3698DBZ6 | 11/29/2021 | (1,800,000) | $108.5500 |
| Sale | H3698DBZ6 | 10/21/2022 | (200,000) | $74.7000 |
| | | | | |
| _Account 4_ | | | | |
| Sale | H3698DBZ6 | 4/7/2021 | (1,000,000) | $110.2500 |
| Sale | H3698DBZ6 | 4/8/2021 | (2,000,000) | $110.3000 |
| Sale | H3698DBZ6 | 4/15/2021 | (800,000) | $110.5250 |
| | | | | |
| _Account 5_ | | | | |
| Purchase | H3698DDD3 | 5/26/2021 | 200,000 | $97.6100 |
| Sale | H3698DDD3 | 10/19/2022 | (200,000) | $59.4000 |
| | | | | |
| _Account 6_ | | | | |
| Purchase | H3698DDD3 | 5/26/2021 | 200,000 | $97.7100 |
| Purchase | H3698DDD3 | 5/27/2021 | 250,000 | $97.8500 |
| Sale | H3698DDD3 | 10/19/2022 | (450,000) | $59.4000 |
| Sale | H3698DBZ6 | 5/27/2021 | (200,000) | $111.4000 |

Account 7

| Purchase | H3698DDD3 | 5/27/2021 | 250,000 | $97.8500 |
| Sale | H3698DDD3 | 10/19/2022 | (250,000) | $59.4000 |
| Sale | H3698DBZ6 | 5/27/2021 | (200,000) | $111.4000 |

Account 8

| Purchase | H3698DCV4 | 6/14/2021 | 300,000 | $103.1000 |
| Sale | H3698DCV4 | 9/8/2021 | (300,000) | $102.9000 |