# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS<br><br>This matter relates to:<br><br>　　*Core Capital* | Case No. 1:23-cv-09287 |

**EXPERT REPORT OF SORIN SORESCU, PH.D.**

**September 19, 2025**

## Table of Contents

1   Introduction .................................................................................................................. 4
   1.1   Qualifications ......................................................................................................... 4
   1.2   Summary of Opinions ........................................................................................... 5
2   Case Background ......................................................................................................... 6
   2.1   Overview of the Company and Allegations ........................................................... 6
   2.2   Bases for Opinions on Market Efficiency ............................................................. 9
3   Credit Suisse AT1 Bonds Background ....................................................................... 12
   3.1   Background on Additional Tier-One Bonds ......................................................... 12
   3.2   Credit Suisse AT1 Bonds .................................................................................... 15
      3.2.1   2013 7.5% Bond ......................................................................................... 15
      3.2.2   2014 6.25% Bond ....................................................................................... 16
      3.2.3   2018 7.5% Bond ......................................................................................... 16
      3.2.4   2018 7.25% Bond ....................................................................................... 16
      3.2.5   2019 6.375% Bond ..................................................................................... 16
      3.2.6   2020 5.1% Bond ......................................................................................... 17
      3.2.7   2020 5.25% Bond ....................................................................................... 17
      3.2.8   2020 4.5% Bond ......................................................................................... 17
      3.2.9   2022 9.75% Bond ....................................................................................... 17
   3.3   Price Data for Credit Suisse AT1 Bonds ............................................................ 17
   3.4   Efficiency of Credit Suisse AT1 Bonds .............................................................. 19
4   Analysis of the Indirect Factors for Market Efficiency ................................................ 21
   4.1   *Cammer* Factor 1: Average Weekly Trading Volume .......................................... 21
   4.2   *Cammer* Factor 2: Analyst Coverage ................................................................. 24
   4.3   *Cammer* Factor 3: Market Makers and Arbitrageurs .......................................... 28
   4.4   Additional Factor: Institutional Ownership .......................................................... 31
   4.5   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ............................................ 32
   4.6   *Krogman* Factor 1: Market Capitalization .......................................................... 34
   4.7   *Krogman* Factor 2: Bid-Ask Spread .................................................................. 35
   4.8   *Krogman* Factor 3: Public Float ........................................................................ 38
5   Analysis of the Direct Factors for Market Efficiency .................................................. 39
   5.1   *Cammer* Factor 5: Cause-and-Effect Relationship Between Company Information and
   Security Prices ............................................................................................................ 39
      5.1.1   Event Study Methodology .......................................................................... 42
      5.1.2   Cause-and-Effect Relationship Analysis Comparing Credit Suisse AT1 Bond Price
      Movements on News Days Versus Least News Days ............................................. 45
6   Ability to Calculate Damages on a Class-Wide Basis ............................................... 48
7   Conclusion ................................................................................................................. 50
Appendix A .................................................................................................................... 51
Appendix B .................................................................................................................... 60
Exhibit 1 ........................................................................................................................ 64
Exhibit 2 ........................................................................................................................ 66
Exhibit 3 ........................................................................................................................ 67
Exhibit 4 ........................................................................................................................ 69

Exhibit 5 ........................................................................................................................ 71
Exhibit 6 ........................................................................................................................ 75
Exhibit 7 ........................................................................................................................ 79
Exhibit 8 ........................................................................................................................ 80
Exhibit 9 ........................................................................................................................ 81
Exhibit 10 ...................................................................................................................... 83

# 1  INTRODUCTION

## 1.1  Qualifications

1.    I am a Professor of Finance and the holder of the *Foreman R. and Ruby Bennett Chair in Business Administration* at Mays Business School, Texas A&M University. I currently also serve as the Director of the *Adam C. Sinn '00 Center for Investment Management*. I teach courses, participate in academic seminars, and conduct research in various areas related to finance, marketing, and economics.

2.    My research focuses on studying the efficiency of the securities market, over- and under-valuation of publicly traded securities, predictability in returns, as well as informational content of security prices. I have published 16 articles in peer-reviewed academic journals, 12 of which appear in top business journals (*Journal of Finance*, *Journal of Financial Economics*, *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis, Journal of Marketing,* and *Marketing Science*).

3.    In addition to my research, I currently co-teach a course on hedge funds with my colleague Professor Brent Adams. This course is distinguished by its experiential learning component: together with our students, we manage a live hedge fund with assets under management in excess of $4 million. The fund is authorized to take both long and short positions across a wide range of asset classes, including equities, fixed income securities, and derivatives. This structure provides students with a unique opportunity to apply academic theory to real-world investment decisions, while also offering me direct engagement with current trading practices and market dynamics.

4.    Prior to joining Mays Business School in 2002, I was an Assistant Professor of Finance at the Bauer College of Business, University of Houston. During this time, I taught topics at the undergraduate, M.S., MBA, EMBA and Ph.D. levels, including corporate finance, financial markets, and investments analysis. I also conducted empirical research on various financial and economic topics. Since 1996 I have been engaged in academic research and continue to produce research that is targeted to top academic journals in these areas.

5.    Prior to working at the Bauer College of Business, I received a Ph.D. in Finance from the

University of Florida in 1996. Prior to those studies, I worked as a research assistant at the University of Florida and as a teaching assistant at McGill University. I received an MBA from McGill University in 1991 and a Bachelor of Engineering from McGill University in 1989.

6.    My curriculum vitae, attached as **Appendix A**, lists my experience outside of teaching at Texas A&M University, University of Florida, and University of Houston. Such experience includes presenting my academic research at governmental, professional, and academic institutions.

7.    In addition to my academic responsibilities, I provide occasional consulting services and expert testimony in matters related to market efficiency, valuation, securities trading, corporate disclosures, loss causation, and damages. My curriculum vitae, attached as **Appendix A**, provides additional details of these consulting activities.

## 1.2    Summary of Opinions

8.    I have been asked by the Court-appointed Counsel for Lead Plaintiff in this matter to determine whether the market for Credit Suisse Group AG ("Credit Suisse" or the "Company") Additional Tier 1 ("AT1") bonds was efficient during the period October 27, 2022 to March 20, 2023 both dates inclusive (the "Class Period").[1,2] In addition, I have been asked to opine on whether the calculation of damages on a class-wide basis in this matter is subject to a common methodology.

9.    The materials I have considered in forming my opinions are summarized in **Appendix B**. My time is billed at a rate of $750 per hour for my work in this matter. I am assisted by staff at Fideres Partners LLP ("Fideres") who performed work under my direction. My compensation is

---

[1] Counsel for the Lead Plaintiff is Pomerantz LLP.

[2] I understand that the Lead Plaintiff in this case is Core Capital Partners, Ltd., and the Defendants are Credit Suisse, Axel P. Lehmann, Ulrich Körner, and Dixit Josh. *See* Class Action Complaint, *Core Capital Partners, Ltd. v. Credit Suisse Group AG et al,* No. 1:23-cv-09287 (Doc. No. 1) (the "Complaint") and Decision and Order Denying PwC's Motion To Dismiss, Granting in Part and Denying in Part the CS Defendants' Motion to Dismiss, Granting Diabat's Motion to Certify a Class, and Granting in Part and Denying in Part the CS Defendants' Motion to Consolidate, *Core Capital Partners, Ltd. v. Credit Suisse Group AG et al,* No. 1:23-cv-09287 (Doc. No. 34) (the "MTD Order").

in no way contingent on the outcome of this case. My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention. I have no financial or other interest in Fideres other than the billings in this matter.

10.  Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for Credit Suisse AT1 bonds was efficient during the Class Period.

11.  I have also formed the opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology.

12.  The remainder of my report is organized as follows: **Section 2** describes the case background and the bases for the reliance requirement and the "fraud-on-the-market" theory relating to market efficiency. **Section 3** provides background information on Credit Suisse's AT1 bonds—the financial instruments covered by the Complaint. **Sections 4** and **5** present my analyses of the *Cammer* and *Krogman* factors, and an additional factor relating to market efficiency during the Class Period. **Section 6** addresses how damages can be calculated on a class-wide basis subject to a common methodology in this matter. **Section 7** contains my conclusions.

## 2   CASE BACKGROUND

### 2.1   Overview of the Company and Allegations

13.  This matter arises from a securities class action brought on behalf of investors who purchased Credit Suisse AT1 bonds in domestic U.S. transactions between October 27, 2022 and March 20, 2023.[3] The Complaint alleges that Credit Suisse and its senior executives engaged in a course of conduct that misrepresented the bank's financial condition, risk management practices, and internal controls.[4] These misstatements and omissions allegedly inflated the market prices of Credit Suisse AT1 bonds and misled investors regarding the true risks associated with their

---

[3] I understand that the Class Period in this action has been shortened compared to the Class Period alleged in the Complaint. *See Core Capital Partners, Ltd. v. Credit Suisse Group AG et al*, No. 1:23-cv-09287 (Doc. No. 34), at 9.

[4] Complaint, ¶7.

holdings.[5]

14.   In addition to its Swiss headquarters, Credit Suisse conducted business in the United States, where it operated through subsidiaries engaged in investment banking, wealth management, and securities activities.[6]

15.   One core allegation in the Complaint concerns Credit Suisse's representations regarding its internal controls over financial reporting and risk management. The Complaint asserts that throughout the Class Period, Credit Suisse represented in SEC filings and public statements that its disclosure controls and internal financial reporting were effective.[7] Plaintiff alleges these statements were materially false, as Credit Suisse in fact suffered from significant weaknesses in its internal control environment.[8] The bank's risk management deficiencies—long highlighted by prior exposures to Greensill and Archegos[9]—remained unresolved, and its governance and oversight mechanisms were inadequate.[10] Plaintiff contends that these deficiencies were concealed from investors, creating the misleading appearance that the bank's systems were sound and reliable.[11]

16.   The Complaint further alleges that Credit Suisse overstated the strength of its balance sheet and financial condition by continuing to report itself as adequately capitalized, well controlled, and that depositors maintained confidence in the bank despite the presence of these internal weaknesses and customer outflows.[12] Risk management deficiencies and governance failures were not remediated despite public claims to the contrary.[13]

---

[5] *Id.*, ¶¶113, 117.

[6] *Id.*, ¶2.

[7] *Id.*, ¶71.

[8] *Id.*

[9] *Id.*, ¶45.

[10] *Id.*, ¶71.

[11] *Id.*

[12] *Id.*, ¶71.

[13] *Id.*

17. The Complaint identifies one corrective disclosure. On March 14, 2023, Credit Suisse's annual report (Form 20-F) disclosed material weaknesses in internal controls.[14] This was followed by sharp declines in AT1 bond prices.[15]

18. The Complaint also identifies another decisive event, corresponding to materialization of risk. On March 19, 2023, the Swiss Financial Market Supervisory Authority ("FINMA") announced extraordinary government support in connection with the UBS takeover of Credit Suisse.[16] FINMA stated that this support triggered the contractual provision to write down all Credit Suisse AT1 bonds to zero, totaling approximately CHF 16 billion.[17] On March 20, 2023, Credit Suisse confirmed the write-down in a filing with the SEC.[18]

19. The March 19 announcement directly contradicted prior assurances regarding governance, internal controls, and capital adequacy. This announcement revealed to the market that prior representations regarding Credit Suisse's risk controls, internal reporting systems, and capital strength were materially false.[19]

20. In addition, the unprecedented nature of the March 19 regulatory action—where AT1 holders were wiped out—underscored the severity of the risks that had been concealed.[20]

21. In sum, the allegations set forth in the Complaint describe a pattern in which Credit Suisse and its executives misrepresented material facts about the bank's internal controls, governance, and financial health, while failing to disclose significant deficiencies that impaired its stability. The partial disclosure of March 14 partially revealed these problems, but the full extent of the bank's weakness became clear only with the March 19, 2023 FINMA action. That event corrected the prior misstatements and omissions and directly caused the collapse in the value of Credit Suisse

---

[14] *Id.*, ¶83.

[15] *Id.*, ¶84.

[16] *Id.*, ¶87.

[17] *Id.*

[18] *Id.*, ¶88.

[19] *Id.*, ¶87-92.

[20] *Id.*

AT1 bonds.

## 2.2    Bases for Opinions on Market Efficiency

22.   In financial literature, the term "efficient market" is used to describe a market in which security prices "always fully reflect available information."[21] In such a market, publicly available information is incorporated into security price movements as investors assimilate disclosures into their investment strategies.[22] Under the "fraud-on-the-market" theory that Plaintiff has asserted, investors can rely on a price reflecting all publicly available information and are therefore reliant on a company's material misrepresentations and omissions. In an efficient market, all purchasers of the security are induced into reliance on any misrepresentations or omissions because those statements or omissions have been incorporated into the value of each class member's purchase price.

23.   Consequently, a company's failure to disclose relevant information or provision of misleading information to shareholders will lead to the security price becoming distorted and either inflated or deflated relative to the price at which the security would trade, absent such misleading or omitted information. Thus, in an efficient market, purchasers implicitly rely on all of a company's disclosures as well as misrepresentations and omissions as this information is impounded into the price at which the security trades.

24.   Many academic studies have empirically validated the hypothesis of market efficiency.[23] Additionally, while some research has identified anomalies that call into question the efficiency of markets, these anomalies have been generally accepted as random patterns in the data, are often not scientifically reproducible or robust to different statistical modeling choices, and/or are not persistent and have been eliminated by arbitrage trading.[24] Therefore, these anomalies do not

---

[21] Fama, E. F. (1970). Efficient Capital Markets: A Review of Theory and Empirical Work. *Journal of Finance*, *25*(2), 383–417, at 383.

[22] *See*, *e.g.*, Vega, C. (2006). Stock Price Reaction to Public and Private Information. *Journal of Financial Economics 82*(1), 103-133. The term "informationally efficient" is also used to refer to this concept.

[23] *See*, *e.g.*, Hou, K., Xue, C., & Zhang, L. (2020). Replicating Anomalies. *Review of Financial Studies*, *33*(5), 2019-2133.

[24] Fama, E. F. (1991). Efficient Capital Markets: II. *Journal of Finance*, *46*(5), 1575-1617.

represent consistent behavior of the overall market. For example, Nobel prize winner Eugene Fama (1998) summarizes the evidence in favor of market efficiency as follows:[25]

> *The recent finance literature seems to produce many long-term return anomalies. Subjected to scrutiny, however, the evidence does not suggest that market efficiency should be abandoned. Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction of stock prices to information is about as common as underreaction. And post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, the long-term return anomalies are fragile. They tend to disappear with reasonable changes in the way they are measured.*

25.  Similarly, my own work shows that stock prices fairly reflect public information conveyed by a firm's dividend policy, or information related to the quality of a firm's corporate governance.[26]

26.  Hou et al. (2020) conclude that "[m]ost anomalies fail to replicate, falling short of the currently acceptable standards for empirical finance…In all, capital markets are more efficient than previously recognized."[27]

27.  The discussion thus far has addressed how financial economists view market efficiency, drawing on academic evidence that most anomalies fail to replicate and that capital markets are more efficient than previously recognized. In the legal setting, however, the question of market efficiency serves a different function. Courts have adopted a pragmatic and modest standard for efficiency, one that is not designed to resolve academic debates, but instead to provide a workable framework for determining whether the "fraud-on-the-market" presumption of reliance applies. The following paragraphs set out how courts, including the U.S. Supreme Court, have articulated this standard.

28. In *Halliburton II* the Supreme Court reaffirmed that the "fraud-on-the-market"

---

[25] Fama, E. F. (1998). Market Efficiency, Long-Term Returns, and Behavioral Finance. *Journal of Financial Economics*, *49*(3), 283-306, at 304.

[26] *See* Boehme, R. D., & Sorescu, S. M. (2002). The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?. *Journal of Finance*, *57*(2), 871-900, and Johnson, S. A., Moorman, T. C., & Sorescu, S. (2009). A Reexamination of Corporate Governance and Equity Prices. *Review of Financial Studies*, *22*(11), 4753-4786.

[27] Hou, K., Xue, C., & Zhang, L. (2020). Replicating Anomalies. *Review of Financial Studies*, *33*(5), 2019-2133, at 2071.

presumption of reliance rests on a modest and practical understanding of market efficiency.[28] The Court noted that *Basic* "acknowledged the debate among economists about the efficiency of capital markets" but "refused to endorse any particular theory of how quickly and completely publicly available information is reflected in market price."[29] Instead, *Basic* rested on the more limited proposition that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."[30]

29. The Court in *Halliburton II* further emphasized that efficiency is not binary, but "a matter of degree and accordingly made it a matter of proof."[31] The presumption of reliance does not require a showing that prices instantaneously or perfectly reflect all public information. Rather, it is sufficient that market professionals integrate material public information into prices within a reasonable period, such that the market price can serve as a proxy for investor reliance.

30. Thus, the efficiency standard endorsed by the Supreme Court is a general efficiency standard designed for judicial application, not a resolution of contested debates among economists. It asks only whether the market is sufficiently developed that material public information, including misrepresentations, is generally incorporated into the security's price. This is a modest and workable standard: most investors, even those pursuing sophisticated strategies, rely on the expectation that prices in such markets are shaped by public information and therefore can be presumed to have been distorted by fraud when material misstatements occur.

31. Courts have developed various tests that attempt to weigh in favor of, or against the presumption of market efficiency. While no single factor is determinative of market efficiency, when viewed as a whole they can be informative in supporting or rebutting a presumption of market efficiency in relation to the reliance element of the fraud-on-the-market theory. Courts refer

---

[28] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, (2014) ("*Halliburton II*") citing *Basic Inc. v. Levinson*, 485 U.S. 224, (1988) ("*Basic*").

[29] *See Halliburton II*, at 2402-05.

[30] *Id.*, at 2403, 2410.

[31] *Id.*

to the basic set of established tests as the *Cammer* and *Krogman* factors.[32]

32. In this report, I will discuss each of these factors in greater detail and evaluate them in relation to Credit Suisse's AT1 bonds. Where appropriate, I will compare the results for each factor against court- and academic-established benchmarks and relay my findings in terms of statistical significance, as determined by scientific tests.

## 3   CREDIT SUISSE AT1 BONDS BACKGROUND

### 3.1   Background on Additional Tier-One Bonds

33. Under the Basel III framework,[33] Additional Tier 1 ("AT1") capital is a form of regulatory capital that ranks just below common equity in the bank capital hierarchy. Its purpose is to absorb losses on a going-concern basis—that is, while the bank remains operational but under stress, before outright failure.[34]

34. To qualify as AT1 under Basel III rules, instruments must: (1) be perpetual, with no maturity date and no incentive to redeem; (2) have discretionary and cancellable distributions, meaning the bank can suspend coupon payments without default; (3) be subordinated to depositors and senior creditors; and (4) include loss-absorption mechanisms that reduce or convert the instruments in times of distress.[35]

35. These loss-absorption features typically take one of two forms: (i) conversion into equity when a bank's capital ratio falls below a trigger, or (ii) regulatory authority to write down the instruments' value, potentially to zero, if the bank experiences significant financial distress.[36]

---

[32] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*"); *Krogman v. Sterritt*, 202 F.R.D. 467, at 477 (N.D. Tex. 2001) ("*Krogman*").

[33] The goal of the Basel III, introduced by the Basel Committee after the global financial crisis, is to improve the resilience of the banking sector through stricter capital requirements, enhanced risk management, and higher liquidity standards. The United States is a participating member of the Basel Committee. *See* https://www.bis.org/bcbs/basel3.htm?m=76 and https://www.federalreserve.gov/supervisionreg/basel/basel-default.htm.

[34] *See* Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56.

[35] *See* https://www.bis.org/basel_framework/chapter/CAP/10.htm.

[36] *See* Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56.

36. AT1 securities gained prominence after the 2008–2009 Global Financial Crisis as regulators sought to bolster bank resilience without relying solely on new common equity. Common examples include perpetual contingent convertible bonds ("CoCos") with explicit loss-absorbing features.[37]

37. Initially issued as perpetual bonds,[38] AT1 bonds can be converted into equity or written off entirely if a bank's Common Equity Tier 1 capital ratio[39] falls below a predefined threshold.[40] This mechanism allows them to act as shock absorbers, helping banks meet regulatory capital requirements during times of financial stress.[41]

38. Because AT1 bonds carry higher risk, including the possibility of conversion or loss, they offer higher coupon payments to compensate investors. They are considered the riskiest type of bond a bank can issue.[42]

39. Like the more conventional corporate bonds, AT1 bonds are traded in over-the-counter ("OTC") markets, where transactions occur through bilateral negotiations between dealers— usually large global banks—and their clients. The bond market is decentralized and geographically dispersed, with participants linked electronically through platforms such as Bloomberg, Tradeweb, or MarketAxess.[43] Unlike common stocks, which trade continuously in high volume on centralized

---

[37] *Id.*

[38] As perpetual bonds, they do not have a fixed maturity date. However, the issuer has the right to call these bonds. *See* Pottmeyer, A., and Heidorn, T. (2020). Introduction of Additional Tier 1 Capital. *Frankfurt School - Working Paper Series*, 229.

[39] A bank's capital includes Tier 1 and Tier 2 capital. Tier 1 capital consists of Common Equity Tier 1 capital (shares and retained earnings) and Additional Tier 1 capital (AT1 instruments). Tier 2 capital consists of other capital instruments and subordinated loans. *See* Pottmeyer, A., and Heidorn, T. (2020). Introduction of Additional Tier 1 Capital. *Frankfurt School - Working Paper Series*, 229.

[40] The trigger event that activates the conversion-to-equity or principal writedown can also be based on a regulator's assessment of the bank's financial condition. For example, in the case of Credit Suisse, the "extraordinary government support" triggered a "complete write- down of the nominal value of all AT1 bonds of Credit Suisse." *See* https://www.finma.ch/en/news/2023/03/20230319-mm-cs-ubs/.

[41] *See* Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56.

[42] Complaint, ¶43.

[43] *See* Goldstein, M. A. and Hotchkiss, E. S. (2020). Providing Liquidity in an Illiquid Market: Dealer Behavior in US Corporate Bonds. *Journal of Financial Economics, 135*(1), 16–40. *See also* International Capital Market Association. (2020, March). *Time to act: ICMA's 3rd study into the state and evolution of the European*

[Start]

exchanges, most bonds trade far less frequently, often only when a particular holder decides to buy or sell.[44] As a result, pricing is less transparent, and liquidity is fragmented across different dealers and instruments. The primary participants include sovereign and corporate issuers, institutional investors such as pension funds, insurance companies, mutual funds, hedge funds, and sovereign wealth funds, as well as the dealer banks that act as intermediaries and market makers. Retail investors play only a limited role in this market.

40.   Credit Suisse's AT1 bonds were issued in two tranches: Regulation S ("Reg S"), offered offshore, and Rule 144A, offered to qualified institutional buyers ("QIBs") in the United States. While they were marketed through different regulatory channels, these bonds were the same economic instrument: they ranked *pari passu*, carried identical covenants, and were subject to the same loss-absorption mechanisms. The distinction was purely jurisdictional in nature and related only to the distribution channel, not to economic substance.

41.   The academic literature supports this conclusion. Miller and Puthenpurackal (2005), in their study of global bonds, explain that fungibility is achieved when "the identical instrument trades within each market as well as among markets without restrictions" and show that such fungibility lowers the cost of capital by expanding the investor base and enhancing liquidity.[45] This is precisely the case with Reg S and Rule 144A tranches: they are structured to be identical securities that can merge into a single, global trading pool once distribution restrictions lapse.

42.   Market practice guidance reinforces this point. As Bloomberg Law notes, in a combined Rule 144A/Reg S debt offering "a U.S. issuer may issue, offer and sell its securities in two tranches… [and] typically, the two tranches have identical terms."[46] The only difference may be in depositing and clearing mechanics: the Rule 144A tranche is typically cleared and deposited

---

*investment grade corporate bond secondary market*,
https://www.icmagroup.org/assets/documents/Regulatory/Secondary-markets/Time-to-act-ICMAs-3rd-study-into-the-state-and-evolution-of-the-European-investment-grade-corporate-bond-secondary-market-040320.pdf.

[44] *See*, *e.g.*, Goldstein, M. A. and Hotchkiss, E. S. (2020). Providing Liquidity in an Illiquid Market: Dealer Behavior in US Corporate Bonds. *Journal of Financial Economics, 135*(1), 16–40.

[45] Miller, D. P. and Puthenpurackal, J. J. (2005). Security Fungibility and the Cost of Capital: Evidence from Global Bonds. *The Journal of Financial and Quantitative Analysis, 40*(4), 849-872, at 850.

[46] Bloomberg Law. *Rule 144A/Reg S Debt Offering (Practice Points).*

through the Depository Trust Company ("DTC") under a 144A CUSIP, while the Reg S tranche is typically cleared and deposited through Euroclear or Clearstream under an ISIN.[47] Over time, the securities are designed to converge, so that investors in both tranches hold economically indistinguishable instruments.

43. Similarly, the industry guidance of the Securities Industry and Financial Markets Association ("SIFMA") explains that revisions to Rule 144 allow restricted 144A securities to become freely tradable within six to twelve months, at which point they may be "merged into the Regulation S securities" to ensure fungibility and market liquidity.[48] This industry practice shows that any initial separation between Reg S and Rule 144A is temporary and logistical, not substantive.

44. Consistent with this market and academic understanding, I reviewed the prospectuses for two of Credit Suisse's AT1 offerings (selected randomly) and confirmed that the contractual terms in the Reg S and Rule 144A tranches are identical.[49] This further underscores that, from an economic standpoint, the Reg S and Rule 144A AT1 tranches were fungible securities representing the same claim, the same risk, and the same loss-absorption potential.

## 3.2    Credit Suisse AT1 Bonds

45. Throughout the Class Period, Credit Suisse had 13 AT1 bonds with a total of around USD 17.2 billion notional value outstanding. I have been instructed by counsel to consider the nine Credit Suisse AT1 bonds in my analysis that were USD-denominated.

### 3.2.1    2013 7.5% Bond

46. On December 11, 2013, Credit Suisse issued $2,250,000,000 of 7.5% AT1 bonds (the

---

[47] I understand that in the case of Credit Suisse AT1 bonds, all Rule 144A and Reg S tranches, except two, were deposited with the DTC in the US. I further understand that all Credit Suisse AT1 tranches were eligible for clearing "through, in the United States, DTC and, outside the United States, the systems operated by Euroclear, Clearstream, Luxembourg, SIX SIS AG   or any other clearing system." *See, e.g.*, CS-CoreCapital_00000158, at 173.

[48] *See* Securities Industry and Financial Markets Association. (2008, October). *SIFMA Guidance: Procedures, Covenants, and Remedies in Light of Revised Rule 144*, at 4.

[49] CS-CoreCapital_00000158; CS-CoreCapital_00000771.

"2013 7.5% Bond").[50] The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H9200RAA9, as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 22546DAB2.

### 3.2.2    2014 6.25% Bond

47.   On June 18, 2014, Credit Suisse issued $2,500,000,000 of 6.25% AT1 bonds (the "2014 6.25% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DAL8, as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 225436AA2.

### 3.2.3    2018 7.5% Bond

48.   On July 16, 2018, Credit Suisse issued $2,000,000,000 of 7.5% AT1 bonds (the "2018 7.5% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DBW3, as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 225401AJ7.

### 3.2.4    2018 7.25% Bond

49.   On September 12, 2018, Credit Suisse issued $1,500,000,000 of 7.25% AT1 bonds (the "2018 7.25% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DBZ6,[51] as well as to QIBs within the meaning of Rule 144A of the U.S. Securities Act of 1933, identified by CUSIP 225401AK4.

### 3.2.5    2019 6.375% Bond

50.   On August 21, 2019, Credit Suisse issued $1,750,000,000 of 6.375% AT1 bonds (the "2019 6.375% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DCP7, as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 225401AL2.

---

[50] Throughout this report, I identify an individual bond with its issuance year, distribution tranche (Reg S vs. Rule 144A), and initial interest rate.

[51] In the Complaint this bond is referred to as the Credit Suisse AT1 Series BZ62 Bond.

### 3.2.6    2020 5.1% Bond

51.  On January 24, 2020, Credit Suisse issued $1,000,000,000 of 5.1% AT1 bonds (the "2020 5.1% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DCV4,[52] as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 225401AN8.

### 3.2.7    2020 5.25% Bond

52.  On August 11, 2020, Credit Suisse issued $1,500,000,000 of 5.25% AT1 bonds (the "2020 5.25% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DDA9, as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 225401AR9.

### 3.2.8    2020 4.5% Bond

53.  On December 9, 2020, Credit Suisse issued $1,500,000,000 of 4.5% AT1 bonds (the "2020 4.5% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DDD3,[53] as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 225401AS7.

### 3.2.9    2022 9.75% Bond

54.  On June 23, 2022, Credit Suisse issued $1,650,000,000 of 9.75% AT1 bonds (the "2022 9.75% Bond"). The bonds have been issued in an "offshore transaction" within the meaning of Reg S, identified by CUSIP H3698DDQ4, as well as to QIBs within the meaning of Rule 144A, identified by CUSIP 225401AX6.

## 3.3    Price Data for Credit Suisse AT1 Bonds

55.  In the United States, post-trade information for corporate bonds is provided through the Trade Reporting and Compliance Engine ("TRACE"), administered by the Financial Industry Regulatory Authority ("FINRA"). Under this system, virtually all corporate bond trades executed

---

[52] In the Complaint this bond is referred to as the Credit Suisse AT1 Series CV40 Bond.

[53] In the Complaint this bond is referred to as the Credit Suisse AT1 Series DD33 Bond.

by dealers must be reported to TRACE within a short period, typically 15 minutes. The reported information includes the price, size, and time of the transaction, and this data is then disseminated to the public.

56.   In Europe, bond market transparency is governed by the Markets in Financial Instruments Directive II ("MiFID II"), which came into effect in 2018. MiFID II requires both pre-trade and post-trade transparency for bonds traded on regulated venues or through investment firms that execute orders against their own account, with venues required to publish indicative bid and offer prices and executed trade details.

57.   On both TRACE and MiFID, prices of AT1 bonds are expressed in terms of a bond's par value.[54] Volume is expressed in dollar terms, i.e., as the number of bonds transacted multiplied by the bond's par value.[55]

58.   For each Credit Suisse AT1 bond, I obtained historical daily data from Bloomberg. Further, Counsel has provided me with data from TRACE.[56] Bloomberg has transaction data available reported on TRACE and across various European trading venues within the meaning of MiFID II.[57,58]

59.   As mentioned in Section 3.1, corporate bonds typically do not trade as frequently as

---

[54] For example, the 2018 7.25% Bond identified with CUSIP H3698DBZ6 had a reported price of 78.625 on October 27, 2022. This represents a dollar price of 78.625% * $1,000 par value = $786.25.

[55] For example, the 2018 7.25% Bond identified with CUSIP H3698DBZ6 had a total reported volume of $34,650,000 on October 27, 2022. This represents $34,650,000 / $1,000 par value = 34,650 transacted bonds.

[56] Data files provided by Counsel for Lead Plaintiff from FINRA pursuant to a document subpoena: H3698DBZ6 FINRA CONFIDENTIAL.xlsx, H3698DCP7 FINRA CONFIDENTIAL.xlsx, H3698DCV4 FINRA CONFIDENTIAL.xlsx, H3698DDA9 FINRA CONFIDENTIAL.xlsx, H3698DDD3 FINRA CONFIDENTIAL.xlsx, H3698DDQ4 FINRA CONFIDENTIAL.xlsx, H3698DDY7 FINRA CONFIDENTIAL.xlsx, H9200RAA9 FINRA CONFIDENTIAL.xlsx, 22546DAB2 FINRA CONFIDENTIAL.xlsx, 225401AJ7 FINRA CONFIDENTIAL.xlsx, 225401AK4 FINRA CONFIDENTIAL.xlsx, 225401AL2 FINRA CONFIDENTIAL.xlsx, 225401AN8 FINRA CONFIDENTIAL.xlsx, 225401AR9 FINRA CONFIDENTIAL.xlsx, 225401AS7 FINRA CONFIDENTIAL.xlsx, 225401AX6 FINRA CONFIDENTIAL.xlsx, 225436AA2 FINRA CONFIDENTIAL.xlsx.

[57] On Bloomberg, the pricing source for transactions reported on TRACE is "TRAC" and the pricing source for transactions reported under MiFID is "MFTD." Given potential double-reporting between TRACE and MiFID, I use MiFID-reported in my analysis, unless otherwise indicated.

[58] I note that transaction reporting for each Credit Suisse AT1 bond is separated by the respective security identifiers for the Rule 144A and Regulation S tranche, despite ultimately representing the identical underlying bond. Throughout this report, I am referring to each Credit Suisse AT1 bond as a whole, unless otherwise specified.

common stock. I determined the trading days for the Credit Suisse AT1 bonds ("AT1 Trading Days") as all the days where at least one of the Credit Suisse AT1 bonds, the S&P 500 Index, or the Swiss Market Index ("SMI") had a price. I then deducted all dates that were full-day holidays according to the New York Stock Exchange ("NYSE"), the SIX Swiss Exchange ("SIX"), or SIFMA.[59]

### 3.4    Efficiency of Credit Suisse AT1 Bonds

60.  I understand that there is a parallel case currently before the same court against Credit Suisse ("Diabat").[60] In that case, I understand that the plaintiff's expert concluded that the markets for Credit Suisse American Depository Shares ("ADSs"), Credit Suisse Options, and Credit Suisse Senior Notes (collectively, the "Credit Suisse Securities") were efficient throughout the Class Period,[61] a finding the court cited approvingly in certifying the class in Diabat.[62]

61.  The conclusion that Credit Suisse Securities, and in particular Credit Suisse ADSs and Senior Notes, traded in an efficient market supports the conclusion that Credit Suisse AT1 bonds also traded in an efficient market. For example, the information environment relating to Credit Suisse Securities is also relevant to Credit Suisse AT1 bonds, because participants in the markets of Credit Suisse Securities will access the same sources of information (e.g., company announcements, media reports, analyst reports, etc.) as participants in the markets of Credit Suisse AT1 bonds.

62.  Courts have held that the familiar *Cammer* and *Krogman* factors used to assess equity-market efficiency are also applicable to bonds, although with appropriate adaptation.[63] For

---

[59] Sources: https://www.sifma.org/resources/general/us-holiday-archive/, https://web.archive.org/web/20221015023441/https://www.nyse.com/markets/hours-calendars, Bloomberg.

[60] *Ali Diabat. v. Credit Suisse Group AG et al,* No. 1:23-cv-05874 (S.D.N.Y.).

[61] *See* Expert Report of Matthew D. Cain, PhD, dated December 13, 2024 ("Cain Report"), *Ali Diabat. v. Credit Suisse Group AG et al,* No. 1:23-cv-05874 (Doc. No. 128-1), ¶3a-c.

[62] *See* MTD Order, at 20-22.

[63] *See, e.g., In re Glob. Brokerage, Inc.,* No. 17-CV-916 (RA) (BCM), 2021 WL 1160056, at *12 (S.D.N.Y. Mar. 18, 2021), *report and recommendation adopted sub nom. In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.,* No. 17-CV-916 (RA) (BCM), 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021) ("*Global Brokerage*"); *In re Vale S.A. Sec. Litig.,* No. 19-cv-526 (RJD) (SJB), 2022 WL 969724, at *4 (E.D.N.Y. Mar. 31, 2022) ("*Vale*"); *In re Teva*

example, in *Global Brokerage*, the court explained that "for bonds (like the FXCM Notes), the *Cammer* factors are frequently applied 'in modified form … [in] recognition of the differences between the manner in which debt bonds and equity securities trade.'"[64]

63. Likewise, the *Vale* court recited and applied the *Cammer* and *Krogman* framework to both ADSs and multiple series of Vale notes, and reiterated that the burden to prove market efficiency "is not an onerous one."[65]

64. At the same time, courts emphasize that applying those factors to bonds requires flexibility and a holistic assessment reflecting how bond markets function. For example, the *Teva* court cautioned that "in assessing market efficiency for debt securities—rather than equity securities—courts must be mindful of the differences between the two."[66] The court continued: "As a result, courts still apply the Cammer factors in evaluating market efficiency for debt securities but are conscious that a more holistic analysis is often necessary."[67]

65. Echoing that point, *Vale* held that because the *Cammer* and *Krogman* factors were designed for equities, they are "less instructive when applied to debt securities"[68] and warned that denying the presumption simply because bonds "do not behave the way equity securities behave 'is throwing out oranges because they are not apples,'"[69] before endorsing a "holistic analysis based

---

*Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156, at *18-19 (D. Conn. Mar. 9, 2021) ("*Teva*"); *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y. 2016), *aff'd in part, vacated in part on other grounds sub nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017) ("*Petrobras*"). I note that the Cain Report arrived at the same conclusion, citing these three cases. *See* Cain Report, at ¶131. These same Defendants did not dispute Dr. Cain's use of the Cammer and Krogman factors to assess whether Credit Suisse bonds traded in an efficient market. *See* Mem. of Law in Opp. to P.'s Mot. for Class Certification, Appointment of Plaintiff as Class Representative, and Appointment of Class Counsel ("Defs.' Diabat Opp.") at 19-20, *Diabat,* No. 1:23-cv-05874 (S.D.N.Y. Jan. 17, 2025), ECF No. 130.

[64] *Global Brokerage*, at *12.

[65] *Vale*, at *7.

[66] *Teva*, at *18.

[67] *Id*., at *19.

[68] *Vale*, at *5.

[69] *Id*.

on the totality of the evidence presented."[70]

66.   Consistent with that flexibility, *Teva* also noted that "the Cammer thresholds are designed for common stock, which trades more frequently than bonds,"[71] reinforcing that bond markets often call for adjusted benchmarks and context.

67.   Finally, courts recognize that some direct evidence of market efficiency translates more directly to bonds: as *Global Brokerage* stated with respect to *Cammer* factor 5 (cause-and-effect), "[t]his factor needs no modification for the bond market,"[72] while also acknowledging that the indirect indicia may need adaptation for over-the-counter debt.

68.   In short, the cases support two complementary propositions: (i) courts use the familiar *Cammer* and *Krogman* framework to evaluate bond-market efficiency; and (ii) when applying those factors to bonds, courts adopt a broader, bond-sensitive lens that looks to the totality of trading mechanics, venue structure, underwriting and dealer roles, and bond-specific information flow.

69.   Therefore, in reaching my conclusion, I rely on these court rulings to assess the efficiency in the market for Credit Suisse's AT1 bonds. My analysis is presented in the following section.

## 4   ANALYSIS OF THE INDIRECT FACTORS FOR MARKET EFFICIENCY

### 4.1   *Cammer* Factor 1: Average Weekly Trading Volume

70.   Trading volume is a fundamental financial metric that represents the number of securities exchanged between market participants during a specified period of time. High trading volumes of a security imply that new information is likely to be quickly incorporated into that security's price. For example, my own work shows that the increase in stock trading volume following the introduction of options for those stocks contributes to more efficient prices for those stocks.[73]

---

[70] *Id.*

[71] *Teva*, at *19.

[72] *Global Brokerage*, at *16.

[73] *See* Danielsen, B. R., & Sorescu, S. M. (2001). Why Do Option Introductions Depress Stock Prices? A Study of Diminishing Short Sale Constraints. *Journal of Financial and Quantitative Analysis*, *36*(4), 451–484.

Further, as explained by Thomas and Cotter (2000): "[t]rading volume…affects information dissemination to the market, and [has been] an important criterion for investment analysts in deciding which stocks to follow."[74] Thus, the trading volume of a given security is one indicator of how developed, liquid, and efficient the market is for that security.

71. In *Cammer*, the court defined security trading volume as a security's average weekly volume as a proportion of that security's shares outstanding. In setting a threshold for the presumption of market efficiency, the court stated:[75]

> *Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.*

72. *Cammer*'s original thresholds were framed in the context of equity securities, and courts have recognized that "the Cammer thresholds are designed for common stock, which trades more frequently than bonds."[76] Accordingly, "for bonds … the Cammer factors are frequently applied in modified form in recognition of the differences between the manner in which debt bonds and equity securities trade."[77] Similarly, the *Vale* court cautioned that "because Cammer and Krogman factors were designed to test market efficiency for equity securities, they are considered less instructive when applied to debt securities"[78] and that a "holistic analysis based on the totality of the evidence"[79] is required.

73. **Exhibit 1** shows the weekly trading volume of each Credit Suisse AT1 bond for both issuance tranches as a proportion of the notional amount outstanding.[80] The average weekly trading

---

[74] Thomas, R. S., & Cotter, J. F. (2000). Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems*, *63*(3), 105-122, at 108.

[75] *Cammer,* 711 F. Supp. at 1293 (citing *Bromberg & Lowenfels*).

[76] *Teva*, at *19.

[77] *Global Brokerage*, at *12.

[78] *Vale*, at *5.

[79] *Id*.

[80] In this analysis, a trading week consists of five consecutive trading days, which may not follow the calendar week. Since the last week consists of two trading days, I scale the volume in that week by 2.5 to get a comparable measure for the average weekly trading volume.

volume of the Credit Suisse AT1 tranches during the Class Period ranges from 0.1% to 4.7%.

74. Of the 18 Credit Suisse AT1 tranches studied, seven exhibit an average weekly trading volume larger than the 2% threshold that the *Cammer* court held would "justify a strong presumption that the market for the security is an efficient one."

75. Twelve of the 18 Credit Suisse AT1 tranches studied exhibit an average weekly trading volume larger than the 1% threshold that the *Cammer* court held would "justify a substantial presumption that the market for the security is an efficient one."

76. It is noteworthy that calculating the average weekly trading volume as a proportion of the notional amount outstanding for each Credit Suisse AT1 tranche separately is conservative given that each of the tranches are a portion of the same total notional amount outstanding. As discussed in Section 3.1, the 18 Credit Suisse AT1 tranches found in the nine Credit Suisse AT1 bonds at issue are economically interchangeable instruments (within each bond), differing only in coupon rate and issuance tranche (Reg S versus Rule 144A). From an economic standpoint, it is reasonable to condense the 18 Credit Suisse AT1 tranches into only nine bonds for the purpose of trading volume analysis, each bond consisting of a unique coupon and issuance date but otherwise aggregating trading activities across the two distribution channels.

77. Viewed from this perspective, the trading volume of each of the nine Credit Suisse AT1 bonds is the sum of the trading volumes of the underlying Rule 144A and Reg S tranches. After combining the two tranches of each AT1 bond, eight of the nine bonds have trading volumes larger than 2.0% during the class period. The trading volume of the remaining bond (the 2020 5.1% Bond) is 1.4%.

78. In my analysis, I include the totality of the trading volume data, including data from the last week of the class period, which coincides with the materialization of risk. I note that the trading volume during that week was significantly higher than in the previous weeks. As a robustness check to ensure my results are not driven by a single outlier, I recompute the trading volumes by excluding the last week from my analysis. In this case, the trading volume remains above 2.0% in five of the nine bonds examined, and is above 1.0% in seven of the nine bonds examined. For the

remaining two bonds (the 2020 5.1% Bond and the 2020 4.5% Bond), the trading volume is 0.9%.

79.    Considering the totality of the evidence and guided by previous court rulings, I conclude that the trading volume in Credit Suisse's AT1 bonds supports market efficiency even if I exclude the last trading week. The average turnover for all bonds taken together exceeds 2.0%, the classic *Cammer* benchmark for equities, and even the lower-volume tranches traded at levels consistent with what courts have deemed sufficient in the bond context when assessed holistically.[81] This conclusion is only strengthened when I include the last trading week in my analysis. Taken together, these results demonstrate that the Credit Suisse AT1 bonds traded actively in institutional markets and that *Cammer* factor 1 weighs in favor of finding an efficient market for these instruments.

## 4.2    *Cammer* Factor 2: Analyst Coverage

80.    Analysts are knowledgeable professionals who study financial information and trends for a specific company or industry. The reports published by analysts include information that they consider to be important for investors, such as an overview of the company's recent history and relevant industry trends, and an analysis of the company's financial statements and projections.[82] Analyst reports may also include opinions on the company's outlook, such as a recommendation to buy, sell, or hold the company's stock, or a price target. Because analysts disseminate recent developments about a covered company through these reports, their presence means that important information about the company is likely to be quickly reflected in the company's stock price.[83] Academic research supports the notion that active analyst coverage contributes to the efficiency of the market for a given stock. For instance, a study published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana (2013) concluded that analyst coverage supports efficiency because it "reduces information asymmetries about the firm's future performance and because it maintains

---

[81] *Cammer,* 711 F. Supp. at 1293 *(*quoting *Bromberg & Lowenfels*, §8.6*)*; *See also* MTD Order, at 21-22.

[82] Bradshaw, M. T., & and Call, A. C. (2025). The Role of Analysts in the Financial Reporting Environment. In W. Ge, A. Koester, & S. McVay (Eds.), *Handbook on the Financial Reporting Environment* (chapter 17, forthcoming). Edward Elgar Publishing Ltd.

[83] Sorescu, S., & Subrahmanyam, A. (2006), The Cross-Section of Analyst Recommendations, *Journal of Financial and Quantitative Analysis*, *41*(1), 139-168.

investor recognition for that firm's stock."[84]

81.  In *Cammer*, the court found that:[85]

*[I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.*

82.  I have identified 21 firms that collectively published 102 analyst reports on Credit Suisse during the Class Period.[86] I set out my findings relating to analyst coverage of Credit Suisse during the Class Period in **Exhibit 2.** The analysts who covered Credit Suisse include reputable firms such as J.P. Morgan, Jefferies, and Morgan Stanley. These analysts likely disseminated value-relevant information on Credit Suisse to the market as it became publicly available, as well as publishing their own detailed research and analysis.

83.  Analyst coverage of Credit Suisse is consistent with the coverage deemed necessary to support an assumption of market efficiency in a number of other cases.[87]

84.  Credit Suisse's level of analyst coverage compares favorably to findings in academic research. For example, research by Charles M.C. Lee and Eric So (2017) found that when ranked into deciles based on the number of analyst forecasts, companies were typically covered by between 0.765 and 7.614 analysts on average.[88] Credit Suisse's coverage by 21 firms compares favorably to these metrics. Additionally, the Mola Study reported that 19% of U.S. firms covered by the Institutional Brokers' Estimate System, a financial database of analyst estimates and

---

[84] Mola, S., Rau, P. R., & Khorana, A. (2013). Is There Life After the Complete Loss of Analyst Coverage?. *The Accounting Review*, *88*(2), 667-705, at 667. ("Mola Study").

[85] *Cammer,* 711 F. Supp. at 1293 (citing *Bromberg & Lowenfels*).

[86] I obtained analyst reports covering Credit Suisse from Investext and LSEG Workspace. These statistics represent a lower bound of the analyst coverage of Credit Suisse because many analyst reports are provided directly to investors but may not be captured by third-party vendors such as Investext or LSEG Workspace. Additionally, I selected a subset of reports published by large banks and research firms.

[87] *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 759 (S.D.N.Y. 2025).

[88] Lee, C. M., & So, E. C. (2017). Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics*, *124*(2), 331-348. *See* Table 1, Panel B – "COV" at 336.

company guidance, received no analyst coverage in a given year.[89] Credit Suisse's analyst coverage ranked above the 90th percentile among all companies listed on the NASDAQ and NYSE from 2016 to 2018.[90]

85.   As discussed in Section 3.4, the information environment for Credit Suisse Securities and Credit Suisse AT1 bonds is very similar. Therefore, information discussed in analyst reports that focus on Credit Suisse ADSs is also important for investors of Credit Suisse AT1 bonds. Furthermore, I note that several analysts issued reports shortly before and during the Class Period that address Credit Suisse debt instruments, and AT1 bonds specifically.

86.   For example, on June 17, 2022, before the start of the Class Period, Barclays issued a report titled "AT1 issuance costs and SNB charges" that specifically discusses Credit Suisse's call of an existing and issuance of a new AT1 bond.[91] The same topic was discussed in J.P. Morgan's European Credit Research report issued on June 24, 2022.[92] Later, on October 5, 2022, shortly before the start of the Class Period, J.P. Morgan's European Credit Research issued a report titled "Debit Suisse" which discusses the volatility of spreads in Credit Suisse debt securities and related investor concerns.[93]

87.   On October 28, 2022, one day after the start of the Class Period, J.P. Morgan's European Credit Research issued a report titled "Trade Idea: Value In Short-Call AT1 And Short-End HoldCo Senior," discussing recent Company communications and the investment attractiveness of AT1 bonds and senior debt.[94]

88.   Later, on December 19, 2022, RBC Capital Markets issued a report titled "Reinstating coverage at Sector Perform." Among other topics, the report discusses funding cost and issuance

---

[89] Mola Study, at 668.

[90] Bhole, B., Surana, S., & Torchio, F. (2020). Benchmarking market efficiency indicators for securities litigation. U. Ill. L. Rev. Online, 96-116. *See* at 104: 90th percentile defined as 20.1 analysts.

[91] *See* Barclays, "AT1 issuance costs and SNB changes," June 17, 2022, p. 1.

[92] *See* J.P. Morgan, "The Financials Statement: Insurance Conference Takeaways and other Banks and Insurance newsflow," June 24, 2022, p. 3-4.

[93] *See* J.P. Morgan, "Debit Suisse," October 5, 2022, p. 1.

[94] *See* J.P. Morgan, "Trade Idea: Value In Short-Call AT1 And Short-End HoldCo Senior," October 28, 2022, p. 1-2.

developments of Credit Suisse for various debt securities, including AT1 bonds, highlighted in the following table.[95]

**Exhibit 12 - Credit Suisse FY23E increase in funding costs**

| | CDS at issuance | CDS now | Redemptions (CHFm) | FY23 Increase in costs (CHFm) | FY22 Redemptions | FY22 Issuance | Potential Pre Funding | FY23 Issuance assuming pre funding | FY23 Increase in costs (CHFm) |
|---|---|---|---|---|---|---|---|---|---|
| | | | **Face Value Issuance** | | | | | **Pre-funding** | |
| AT1 | 460bps | 830bps | 7,000 | 259 | 1,000 | 2,000 | 1,000 | 6,000 | 222 |
| Holdco | 83bps | 411bps | 7,000 | 230 | 9,000 | 16,000 | 7,000 | - | - |
| Opco | 57bps | 350bps | 8,000 | 234 | 7,000 | 7,000 | - | 8,000 | 234 |
| | | | | **723** | | | | | **456** |

Source: RBC Capital Markets estimates, Bloomberg, CS Issuance Plan.

89. Therefore, when compared to benchmarks established by academic literature, analyst coverage of the Company during the Class Period supports the conclusion that Credit Suisse AT1 bonds traded in an efficient market throughout the Class Period.

90. In addition to the analyst reports documented above, each Credit Suisse AT1 bond was also rated by at least two independent bond rating agencies, including DBRS Morningstar, Fitch, Moody's, and Standard & Poor's (*see* **Exhibit 3**). Investors in bond markets rely heavily on the assessments of credit rating agencies, fixed-income research desks, and institutional market professionals. As the court in *Teva* explained, in evaluating debt securities courts recognize that bonds are less likely to be the subject of equity analyst coverage, but that coverage by bond analysts, credit rating agencies, and other market professionals is nonetheless probative.[96]

91. Accordingly, I consider the presence of credit rating agency coverage alongside traditional analyst reports when assessing the *Cammer* factor 2 for Credit Suisse AT1 bonds. Rating agencies perform an analogous function by continuously monitoring issuers, evaluating creditworthiness, and publishing ratings and updates that are relied upon by institutional investors. These reports contribute to the flow of material information into bond prices in much the same way that equity

---

[95] *See* RBC Capital Markets, "Reinstating coverage at Sector Perform," December 19, 2022, p. 12-13.

[96] *Teva*, at *19.

analyst reports do for stocks. Thus, consistent with judicial guidance, incorporating rating agency coverage into the *Cammer* factor 2 analysis provides a more accurate measure of how information was disseminated to market participants in the bond market.

92. In addition to the analyst reports and rating agencies documented above, there was a significant amount of media coverage of Credit Suisse. For example, a search of media coverage of Credit Suisse using Factiva identified 5,699 unique English-language articles published during the Class Period.[97] Moreover, Credit Suisse's SEC filings were immediately made available to the public through the SEC's online database EDGAR during the Class Period.[98]

93. Taken together, the evidence demonstrates that Credit Suisse was subject to extensive coverage by securities analysts, fixed-income professionals, and credit rating agencies, supplemented by substantial financial media attention and timely SEC filings. Courts have consistently held that *Cammer* factor 2 should be applied flexibly to bonds, recognizing that coverage by rating agencies plays an analogous role to equity analyst coverage in ensuring that material information is rapidly incorporated into prices. In light of this broad and multi-faceted coverage, it is my opinion that *Cammer* factor 2 supports the conclusion that Credit Suisse AT1 bonds traded in an efficient market during the Class Period.

### 4.3  *Cammer* Factor 3: Market Makers and Arbitrageurs

94. The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours. Market makers can facilitate market efficiency in an over-the-counter market

---

[97] Factiva is a business and news research database that aggregates articles from an extensive collection of global news sources including Dow Jones Newswires, PR Newswire, The Wall Street Journal, Reuters, MarketWatch, and Investor's Business Daily. The Factiva searched returned 9,437 articles. After removing potential duplicates, the search returned 5,699 unique articles.

[98] *See* SEC EDGAR, Credit Suisse Group AG: https://www.sec.gov/edgar/browse/?CIK=0001159510 and Credit Suisse AG: https://www.sec.gov/edgar/browse/?CIK=0001053092

because they are (Barber et al. 1994):[99]

> ... [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.

95.  In *Cammer*, when evaluating market efficiency by looking at market makers, the court determined that:[100]

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.

96.  Courts have recognized that the *Cammer* factor 3 must be applied flexibly to bonds, because debt instruments trade in the over-the-counter market rather than on centralized exchanges with designated specialists. In *Global Brokerage*, Magistrate Judge Moses explained that "for bonds (like the FXCM Notes), the Cammer factors are frequently applied in modified form in recognition of the differences between the manner in which debt bonds and equity securities trade."[101] Similarly, in *Teva*, Judge Underhill emphasized that in the bond market, the presence of dealers and underwriters can serve as the functional equivalent of market makers under the third *Cammer* factor, since these intermediaries provide quotes, facilitate trades, and help incorporate information into bond prices.[102] Together, these rulings make clear that *Cammer* factor 3 may be satisfied for bonds by showing the active participation of underwriters, dealer banks, and institutional intermediaries acting as liquidity providers.

97.  **Exhibit 4** shows the number of unique reporting dealers per Credit Suisse AT1 bond

---

[99] Barber, B. M., Griffin, P. A., & Lev, Baruch. (1994). The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporation Law*, *19*(2), 285-312, at 291.

[100] *Cammer*, 711 F. Supp. at 1293.

[101] *Global Brokerage*, at *12.

[102] *Teva*, at *20.

tranche that reported at least ten trades on TRACE during the Class Period.[103] There were between 2 and 19 market makers actively trading Credit Suisse AT1 bonds, supporting the conclusion that Credit Suisse AT1 bonds traded in an efficient market.[104] On average, the Credit Suisse AT1 bonds had over eight different market makers.

98.   I understand that courts have also regarded underwriters in assessing market efficiency of debt securities.[105] Therefore, I have examined the offering documents for each Credit Suisse AT1 bond to identify the banks involved in their distribution and found that each AT1 bond had multiple banking entities participating in the issuance. **Exhibit 5** lists these entities, together with their respective role, such as Joint Lead Manager or Co-Manager. Notably, several banks including Citigroup, Deutsche Bank, and Wells Fargo, acted as underwriters. Additionally, for each bond, I obtained the syndicate list from Bloomberg, which is also presented in **Exhibit 5**. The fact that each Credit Suisse AT1 bond had multiple entities acting as managers during the issuance of the bonds further supports the conclusion that Credit Suisse AT1 bonds traded in an efficient market during the Class Period.

99.   Moreover, I understand that both courts and academic research support the view that institutional investors may provide similar benefits to market makers by supplying trading liquidity and informationally efficient and informed trading, and therefore can provide auxiliary support for

---

[103] Based on data provided by Counsel for Lead Plaintiff from FINRA pursuant to a document subpoena, *see* supra note 56. I have not received TRACE data through this subpoena for the Credit Suisse AT1 tranches identified with CUSIPs H3698DAL8 and H3698DBW3. I note that the absence of the data from TRACE does not indicate that there is no TRACE data or that there were no market makers for the two tranches. In fact, as I show in this section, both identifiers were covered by multiple entities acting as managers as well as institutional investors, and the corresponding Rule 144A tranche for each bond had at least six market makers.

[104] For each Credit Suisse AT1 bond tranche, I classify a reporting entity as a market maker if it was reported ten or more times as the "Report Side MPID" with a "Status" of "T" during the Class Period. The Credit Suisse AT1 bond tranche 225401AN8 does not have market makers under this definition.

[105] *See Petrobras*, 312 F.R.D. at 366.

market efficiency.[106,107] As I discuss in Section 4.4 below, Credit Suisse AT1 bonds were almost exclusively held by institutional investors throughout the Class Period.

100. In sum, because of the presence of market makers, the highly liquid and well-developed trading venues of Credit Suisse AT1 bonds, the involvement of underwriters and the substantial holdings by sophisticated institutional investors during the Class Period, which I further elaborate on below, Credit Suisse satisfies the intent of this *Cammer* factor, thus providing further support in favor of the efficiency of the market for Credit Suisse AT1 bonds throughout the Class Period.

## 4.4 Additional Factor: Institutional Ownership

101. Academic research has supported the notion that institutional investors can facilitate trading liquidity.[108] Institutional investors are sophisticated investors who have significant resources to allocate to investing decisions; investment vehicles such as pension funds, mutual funds, investment banks, hedge funds and endowments, are considered institutional investors. Such investors trade large block holdings of securities in response to new information, as it becomes available, which results in the quick incorporation of that information into security prices, thus facilitating market efficiency.[109]

102. In **Exhibit 6**, I show that at least 229 distinct institutions held Credit Suisse AT1 bonds at

---

[106] *See, e.g.*, *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[107] *See, e.g.*, Akbas, F., Armstrong, W. J., Sorescu, S. & Subrahmanyam, A. (2016). Capital Market Efficiency and Arbitrage Efficacy, *Journal of Financial and Quantitative Analysis*, *51*(2), 387-413, at 387.

[108] Mola Study, at 678 (Table 3). Authors reported that Sample firms had a median of 9 institutional investors, while Covered firms had a median of 40 institutional investors; *see also* Barber, B. M., Griffin, P. A., & Lev, Baruch. (1994). The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporation Law*, *19*(2), 285-312, at 302.

[109] *See, e.g.*, Asquith, P., Pathak, P. A., & Ritter, J. R. (2005). Short Interest, Institutional Ownership, and Stock Returns. *Journal of Financial Economics*, *78*(2), 243-276; Boehme, R. D., Danielsen, B. R., Kumar, P., & Sorescu, S. M. (2009). Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) Meets Miller (1977). *Journal of Financial Markets*, *12*(3), 438-468; and Akbas, F., Armstrong, W., Sorescu, S., & Subrahmanyam, A. (2015). Smart Money, Dumb Money, and Equity Return Anomalies. *Journal of Financial Economics*, *118*, 355-382.

some point during the Class Period. Additionally, I show in **Exhibit 7** that those institutions held on average between 5% and 46% of Credit Suisse AT1 bonds notional outstanding during the Class Period.

103. Consistent with the case law,[110] such levels of institutional involvement indicate that material information about Credit Suisse was being tracked and acted upon by sophisticated market participants, ensuring that the Credit Suisse AT1 bond prices reflected available public information. Accordingly, in my opinion, the institutional ownership evidence strongly supports the finding of market efficiency under this first additional factor.

### 4.5   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

104. Form S-3 (and Form F-3 with respect to foreign issuers)[111] is a simplified registration form that eligible companies can file with the SEC in order to raise capital, typically through secondary security offerings. Form S-3 allows companies to provide references to previous SEC filings and avoid repeating large quantities of information, as required in traditional registration documents.[112] In order to be eligible to file a Form S-3 to issue securities other than common equity, the market capitalization of the company's non-convertible securities, other than common equity, must exceed $750 million.[113] Additionally, the company must have a class of securities eligible for coverage under the Exchange Act, have submitted all necessary filings with the SEC in a timely manner for the past 12 months, and have not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[114] In *Cammer*, the court determined that to show the level of float necessary for filing a Form S-3 would be an indicator of market efficiency:[115]

> *[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of*

---

[110] *See, e.g., Teva*, at 41.

[111] https://www.sec.gov/files/formf-3.pdf.

[112] *Id.*

[113] *Id.*

[114] https://www.sec.gov/files/forms-3.pdf.

[115] *Cammer*, 711 F. Supp. at 1287.

*timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.*

105. Courts have held that *Cammer* factor 4 applies to foreign issuers and their debt securities through the functional equivalent of S-3 eligibility. In *Teva*, the court noted that "A Form F-3 is the equivalent of a Form S-3 for foreign companies"[116] and found that *Teva*, an Israeli issuer, was eligible to file F-3s throughout the class period; on that basis, "this factor weighs in favor of market efficiency."[117] Likewise, in *Vale*, the court noted that "Vale was eligible to file the SEC Form F-3 throughout the class period."[118] And in *Global Brokerage*, which involved notes issued by a U.S. company, the court reiterated that "Factor 4 applies to equity and bond markets alike," noting that even though the notes were unregistered, FXCM had filed Form S-3 registration statements during the period, which "weighs, albeit slightly, in favor of efficiency."[119]

106. Taken together, these cases show that courts treat the fourth *Cammer* factor as directly relevant for issuers of bonds, including foreign issuers. While bonds themselves may not be exchange-traded securities, the issuer's ability to file Form S-3 (or its foreign counterpart, Form F-3) and its history of making continuous, timely disclosures to the SEC are considered strong evidence that information is widely disseminated and incorporated into the price of the issuer's debt.

107. Moreover, I understand that the aggregate market capitalization of, for example, Credit Suisse Senior Notes exceeded the required threshold of $750 million for Form F-3 filing over the Class Period.[120] Furthermore, Credit Suisse made all required filings with the SEC in a timely manner during the Class Period. In fact, Credit Suisse filed at least 13 SEC Forms F-3, F-3/A, and

---

[116] *Teva*, at *17.

[117] *Id*.

[118] *Vale*, at *3.

[119] *Global Brokerage*, at *16.

[120] *See* Cain Report, at ¶152.

F-3ASR before the Class Period, and the most recent was a Form F-3/A filed on June 16, 2020.[121] Thus, despite not filing a Form F-3 during the Class Period, Credit Suisse met eligibility requirements during the Class Period in excess of what was determined necessary by the *Cammer* court and subsequent case law to weigh in favor of efficiency.

108. As a result, this factor supports the efficiency of the market for Credit Suisse AT1 bonds during the Class Period.

### 4.6  *Krogman* Factor 1: Market Capitalization

109. The market capitalization of a company is the total value of its shares outstanding. In *Cammer*, the court acknowledged that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency," implying that a high market capitalization would weigh in favor of efficiency.[122] Moreover, in *Krogman*, the court stated that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[123] Generally, because there is greater investor interest for larger corporations than smaller ones, market capitalization is often considered as a factor in enhancing market efficiency.

110. Courts apply *Krogman* factor 1 to bonds by focusing on the size of the bond issue itself, rather than the issuer's equity float. In *Global Brokerage*, the court explained that "the first Krogman factor considers market capitalization," but "[w]here a debt security is at issue, courts modify this factor to consider par value," citing *Petrobras* where "the aggregate par value of Petrobras Notes totaled $41.4 billion."[124] The court then evaluated the FXCM notes by total par value ($173 million) and—because neither side supplied persuasive comparators—held that plaintiffs had not shown that issue size implied efficiency.

---

[121] *See* https://www.sec.gov/edgar/browse/?CIK=0001159510.

[122] *Cammer*, 711 F. Supp. at 1287.

[123] *Krogman*, 202 F.R.D. at 478.

[124] *Global Brokerage*, at *17.

111. Other courts measure market value of the notes outstanding during the class period as a functional analogue to equity market cap. In *Teva*, the court noted that the average market capitalization "ranged from nearly $1.5 billion to over $3 billion," and considered that magnitude within the *Krogman* framework for the bonds.

112. Read together, these two prior court cases show that for bonds, *Krogman* factor 1 asks whether the issue is large in economic terms—shown by aggregate par value or by the market value of notes outstanding—and whether that size is meaningful relative to the bond market. Courts will not deem size probative "standing alone" without context (as in *Global Brokerage* where the size was only $173 million), but where the issue size is measured in billions (as in *Teva*), *Krogman* factor 1 supports efficiency for bonds.

113. **Exhibit 7** reports market capitalization, measured by the par value, for each Credit Suisse AT1 bond throughout the Class Period. This market capitalization ranged between $1.0 billion and $2.5 billion during the Class Period, with an average of $1.7 billion.

114. While par value is not the same metric as market value, courts evaluating bonds look to the economic size of the notes as an analogue to equity market capitalization. In *Teva*, for example, the court recorded that the notes' average market capitalization ranged from nearly $1.5 billion to over $3 billion and treated that magnitude as probative within the *Krogman* framework for debt securities.[125] In my opinion, Credit Suisse's AT1 bonds—each exceeding $1 billion in par value and thus squarely in the same multi-billion-dollar range the *Teva* court found consistent with market efficiency—satisfy *Krogman* factor 1 for the bond context.[126]

## 4.7  *Krogman* Factor 2: Bid-Ask Spread

115. The bid-ask spread of any financial product is the difference between the price an investor could sell a product at (the bid quote) and the price an investor could purchase the product at (the ask quote). The *Krogman* court considered a small bid-ask spread to be an indicator of market

---

[125] *Teva*, at *20-21.

[126] This conclusion is corroborated by the Court's ruling in favor of market efficiency for Credit Suisse's Senior Notes, whose market capitalization, according to the plaintiff's expert report, ranged from $618 million to $2.66 billion. *See* Cain Report, ¶166.

efficiency, as a "large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[127]

116. A large bid-ask spread indicates that investors must pay more to buy and receive less to sell the given security due to high transaction costs, which may dissuade investors from trading.[128] This can hinder price discovery, leading to a less efficient market. Conversely, a small bid-ask spread indicates that a stock is associated with low transaction costs, which can increase trading activity for the given stock and lead to a more efficient market.

117. In the corporate bond market there is no consolidated public source of bid–ask quotations comparable to exchange-traded equities; the U.S. post-trade tape (i.e., TRACE) reports transactions but does not publish bid–ask quotes. Courts have acknowledged this structural gap. In *Global Brokerage*, plaintiffs' expert could not assess *Krogman* factor 2 for the issuer's notes precisely because bond bid–ask data are not reported by TRACE, and the court recognized that this limitation constrains what can be shown on this factor.

118. Consistent with market practice, the expert in the parallel *Diabat* matter explained that "there are no publicly disseminated bid-ask spreads in the corporate bond market,"[129] and therefore estimated spreads from Bloomberg's evaluated bid and ask fields derived from its BVAL methodology.[130],[131]

---

[127] *Krogman*, 202 F.R.D. at 478.

[128] Amihud, Y., & Mendelson, H. (1986). Asset Prices and the Bid-Ask Spread. *Journal of Financial Economics*, *17*(2) 223-249.

[129] *See* Cain Report, ¶169.

[130] The respective data fields for bid- and ask spreads are "PX_BID" and "PX_ASK." Bloomberg does not differentiate between the respective bond tranches (Reg S and Rule 144A) for the bid- and ask spreads given they represent the same underlying bond.

[131] In the absence of actual trade prices—particularly for less-liquid bonds—Bloomberg's BVAL (Bloomberg Valuation Service) provides an approximation of fair market value. As described by Bloomberg, BVAL computes valuations using a weighted combination of Direct Observations and Observed Comparables, where direct observations may include institutional-sized trades, executable bid/ask quotes, and indicative quotes received by Bloomberg. In cases where direct inputs are unavailable, BVAL relies on correlated pricing from similar reference bonds, combining these model outputs into a defensible final estimate. Importantly, Bloomberg positions BVAL as a transparent and independent evaluated pricing source, actively used across the fixed-income industry for pricing, fund valuation, and risk management. *See* Bloomberg L.P. (2011, April). *BVAL Pricing Methodology for Government, Supranational, Agency & Corporate Bonds.*

119. Because reliable bond bid–ask quotes are often unavailable, courts de-emphasize *Krogman* factor 2 in bond cases and assess market efficiency holistically on the totality of the evidence rather than penalizing plaintiffs for the absence of spread data. In *Vale*, the court endorsed a flexible, bond-appropriate application of the *Cammer/Krogman* framework and accepted market efficiency showings for notes based on overwhelming indirect evidence even where certain indirect factors could not be calculated for the debt instruments.[132]

120. *Teva* similarly evaluated instruments that traded OTC and treated the bid–ask showing contextually, noting, for example, that an average OTC spread of 2.66% for a *Teva* security "weighs moderately in favor of market efficiency," and that OTC trading "does not indicate that the market … was inefficient" when considered with the broader record.[133]

121. In the parallel *Diabat* case, which involves Credit Suisse's Senior Notes, the plaintiff's expert computed estimated bid–ask spreads from Bloomberg BVAL data and reported mean spreads between 0.09% and 1.06% and medians between 0.10% and 0.99%; the court in that matter certified the class.[134]

122. In the case of AT1 bonds, using the same methodology, I estimate mean bid–ask spreads for the Credit Suisse AT1 bonds using the Bloomberg BVAL data to be between 0.85% and 1.76% and median spreads to be between 0.35% and 0.80%.[135] These results, shown in **Exhibit 8**, are comparable in magnitude to the *Diabat* Senior Notes estimates, notwithstanding differences in subordination and instrument features.

123. As a matter of weight in drawing market efficiency conclusions, estimated spreads should appropriately be afforded less probative value than spreads obtained from actual quotes. Considering also the fact that courts accord limited weight to *Krogman* factor 2 in the case of

---

[132] *Vale*, at *4-5.

[133] *Teva*, at *18.

[134] *See* Cain Report, ¶170; MTD Order, at 22.

[135] The bid-ask spread can be expressed either as the absolute difference between these prices in their currency or as a percentage, e.g., relative to their midpoint. I calculated the bid-ask spread as a percentage of their midpoint using daily closing bid and ask quotes ("PX_BID" and "PX_ASK") from Bloomberg's BVAL pricing.

bonds—and routinely adopt a holistic approach—the evidence I present in **Exhibit 8** is best viewed as weak, but directionally supportive of market efficiency.

124. On balance, I conclude that *Krogman* factor 2 is neutral to slightly positive for market efficiency in the Credit Suisse AT1 bond market, to be considered alongside the stronger *Cammer*/*Krogman* evidence addressed elsewhere.

### 4.8  *Krogman* Factor 3: Public Float

125. Public float refers to the notional value of a bond that is not held by corporate insiders (i.e., the notional value of the bond held by the public). Therefore, a high ratio of public float to the total notional value outstanding indicates that a large percentage of the bond is held by the public and therefore can be traded without restrictions, thus enhancing the efficiency of a market. Conversely, a security may have a large market capitalization but a low public float-to-notional value outstanding ratio, indicating that the majority of the security's total notional outstanding is held by insiders and cannot be traded, thus decreasing the efficiency of the market in question.

126. Because the original *Krogman* factor 3 applies to publicly-traded stocks, courts have tailored this factor to debt markets by focusing on the amount of debt available for trading by outside investors, rather than share counts. As Judge Moses explains in *Global Brokerage*, the relevant inquiry for bonds is "the issuer's float – that is, the number of shares (or, in the case of debt securities, par value) available for trading by outside investors in the open market."[136]

127. Courts also recognize evidentiary limits unique to bonds and apply the third *Krogman* factor with practical flexibility. In *Teva*, the court stated: "Because of a lack of available evidence, it was not possible to calculate the 'float' for the Notes … Thus, the first two Krogman factors weigh substantially in favor of market efficiency, and Krogman 3 is not applicable."[137] Likewise in *Vale*, the court endorsed considering par-value proxies and other indirect indicia, crediting "a high aggregate par value, larger than the total capitalization of many public companies"[138] as

---

[136] *Global Brokerage*, at *18.

[137] *Teva*, at *20.

[138] *Vale*, at *5.

probative that the notes traded in an efficient market.

128. Together, these rulings confirm that for bonds, courts permit methodological accommodations—the question is whether a very large proportion of the debt is in public hands, not whether equity-style insider/share tallies can be produced.

129. Consistent with this case law, I implement a bond-appropriate float measure by comparing issuer/insider holdings to total notes outstanding, as reported on Bloomberg.[139]

130. In **Exhibit 7**, I show that insider holdings never exceeded 0.58% of the notional value outstanding for each Credit Suisse AT1 bond during the Class Period, and represented, on average, 0.22% of the notional value of Credit Suisse AT1 bonds during the Class Period. Therefore, approximately 99.78% of the notional value of each Credit Suisse AT1 bond was held by institutions and other outside investors during the Class Period.

131. This methodological approach aligns with the flexible, bond-specific application of *Krogman* factor 3, as recognized in *Global Brokerage*, *Teva*, and *Vale*, and as adopted by the plaintiff's expert in the parallel *Diabat* case. Therefore, the results presented in **Exhibit 7** provide directional support for market efficiency of the Credit Suisse AT1 bond market under *Krogman* factor 3.

# 5   ANALYSIS OF THE DIRECT FACTORS FOR MARKET EFFICIENCY

## 5.1   *Cammer* Factor 5: Cause-and-Effect Relationship Between Company Information and Security Prices

132. The fifth *Cammer* factor relates to whether the security price of a company quickly incorporates new value-relevant information. In *Cammer*, the court determined:[140]

> [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a [cause-and-effect] relationship between company disclosures and resulting

---

[139] This is the same approach used by the plaintiff's expert in the parallel *Diabat* matter, which Defendants did not contest. *See* Cain Report, ¶173; Defs.' Diabat Opp. at 19-20.

[140] *Cammer*, 711 F. Supp. at 1291.

*movements in stock price.*

133. Courts have consistently recognized that *Cammer* 5 is the most direct and probative measure of market efficiency, even in the case of bonds. In *Global Brokerage*, the court explained that "this factor needs no modification for the bond market" and reiterated that *Cammer* factor 5 "is the most important Cammer factor because [without it], it is difficult to presume that the market will integrate the release of material information about a security into its price."[141]

134. At the same time, courts have recognized that bonds respond to different types of information than equity securities. As the *Global Brokerage* court noted, "bond prices do not react to the same types of information that drive stock prices. … Unlike equity, … debt reacts to the risk of a change in interest rates and to default risk."[142] Consistent with this view, event studies for bonds are focused on credit-sensitive or liquidity-relevant disclosures, as well as systemic shocks, rather than the types of earnings announcements or equity-specific news that typically drive stock prices. In *Global Brokerage*, the court accepted a bond-specific event study focused on such debt-relevant catalysts, finding that statistically significant price reactions supported efficiency for the FXCM notes.[143]

135. Courts have also made clear that *Cammer* factor 5 must be applied flexibly in the bond context. In *Vale*, the court emphasized that although *Cammer* factor 5 is a "direct" test of efficiency, "the Cammer and Krogman factors were designed to test market efficiency for equity securities and are considered less instructive when applied to debt securities," endorsing instead "a holistic analysis based on the totality of the evidence presented."[144] The court further cautioned that "denying the *Basic* presumption for a debt security because it does not behave the way equity securities behave would be like throwing out oranges because they are not apples."[145]

136. While *Cammer* factor 5 remains the most direct test of efficiency, its application to bonds

---

[141] *Global Brokerage*, at *16.

[142] *Id.*

[143] *Global Brokerage*, at *16-17.

[144] *Vale*, at *5.

[145] *Id.*

requires recognition of the distinct information environment in which debt instruments trade. Bond event studies must focus on debt-relevant news such as credit risk, default risk, and systemic interest-rate shocks. Moreover, when such direct evidence is inconclusive or more difficult to obtain, courts do not penalize plaintiffs; instead, they weigh *Cammer* factor 5 alongside the full suite of *Cammer* and *Krogman* factors, many of which strongly support efficiency in the bond context. This flexible, bond-specific approach to *Cammer* factor 5 is consistent with case law and informs my assessment of market efficiency for the Credit Suisse AT1 bonds.

137. In keeping with this flexibility, I expand the set of news events I consider in my *Cammer* factor 5 test to also include events that are relevant to the firm as a whole, not just to bondholders, noting that the previous court cases I cite focus on senior notes rather than the AT1 bonds (which are subordinated notes). While senior notes typically react primarily to interest-rate and default-risk disclosures, subordinated instruments such as AT1 bonds may also react to broader firm-specific news when the firm is under financial distress. AT1 bonds are designed to absorb losses on a going-concern basis and are explicitly subordinated in the capital structure, which means their value is closely tied to the issuer's ongoing viability. In periods of distress, the prices of AT1 bonds can therefore respond to news such as earnings announcements or regulatory interventions because such events directly affect the likelihood that subordinated creditors will bear losses.

138. For this reason, in assessing *Cammer* factor 5 for AT1 bonds, I also consider firm-specific news in addition to the narrower set of bond news used in the court cases I cited. Importantly, however, my results do not depend on this broader set of news events: the analysis would yield the same conclusion of efficiency if I restricted the focus solely to "bond-related news" (i.e., credit- and default-relevant disclosures). This confirms that the cause-and-effect relationship between information and price movements for Credit Suisse's AT1 bonds is robust to both the narrow debt-specific and the broader firm-specific set of material information.

139. To assess the extent of a cause-and-effect relationship for Credit Suisse, I compared the movements in the price of Credit Suisse AT1 bonds on days with relevant company-specific news with movements on days on which no company-specific news was released. I explain my approach to studying movements in the price of Credit Suisse AT1 bonds, classifying value-relevant, company-specific news and the results of my analysis in the following sections.

### 5.1.1   Event Study Methodology

140. To study the price movements of Credit Suisse AT1 bonds on various trading days, I conducted empirical tests using the results of an event study.[146] Event studies are widely used by economists to measure the price reactions of a security to new, company-specific, value-relevant information, and commonly used in assessing market efficiency in securities litigation.[147] An event study involves three steps:

141. First, an economist estimates the predicted return of the security on a given day. A generally accepted method for this is to develop a regression model over a selected period of time to observe the typical relationship between the price of the relevant security and market and/or industry indices. Through this regression model, the economist can model the predicted daily return of the relevant security based on market and/or industry returns.

142. Second, an economist estimates the abnormal return of the security on a given day. The "abnormal" return can be calculated by subtracting the predicted return from the actual return. The abnormal return represents the component of the daily security price return that is not attributable to market- or industry-wide movements, but, rather, is attributable to company-specific or security-specific idiosyncrasies.

143. Finally, an economist tests the statistical significance of the abnormal return. In other words, an economist tests whether the deviation from expected price movements on the day (i.e., the abnormal return) is sufficiently large compared to the usual volatility of the security's return such that random price fluctuations can be rejected as the cause.

144. I applied this widely used and generally accepted approach to perform my event study here. Specifically, I performed a regression analysis to estimate the relationship between Credit Suisse AT1 bonds' price returns and: (1) changes in market-wide factors that would be expected to impact all publicly traded stocks; (2) changes in industry-wide factors that would be expected to impact

---

[146] I conducted the event study analysis solely for the purposes of assessing market efficiency of Credit Suisse AT1 bonds. I do not form an opinion whether the results of my event study can be used in any other way.

[147] *See* MacKinlay, A. C. (1997). Event Studies in Economics and Finance. *Journal of Economic Literature*, *35*(1), 13-39.

publicly traded stocks in Credit Suisse's industry; (3) changes in the risk-free interest rate that is expected to impact the pricing of interest-bearing securities, and (4) changes in a AT1 bond index that is expected to impact the pricing of AT1 bonds generally (collectively, the "Explanatory Variables"). By modelling how Credit Suisse AT1 bond returns moved relative to the Explanatory Variables, I was able to measure the response of each Credit Suisse AT1 bond to the release of new company-specific information.

145. For each regression, I employed 120 trading days (approximately six months) (the "Estimation Window") of data to predict the return of each Credit Suisse AT1 bond on a given day.[148],[149] It is common practice to employ a 120-day estimation window when feasible.[150]

146. In conducting my *Cammer* 5 analysis, I relied on the Reg S tranches of Credit Suisse's AT1 bonds because transaction and pricing data were more consistently available for these tranches than for the corresponding Rule 144A tranches. It is standard practice in empirical finance to use the most data-rich source when evaluating market responsiveness, since greater data availability allows for more reliable statistical inference. Importantly, however, this methodological choice does not limit the scope of my conclusions. As discussed above in Section 3.1, the Reg S and Rule 144A tranches of each AT1 issuance were economically fungible, carrying identical contractual terms, *pari passu* ranking, and identical risk exposure. Courts and market practice treat these

---

[148] For the purpose of estimating this regression, I exclude any trading days with earnings releases, and any trading days on which an alleged corrective disclosure, or alleged materialization of risk, occurred before taking the prior 120 trading days. The effect of earnings releases, alleged corrective disclosure dates, and alleged materialization of risk dates, which release non-random firm-specific information, should be removed to prevent them from influencing parameter estimates of the normal performance model.

[149] As Credit Suisse AT1 bonds did not trade on every AT1 Trading Day, the number of observations in the Estimation Window varies for each Credit Suisse AT1 bond. For example, on March 10, 2023, the Estimation Window for the 2018 7.5% Bond identified with CUSIP H3698DBW3 contains 99 observations.

[150] *See, e.g.*, Mitchell, M. L., & Netter, J. M. (1994). The role of financial economics in securities fraud cases: applications at the securities and exchange commission. *Business Lawyer*, *49*(2), 545-590 (*see* at 568 "The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); MacKinlay, A. C. (1997). Event Studies in Economics and Finance. *Journal of Economic Literature*, *35*(1), 13-39 (*see* at 15 "Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.")

tranches as the same economic instrument, differing only in their initial distribution channels. Accordingly, the *Cammer* 5 results I obtain using Reg S tranches generalize to the Credit Suisse AT1 bonds as a whole.

147. To model the relationship between Credit Suisse AT1 bonds' returns and overall market factors, I used the S&P 500 Total Return Index (the "Market Index").

148. To model the relationship between Credit Suisse AT1 bonds' returns and industry-wide factors, I used a peer index comprising of stock returns of Credit Suisse's competitors (the "Peer Index").[151]

149. To model the relationship between Credit Suisse AT1 bonds' returns and the risk-free rate, I used the 10-year U.S. Treasury Note.

150. To model the relationship between Credit Suisse AT1 bonds' returns and the AT1 asset class, I used the Markit iBoxx USD Contingent Convertible Index (the "AT1 Bond Index").

151. I ran my regressions of the daily return of each Credit Suisse AT1 bond on the daily return of each of the Explanatory Variables over each Estimation Window. I utilized the results of these regressions to predict the Credit Suisse AT1 bond price return on each day of the Class Period. I then computed abnormal returns by subtracting the predicted return from the actual return on each day. The abnormal return reflects the component of each Credit Suisse AT1 bond price return that is not attributable to the Explanatory Variables.

152. I then compared the abnormal return on each date to the historical volatility of Credit Suisse AT1 bond price returns in the relevant estimation window to determine the statistical significance of each abnormal return in the Class Period. The standard error of the regression provides a metric for how much "randomness" remains in the price movement of each Credit Suisse AT1 bond after

---

[151] I understand that plaintiff's expert in the parallel case used an "equal-weighted index comprised of the peers that Credit Suisse lists in its SEC Form 20-F filings filed on March 10, 2022 and March 14, 2023, p. 265 and 250 in the respective filings, specifically stating: "The core group considered for the purposes of Group peer benchmarking are Bank of America, Barclays, Citigroup, Deutsche Bank, Goldman Sachs, JPMorgan Chase, Morgan Stanley and UBS." The returns of UBS are removed from the Peer Index on March 15, 2023, when rumors began to circulate that UBS could merge with Credit Suisse …" *See Cain Report*, ¶69. I construct a Peer Index based on this information for my analysis.

accounting for movements in the Explanatory Variables.[152]

153. To test for statistical significance of abnormal returns on each day of the Class Period, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the actual return and the predicted return. It is calculated by dividing the abnormal return by the standard error of the regression. There is a 95% chance that, barring some non-random explanation, the actual observed return will fall within approximately 1.98 standard deviations of the predicted return. I classify a day as having a significant price movement if its t-statistic meets this threshold, i.e., I adopt a 95% confidence level.

### 5.1.2  Cause-and-Effect Relationship Analysis Comparing Credit Suisse AT1 Bond Price Movements on News Days Versus Least News Days

154. A widely used, peer-reviewed method for assessing whether a security price reacts to news, particularly in the context of testing market efficiency in securities class actions, involves comparing the security's behavior on days that company-specific news was released to the security's behavior on days that little or no company-specific news regarding that security was released.[153] A finding that the proportion of days with statistically significant abnormal returns is greater on days with news versus days with little or no news is regarded as strong evidence that the security responds promptly to new information, thereby supporting a finding of market efficiency.

155. Research has shown that in an efficient market, a security may exhibit large price movements in the absence of new information and, conversely, may not always exhibit large price movements in response to new information.[154] Accordingly, I compare the behavior of the Credit

---

[152] The standard error of the regression is also referred to as the "standard error of the estimate" and "root mean squared error."

[153] Villanueva, O. M., & Feinstein, S. (2021). Stock Price Reactivity to Earnings Announcements: The Role of The Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting*, *57*(1), 203-234.

[154] *See* Boudoukh, J., Feldman, R., Kogan, S., & Richardson, M. (2019). Information, Trading, and Volatility: Evidence from Firm-Specific News. *The Review of Financial Studies*, *32*(3), 992-1033, at 1004; Fair, R. C. (2002). Events That Shook the Market. *The Journal of Business*, *75*(4), 713-731, at 713-714.

Suisse AT1 bond price on a *group* of days with news to its stock price behavior on a *group* of days with little or no news.[155]

156. I analyzed the following category of events as key dates pertaining to public news announcements during the Class Period that were likely to contain new information relevant to AT1 investors (hereinafter referred to as "News Days"): earnings releases,[156] earnings guidance updates,[157] credit rating changes,[158] and the regulatory intervention to write-down all AT1 bonds to zero on March 19, 2023.[159] Overall, I identify a total of five news days during the class period, which are detailed in **Exhibit 9.** One would not expect statistically significant price movements on all News Days since, for example, an earnings announcement may be consistent with market expectations or may contain a mixture of positive and negative information.

157. I compared the proportion of days with significant bond price movements, the average bond price movement and average trading volume of Credit Suisse AT1 bonds on News Days versus those metrics on other days during the Class Period (hereinafter referred to as "Least News Days").[160] The Least News Days provide a benchmark measurement of days in which little or no company-specific information was provided to the market.

---

[155] Courts have widely accepted this approach in the context of testing market efficiency in securities class actions. *See, e.g.*, *In re: Under Armour Securities Litigation,* 631 F.Supp.3d 285, 311-12 (D. Md. 2022); *Bond v. Clover Health Investments*, Corp., et al., 2023 WL 1999859, at *11 (M.D. Tenn. Feb. 14, 2023); *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).

[156] Credit Suisse had two quarterly earnings reports during the Class Period, October 27, 2022 and February 9, 2023.

[157] Credit Suisse made a separate earnings guidance update on November 23, 2022. *See* sec.gov/Archives/edgar/data/1159510/000137036822000096/a221123-6k_4q22outlook.htm.

[158] On November 1, 2022, some of Credit Suisse's debt was downgraded by S&P and Moody's. *See* "Moody's affirms Credit Suisse Group's AG senior unsecured debt at Baa2 and downgrades Credit Suisse AG's senior unsecured debt to A3 and deposits to A3/Prime-2; outlook negative," Moody's Investors Service, November 1, 2022, 4:38 PM, and "Research Update: Credit Suisse AG Downgraded To 'A-/A-2' On Execution And Franchise Risks Under Restructuring Plan; Outlook Stable," S&P Global Ratings, November 2, 2022, 4:38 PM. I follow the reasoning in the Cain Report and consider the next trading day, November 2, 2022, as the market impact day for this news. *See* Cain Report, footnote 219.

[159] *See* https://www.finma.ch/en/news/2023/03/20230319-mm-cs-ubs/.

[160] Least News Days were identified as all AT1 Trading Days that were not an alleged corrective disclosure, alleged materialization of risk, an earnings announcement or earnings guidance update, or a day on which Credit Suisse filed a SEC Form 6-K, 6-K/A, 20-F, or 20-F/A with SEC through the group entity (i.e., Credit Suisse Group AG) or bank entity (i.e., Credit Suisse AG).

158. **Exhibit 9** reports the event study results across the nine Credit Suisse AT1 bonds on the five News Days during the Class Period.[161] For each News Day bond pair, the table lists the date, description of the announcement, closing bond price, raw price return, abnormal return from my event study, and the t-statistic and significance level of the abnormal return. Overall, 16 of the 39 News Day bond pairs were associated with bond price movements that were statistically significant at the 95% confidence level.[162] I compare this rate with that of Least News Days in the following exhibit.

159. **Exhibit 10** summarizes the statistical comparison of Credit Suisse AT1 bonds price returns for the 39 News Days bond pairs versus the 471 Least News Days bond pairs.[163] The tests of statistical significance are based on 510 observations, which represent the sum of News Days bond and Least News Days bond pairs. As shown in **Exhibit 10**, 41% of News Days bond pairs were associated with bond price movements that were statistically significant at the 95% confidence level. This compares to only 11% of Least News Days bond pairs with statistically significant bond price movements. I tested the statistical significance of the difference between the proportions (30%) using a Fisher's exact test and found that this difference was statistically significant at the 99% confidence level.[164] This provides strong evidence of a cause-and-effect relationship between public information and Credit Suisse AT1 bonds price movements.

160. In **Exhibit 10** I also compare the average absolute abnormal returns (i.e., 15.44% vs. 1.83%) and the average volume (i.e., 47.72 vs. 5.74) between News Days bond pairs and Least News Days bond pairs. In both cases, the difference is statistically significant at more than 99% confidence level. These results further support the finding of a cause-and-effect relationship

---

[161] When a Credit Suisse AT1 bond did not have a return on a News Day, I have not considered the bond on that day.

[162] There were five News Days for nine Credit Suisse AT1 bonds, for a total 45 News Days bond pairs. Four bonds did not have a return on November 2, 2022, one bond did not have a return on November 23, 2022, and one bond did not have a return on February 9, 2023, resulting in missing data for six News Days bond pairs. Thus, the number of News Days Bond pairs I considered in my analysis is 39.

[163] There were 73 Least News Days for nine Credit Suisse AT1 bonds, for a total 657 Least News Days bond pairs. All bonds did not have a return on at least one Least News Days, resulting in missing data for 186 Least News Days bond pairs. Thus, the number of Least News Days bond pairs I considered in my analysis is 471.

[164] The p-value of the difference was less than 0.001. The p-value can be compared directly to the chosen level of significance, e.g., a p-value of less than 0.01 indicates statistical significance at the 1% level of significance (equivalent to a 99% confidence level).

between new information relevant to AT1 investors and Credit Suisse AT1 bonds price movements.

161. In summary, my findings set out above establish a clear cause-and-effect relationship between new company-specific information and Credit Suisse AT1 bonds' price movements. Thus, *Cammer* factor 5 is easily verified, which reiterates my conclusion that Credit Suisse AT1 bonds traded in an efficient market during the Class Period.

## 6   ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

162. As outlined in the Complaint, Plaintiffs allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") when they made false and misleading statements in relation to Credit Suisse's financial condition. I have been asked to consider whether damages in this matter can be measured on a class-wide basis under Section 10(b) of the Exchange Act for all purchases of Credit Suisse AT1 bonds during the Class Period. At this stage, I have not been asked to calculate damages or to provide a detailed loss causation analysis. Rather, my task is to assess whether damages are, in principle, measurable based on a common methodology that can be applied across the Class.

163. The accepted economic framework for securities fraud claims is the out-of-pocket measure of damages. This approach has been recognized repeatedly by courts in securities cases as the appropriate measure of recovery. Under this framework, an investor suffers damages when acquiring securities at prices inflated due to alleged misrepresentations and/or omissions, provided that the inflation later dissipates as a result of corrective disclosures, materialization of previously concealed risks, or both.[165]

164. Price inflation can be measured on a class-wide basis by analyzing the price reaction of the security to corrective disclosures or other events alleged to have revealed the truth. The decline in the security's price in response to such events reflects the dissipation of artificial inflation. As the Supreme Court emphasized in *Halliburton II*, an efficient market is expected to incorporate new

---

[165] *See, e.g.*, Mitchell, M. L., & Netter, J. M. (1994). The role of financial economics in securities fraud cases: applications at the securities and exchange commission. *Business Lawyer, 49*(2), 545-590.

information into security prices in a manner sufficient for reliance to be presumed.[166] Thus, well-accepted methodologies such as event studies can be used to isolate the portion of price movements attributable to the revelation of concealed information, distinguishing it from market-wide, industry-wide, or unrelated company-specific news.

165. Once daily levels of artificial inflation are estimated, damages for any class member can be calculated in a mechanical manner by applying those inflation levels to the investor's transaction history. The damages for a given purchase equal the level of inflation in the bond's price on the purchase date minus the level of inflation on the sale date (or, if the bond is held through the final disclosure, the inflation at that time). Although the dollar amount of damages may differ across investors depending on the timing of their transactions, the underlying methodology is the same for all class members.

166. In addition, any damages methodology will incorporate the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), including the statutory 90-day lookback provision.[167] This provision caps damages at the difference between the purchase price of the security and the average trading price during the 90-day period following the final corrective disclosure. Courts consistently recognize that this adjustment, which is straightforward to implement, can be applied on a class-wide basis.

167. Various approaches exist for modeling the evolution of artificial inflation over the Class Period. These include the constant dollar inflation method (assuming a fixed absolute inflation amount per bond), the constant percentage inflation method (assuming inflation proportional to bond value), and more flexible time-varying approaches. The choice among these methods depends on case-specific facts and disclosures, but all share a common feature: they can be implemented consistently for all class members.

168. Importantly, under *Dura Pharmaceuticals, Inc. v. Broudo*, an investor who both purchased and sold securities before the first corrective disclosure (and before the alleged inflation was

---

[166] *Halliburton II.*

[167] Private Securities Litigation Reform Act of 1995.

removed from the price) would not be entitled to damages, since such an investor would not have suffered a loss caused by the revelation of the alleged fraud.[168] Similarly, securities purchased and sold entirely between two corrective disclosures are not eligible for damages. These principles apply equally in the context of AT1 bonds.

169. My work on this matter remains ongoing. Additional expert analyses, market data, or company documents may affect the precise implementation of the damages methodology. Nonetheless, it is my opinion that damages for purchasers of Credit Suisse AT1 bonds during the Class Period can be measured on a class-wide basis using established, common methods that are consistent with both financial economics and the legal standards governing securities class actions.

# 7   CONCLUSION

170. In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that the nine AT1 bonds issued by Credit Suisse and mentioned in Exhibit 1 of this report traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

I declare under penalty of perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED THIS September 19, 2025*

Sorin M. Sorescu, Ph.D.

---

[168] *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).

## APPENDIX A

### SORIN M. SORESCU

*Foreman R. and Ruby Bennett Chair in Business Administration*
Professor and Director of the *Adam C. Sinn `00 Center for Investment Management*
Mays Business School at Texas A&M University College Station, Texas 77843-4113
Email: ssorescu@tamu.edu

September 19, 2025

### AREAS OF RESEARCH AND TEACHING INTEREST

- Market Efficiency
- Asset Management and Asset Allocation
- Banking and Macro Finance

### EDUCATION

| | | |
|---|---|---|
| • University of Florida | Ph.D. in Finance | 1996 |

*Dissertation topic: The Effect of Options on Stock Prices.*

| | | |
|---|---|---|
| • McGill University | Master of Business Administration | 1991 |
| • McGill University | Bachelors of Electrical Engineering | 1988 |

### EXPERIENCE

**Academic:**

| | | |
|---|---|---|
| • Director of the *Adam C. Sinn `00 Center for Investment Management* | *Texas A&M University* | *since 2023* |
| • Executive Associate Dean | Texas A&M University | 2020-2021 |
| • Head of the Department of Finance | Texas A&M University | 2009-2021 |
| • Professor (tenured) | Texas A&M University | since 2009 |
| • Associate Professor (tenured) | Texas A&M University | 2002 to 2009 |
| • Assistant Professor | University of Houston | 1996 to 2002 |
| • Research Assistant | University of Florida | 1992 to 1996 |
| • Teaching Assistant | McGill University | 1990 to 1992 |

**Non Academic:**

| | | |
|---|---|---|
| • Electrical Engineer | CAE Electronics (Montreal, Canada) | 1988 to 1990 |

### REFEREED PUBLICATIONS

- Baratsas, Stefanos. G., Alexander M. Niziolek, Onur Onel, Logan R. Matthews, Christodoulos A. Floudas, Detlef R. Hallermann, Sorin M. Sorescu, and Efstratios N. Pistikopoulos, 2021, "A framework to predict the price of energy for the end-users with applications to monetary and energy policies," **Nature Communications** 12 (18).

- Sorescu, Alina, Sorin Sorescu, William Armstrong, and Bart Devoldere, 2018, "*Two Centuries of Innovations and Stock Market Bubbles,*" winner of an MSI Research Competition Grant, 2013, winner of the Best Paper Award at the Strategic Management Conference, Lausanne, 2013, winner of Mays Business School interdisciplinary research proposal, **Marketing Science**, 37 (4), 507-529.

- Akbas, Ferhat, Ekkehart Boehmer, Bilal Erturk and Sorin Sorescu, 2017, "*Short Interest, Returns, and Information,*" **Financial Management**, 46(2), 455-486.

**REFEREED PUBLICATIONS (continued)**

- Sorescu, Alina and Sorin Sorescu, 2016, "*Customer Satisfaction and Long-Term Stock Returns*," **Journal of Marketing**, 80 (September), 110-115.

- Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2016, "*Capital Markets Efficiency and Arbitrage Efficacy,"* **Journal of Financial and Quantitative Analysis**, 51 (2), 387-413.

- Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2015, "*Smart Money, Dumb Money, and Equity Return Anomalies,"* **Journal of Financial Economics**, 118 (2), 355-382.

- Johnson, Shane, Theodore Moorman, and Sorin M. Sorescu, 2009, "*A Reexamination of Corporate Governance and Equity Prices*," **Review of Financial Studies**, 22 (11), 4753-4786.

- Boehme, Rodney D., Bartley R. Danielsen, Praveen Kumar, and Sorin M. Sorescu, 2009, "*Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) Meets Miller (1977),"* **Journal of Financial Markets**, 12 (3), 438-468.

- Kumar, Praveen, Sorin M. Sorescu, Rodney D. Boehme, and Bartley R. Danielsen, 2008, "*Estimation Risk, Information, and the Conditional CAPM*," **Review of Financial Studies**, 21 (3), 1037-1076. Leading article.

- Kolari, Jim, Theodore Moorman, and Sorin M. Sorescu, 2008, "*Foreign Exchange Risk and the Cross- Section of Stock Returns,"* **Journal of International Money and Finance**, 27 (7), 1074-1097.

- Boehme, Rodney D., Bartley R. Danielsen, and Sorin M. Sorescu, 2006, "*Short-sale Constraints, Dispersion of Opinion and Overvaluation,"* **Journal of Financial and Quantitative Analysis**, 41 (2), 455-487.

- Sorescu, Sorin M., and Avanidhar Subrahmanyam, 2006, "*The Cross-Section of Analyst Recommendations*," **Journal of Financial and Quantitative Analysis**, 41 (1), 139-168.

- Boehme, Rodney, and Sorin M. Sorescu, 2002, "*The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?*," **Journal of Finance**, 57 (2), pp. 871-900.

- Danielsen, Bartley, and Sorin M. Sorescu, 2001, "*Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints*," **Journal of Financial and Quantitative Analysis**, 36 (4), pp. 451-484.

- De Young, Robert, William Lang, Mark J. Flannery, and Sorin M. Sorescu, 2001, "*The Information Content of Bank Exam Ratings and Subordinated Debt Prices*," **Journal of Money, Credit and Banking**, 33 (4), pp. 900-925.

- Sorescu, Sorin M., 2000, "*The Effect of Options on Stock Prices: 1973-1995*," **Journal of Finance**, 55 (1), pp. 487-514.

- Flannery, Mark J., and Sorin M. Sorescu, 1996, "*Evidence of Bank Market Discipline in Subordinated Debenture Yields: 1983-1991*," **Journal of Finance**, 51 (4), pp. 1347-1377.

**WORKING PAPERS**

- Flannery, Mark J. and Sorin M. Sorescu, 2024, *Partial Effects of Fed Tightening on U.S. Banks' Capital*.

- Kim, Hwagyun, Adam C. Kolasinski, Sang-Ook Shin, Sorin M. Sorescu, 2023, *Bank Runs, Ambiguity, and Stock Prices.*

**WORKING PAPERS (continued)**

- Kang, Le, Hwagyun Kim, Ju Hyun Kim, Seongjin Kim, and Sorin M. Sorescu, 2023, *How to (Properly) Compete Credit Default Swap Returns.*

**WORK IN PROGRESS**

- Large Language Models and Stock Returns (with Boone Bowles, Avanidhar Subrahmanyam, and Raymond Duch)
- US national debt and the value of the US dollar seigniorage
- Ownership form and outcomes in the healthcare industry
- Time series return predictability and asset allocation

**APPLIED RESEARCH – ENERGY PRICE INDEX**

- Baratsas, Stefanos, Christodoulos Floudas, Efstratios Pistikopoulos, and Sorin M. Sorescu, 2018, *Texas A&M Energy Price Index* (TEPI). Comprised of 56 different energy products, the TEPI measures changes in the price level of a representative basket of energy consumption from the perspective of the aggregate US consumer. In addition to the broader TEPI, we developed four sector-specific sub- indices, each of them focused on measuring changes in energy prices that are relevant to specific sectors of the economy:
  - Residential Energy Price Index
  - Transportation Energy Price Index
  - Commercial Energy Price Index
  - Industrial Energy Price Index.

**AWARDS AND HONORS**

- 2018      *Foreman R. and Ruby Bennett Chair in Business Administration*, Mays Business School, Texas A&M University
- 2016-2018      *Ruby and Earle A. Shields Jr. '41 Chair in Investment Advising,* Mays Business School, Texas A&M University
- 2017      *Selfless Service Resolution* passed by the Student Senate of Texas A&M University in recognition of 15 years of service to the university and its student body
- 2013      *Dan H. Robertson Outstanding MBA Faculty Member Award*, selected by MBA students as best teacher in the MBA Program, Texas A&M University
- 2007-2016      *Patricia and Bookman Peters Research Professorship*, Mays Business School, Texas A&M University
- 2003-2007      *Mays Research Fellow*, Mays Business School, Texas A&M University
- 2001-2002      *Bauer Faculty Fellow*, C.T. Bauer College of Business, University of Houston
- 2000      *MidCon Award* for Best Teaching Performance in the Executive MBA Program, C.T. Bauer College of Business, University of Houston
- 2000      *Melcher Teaching Fellow*, College of Business Administration, University of Houston
- 1999      *Melcher Research Fellow*, College of Business Administration, University of Houston
- 1998      *Melcher Teaching Fellow*, College of Business Administration, University of Houston
- 1998      *MidCon Award* for Best Teaching Performance in the Executive MBA Program, College of Business Administration, University of Houston
- 1996      *Presidential Recognition* for outstanding student, University of Florida
- 1995      *Doctoral Student Consortium Fellow*, Financial Management Association
- 1995      *Competitive Paper Award* for Best Paper in Financial Institutions, FMA.
- 1992-1995      *Competitive Doctoral Fellowship* from the Social Sciences and Humanities Research Council of Canada
- 1991      *McGill Associates Medal and Fellowship* for Best MBA Student, McGill University.

**INVITED PRESENTATIONS ACADEMIC**

- Federal Deposit Insurance Corporation, Spring 2023
- Office of the Comptroller of the Currency, Spring 2023
- Texas Tech University, Spring 2013
- University of Georgia, Spring 2010
- Florida State University, Spring 2010
- Tilburg University, Spring 2008
- University of Florida, Spring 2007
- University of Texas San Antonio, Fall 2006
- University of Kansas, Spring 2003
- Texas Christian University, Spring 2003
- Texas A&M University, Fall 2001
- Stockholm School of Economics, Fall 2000
- Swedish School of Economics and Business Administration, Fall 2000
- University of Houston, Spring 1996
- Rutgers University, Spring 1996
- University of Wisconsin – Milwaukee, Spring 1996
- Federal Reserve Bank of Chicago, Spring 1996
- Michigan State University, Fall 1995
- Laval University, Spring 1995.

**INVITED PRESENTATIONS – INVESTMENT PROFESSIONALS**

- National Association of State Retirement Administrators, Fort Lauderdale, FL, 2007
- The Chicago Quantitative Alliance spring meeting, Las Vegas, NV, 2008
- The Super Bowl of Indexing, Phoenix, AZ, 2008
- Macquarie Securities Seminar, New York, NY, 2009

**CONFERENCE PROCEEDINGS**

- De **Young**, Robert, William Lang, Mark J. Flannery, and Sorin M. Sorescu, 1998, "*Could Publications of Bank CAMEL Ratings Improve Market Discipline?* " <u>Proceedings of the 34th Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago</u>, pp. 402-421.

- Flannery, Mark J., and Sorin M. Sorescu, 1995, "*Pricing Bank Default Risk in Subordinated Debenture Yields*," <u>Proceedings of the 31st Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago</u>, pp. 459-482.

**CONFERENCE PRESENTATIONS**

- Akbas, Ferhat, William Armstrong, Sorin Sorescu and Avanidhar Subrahmanyam, "*Smart Money, Dumb Money, and Equity Return Anomalies,*" presented at the 2015 meetings of the <u>American Finance Association</u>, Boston, MA, January 2015.

- Akbas, Ferhat, William Armstrong, Sorin Sorescu and Avanidhar Subrahmanyam, "*Time Varying Market Efficiency,*" presented at the 2013 annual meetings of the <u>American Finance Association</u>, San Diego, CA, January 2013.

- Kumar, Praveen, Sorin M. Sorescu, Rodney D. Boehme and Bartley R. Danielsen, 2007, "*Estimation Risk, Information, and the Conditional CAPM,*" presented at the 2007 annual meetings of the <u>Western Finance Association</u>, Big Sky, Montana, 2007.

- Johnson, Shane, Theodore Moorman and Sorin M. Sorescu, 2006, "*Governance, Stock Returns, and Market Efficiency,*" presented at the 2007 annual meetings of the <u>American Finance Association</u>, Chicago, IL, January 2007.

**CONFERENCE PRESENTATIONS (continued)**

- Kolari, Jim, Theodore Moorman and Sorin M. Sorescu, 2006, "*Foreign Exchange Risk and the Cross- Section of Stock Returns,*" presented at the 2006 meetings of the <u>Financial Management Association</u>, Salt Lake City, UT, October 2006.

- Boehme, Rodney D., Bartley R. Danielsen Praveen Kumar, and Sorin M. Sorescu, 2006, "*Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) meets Miller (1977),*" presented at the 2006 annual meetings of the <u>Western Finance Association</u>, Keystone, CO, June 2006.

- Boehme, Rodney D., Bartley R. Danielsen, and *Sorin M. Sorescu, 2003, "Short Sale Constraints and Overvaluation," presented at the 2003 meeti*ngs of the <u>American Finance Association</u>, Washington, DC, January 2003.

- Boehme, Rodney D., Bartley R. Danielsen, and Sorin M. Sorescu, 2002, "*Long-Term Performance after Stock Splits: Underreaction or Market Friction?*" presented at the 2002 meetings of the <u>Financial Management Association</u>, San Antonio, TX, October 2002.

- Boehme, Rodney, and Sorin M. Sorescu, 2000, "*The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?,*" presented at the October 2000 Annual Meetings of the <u>Financial Management Association</u>, Seattle, Washington.

- Boehme, Rodney, and Sorin M. Sorescu, 2000, "*The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?,*" presented at the August 2000 Annual Meetings of the <u>European Finance Association</u>, London, United Kingdom. on <u>SSRN's Top Ten download lists</u> for *Capital Markets: Market Efficiency*, *FEN Conferences and Meetings*, and *European Finance Association Meetings 2000*

- Danielsen, Bartley, and Sorin M. Sorescu, 2000, "*Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints*," presented at the October 2000 Annual Meetings of the <u>Financial Management Association</u>, Seattle, Washington.

- Ramchand, Latha, and Sorin M. Sorescu, 2000, "*Long Run Stock Returns Following Equity Offerings: A Study of Global Equity Offers by U.S. Firms*," presented at the October 2000 Annual Meetings of the <u>Financial Management Association</u>, Seattle, Washington.

- Danielsen, Bartley, and Sorin M. Sorescu, 2000, "*Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints*," presented (by co-author) at the April 2000 Annual Meetings of the <u>Midwest Finance Association</u>, Chicago, Illinois.

- DeYoung, Robert, Mark J. Flannery, William Lang, and Sorin M. Sorescu, 1998, "*The Informational Advantage of Specialized Monitors: The Case of Bank Examiners*," presented at the June 1998 Annual Meetings of the <u>Western Economic Association</u>, Lake Tahoe, Nevada.

- DeYoung, Robert, Mark J. Flannery, William Lang, and Sorin M. Sorescu, 1998, "*Could Publications of Bank CAMEL Ratings Improve Market Discipline*?," presented at Federal Reserve Bank of Chicago 34th Annual Conference on Bank Structure and Competition, May 1998, Chicago, Illinois.

- Sorescu, Sorin M., 1996, "*The Price Effect of Option Introductions*: 1973-1992," presented at the 1996 Annual Meetings of the <u>Financial Management Association</u>, New Orleans, Louisiana.

- Flannery Mark J., and Sorin M. Sorescu, 1995, "*Evidence of Bank Market Discipline in Subordinated Debenture Yields: 1983-1991*," presented at the October 1995 Annual Meetings of the <u>Financial Management Association</u>, New York City, New York, <u>Winner of the 1995 FMA Award for Best Paper in Financial Institutions.</u>

- Flannery, Mark J., and Sorin M. Sorescu, 1995, "*Pricing Bank Default Risk in Subordinated Debenture Yields,*" presented at the Federal Reserve Bank of Chicago 31st Annual Conference on Bank Structure and Competition, May 1995, Chicago, Illinois.

**TEACHING EXPERIENCE**

**Undergraduate Level**

- Hedge Funds (includes managing of a $4 million student-managed fund), 2024-2025
- Study-Abroad European Investment Management Class, 2023-2025
- Financial Markets and Institutions, Texas A&M University, 2017, 2018, 2020, 2023
- Aggies on Wall Street, Texas A&M University, 2014, 2015, 2016
- Trading and Active Management, Texas A&M University, 2008
- Introduction to Trading and Investments, Texas A&M University, 2011
- Investments, Texas A&M University, 2006, 2008
- Advanced Corporate Finance, University of Florida, 1995-1996
- Financial Markets and Institutions, University of Houston, 1996-2002.
- Maroon Fund, 2013-2015.

**MBA Level**

- Macro-Economics, Texas A&M University, 2012
- Investments, Texas A&M University, 2010
- Advanced Corporate Finance, University of Houston, 1998
- Financial Markets, University of Houston, 1996-2001.

**MS Level**

- Advanced Corporate Finance, Texas A&M University, 2002-2004.
- Energy Finance, Texas A&M University, 2024-2025

**Executive and Professional MBA Level**

- Executive Seminar in Commercial Banking, Texas A&M University, 2023
- Investments, Texas A&M University, 2010
- Corporate Finance and Financial Markets, University of Houston, 1998-2002.
- Corporate Finance, Texas A&M University, 2013, 2014
- Corporate Finance and Valuation, Texas A&M University, 2015

**Doctoral Level**

- Empirical Research Seminar in Financial Markets, University of Houston, 1999, 2001.
- Empirical Research Seminar in Asset Pricing, Texas A&M University, 2004, 2006.

**ADMINISTRATIVE EXPERIENCE**

- Director of the *Adam C. Sinn '00 Center for Investment Management*, since February 2023

  o Supports high-impact educational programs in the department that are related to investment management.

  o Supports academic research in all areas of investment management with an emphasis on AI.

  o Oversees a student-managed hedge fund that is authorized to trade short positions, options, and futures; the fund offers a laboratory for students and faculty to test new investment strategies.

**ADMINISTRATIVE EXPERIENCE (continued)**

- Interim Executive Associate Dean, September 2020 to January 2023
    - Assisted the Head of the Department of Finance with raising $20 million from Mr. Adam C. Sinn `00.
    - Facilitated recruitment of 11 new tenured/tenure-track faculty positions and nine new academic professional track faculty at Mays.
    - Prepared a five-year BBA enrollment growth plan for the university and obtained funding for the first of the five years
    - Assisted with the building expansion of the Mays Business Education Complex
    - Worked collaboratively with relevant stakeholders to recommend an optimal allocation of space in our existing building as well as in the proposed building expansion
    - Worked with the Provost's Office to secure over $2 million in increased base funding for Mays during FY2022
    - Worked with the Dean to rewrite the Mays Faculty Evaluation Guidelines
    - Facilitated an estate gift in the amount of $1.2 million for the Center for Retailing Studies
    - Improved work efficiency at Mays by implementing several electronic workflows using DocuSign, including memos addressed to the Provost or Dean of Faculties, Entry/Exit Forms, and External Employment authorizations
    - Managed Mays' compliance with COVID guidelines, including Alternate Work Locations
    - Managed Mays' compliance with university guidelines about Conflict of Commitment
    - Worked with relevant stakeholders to select an architect and construction manager for the Mays building expansion
    - Facilitated the review process for the following Mays centers: CMIS, CHRM, CIBS, CED, CRS
    - Facilitated the review process for several endowed positions including renewals and new appointments
    - Conducted several training sessions with Mays staff pertaining to the use of Interfolio for faculty hires and for promotion and tenure cases
- Head of the Department of Finance, January 2009 to August 2020
    - Increased departmental budget from $4 million to $10 million per year
    - Hired 13 tenured/tenure track and 14 academic professional track faculty members
    - Increased the departmental endowment by over $12 million
    - Initiated or facilitated the creation of new revenue programs, industry partnerships, and philanthropic giving, resulting in significant new additional revenues for the department
- Director of the Finance Ph.D. Program, Mays Business School, Texas A&M University, Sept 2003 - June 2006, and January 2008 to December 2008

**PROFESSIONAL SERVICE**

- Member of the advisory board of the Texas A&M Energy Institute (2018 to present)
- Member of the team that created the Energy Price Index (2016-2021)

PAGE 57

**PROFESSIONAL SERVICE (continued)**

- Member of the advisory board of the Innovation Partners (2019 to present)

- Member of a university committee charged with establishing a faculty code of conduct at Texas A&M University (2019-2020)

- Member of the advisory board of ADVANCE, a unit of Texas A&M University whose mission is to promote improvement of workplace climate, recruitment, and retention of faculty (2020 to present)

- Member of the task force charged with developing the Program of Requirements for the Mays Business Education Complex (2018-2020)

- Chair or co-chair of the PhD Advisory Committee for Ferhat Akbas (2008-2011), Alex Petkevich (2008-2011), Ted Moorman (2003-2005), Bilal Erturk (2003-2006), and Will Armstrong (2009-2012)

- Member of the Ph.D. Advisory Committee for Daniel Chi (2003-2005) and Ariel Viale (2003-2006)

- Regents Scholar Mentor, Mays Business School, Texas A&M University (2006-2007)

- Chair of the faculty search committee, Mays Business School, Texas A&M University (2002-2003)

- Member of the faculty search committee, Finance Department, Mays Business School, Texas A&M University (2003-2007)

- Organized the Finance seminar series, Finance Department, Mays Business School (2002-2003)

- Doctoral student initial placement
  - *Will Armstrong,* Texas Tech
  - *Ferhat Akbas,* Kansas
  - *Bilal Erturk,* Oklahoma State
  - *Ted Moorman*, University of New Hampshire

- Referee for peer-reviewed journals
  - *Journal of Finance*
  - *Review of Financial Studies*
  - *Journal of Financial Markets*
  - *Journal of Money, Credit, and Banking*
  - *Journal of Financial Intermediation*
  - *Journal of Financial and Quantitative Analysis*
  - *Financial Management*
  - *Financial Review*
  - *Quarterly Review of Economics and Finance*
  - *Journal of Financial Research*

- Member of the program committee
  - *Eastern Finance Association, 1999-2001*
  - *Financial Management Association, 2003, 2005, 2009-2014*
  - *Western Financial Association 2011-2014, 2016-2017*

- Conference discussant:
  - *American Finance Association*
  - *NBER*
  - *Eastern Finance Association*
  - *European Finance Association*
  - *Financial Management Association*
  - *ITAM Asset Pricing Conference, Mexico City*

**EXECUTIVE TRAINING AND PRESENTATIONS**

- Presented a session on market risk to commercial banking executives as part of a seminar sponsored jointly by Mays Business School and the Risk Management Association, 2023
- Prepared and presented a course in Energy Finance for King Abdulah Petroleum Studies and Research Center (KAPSARC) in Riyadh, Saudi Arabia, September 2023
- Gerson Lehrman Group, 2007-2009
- El Paso Energy, Houston, TX, 2000-2002
- Shell Oil, Houston, TX, 1998-2000

**EXPERT WITNESS / CONSULTING EXPERIENCE**

- *PWCM Master Fund Ltd., Pentwater Equity Opportunities Master Fund Ltd., LMA SPC for and on behalf of MAP 98 Segregated Portfolio, and Pentwater Unconstrained Master Fund Ltd., v. The Boeing Company, Dennis A. Muilenburg, and Gregory D. Smith (2025)* - consulting expert in a security fraud litigation, retained by counsel for the plaintiff to advise on matters related to market efficiency and damages.

- *Continental General Insurance Company and Percy Rockdale, LLC, Individually and on Behalf of All Others Similarly Situated v. Sigurdur Olafsson, Bryan M. Reasons, and Paul Bisaro (2025)* - consulting expert in a class action lawsuit, retained by counsel for the plaintiff to determine if the stock price of Mallinckrodt traded in an efficient market.

- *Oklahoma Firefighters Pension and Retirement System et al v. Six Flags Entertainment Corporation (2024)* - consulting expert in a class action lawsuit, retained by counsel for the plaintiff to determine if the stock price of Six Flags traded in an efficient market.

- *Mohammed Usman Ali et al. v. Franklin Wireless Corp., O.C. Kim, and David Brown (2022)* – consulting expert in a class action lawsuit, retained by counsel for the plaintiff to determine if the stock price of Franklin Wireless traded in an efficient market.

- *ForesTech Energy, LLC v. German Pellets Texas LLC, German Pellets Holding USA, Inc, and German Pellets GmbH (2015)*—consulting expert on valuation of a wood pellet mill and associated equity claims. Attorneys: Orgain, Bell, & Tucker, Beaumont, TX. Retained by counsel for the plaintiff to prepare expert report. Case settled before deposition.

- *Houston Police Officers Pension System v. State Street Bank and Trust (2009-2012)*—consulting expert on matters related to disclosure in a case involving subprime mortgage-backed securities. Attorneys: Ropes and Gray, Boston, MA. Retained by counsel for the defendant to prepare expert report. Testified at deposition in May 2010. Case settled before trial.

- *Memorial Hermann Hospital System v. State Street Bank and Trust (2009-2012)*—consulting expert on matters related to disclosure in a case involving subprime mortgage-backed securities. Attorneys: Ropes and Gray, Boston, MA. Retained by counsel for the defendant to prepare expert report. Testified at deposition in May 2010. Case settled before trial.

- *Securities and Exchange Commission v. Rose et al. (2006-2007)*—consulting expert in a case involving manipulation of security prices by traders. Attorneys: SEC Central Regional Office, Denver, CO. Retained by counsel for the plaintiff. Prepared expert report and testified in Federal Court (Houston, TX) in April 2007.

**PERSONAL**

- Married, two children
- US Citizen
- Foreign languages: fluent in French and Romanian, conversational in Spanish, beginner Italian

APPENDIX B

**Materials Considered**

**Case Documents:**
- Class Action Complaint (Doc. No. 1), dated October 20, 2023.
- Decision and Order Denying PwC's Motion To Dismiss, Granting in Part and Denying in Part the CS Defendants' Motion to Dismiss, Granting Diabat's Motion to Certify a Class, and Granting in Part and Denying in Part the CS Defendants' Motion to Consolidate (Doc. No. 34), dated July 7, 2025.
- Expert Report of Matthew D. Cain, PhD (Doc. No. 128-1), dated December 13, 2024.

**Court Decisions and Securities Law:**
- *Ali v. Franklin Wireless Corp. et al,* 3:21-cv-00687 (S.D.C.A. 2021).
- *Basic Inc. v. Levinson*, 485 U.S. 224, (1988).
- *Bond v. Clover Health Investments*, Corp., et al., 2023 WL 1999859 (M.D. Tenn. Feb. 14, 2023).
- *Bromberg & Lowenfels*, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).
- *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, (2014).
- *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).
- *In re Glob. Brokerage, Inc.,* No. 17-CV-916 (RA) (BCM), 2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021).
- *In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, No. 17-CV-916 (RA) (BCM), 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021).
- *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).
- *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y. 2016).
- *In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).
- *In re: QuantumScape Securities Class Action Litigation*, 2022 WL 17974629 (N.D. Cal. Dec. 19, 2022).
- *In re Teva Sec. Litig.*, No. 3:17-CV-558 (SRU), 2021 WL 872156 (D. Conn. Mar. 9, 2021).
- *In re: Under Armour Securities Litigation,* 631 F.Supp.3d 285, 311-12 (D. Md. 2022).
- *In re Vale S.A. Sec. Litig.*, No. 19-cv-526 (RJD) (SJB), 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022).
- *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 759 (S.D.N.Y. 2025).
- *Krogman v. Sterritt*, 202 F.R.D. 467, at 477 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

**Academic Literature:**
- Akbas, F., Armstrong, W., Sorescu, S., & Subrahmanyam, A. (2015). Smart Money, Dumb Money, and Equity Return Anomalies. *Journal of Financial Economics*, *118*, 355-382.

- Akbas, F., Armstrong, W. J., Sorescu, S. & Subrahmanyam, A. (2016). Capital Market Efficiency and Arbitrage Efficacy, *Journal of Financial and Quantitative Analysis*, *51*(2), 387-413.
- Amihud, Y., & Mendelson, H. (1986). Asset Prices and the Bid-Ask Spread. *Journal of Financial Economics*, *17*(2) 223-249.
- Asquith, P., Pathak, P. A., & Ritter, J. R. (2005). Short Interest, Institutional Ownership, and Stock Returns. *Journal of Financial Economics*, *78*(2), 243-276.
- Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56.
- Barber, B. M., Griffin, P. A., & Lev, Baruch. (1994). The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporation Law*, *19*(2), 285-312.
- Bhole, B., Surana, S., & Torchio, F. (2020). Benchmarking market efficiency indicators for securities litigation. U. Ill. L. Rev. Online, 96-116.
- Boehme, R. D., & Sorescu, S. M. (2002). The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?. *Journal of Finance*, *57*(2), 871-900.
- Boehme, R. D., Danielsen, B. R., Kumar, P., & Sorescu, S. M. (2009). Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) Meets Miller (1977). *Journal of Financial Markets*, *12*(3), 438-468.
- Boudoukh, J., Feldman, R., Kogan, S., & Richardson, M. (2019). Information, Trading, and Volatility: Evidence from Firm-Specific News. *The Review of Financial Studies*, *32*(3), 992-1033.
- Bradshaw, M. T., & and Call, A. C. (2025). The Role of Analysts in the Financial Reporting Environment. In W. Ge, A. Koester, & S. McVay (Eds.), *Handbook on the Financial Reporting Environment* (chapter 17, forthcoming). Edward Elgar Publishing Ltd.
- Danielsen, B. R., & Sorescu, S. M. (2001). Why Do Option Introductions Depress Stock Prices? A Study of Diminishing Short Sale Constraints. *Journal of Financial and Quantitative Analysis*, *36*(4), 451–484.
- Fair, R. C. (2002). Events That Shook the Market. *The Journal of Business*, *75*(4), 713-731, at 713-714.
- Fama, E. F. (1970). Efficient Capital Markets: A Review of Theory and Empirical Work. *Journal of Finance*, *25*(2), 383–417.
- Fama, E. F. (1991). Efficient Capital Markets: II. *Journal of Finance*, *46*(5), 1575-1617.
- Fama, E. F. (1998). Market Efficiency, Long-Term Returns, and Behavioral Finance. *Journal of Financial Economics*, *49*(3), 283-306.
- Goldstein, M. A. and Hotchkiss, E. S. (2020). Providing Liquidity in an Illiquid Market: Dealer Behavior in US Corporate Bonds. *Journal of Financial Economics, 135*(1), 16–40.
- Hou, K., Xue, C., & Zhang, L. (2020). Replicating Anomalies. *Review of Financial Studies*, *33*(5), 2019-2133.
- Johnson, S. A., Moorman, T. C., & Sorescu, S. (2009). A Reexamination of Corporate Governance and Equity Prices. *Review of Financial Studies*, *22*(11), 4753-4786.

- Lee, C. M., & So, E. C. (2017). Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics*, *124*(2), 331-348.
- MacKinlay, A. C. (1997). Event Studies in Economics and Finance. *Journal of Economic Literature*, *35*(1), 13-39.
- Miller, D. P. and Puthenpurackal, J. J. (2005). Security Fungibility and the Cost of Capital: Evidence from Global Bonds. *The Journal of Financial and Quantitative Analysis, 40*(4), 849-872.
- Mitchell, M. L., & Netter, J. M. (1994). The role of financial economics in securities fraud cases: applications at the securities and exchange commission. *Business Lawyer*, *49*(2), 545-590.
- Mola, S., Rau, P. R., & Khorana, A. (2013). Is There Life After the Complete Loss of Analyst Coverage?. *The Accounting Review*, *88*(2), 667-705.
- Pottmeyer, A., and Heidorn, T. (2020). Introduction of Additional Tier 1 Capital. *Frankfurt School - Working Paper Series*, 229.
- Sorescu, S., & Subrahmanyam, A. (2006), The Cross-Section of Analyst Recommendations, *Journal of Financial and Quantitative Analysis*, *41*(1), 139-168.
- Thomas, R. S., & Cotter, J. F. (2000). Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems*, *63*(3), 105-122, at 108.
- Vega, C. (2006). Stock Price Reaction to Public and Private Information. *Journal of Financial Economics 82*(1), 103-133.
- Villanueva, O. M., & Feinstein, S. (2021). Stock Price Reactivity to Earnings Announcements: The Role of The Cammer/Krogman Factors. *Review of Quantitative Finance and Accounting*, *57*(1), 203-234.

**Analyst Reports:**
- Barclays, "AT1 issuance costs and SNB changes," June 17, 2022.
- J.P. Morgan, "The Financials Statement: Insurance Conference Takeaways and other Banks and Insurance newsflow," June 24, 2022.
- J.P. Morgan, "Debit Suisse," October 5, 2022.
- J.P. Morgan, "Trade Idea: Value In Short-Call AT1 And Short-End HoldCo Senior", October 28, 2022.
- RBC Capital Markets, "Reinstating coverage at Sector Perform," December 19, 2022.

**Data Sources:**
- Bloomberg.
- Dow Jones Factiva.
- Investext.
- LSEG Workspace.
- SEC Edgar Online.
- Credit Suisse Earnings Releases and SEC Filings.
- Data files provided by Counsel for Lead Plaintiff from FINRA pursuant to a document subpoena:
  - 22546DAB2 FINRA CONFIDENTIAL.xlsx
  - 225401AJ7 FINRA CONFIDENTIAL.xlsx

- 225401AK4 FINRA CONFIDENTIAL.xlsx
- 225401AL2 FINRA CONFIDENTIAL.xlsx
- 225401AN8 FINRA CONFIDENTIAL.xlsx
- 225401AR9 FINRA CONFIDENTIAL.xlsx
- 225401AS7 FINRA CONFIDENTIAL.xlsx
- 225401AX6 FINRA CONFIDENTIAL.xlsx
- 225436AA2 FINRA CONFIDENTIAL.xlsx
- H9200RAA9 FINRA CONFIDENTIAL.xlsx
- H3698DBZ6 FINRA CONFIDENTIAL.xlsx
- H3698DCP7 FINRA CONFIDENTIAL.xlsx
- H3698DCV4 FINRA CONFIDENTIAL.xlsx
- H3698DDA9 FINRA CONFIDENTIAL.xlsx
- H3698DDD3 FINRA CONFIDENTIAL.xlsx
- H3698DDQ4 FINRA CONFIDENTIAL.xlsx
- H3698DDY7 FINRA CONFIDENTIAL.xlsx

**Other:**
- Bloomberg Law. *Rule 144A/Reg S Debt Offering (Practice Points).*
- Bloomberg L.P. (2011, April). *BVAL Pricing Methodology for Government, Supranational, Agency & Corporate Bonds*.
- International Capital Market Association. (2020, March). *Time to act: ICMA's 3rd study into the state and evolution of the European investment grade corporate bond secondary market.*
- Securities Industry and Financial Markets Association. (2008, October). *SIFMA Guidance: Procedures, Covenants, and Remedies in Light of Revised Rule 144.*
- https://www.bis.org/basel_framework/chapter/CAP/10.htm.
- https://www.bis.org/bcbs/basel3.htm?m=76.
- https://www.federalreserve.gov/supervisionreg/basel/basel-default.htm.
- https://www.finma.ch/en/news/2023/03/20230319-mm-cs-ubs/.
- https://www.sifma.org/resources/general/us-holiday-archive/.
- https://web.archive.org/web/20221015023441/https://www.nyse.com/markets/hours-calendars.
- All other documents cited or referred to within this report.

**EXHIBIT 1**

## Credit Suisse AT1 Bonds Average Weekly Trading Volume During the Class Period

| Week | 2013 7.5% Bond | | 2014 6.25% Bond | | 2018 7.5% Bond | | 2018 7.25% Bond | | 2019 6.375% Bond | |
|---|---|---|---|---|---|---|---|---|---|---|
| | H9200RAA9 | 22546DAB2 | H3698DAL8 | 225436AA2 | H3698DBW3 | 225401AJ7 | H3698DBZ6 | 225401AK4 | H3698DCP7 | 225401AL2 |
| 0 | 5.2% | 1.0% | 2.3% | 0.3% | 4.9% | 4.0% | 2.4% | 1.4% | 1.8% | 0.3% |
| 1 | 1.6% | 1.7% | 0.7% | 0.0% | 0.4% | 0.1% | 0.6% | 0.5% | 0.7% | 0.0% |
| 2 | 2.5% | 2.0% | 0.8% | 0.1% | 0.4% | 0.1% | 1.8% | 0.4% | 0.4% | 0.2% |
| 3 | 0.4% | 0.0% | 0.4% | 0.0% | 0.1% | 0.0% | 0.8% | 0.5% | 0.9% | 0.8% |
| 4 | 2.8% | 0.7% | 1.2% | 1.3% | 1.5% | 0.1% | 2.6% | 1.0% | 1.8% | 0.1% |
| 5 | 3.2% | 2.9% | 1.0% | 1.1% | 1.2% | 1.4% | 2.8% | 0.1% | 3.5% | 0.0% |
| 6 | 1.0% | 2.6% | 0.3% | 0.4% | 1.0% | 0.1% | 0.8% | 0.3% | 0.6% | 0.0% |
| 7 | 0.1% | 0.5% | 0.1% | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% | 0.1% | 0.0% |
| 8 | 0.1% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% | 0.1% | 0.0% |
| 9 | 0.4% | 0.0% | 0.6% | 1.0% | 0.5% | 1.1% | 0.6% | 0.1% | 0.3% | 0.2% |
| 10 | 1.3% | 0.0% | 2.3% | 0.2% | 1.9% | 0.7% | 0.5% | 0.0% | 0.9% | 0.0% |
| 11 | 1.6% | 0.6% | 1.6% | 0.4% | 1.0% | 0.0% | 0.3% | 0.4% | 0.4% | 0.3% |
| 12 | 0.9% | 0.4% | 0.7% | 0.0% | 1.1% | 0.4% | 6.3% | 0.7% | 0.5% | 0.5% |
| 13 | 0.9% | 0.0% | 0.7% | 0.1% | 0.7% | 0.1% | 1.3% | 1.0% | 0.1% | 0.0% |
| 14 | 3.0% | 3.2% | 1.1% | 0.3% | 5.4% | 0.5% | 4.7% | 0.0% | 0.4% | 0.0% |
| 15 | 2.3% | 0.9% | 1.3% | 0.5% | 1.3% | 0.2% | 1.9% | 0.1% | 0.8% | 0.0% |
| 16 | 0.8% | 0.2% | 0.9% | 0.9% | 0.3% | 0.1% | 0.8% | 0.0% | 0.4% | 0.0% |
| 17 | 0.5% | 0.6% | 1.1% | 0.4% | 1.7% | 0.0% | 1.5% | 0.0% | 2.4% | 0.0% |
| 18 | 3.2% | 3.5% | 7.1% | 7.6% | 7.1% | 3.2% | 4.0% | 2.0% | 6.3% | 3.0% |
| 19 | 15.0% | 1.3% | 39.8% | 13.6% | 21.8% | 0.4% | 23.4% | 1.5% | 23.4% | 0.3% |
| **Average** | **2.3%** | **1.1%** | **3.2%** | **1.4%** | **2.6%** | **0.6%** | **2.9%** | **0.5%** | **2.3%** | **0.3%** |
| **Average excl. last Week** | **1.7%** | **1.1%** | **1.3%** | **0.8%** | **1.6%** | **0.6%** | **1.8%** | **0.4%** | **1.2%** | **0.3%** |

| Week | 2020 5.1% Bond | | 2020 5.25% Bond | | 2020 4.5% Bond | | 2022 9.75% Bond | |
|---|---|---|---|---|---|---|---|---|
| | H3698DCV4 | 225401AN8 | H3698DDA9 | 225401AR9 | H3698DDD3 | 225401AS7 | H3698DDQ4 | 225401AX6 |
| 0 | 1.4% | 0.0% | 0.4% | 0.6% | 0.6% | 0.0% | 2.6% | 0.7% |
| 1 | 0.1% | 0.0% | 1.7% | 0.2% | 0.3% | 0.0% | 4.4% | 0.9% |
| 2 | 1.0% | 0.0% | 1.3% | 0.5% | 1.3% | 0.0% | 2.1% | 0.3% |
| 3 | 2.3% | 0.3% | 3.3% | 0.0% | 0.2% | 0.0% | 1.4% | 0.2% |
| 4 | 1.9% | 0.4% | 5.1% | 0.9% | 1.0% | 0.0% | 4.4% | 2.2% |
| 5 | 0.8% | 0.0% | 4.8% | 0.0% | 0.7% | 0.0% | 8.3% | 2.4% |
| 6 | 0.4% | 0.0% | 0.1% | 0.0% | 1.8% | 0.0% | 4.2% | 1.7% |
| 7 | 0.3% | 0.0% | 0.3% | 0.2% | 1.4% | 0.0% | 1.3% | 0.7% |
| 8 | 0.1% | 0.0% | 0.0% | 0.0% | 0.4% | 0.0% | 0.7% | 0.0% |
| 9 | 0.4% | 0.0% | 0.5% | 0.0% | 0.0% | 0.0% | 2.5% | 1.8% |
| 10 | 0.7% | 0.0% | 0.5% | 0.0% | 1.2% | 0.0% | 6.6% | 3.2% |
| 11 | 0.4% | 0.0% | 1.0% | 0.0% | 0.3% | 0.0% | 1.8% | 0.0% |
| 12 | 0.6% | 0.0% | 3.2% | 0.5% | 0.6% | 0.0% | 1.9% | 0.4% |
| 13 | 0.3% | 0.0% | 0.9% | 0.1% | 0.2% | 0.0% | 2.7% | 0.7% |
| 14 | 1.0% | 0.0% | 0.3% | 0.0% | 0.3% | 0.0% | 2.2% | 1.3% |
| 15 | 0.2% | 0.0% | 0.8% | 1.1% | 0.1% | 0.1% | 2.4% | 0.6% |
| 16 | 1.0% | 0.0% | 0.8% | 1.2% | 0.4% | 0.0% | 0.9% | 1.8% |
| 17 | 0.2% | 0.0% | 0.3% | 0.0% | 0.2% | 0.0% | 1.2% | 1.7% |
| 18 | 3.2% | 0.4% | 4.4% | 2.3% | 2.9% | 2.6% | 7.0% | 11.1% |
| 19 | 10.4% | 0.1% | 21.8% | 10.0% | 22.4% | 4.8% | 36.0% | 1.2% |
| **Average** | **1.3%** | **0.1%** | **2.6%** | **0.9%** | **1.8%** | **0.4%** | **4.7%** | **1.7%** |
| **Average excl. last Week** | **0.9%** | **0.1%** | **1.6%** | **0.4%** | **0.7%** | **0.1%** | **3.1%** | **1.7%** |

Notes: In this analysis, a trading week consists of five consecutive trading days, which may not follow the calendar week. Since the last week consists of two trading days, I scale the volume in that week by 2.5 to get a comparable measure for the average weekly trading volume. Data Sources: Bloomberg.

PAGE 65

**EXHIBIT 2**

**Summary of Analyst Reports Issued for Credit Suisse During the Class Period**

**October 27, 2022 – March 20, 2023**

| | Analyst Name | No. of Reports Issued |
|---|---|---|
| [1] | JPMorgan | 14 |
| [2] | Kepler Cheuvreux | 13 |
| [3] | RBC Capital Markets | 8 |
| [4] | Jefferies | 7 |
| [5] | JPMorgan Econ & FI | 7 |
| [6] | Keefe, Bruyette & Woods Europe | 7 |
| [7] | Barclays | 6 |
| [8] | Deutsche Bank | 6 |
| [9] | Morgan Stanley | 6 |
| [10] | CFRA Equity Research | 5 |
| [11] | Moody's Investors Services | 4 |
| [12] | BNP Paribas Exane | 3 |
| [13] | HSBC Global Investment Research | 3 |
| [14] | Landesbank Baden-Wuerttemberg | 3 |
| [15] | ODDO BHF | 3 |
| [16] | SBG Securities | 2 |
| [17] | Banco Santander | 1 |
| [18] | Commerzbank Corporate Clients | 1 |
| [19] | Societe Generale | 1 |
| [20] | Stifel Nicolaus and Company, Incorporated | 1 |
| [21] | UBS Equities | 1 |
| | **Total** | **102** |

Data Source: LSEG Workspace, Investext.

**EXHIBIT 3**

## Credit Ratings of Credit Suisse AT1 Bonds

| AT1 Bond | CUSIP | Rating Agency | Rating on 10/27/2022 | Rating Changes Between 10/27/22 and 03/20/2023[169] | Rating on 03/20/2023 |
|---|---|---|---|---|---|
| 2013 7.5% | H9200RAA9 | DBRS Morningstar | BBBHu | BBBu (11/02/2022); BBHu (03/16/2023) | BBHu |
|  | 22546DAB2 | Fitch | BB- |  | BB- |
|  |  | Standard & Poor's | BB- | B+ (11/01/2022); C (03/20/2023) | C |
| 2014 6.25% | 225436AA2 | Fitch | BB- |  | BB- |
|  | H3698DAL8 | Standard & Poor's | BB- | B+ (11/01/2022); C (03/20/2023) | C |
| 2018 7.5% | H3698DBW3 | Fitch | BB- |  | BB- |
|  | 225401AJ7 | Moody's | Ba3u (hyb) | B1u (hyb) (11/01/2022); Cu (hyb) (03/20/2023) | Cu (hyb) |
|  |  | Standard & Poor's | B+ | B (11/01/2022); C (03/20/2023) | C |
| 2018 7.25% | H3698DBZ6 | Fitch | BB- |  | BB- |
|  | 225401AK4 | Moody's | Ba3u (hyb) | B1u (hyb) (11/01/2022); Cu (hyb) (03/20/2023) | Cu (hyb) |
|  |  | Standard & Poor's | B+ | B (11/01/2022); C (03/20/2023) | C |
| 2019 6.375% | H3698DCP7 | Fitch | BB- |  | BB- |
|  | 225401AL2 | Moody's | Ba3u (hyb) | B1u (hyb) (11/01/2022); Cu (hyb) (03/20/2023) | Cu (hyb) |
|  |  | Standard & Poor's | B+ | B (11/01/2022); C (03/20/2023) | C |
| 2020 5.1% | H3698DCV4 | Fitch | BB- |  | BB- |
|  | 225401AN8 | Moody's | Ba3u (hyb) | B1u (hyb) (11/01/2022); Cu (hyb) (03/20/2023) | Cu (hyb) |
|  |  | Standard & Poor's | B+ | B (11/01/2022); C (03/20/2023) | C |
| 2020 5.25% | 225401AR9 | Fitch | BB- |  | BB- |
|  | H3698DDA9 | Moody's | Ba3u (hyb) | B1u (hyb) (11/01/2022); Cu (hyb) (03/20/2023) | Cu (hyb) |
|  |  | Standard & Poor's | B+ | B (11/01/2022); C (03/20/2023) | C |
| 2020 4.5% | H3698DDD3 | Fitch | BB- |  | BB- |
|  | 225401AS7 | Moody's | Ba3u (hyb) | B1u (hyb) (11/01/2022); Cu (hyb) (03/20/2023) | Cu (hyb) |
|  |  | Standard & Poor's | B+ | B (11/01/2022); C (03/20/2023) | C |

[169] The effective date of each rating change is shown in parentheses.

| | | | | | |
|---|---|---|---|---|---|
| 2022 9.75% | H3698DDQ4 | Fitch | BB- | | BB- |
| | 225401AX6 | Standard & Poor's | B+ | B (11/01/2022); C (03/20/2023) | C |

Notes: I used Bloomberg's DES function to access the 'Bond Ratings' page for each Credit Suisse AT1 bond. I only report ratings provided by Nationally Recognized Statistical Rating Organizations (NRSROs).

Data Sources: Bloomberg.

**EXHIBIT 4**

**Market Makers of Credit Suisse AT1 Bonds**

| Count | 2013 7.5% Bond H9200RAA9 | 22546DAB2 | 2014 6.25% Bond 225436AA2 | 2018 7.5% Bond 225401AJ7 | 2018 7.25% Bond H3698DBZ6 | 225401AK4 | 2019 6.375% Bond H3698DCP7 | 225401AL2 |
|---|---|---|---|---|---|---|---|---|
| 1 | BCAP | BOFA | BCAP | BCAP | BCAP | BOFA | BCAP | GSCO |
| 2 | BOFA | CITI | BOFA | BOFA | BLTK | GSCO | BNDS | MSCO |
| 3 | CITI | GSCO | CITI | CITI | BNDS | JEFF | BOFA | |
| 4 | DBKS | HSBC | FBCO | GSCO | BOFA | PARI | CITI | |
| 5 | DEAN | JEFF | GSCO | JEFF | CBSE | | DEAN | |
| 6 | FBCO | MSCO | JEFF | PARI | CITI | | GSCO | |
| 7 | GSCO | PARI | MSCO | | DBKS | | JEFF | |
| 8 | IBKR | SAMI | PARI | | FBCO | | MKTX | |
| 9 | JEFF | | | | GSCO | | MSCO | |
| 10 | MKTX | | | | IBKR | | PARI | |
| 11 | MSCO | | | | IPGR | | UBSW | |
| 12 | PARI | | | | ITCM | | | |
| 13 | SAMI | | | | JEFF | | | |
| 14 | SSCO | | | | MKTX | | | |
| 15 | SUMI | | | | MSCO | | | |
| 16 | UBSW | | | | SSCO | | | |
| 17 | | | | | SUMI | | | |
| 18 | | | | | UBSW | | | |
| 19 | | | | | VMEX | | | |
| **Total** | **16** | **8** | **8** | **6** | **19** | **4** | **11** | **2** |

| Count | 2020 5.1% Bond | | 2020 5.25% Bond | | 2020 4.5% Bond | | 2022 9.75% Bond | |
|---|---|---|---|---|---|---|---|---|
| | H3698DCV4 | 225401AN8 | H3698DDA9 | 225401AR9 | H3698DDD3 | 225401AS7 | H3698DDQ4 | 225401AX6 |
| 1 | BNDS | | BCAP | BOFA | ANDB | BOFA | BNDS | BCAP |
| 2 | BOFA | | BNDS | DBKS | BNDS | JEFF | BOFA | BOFA |
| 3 | FBCO | | BOFA | GSCO | BOFA | | CITI | CITI |
| 4 | IBKR | | CITI | JEFF | FBCO | | DBKS | DBKS |
| 5 | JEFF | | GSCO | PARI | IBKR | | DEAN | FBCO |
| 6 | JPMS | | JEFF | | JEFF | | FBCO | GSCO |
| 7 | MKTX | | MKTX | | MKTX | | GSCO | JEFF |
| 8 | MSCO | | MSCO | | MSCO | | IBKR | MKTX |
| 9 | UBSW | | PARI | | SUMI | | JEFF | MSCO |
| 10 | | | UBSW | | UBSW | | JPMS | PARI |
| 11 | | | | | | | MAXM | SAMI |
| 12 | | | | | | | MKTX | |
| 13 | | | | | | | MSCO | |
| 14 | | | | | | | PARI | |
| 15 | | | | | | | SSCO | |
| 16 | | | | | | | UBSW | |
| **Total** | **9** | **0** | **10** | **5** | **10** | **2** | **16** | **11** |

Notes: For each Credit Suisse AT1 bond tranche, I classify a reporting entity as a market maker if it was reported 10 or more times as the "Report Side MPID" with a "Status" of "T" during the Class Period.

Data Source: Data files provided by Counsel for Lead Plaintiff from FINRA pursuant to a document subpoena: H3698DB26 FINRA CONFIDENTIAL.xlsx, H3698DCP7 FINRA CONFIDENTIAL.xlsx, H3698DCV4 FINRA CONFIDENTIAL.xlsx, H3698DDA9 FINRA CONFIDENTIAL.xlsx, H3698DDD3 FINRA CONFIDENTIAL.xlsx, H3698DDQ4 FINRA CONFIDENTIAL.xlsx, H3698DDY7 FINRA CONFIDENTIAL.xlsx, H9200RAA9 FINRA CONFIDENTIAL.xlsx, 22546DAB2 FINRA CONFIDENTIAL.xlsx, 225401AJ7 FINRA CONFIDENTIAL.xlsx, 225401AK4 FINRA CONFIDENTIAL.xlsx, 225401AL2 FINRA CONFIDENTIAL.xlsx, 225401AN8 FINRA CONFIDENTIAL.xlsx, 225401AR9 FINRA CONFIDENTIAL.xlsx, 225401AS7 FINRA CONFIDENTIAL.xlsx, 225401AX6 FINRA CONFIDENTIAL.xlsx, 225436AA2 FINRA CONFIDENTIAL.xlsx. I have not received TRACE data through this subpoena for the Credit Suisse AT1 tranches identified with CUSIPs H3698DAL8 and H3698DBW3.

PAGE 70

**EXHIBIT 5**

## Managers of Credit Suisse AT1 Bonds

| AT1 Bond | CUSIP | Underwriting Banks (Offering Document)[170] | Underwriting Banks (Bloomberg)[171] |
|---|---|---|---|
| 2013 7.5% | 225546DAB2 H9200RAA9 | **Joint Lead Managers**: Barclays, ING, Lloyds Bank, Natixis, Wells Fargo Securities<br>**Co-Managers**: Banco Bilbao Vizcaya Argentaria, S.A., BB Securities, BMO Capital Markets, BNY Mellon Capital Markets LLC, BofA Merrill Lynch, Bradesco BBI, Capital One Securities, CIBC, Citigroup, Commerzbank, Credit Agricole CIB, Deutsche Bank Securities, Itaú BBA, Morgan Stanley, Nordea Markets, RBC Capital Markets, Santander, Scotiabank, Societe Generale, SunTrust Robinson Humphrey, Swedbank AB, TD Securities, US Bancorp, VTB Capital. | **Joint Lead Managers – No Books**: Barclays Capital, ING Bank NV, Lloyds Bank PLC, Natixis, Wells Fargo Securities LLC.<br>**Co-Managers**: Banco Santander (US), Bank of New York Mellon, Bank of America Merrill Lynch, BB Securities Ltd, BBVA Securities Inc, BMO Capital Markets Corp, Bradesco Securities Inc, Capital One Securities Inc, CIBC World Markets PLC, Citigroup Global Markets Inc, Commerzbank, Credit Agricole Securities USA Inc, Deutsche Bank Securities Inc, Itau BBA USA Securities Inc, Morgan Stanley, Nordea Capital Markets, RBC Capital Markets, Scotiabank UK Ltd, Societe Generale, SunTrust Robinson Humphrey, Swedbank AB/NY, TD Securities, US Bancorp Piper Jaffray, VTB Capital Plc. |
| 2014 6.25% | 225436AA2 H3698DAL8 | **Joint Lead Managers**: Banca IMI, BBVA, Credit Agricole CIB, HSBC, ING, RBC Capital Markets, Santander, UniCredit Bank, Wells Fargo Securities<br>**Co-Managers**: ANZ, Barclays, BB Securities, BMO Capital Markets, BNP Paribas, BNY Mellon Capital Markets LLC, Bradesco BBI, Capital One Securities, Citigroup, Commerzbank, Commonwealth Bank of Australia, Danske Bank, DBS Bank Ltd, Espirito Santo Investment Bank, Fifth Third Securities, Lloyds Bank, Millennium bcp, Morgan Stanley, nabSecurities LLC, Natixis, Rabobank International, SEB, Standard Chartered Bank, SunTrust Robinson Humphrey, Swedbank AB, TD Securities, United Overseas Bank Limited, US Bancorp. | **Joint Lead Managers – No Books**: Banca IMI, BBVA Securities Inc, Credit Agricole Securities USA Inc, HSBC Securities, ING Capital Advisors, RBC Capital Markets, UniCredit, Wells Fargo. |

[170] I obtained this information directly from each AT1 bond's offering documents and treat any bank entity listed in the offering documents as an underwriter.

[171] I used Bloomberg's DES function to access the "Involved Parties" page for each AT1 bond, which lists the entities included in the "Syndicate" group.

PAGE 71

| | | |
|---|---|---|
| 2018 7.5% | 225401AJ7<br>H3698DBW3 | **Passive Book-Running Manager:** Wells Fargo Securities. **Joint Lead Managers:** Banca IMI, BBVA, Danske Bank, Deutsche Bank Securities, NatWest Markets, Rabo Securities, RBC Capital Markets, Santander, Société Générale Corporate & Investment Banking, TD Securities, UniCredit Capital Markets. **Co-Managers:** ANZ Securities, BB&T Capital Markets, BMO Capital Markets, BNY Mellon Capital Markets LLC, Capital One Securities, CIBC Capital Markets, Citigroup, Citizens Capital Markets, Fifth Third Securities, HSBC, Huntington Capital Markets, KeyBanc Capital Markets, Morgan Stanley, nabSecurities LLC, Scotiabank, SunTrust Robinson Humphrey. | **Joint Lead Managers – Books:** Wells Fargo Securities LLC. **Joint Lead Managers – No Books:** Banca IMI Securities Corp, Banco Santander (US), BBVA Securities Inc, Danske Bank, Deutsche Bank Securities Inc, Natwest Capital Markets, Rabo Securities USA Inc, RBC Capital Markets, Societe Generale, TD Securities USA LLC, UniCredit Capital Markets Inc. **Co-Managers:** ANZ Securities, BB&T Capital Markets, BMO Capital Markets Corp, BNY Mellon Capital Markets LLC, Capital One Securities Inc, CIBC World Markets, Citizens Capital Markets/Old, Fifth Third Securities, HSBC Securities, Huntington Investment Co/The, KeyBanc Capital Markets, Morgan Stanley, Scotia Capital USA Inc, SunTrust Robinson Humphrey. |
| 2018 7.25% | 225401AK4<br>H3698DBZ6 | **Joint Lead Managers:** ABN AMRO, ING, Lloyds Securities, RBC Capital Markets, Société Générale Corporate & Investment Banking, TD Securities, Wells Fargo Securities. **Co-Managers:** CaixaBank, Capital One Securities, Citizens Capital Markets, Commerzbank, Danske Bank, Natixis, Rabo Securities, SunTrust Robinson Humphrey, BB&T Capital Markets, BMO Capital Markets, BNY Mellon Capital Markets LLC, CIBC Capital Markets, Citigroup, Deutsche Bank Securities, Fifth Third Securities, HSBC, Huntington Capital Markets, KeyBanc Capital Markets, Morgan Stanley, nabSecurities LLC, Regions Securities LLC, Scotiabank. | **Co-Managers:** ABN AMRO Securities USA LLC, BB&T Capital Markets, BMO Capital Markets Corp, BNY Mellon Capital Markets LLC, CaixaBank SA/Mexico, Capital One Securities Inc, CIBC World Markets, Citigroup Global Markets Inc, Citizens Capital Markets/Old, Commerzbank AG, Danske Bank A/S - London, Deutsche Bank Securities Inc, Fifth Third Securities, HSBC Securities, Huntington Investment Co/The, ING Financial Markets LLC, KeyBanc Capital Markets, Lloyds Securities Inc, Morgan Stanley & Co Inc, nabSecurities LLC, Natixis Securities Americas LLC, Rabo Securities USA Inc, RBC Capital Markets LLC, Regions Securities LLC, Robinson Humphrey Co Inc, Scotia Capital USA Inc, Societe Generale, TD Securities USA LLC, Wells Fargo Securities LLC. |
| 2019 6.375% | 225401AL2<br>H3698DCP7 | **Joint Lead Managers:** Banca IMI, BBVA, NatWest Markets, RBC Capital Markets, Scotiabank, Societe Generale, TD Securities, Wells Fargo. **Senior Co-Managers:** ABN AMRO, BB&T Capital Markets, BMO Capital Markets, Capital One Securities, CIBC Capital Markets, Citizens Bank, Danske Bank, ING, Rabo Securities, Santander. **Co-Managers:** ANZ Securities, BNY Mellon Capital Markets LLC, Commonwealth Bank of Australia, Deutsche Bank Securities, HSBC, Lloyds Securities, Morgan Stanley, nabSecurities LLC, Natixis, Nordea, Regions Securities LLC, SEB, Standard Chartered Bank, SunTrust Robinson Humphrey, Westpac. | **Joint Lead Managers – No Books:** Banca IMI, BBVA Securities Inc, RBC Capital Markets, Scotia Capital USA Inc, SG Americas Securities LLC, TD Securities USA LLC, Wells Fargo Securities LLC. **Co-Managers:** ABN Amro Capital USA LLC, ANZ Securities, BB&T Capital Markets, BMO Capital Markets Corp, BNY Mellon Capital Markets LLC, Capital One Securities Inc, CIBC World Markets, Citizens Capital Markets, Commonwealth Bank Australia, Danske Bank A/S - London, Deutsche Bank Securities Inc, HSBC Securities, ING Financial Markets LLC, Lloyds Securities Inc, Morgan Stanley, nabSecurities LLC, Natixis Securities Americas LLC, Nordea Bank Abp, Rabo Securities USA Inc, Regions Securities LLC, Santander Investment Securities Inc, Skandinaviska Enskilda Banken, Standard Chartered Bank (US), SunTrust Robinson Humphrey, Westpac Banking Corporation. |

| | | | |
|---|---|---|---|
| 2020 5.1% | 22540IAN8 H3698DCV4 | **Joint Lead Managers:** Banca IMI, Danske Bank, ING, Lloyds Securities, NatWest Markets, RBC Capital Markets, Santander, Scotiabank, Société Générale Corporate & Investment Banking, TD Securities, Wells Fargo Securities. **Senior Co-Managers:** ABN AMRO, BBVA, BMO Capital Markets, Capital One Securities, CIBC Capital Markets, Citizens Capital Markets, Natixis, Nordea, Rabo Securities, Standard Chartered Bank, SunTrust Robinson Humphrey, UniCredit. **Co-Managers:** ANZ Securities, Banco de Sabadell, Bankia, BNY Mellon Capital Markets LLC, CaixaBank, Commonwealth Bank of Australia, Deutsche Bank Securities, HSBC, Morgan Stanley, nabSecurities LLC, Regions Securities LLC, SEB, Huntington Capital Markets. | ***Joint Lead Managers – No Books:*** Banca IMI SpA/United Kingdom, Danske Bank A/S - London, ING Financial Markets LLC, Lloyds Securities Inc, NatWest Markets, RBC Capital Markets LLC, Santander Investment Securities Inc, Scotia Capital USA Inc, Societe Generale, TD Securities USA LLC, Wells Fargo Securities LLC. **Senior Co-Managers:** ABN Amro Capital USA LLC, Banco Bilbao Vizcaya Argentaria, BMO Capital Markets Corp, Capital One Securities Inc, CIBC World Markets, Citizens Capital Markets, Natixis Securities Americas LLC, Nordea Bank Abp, Rabo Securities USA Inc, Standard Chartered Bank (US), SunTrust Robinson Humphrey, UniCredit Capital Markets Inc. **Co-Managers:** ANZ Securities, Banco de Sabadell SA/London, Bankia, BNY Mellon Capital Markets LLC, CaixaBank SA/United Kingdom, Commonwealth Bank Australia, Deutsche Bank Securities Inc, HSBC Securities, Huntington Investment Co/The, Morgan Stanley & Co LLC, nabSecurities LLC, Regions Securities LLC, Skandinaviska Enskilda Banken AB. |
| 2020 5.25% | 22540IAR9 H3698DDA9 | **Joint Lead Managers:** BBVA, Natixis, UniCredit, Santander, Scotiabank, Wells Fargo Securities. **Senior Co-Managers:** ABN AMRO, CIBC Capital Markets, ING, NatWest Markets, Rabo Securities, Societe Generale, TD Securities. **Co-Managers:** Banco de Sabadell, BMO Capital Markets, BNY Mellon Capital Markets LLC, CaixaBank, Capital One Securities, Citigroup, Citizens Capital Markets, Danske Bank, Deutsche Bank Securities, HSBC, Landesbank Baden-Württemberg, Lloyds, Morgan Stanley, Nordea, RBC Capital Markets, Standard Chartered Bank. | ***Joint Lead Managers – No Books:*** Banco Bilbao Vizcaya Argentaria SA, Natixis Securities Americas LLC, Santander Investment Securities Inc, Scotia Capital USA Inc, UniCredit Bank AG, Wells Fargo Securities LLC. **Co-Managers:** ABN AMRO Securities USA LLC, Banco de Sabadell SA/London, BMO Capital Markets Corp, BNY Mellon Capital Markets LLC, CaixaBank, Capital One Securities Inc, CIBC World Markets, Citigroup Global Markets Inc, Citizens Capital Markets, Danske Bank, Deutsche Bank Securities Inc, HSBC Securities, ING Financial Markets LLC, Landesbank Baden-Wuerttemberg, Lloyds Bank Corporate Markets Wertpapier, Morgan Stanley & Co LLC, Natwest Capital Markets, Nordea Bank Abp, Rabo Securities USA Inc, RBC Capital Markets, SG Americas Securities LLC, Standard Chartered Bank (US), TD Securities USA LLC. |
| 2020 4.5% | 22540IAS7 H3698DDD3 | **Joint Lead Managers:** Commerzbank, IMI-Intesa Sanpaolo, Santander, Societe Generale, Standard Chartered Bank. **Senior Co-Managers:** BBVA, CaixaBank, Citizens Capital Markets, Mediobanca, Rabo Securities, Scotiabank. **Co-Managers:** Banco de Sabadell, Citigroup, Deutsche Bank Securities, HSBC, Morgan Stanley, Wells Fargo Securities. | ***Joint Lead Managers – No Books:*** Commerz Markets LLC, Intesa Sanpaolo/NY, Santander Investment Securities Inc, SG Americas Securities LLC, Standard Chartered Bank (US). **Co-Managers:** Banco Bilbao Vizcaya Argentaria, Banco de Sabadell SA/Miami, CaixaBank, Citigroup Global Markets Inc, Citizens Capital Markets, Deutsche Bank Securities Inc, HSBC Securities, Mediobanca, Morgan Stanley, Rabo Securities USA Inc, Scotia Capital USA Inc, Wells Fargo Securities LLC. |

| 2022 9.75% | 225401AX6<br>H3698DDQ4 | **Senior Co-Managers**: Lloyds Bank Corporate Markets Wertpapierhandelsbank, Santander, Societe Generale.<br>**Co-Managers**: BMO Capital Markets, CIBC Capital Markets, Citizens Capital Markets, ING, IMI – Intesa Sanpaolo, Nordea, RBC Capital Markets, Scotiabank, TD Securities.<br>**Junior Co-Managers**: BNY Mellon Capital Markets LLC, Capital One Securities, Deutsche Bank Securities, HSBC, Truist Securities. | **Senior Co-Managers**: Lloyds Bank Corporate Markets Wertpapier, Santander Investment Securities Inc, Societe Generale.<br>**Co-Managers**: BMO Capital Markets Corp, BNY Mellon Capital Markets LLC, Capital One Securities Inc, CIBC World Markets, Citizens Capital Markets, Deutsche Bank Securities Inc, HSBC Bank PLC, ING Financial Markets LLC, Intesa Sanpaolo SpA/London, Nordea Bank Abp, RBC Capital Markets LLC, Scotia Capital USA Inc, TD Securities USA LLC, Truist Securities Inc. |

Notes: I note that for CUSIP H3698DCP7, Bloomberg only reports Credit Suisse as "Sole Manager."
Data Sources: Bloomberg, CS-CoreCapital_00000624, CS-CoreCapital_00000919, CS-CoreCapital_00000158, CS-CoreCapital_00000322, CS-CoreCapital_00000001, CS-CoreCapital_00001349, CS-CoreCapital_00001508, CS-CoreCapital_00000771, CS-CoreCapital_00001064.

**EXHIBIT 6**

**Institutional Holders of Credit Suisse AT1 bonds**

| No. | Institution | No. | Institution |
|-----|-------------|-----|-------------|
| [1] | Aberdeen Group PLC | [26] | Azimut Holding SpA |
| [2] | Accident Fund Co/The | [27] | Banca Mediolanum SpA |
| [3] | ADEPA Asset Management SA | [28] | Banco Santander SA |
| [4] | Aegon Ltd | [29] | Bank J Safra Sarasin AG |
| [5] | Algebris Investments UK LLP | [30] | Bank of America Corp |
| [6] | AllianceBernstein Holding LP | [31] | Bank of Montreal |
| [7] | Allianz SE | [32] | Bank of New York Mellon Corp/The |
| [8] | Allspring Global Investments Holdings LLC | [33] | Banque Degroof Petercam SA |
| [9] | ALPS Advisors Inc | [34] | Banque Lombard Odier & Cie SA |
| [10] | Altana Wealth Ltd | [35] | Bestinver SA |
| [11] | American Century Cos Inc | [36] | Betashares Capital Ltd |
| [12] | American International Group Inc | [37] | BI Management AS/Denmark |
| [13] | Ameriprise Financial Inc | [38] | Blackrock Inc |
| [14] | Amundi Deutschland GmbH | [39] | Blue Care Network of Michigan |
| [15] | Apex Fundrock Ltd | [40] | Blue Cross & Blue Shield Association |
| [16] | Argo Group International Holdings Inc | [41] | BlueBay Funds Management Co SA |
| [17] | Arquipensiones EGFP SA/Spain | [42] | BlueCross BlueShield of Tennessee Inc |
| [18] | Arquipensiones EGFP SA/Spain | [43] | BMO Global Asset Management |
| [19] | Artemis Investment Management LLP | [44] | BPER International SICAV/Luxembourg |
| [20] | Assenagon Asset Management SA | [45] | Brighthouse Financial Inc |
| [21] | Atrium Sicav/Luxembourg | [46] | Brinker Capital LLC |
| [22] | Automobile Club of Michigan | [47] | Brompton Funds Ltd |
| [23] | Axiom Alternative Investments Sarl | [48] | BSI SA |
| [24] | Axiom Fund SCA SICAV-SIF | [49] | Caixa Penedes Gestio SGIIC SA/Spain |
| [25] | Axxion SA | [50] | Calamos Partners LLC |

| No. | Institution | No. | Institution |
|---|---|---|---|
| [51] | Canadian Imperial Bank of Commerce | [81] | Erie Family Life Insurance Co |
| [52] | Canoe Financial LP | [82] | Erste Group Bank AG |
| [53] | Capital Group Cos Inc/The | [83] | Espirito Santo Tourism Portugal-Consultoria de Gestao Empresarial SA |
| [54] | Casa 4 Funds European Asset Management/Luxembourg | [84] | EuroFin Investments Pte Ltd |
| [55] | Case Kapitalforvaltning AB | [85] | Euromobiliare Asset Management SGR SpA |
| [56] | CCLA Investment Management Ltd | [86] | European & Global Investments Ltd |
| [57] | CI Financial Corp | [87] | Factory Mutual Insurance Co |
| [58] | CNA Financial Corp | [88] | Federated Advisory Services Co |
| [59] | Cohen & Steers Inc | [89] | Federated Hermes Inc |
| [60] | COHEN & STEERS INC. | [90] | Fidelity Investments Canada ULC |
| [61] | CompAM Fund SICAV | [91] | Fideuram - Intesa Sanpaolo Private Banking SpA |
| [62] | Consulting Group Advisory Services LLC | [92] | FIL Ltd |
| [63] | Consultinvest Asset Management-SPA-SGR | [93] | Fineco Asset Management DAC |
| [64] | Continental General Insurance Co | [94] | First American Title Insurance Co |
| [65] | Credit Agricole Group | [95] | First Trinity Financial Corp |
| [66] | CUNA Mutual Holding Co | [96] | Flaherty & Crumrine Inc |
| [67] | Dai-ichi Life Holdings Inc Group | [97] | FMR LLC |
| [68] | Danske Bank A/S | [98] | Forestry Mutual Insurance Co |
| [69] | DekaBank Deutsche Girozentrale | [99] | Franklin Resources Inc |
| [70] | Desjardins Global Asset Management Inc/Canada | [100] | Frost Investment Advisors LLC |
| [71] | Destra Capital Advisors LLC | [101] | Fundsight SA |
| [72] | Doctors Co An Interinsurance Exchange/The | [102] | GAM Holding AG |
| [73] | Dunham & Associates Investment Counsel Inc | [103] | GAOTENG GLOBAL ASSET MANAGEMENT |
| [74] | E Fund Management Hong Kong Co Ltd | [104] | Generali |
| [75] | Eaton Vance Corp | [105] | Gesalcala SGIIC SA |
| [76] | Edmond de Rothschild Group/Private Equity | [106] | Gesnorte SA SGIIC/Spain |
| [77] | EFG ASSET MANAGEMENT HK LTD | [107] | Goldman Sachs Group Inc/The |
| [78] | Eiffel Investment Group SAS | [108] | Government Pension Investment Fund Japan |
| [79] | Elevance Health Inc | [109] | Grace Partners of DuPage LP |
| [80] | Equitable Holdings Inc | [110] | GuideStone Capital Management LLC |
| [111] | GVC Gaesco Gestion SGIIC SA | [141] | Lyxor Asset Management SASU |

| No. | Institution | No. | Institution |
|---|---|---|---|
| [112] | HANSAINVEST Hanseatische Investment-GmbH | [142] | M&G Luxembourg SA |
| [113] | Hargreaves Lansdown PLC | [143] | M&G PLC |
| [114] | Hartford Insurance Group Inc/The | [144] | Macquarie Group Ltd |
| [115] | Horizon Healthcare Services Inc | [145] | Man Group PLC/Jersey |
| [116] | Hospitals Insurance Co Inc | [146] | Manulife Financial Corp |
| [117] | Hotchkis and Wiley Capital Management LLC | [147] | Marsh & McLennan Cos Inc |
| [118] | HSBC Holdings PLC | [148] | Massachusetts Mutual Life Insurance Co |
| [119] | Insignia Financial Ltd | [149] | MCIC VT A RECIP RRG |
| [120] | Interinsurance Exchange of The Automobile Club | [150] | MDAdvantage Insurance Co of New Jersey |
| [121] | Intermoney Gestion SGIIC SA/Spain | [151] | MDO Management Co SA |
| [122] | Intesa Sanpaolo SpA | [152] | Medica Insurance Co |
| [123] | Invesco Ltd | [153] | MetLife Inc |
| [124] | Investeringsforeningen Portfoliomanager | [154] | Morningstar Inc |
| [125] | Israel Brokerage & Investments IBI Ltd | [155] | Mutuactivos SA SGIIC/Spain |
| [126] | Janus Henderson Group PLC | [156] | Muzinich & Co Inc |
| [127] | JPMorgan Chase & Co | [157] | Muzinich & Co Ireland Ltd |
| [128] | Julius Baer Group Ltd | [158] | Nationwide Fund Advisors |
| [129] | Jupiter Fund Management PLC | [159] | Natixis SA |
| [130] | Jyske Bank/Zurich | [160] | Neuberger Berman Group LLC |
| [131] | Jyske Invest | [161] | New Capital Fund Management Ltd |
| [132] | Kelso & Co LP | [162] | Nomura Holdings Inc |
| [133] | La Banque Postale SA | [163] | Nordea Bank Abp |
| [134] | Lazard Inc | [164] | Nykredit Portefoelje Administration A/S |
| [135] | Legal & General Group PLC | [165] | ODIN Forvaltning AS |
| [136] | Lincoln Benefit Life Co | [166] | Olive Street Investment Advisers LLC |
| [137] | Lincoln Financial Investments Corp | [167] | PACIFIC LIFE INSURANCE COMPANY |
| [138] | Logan Circle Partners LP | [168] | Partner Reinsurance Co of the US |
| [139] | London LGPS CIV Ltd | [169] | Physicians Life Insurance Co |
| [140] | Longchamp Asset Management SASU | [170] | Pictet & Cie Group SCA |
| [171] | PIMCO Australia Pty Ltd | [201] | Southern Farm Bureau Life Insurance Co |
| [172] | PIMCO ETF TRUST | [202] | St James's Place PLC |

PAGE 77

| No. | Institution | No. | Institution |
|---|---|---|---|
| [173] | PineBridge Investments LP | [203] | STANDARD LIFE INVESTMENTS |
| [174] | Planetarium Advisor SA | [204] | Sun Life Financial Inc |
| [175] | Plenisfer Investments SpA Societa' Di Gestione Del Risparmio | [205] | TCW Group Inc/The |
| [176] | Popso Suisse Investment Fund SICAV/Luxembourg | [206] | Teachers Insurance & Annuity Association of America |
| [177] | Power Corp of Canada | [207] | Temasek Holdings Pte Ltd |
| [178] | PPM AMERICA | [208] | Texas Life Insurance Co |
| [179] | Premier Miton Group PLC | [209] | Thrivent Financial for Lutherans |
| [180] | Premium Selection UCITS ICAV | [210] | UBS AG |
| [181] | Principal Financial Group Inc | [211] | UNION BANCAIRE PRIVEE |
| [182] | Prudential Financial Inc | [212] | United Services Automobile Association |
| [183] | Prudential PLC | [213] | Van Eck Associates Corp |
| [184] | Purpose Investments Inc | [214] | Vanguard Group Inc/The |
| [185] | QUAESTIO HOLDING SA | [215] | Vantagepoint Investment Advisers LLC |
| [186] | Quaestio Investments SA/Luxembourg | [216] | Venerable Insurance and Annuity Co |
| [187] | Quilter PLC | [217] | Vontobel Holding AG |
| [188] | REDHEDGE ICAV | [218] | VP Fund Solutions Liechtenstein AG |
| [189] | Redwood Asset Management Inc | [219] | Wam Acquisition SA |
| [190] | Royal Bank of Canada | [220] | Wealth Fund Partners A/S |
| [191] | Royal London Asset Management Ltd | [221] | Wellington Management Group LLP |
| [192] | Russell Investments Group Ltd | [222] | Wells Fargo & Co |
| [193] | Safety National Casualty Corp | [223] | Wilton Reassurance Co |
| [194] | Safety Property & Casualty Insurance Co | [224] | Wilton Reassurance Life Co of NY |
| [195] | Santander Investment SA | [225] | WisdomTree Inc |
| [196] | Schroders PLC | [226] | Woodmen of the World Life Insurance Society |
| [197] | SEI Investments Co | [227] | Yelin Lapidot Holdings Management Ltd |
| [198] | Silac Insurance Co | [228] | Yorktown Management & Research Co Inc |
| [199] | Skandinaviska Enskilda Banken AB | [229] | Zuercher Kantonalbank |
| [200] | Societe Generale SA | | |

Data Sources: Bloomberg.

# EXHIBIT 7

## Credit Suisse AT1 Bonds Outstanding, Insider Holdings, and Institutional Holdings

| AT1 Bond | CUSIPs | Notional Amount Outstanding | Unique Institutions Owning Bonds | Average Institutional Holdings | Average Institutional Holdings as % of Amount Outstanding | Average Insider Holdings | Average Insider Holdings as % of Amount Outstanding | Average Notional Float | Average Institutional Holdings as % of Float |
|---|---|---|---|---|---|---|---|---|---|
| 2013 7.5% | H9200RAA9 225460AB2 | $2,250,000,000 | 89 | $983,631,500 | 43.72% | $3,697,000 | 0.16% | $2,246,303,000 | 43.79% |
| 2014 6.25% | H3698DAL8 225436AA2 | $2,500,000,000 | 77 | $706,970,000 | 28.28% | $4,200,000 | 0.17% | $2,495,800,000 | 28.34% |
| 2018 7.5% | H3698DBW3 225401AJ7 | $2,000,000,000 | 77 | $821,250,000 | 41.06% | $9,480,000 | 0.47% | $1,990,520,000 | 41.26% |
| 2018 7.25% | H3698DBZ6 225401AK4 | $1,500,000,000 | 70 | $436,397,000 | 29.09% | $2,480,000 | 0.17% | $1,497,520,000 | 29.14% |
| 2019 6.375% | H3698DCP7 225401AL2 | $1,750,000,000 | 85 | $583,593,500 | 33.35% | $10,082,000 | 0.58% | $1,739,918,000 | 33.54% |
| 2020 5.1% | H3698DCV4 225401AN8 | $1,000,000,000 | 24 | $54,755,000 | 5.48% | $0 | 0.00% | $1,000,000,000 | 5.48% |
| 2020 5.25% | H3698DDA9 225401AR9 | $1,500,000,000 | 66 | $517,052,000 | 34.47% | $6,000,000 | 0.40% | $1,494,000,000 | 34.64% |
| 2020 4.5% | H3698DDD3 225401AS7 | $1,500,000,000 | 35 | $180,989,500 | 12.07% | $0 | 0.00% | $1,500,000,000 | 12.07% |
| 2022 9.75% | H3698DDQ4 225401AX6 | $1,650,000,000 | 74 | $755,225,500 | 45.77% | $900,000 | 0.05% | $1,649,100,000 | 45.80% |

Notes: Insider Holdings are holdings of Credit Suisse as reported by Bloomberg.
Data Sources: Bloomberg.

**EXHIBIT 8**

| No. | AT1 Bond | CUSIPs | Average | Median |
|---|---|---|---|---|
| 1 | 2013 7.5% | H9200RAA9<br>22546DAB2 | 1.30% | 0.46% |
| 2 | 2014 6.25% | H3698DAL8<br>225436AA2 | 1.22% | 0.46% |
| 3 | 2018 7.5% | H3698DBW3<br>225401AJ7 | 1.46% | 0.77% |
| 4 | 2018 7.25% | H3698DBZ6<br>225401AK4 | 0.85% | 0.47% |
| 5 | 2019 6.375% | H3698DCP7<br>225401AL2 | 1.07% | 0.56% |
| 6 | 2020 5.1% | H3698DCV4<br>225401AN8 | 1.76% | 0.80% |
| 7 | 2020 5.25% | H3698DDA9<br>225401AR9 | 1.46% | 0.61% |
| 8 | 2020 4.5% | H3698DDD3<br>225401AS7 | 1.13% | 0.70% |
| 9 | 2022 9.75% | H3698DDQ4<br>225401AX6 | 1.01% | 0.35% |

Notes: Based on evaluated bid and ask quotes derived from Bloomberg's BVAL pricing. The respective bid and ask fields are PX_BID and PX_ASK.
Data Sources: Bloomberg.

**EXHIBIT 9**

## Event Study Analysis of Credit Suisse News Days

| Date | Event | AT1 Bond | CUSIP | Return | Abnormal Return | Abnormal Dollar | T-Statistic | P-Value | Significance |
|---|---|---|---|---|---|---|---|---|---|
| Oct 27, 2022 | Earnings Announcement | 2013 7.5% | H9200RAA9 | 1.22% | 0.56% | $5.07 | 0.55 | 0.59 | |
| | | 2014 6.25% | H3698DAL8 | 1.45% | 0.18% | $1.54 | 0.15 | 0.88 | |
| | | 2018 7.25% | H3698DBZ6 | 1.23% | 0.24% | $1.88 | 0.16 | 0.87 | |
| | | 2018 7.5% | H3698DBW3 | 1.39% | 0.34% | $2.96 | 0.21 | 0.83 | |
| | | 2019 6.375% | H3698DCP7 | 2.01% | 0.63% | $4.78 | 0.46 | 0.65 | |
| | | 2020 4.5% | H3698DDD3 | 1.15% | -0.24% | -$1.48 | -0.15 | 0.88 | |
| | | 2020 5.1% | H3698DCV4 | 4.02% | 2.74% | $17.46 | 1.93 | 0.06 | * |
| | | 2020 5.25% | H3698DDA9 | 1.64% | 0.44% | $3.26 | 0.38 | 0.70 | |
| | | 2022 9.75% | H3698DDQ4 | 1.80% | 1.03% | $9.99 | 1.07 | 0.29 | |
| Nov 2, 2022 | Credit Rating Change | 2013 7.5% | H9200RAA9 | 0.00% | -0.66% | -$5.96 | -0.64 | 0.52 | |
| | | 2014 6.25% | H3698DAL8 | -1.70% | -2.95% | -$24.93 | -2.39 | 0.02 | ** |
| | | 2018 7.5% | H3698DBW3 | -1.04% | -2.04% | -$18.16 | -1.29 | 0.20 | |
| | | 2020 4.5% | H3698DDD3 | -3.02% | -3.51% | -$21.04 | -2.18 | 0.03 | ** |
| | | 2022 9.75% | H3698DDQ4 | -1.11% | -1.51% | -$14.30 | -1.49 | 0.14 | |
| Nov 23, 2022 | Earnings Guidance Update | 2013 7.5% | H9200RAA9 | -2.58% | -2.55% | -$23.43 | -2.43 | 0.02 | ** |
| | | 2014 6.25% | H3698DAL8 | -5.10% | -5.01% | -$41.75 | -3.68 | 0.00 | *** |
| | | 2018 7.25% | H3698DBZ6 | -3.21% | -3.06% | -$23.87 | -1.89 | 0.06 | * |
| | | 2018 7.5% | H3698DBW3 | -0.63% | -0.63% | -$5.56 | -0.39 | 0.70 | |
| | | 2019 6.375% | H3698DCP7 | -3.11% | -3.01% | -$22.02 | -2.04 | 0.04 | ** |
| | | 2020 5.1% | H3698DCV4 | -4.14% | -3.91% | -$23.14 | -2.48 | 0.02 | ** |
| | | 2020 5.25% | H3698DDA9 | -3.06% | -3.02% | -$20.86 | -2.23 | 0.03 | ** |
| | | 2022 9.75% | H3698DDQ4 | -0.85% | -0.98% | -$9.28 | -0.98 | 0.33 | |

| Date | Event | AT1 Bond | CUSIP | Return | Abnormal Return | Abnormal Dollar | T-Statistic | P-Value | Significance |
|---|---|---|---|---|---|---|---|---|---|
| **Feb 9, 2023** | Earnings Announcement | 2013 7.5% | H9200RAA9 | 0.74% | 0.69% | $6.49 | 0.57 | 0.57 | |
| | | 2014 6.25% | H3698DAL8 | 1.47% | 1.42% | $12.37 | 0.98 | 0.33 | |
| | | 2018 7.25% | H3698DBZ6 | 2.04% | 1.99% | $16.39 | 1.02 | 0.31 | |
| | | 2018 7.5% | H3698DBW3 | 2.55% | 2.26% | $21.01 | 1.28 | 0.20 | |
| | | 2019 6.375% | H3698DCP7 | 0.67% | 0.55% | $4.47 | 0.28 | 0.78 | |
| | | 2020 4.5% | H3698DDD3 | 0.22% | -0.06% | -$0.40 | -0.03 | 0.98 | |
| | | 2020 5.1% | H3698DCV4 | -2.01% | -1.92% | -$13.77 | -0.86 | 0.39 | |
| | | 2022 9.75% | H3698DDQ4 | 0.90% | 0.90% | $8.61 | 0.68 | 0.50 | |
| **Mar 20, 2023** | Write-Down Event | 2013 7.5% | H9200RAA9 | -89.98% | -79.21% | -$276.77 | -16.13 | 0.00 | *** |
| | | 2014 6.25% | H3698DAL8 | -92.31% | -83.08% | -$216.00 | -13.34 | 0.00 | *** |
| | | 2018 7.25% | H3698DBZ6 | -88.77% | -68.88% | -$199.29 | -16.39 | 0.00 | *** |
| | | 2018 7.5% | H3698DBW3 | -80.75% | -57.07% | -$140.82 | -11.81 | 0.00 | *** |
| | | 2019 6.375% | H3698DCP7 | -87.39% | -45.66% | -$126.78 | -14.24 | 0.00 | *** |
| | | 2020 4.5% | H3698DDD3 | -81.52% | -32.53% | -$74.83 | -11.04 | 0.00 | *** |
| | | 2020 5.1% | H3698DCV4 | -88.56% | -59.78% | -$158.19 | -17.09 | 0.00 | *** |
| | | 2020 5.25% | H3698DDA9 | -82.50% | -59.14% | -$118.28 | -9.28 | 0.00 | *** |
| | | 2022 9.75% | H3698DDQ4 | -90.29% | -67.88% | -$223.59 | -17.81 | 0.00 | *** |

Notes:
  (1) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.
  (2) Dates shown in the "Date" column reflect the market impact date of the relevant news.
Data Sources: Bloomberg, Factiva, SEC Edgar.

**EXHIBIT 10**

**Comparison of Abnormal Returns for Credit Suisse AT1 Bonds**
**News Days vs. Least News Days During the Class Period**

| Statistic | News Days | Least News Days | P-Value of Difference |
|---|---|---|---|
| N | 39 | 471 | |
| Significant Days at 95% Confidence Level | 16 | 50 | |
| % Significant Days at 95% Confidence Level | 41.03% | 10.62% | 0.000* |
| Average Absolute Abnormal Return | 15.44% | 1.83% | 0.003 |
| Average Daily Trading Volume ($m) | 47.72 | 5.74 | 0.001 |

Notes: *This difference is statistically significant at the 1% significance level, according to a Fisher's exact test.
Data Sources: Bloomberg, Factiva, SEC Edgar.