# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS<br><br>This matter relates to:<br><br>*Core Capital* | Case No. 1:23-cv-09287 |

**EXPERT REPLY REPORT OF SORIN SORESCU, PH.D.**

**October 24, 2025**

**Table of Contents**


1 Introduction ........ 3
2 Summary of Opinions ........ 4
3 Prof. Smith's Application of Fundamental Efficiency Renders His Opinions Flawed And Irrelevant in this Matter ........ 8
4 Prof. Smith's Critique of Aggregating AT1 Bonds Misunderstands the Nature of a Common Information Environment ........ 10
5 The Pooled *Cammer* Factor 5 Analysis Is Statistically Sound ........ 14
6 Prof. Smith's "Hindsight Bias" Argument is Unfounded and Ignores the Unfolding Liquidity Crisis Preceding the Write-Down ........ 16
6.1 Prof. Smith Ignores Judicial Precedent in the *Diabat* Case ........ 17
6.2 Prof. Smith's "Hindsight Bias" Argument Ignores the Crisis of Confidence that Unfolded During the Class Period Placing Credit Suisse Within the Risk Zone for Regulatory Intervention 18
6.3 Prof. Smith's Own Sensitivity Test Supports Market Efficiency ........ 22
7 Prof. Smith's Contention that the March 20 Price Reaction was Unrelated to the March 19 Announcement Appears to Miss the Fact that March 19 was a Sunday ........ 23
8 Conclusion ........ 24
Appendix A ........ 27
Appendix B ........ 36

# 1 INTRODUCTION

1. On September 19, 2025, I submitted an expert report in this matter (my "Efficiency Report"). In that report, I conclude that:

a. The market for Credit Suisse AT1 bonds was efficient during the Class Period.[1]

b. Damages in this matter can be calculated on a class-wide basis subject to a common methodology.[2]

2. Following the submission of my Efficiency Report, Counsel for the Plaintiff provided me with Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Defendants' Opp. Brief"), dated October 10, 2025, together with the Expert Report of David C. Smith, Ph.D. ("Smith Report"), also dated October 10, 2025.[3] I have been instructed to review, evaluate, and respond to certain arguments made in the Smith Report and Defendants' Opp. Brief.

3. Details regarding my background and compensation were previously provided in my Efficiency Report and are incorporated here by reference. For convenience, I provide an updated curriculum vitae in **Appendix A**.

4. In developing the opinions presented in this report, I have drawn on the analyses detailed in my Efficiency Report, as well as my professional expertise, training, and experience in economics, finance, banking, and econometrics, alongside the facts and allegations relevant to this matter. All materials I have considered in forming my opinions are listed in **Appendix B** of this Reply Report, in addition to those previously cited in **Appendix B** of my Efficiency Report.

---

[1] Efficiency Report ¶ 10. Capitalized terms in this report have the same meaning as in my Efficiency Report, unless otherwise stated.

[2] Efficiency Report ¶ 11.

[3] *See* Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *Core Capital Partners, Ltd. v. Credit Suisse Group AG et al*, No. 1:23-cv-09287 (Doc. No. 52) and Expert Report of David C. Smith, Ph.D., *Core Capital Partners, Ltd. v. Credit Suisse Group AG et al*, No. 1:23-cv-09287 (Doc. No. 53-1).

5. I reserve the right to update or amend this report to incorporate new information that may emerge through ongoing discovery or as a result of future rulings by the Court.

## 2 SUMMARY OF OPINIONS

6. Prof. Smith's report primarily addresses my *Cammer* factor 5 analysis. His report does not offer a rebuttal to my conclusions regarding the other *Cammer* and *Krogman* factors:

a. ***Cammer* Factor 1 (Trading Volume)**: In my Efficiency Report, I conclude that the trading volume of Credit Suisse's AT1 bonds supports market efficiency. I demonstrate that the average turnover for all AT1 bonds exceeds the 2.0% benchmark established in *Cammer* for equities—a notably high standard derived from the more liquid equity markets. Even the lower-volume tranches traded at levels that meet or exceed those that courts have previously found sufficient to establish market efficiency in certified bond cases when considered holistically.[4]

b. ***Cammer* Factor 2 (Analyst Coverage)**: In my Efficiency Report, I show that Credit Suisse AT1 bonds were extensively followed by securities analysts, fixed-income professionals, and credit rating agencies, and received significant attention in financial media and SEC filings—all of which weigh in favor of an efficient market.[5]

c. ***Cammer* Factor 3 (Market Makers)**: I demonstrate that the presence of market makers, the highly liquid and well-developed trading venues of Credit Suisse AT1 bonds, the involvement of underwriters, and the substantial holdings by sophisticated institutional investors during the Class Period each supports market efficiency.[6]

d. ***Cammer* Factor 4 (S-3 Eligibility)**: I establish that Credit Suisse, as a foreign

[4] Efficiency Report ¶¶ 72-79.

[5] Efficiency Report ¶¶ 82-93.

[6] Efficiency Report ¶¶ 97-100.

issuer, exceeded the $750 million threshold for Form F-3 eligibility, made all required SEC filings on a timely basis, and filed at least 13 Forms F-3, F-3/A, and F-3ASR prior to the Class Period—all further supporting market efficiency.[7]

e. **Other Factors Supporting Efficiency**: In my Efficiency Report, I further show that Credit Suisse AT1 bonds had a level of institutional ownership, market capitalization, average bid-ask spread, and public float, that each shows directional support for market efficiency.[8]

f. **Common Damages Methodology**: I conclude that damages in this matter can be calculated on a class-wide basis subject to a common methodology.[9]

7. The conclusion that I draw in my Efficiency Report—that the market for Credit Suisse AT1 bonds was efficient during the Class Period—remains robust and well-supported by the evidence. Prof. Smith's criticisms of my *Cammer* factor 5 analysis do not alter my conclusions for several key reasons:

a. Prof. Smith's critique of my *Cammer* factor 5 analysis is based on a different premise regarding the standard for market efficiency. My report applies the standard of informational efficiency, which I understand is the prerequisite for invoking the presumption of reliance. Prof. Smith ignores this established standard and instead substitutes his own notion of "fundamental efficiency," a theory that has been consistently rejected by courts, including the U.S. Supreme Court, as a basis for presuming reliance.

b. Prof. Smith suggests that I should not have pooled the abnormal returns from the nine Credit Suisse AT1 bonds for the purpose of calculating the statistical test in my analysis of the *Cammer* factor 5. I disagree. There are two reasons why this

[7] Efficiency Report ¶¶ 105-08.

[8] Efficiency Report ¶¶ 102-03, 113-14, 118-24, 130-31.

[9] Efficiency Report ¶ 169.

aggregate analysis, an approach this Court has previously approved,[10] is a robust and appropriate method for assessing informational efficiency in the context of the *Cammer* factor 5: (i) the nine Credit Suisse AT1 bonds share a major common risk factor—the complete loss of capital, and (ii) not pooling the returns significantly diminishes the power of the statistical test:

i. Prof. Smith's argument ignores the fundamental structure and main function of AT1 bonds—to serve as a policy instrument that isolates taxpayers from social losses in the event of a major banking crisis. Indeed, under the Basel III framework, AT1 bonds are designed to impose losses upon investors when a bank is under financial distress, in order to prevent contagion to the broader financial sector that could necessitate a bailout with public funds. The nine Credit Suisse AT1 bonds at issue acted as a single policy instrument, traded in a common information environment reacting to the same set of news, and, most importantly, were subject to a common and significant risk factor—that of a complete loss of capital driven by regulatory action.

ii. From a statistical standpoint, Prof. Smith's bond-by-bond approach reduces the power of the statistical test and thus makes it less likely to detect bond price reaction to relevant news. On this basis, his results do not refute the evidence of a cause-and-effect relationship between new information and bond price movements.

c. Prof. Smith asserts that I should not have used, as a relevant news date for the purpose of my *Cammer* factor 5 analysis, March 19, 2023, the date when the market learned about the Swiss government decision to write down the value of the Credit Suisse AT1 bonds (with corresponding market impact the following Monday, March 20, 2023). Prof. Smith claims that I selected that date with "hindsight bias," having full knowledge after the fact that the write-down did, in fact, occur. Prof. Smith's assertion is unfounded on two levels: (i) the write-down

[10] *See In re Credit Suisse Sec. Fraud Class Actions*, 2025 WL 1866293, at *11 (S.D.N.Y. July 7, 2025).

event was the culmination of an unfolding liquidity crisis that placed the bank within the risk zone of regulatory intervention, and (ii) the results are robust to the exclusion of March 20, 2023.

i. My selection of News Days followed objective, pre-defined criteria of events that contain value-relevant news for AT1 bonds. These events are earnings releases, earnings guidance updates, credit rating changes, and any value-relevant regulatory event that was foreseeable *ex-ante*.[11] The price reaction on March 20, 2023, falls into the last category. AT1 bonds, by design, are a policy instrument intended to impose losses upon investors when a bank's survival as a going concern is in doubt. Prior to March 19, 2023, the sequence of public news about Credit Suisse's deteriorating financial conditions progressively placed the bank within the risk zone of a write-down event. The write-down decision made by Swiss regulators on Sunday, March 19, 2023 (with corresponding market impact the following Monday, March 20, 2023), was endogenous to Credit Suisse's decline in liquidity. The write-down was, therefore, reasonably foreseeable *ex-ante* to the same extent as a change in bond rating would have been foreseeable—investors know it *could* happen, but they don't know whether it will happen, or when. When the write-down did happen, the largest, most significant source of risk materialized into a complete loss of capital for AT1 bond investors. To exclude such event from the set of relevant News Days would imply a significant departure from this objective methodology.

ii. My conclusions are robust to the exclusion of March 20, 2023. Even when this date is removed from the analysis, the results continue to support a conclusion of market efficiency. For example, Prof. Smith's own tabulations still show a roughly two-to-one gap in the frequency of significant moves on News versus Least News Days—evidence that remains consistent with an efficient response

[11] Efficiency Report ¶ 156.

to public information.

d. Separately, Prof. Smith appears to suggest that because the date when I measure the price reaction (March 20, 2023) is not the same as the date of the write-down event (March 19, 2023) my conclusions about market efficiency are flawed. This argument appears to ignore the fact that March 19, 2023, was a Sunday, with the corresponding price reaction occurring the following Monday, March 20, 2023.[12]

## 3 PROF. SMITH'S APPLICATION OF FUNDAMENTAL EFFICIENCY RENDERS HIS OPINIONS FLAWED AND IRRELEVANT IN THIS MATTER

8. In reaching my conclusion that Credit Suisse's AT1 bonds at issue traded in an efficient market during the Class Period, I applied the court-accepted standard of informational efficiency—a "general efficiency standard designed for judicial application, not a resolution of contested debates among economists."[13] As I detail in my Efficiency Report, this standard:

> [A]sks only whether the market is sufficiently developed that material public information, including misrepresentations, is generally incorporated into the security's price. This is a modest and workable standard: most investors, even those pursuing sophisticated strategies, rely on the expectation that prices in such markets are shaped by public information and therefore can be presumed to have been distorted by fraud when material misstatements occur.[14]

9. I understand that this standard is consistent with judicial guidance. Courts, including the U.S. Supreme Court, have repeatedly held that demonstrating a market's informational efficiency does not require showing that prices reflect fundamental value or react perfectly to every piece of information. Rather, it is sufficient to establish that prices generally incorporate publicly available, material information.[15] As agreed among financial economists, this standard of market efficiency

[12] Smith Report ¶ 65. I am not claiming that Prof. Smith does not recognize that March 19, 2023, was a Sunday; he does so in other parts of his report. But the argument in this particular paragraph appears to suggest that the market reaction should have happened on March 19, 2023, so that "no price inflation would remain on March 20, 2023."

[13] Efficiency Report ¶ 30.

[14] *Id*.

[15] *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 271 (2014). "In other words, an efficient market is one in which market professionals generally consider most publicly announced material statements about companies, thereby affecting stock prices." *See Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017)

"does not require that markets be anywhere near perfectly efficient."[16]

10. I understand that in *Halliburton II*, the Supreme Court likewise does not adopt a "fundamental efficiency" standard. Rather, the Court reiterated that *Basic* "refused to endorse any particular theory of how quickly and completely publicly available information is reflected in market price," and affirmed that the fraud-on-the-market theory rests on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[17] Courts have repeatedly made clear that the legal standard for informational efficiency is satisfied if the market is sufficiently developed for material information to be reflected in prices, not that prices react perfectly or in the correct direction.[18] Prof. Smith's application of a fundamental efficiency standard is therefore more stringent than the informational efficiency standard that courts require.

11. Prof. Smith's opinions regarding the efficiency of the market for Credit Suisse AT1 bonds are, therefore, flawed and irrelevant to the question at hand. Prof. Smith appears to confuse informational efficiency and fundamental efficiency. He demonstrates this confusion by asserting

(quotations and citations omitted). *See also*, *e.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005), where the Appeals Court for the First Circuit explained that "[t]he district court was right to worry about these implications of Defendants' efficiency arguments; it did not err by rejecting Defendants' proposed definition of market efficiency requiring consistency with fundamental value. By drawing on the standard of efficiency in *Cammer* and holding that 'a share's market price [must] reflect publicly available information, not . . . perfectly and correctly incorporate it,' the district court adopted the correct standard of efficiency."

[16] Brief of Financial Economists as Amici Curiae in Support of Respondents for the Supreme Court of the United States, *Halliburton Co. v. Erica P. John Fund, Inc.* 573 U.S. 258 (2014).

[17] *Halliburton II* citing *Basic*, at 2402-05, 2410.

[18] *See, e.g. In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005): the court stated that "For purposes of establishing the fraud-on-the-market presumption of reliance, we adopt the prevailing definition of market efficiency, which provides that an efficient market is one in which the market price of the stock fully reflects all publicly available information. By 'fully reflect,' we mean that market price responds so quickly to new information that ordinary investors cannot make trading profits on the basis of such information. This is known as 'informational efficiency.' We reject a second and much broader meaning of 'fully reflect,' known as 'fundamental value efficiency,' which requires that a market respond to information not only quickly but accurately, such that the market price of a stock reflects its fundamental value." In *In re VeriFone Sec. Litig.*, 784 F. Supp. at 1479 (N.D. Cal. 1992) n. 7, the court also stated that the fraud-on-the-market theory does not require "proof that the market correctly reflects some 'fundamental value' of the security. To apply the fraud-on-the-market theory, it is sufficient that the market for a security be 'efficient' only in the sense that market prices reflect the available information about the security." *See also*, *e.g.*, *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 370 (S.D.N.Y. 2016) ("Such evidence goes to the accuracy of the price of a security, and the Supreme Court has explained that it is not the accuracy of a price as a reflection of underlying value but instead the sensitivity of the price to false statements that underlies the *Basic* presumption").

that an efficient market requires prices to react "fully, rapidly, and in the direction implied by new, value-relevant public information"[19] and that "[i]f a market is efficient, prices will react quickly and in a direction consistent with new information that is relevant to the instrument's future cash flows, closing off the opportunity to earn consistent economic profits from trading."[20] This standard, which demands not merely a reaction to value-relevant information, but a perfect and "correct" one, imposes a far more stringent test than what I understand is required by courts to presume reliance under the fraud-on-the-market theory.

## 4 PROF. SMITH'S CRITIQUE OF AGGREGATING AT1 BONDS MISUNDERSTANDS THE NATURE OF A COMMON INFORMATION ENVIRONMENT

12. Prof. Smith asserts in his report that "each bond (even if issued by the same company) needs to be evaluated separately" due to its "distinct economic features."[21] As detailed below, this conclusion is flawed and unsupported by the very evidence he considers. Prof. Smith's conclusion does not account for the economic reality of AT1 bonds, particularly their common design features, intended policy usage, and information environment in which they trade.

13. Supporting my opinion, Prof. Smith acknowledges that the nine Credit Suisse AT1 bonds I analyzed in my Efficiency Report share multiple common features.[22] Specifically, Prof. Smith highlights that all of the Credit Suisse AT1 bonds were "perpetual," "offered 'fixed-to-floating' rates that paid a fixed coupon up to a certain date," and "then paid a rate equal to an index rate that could change over time, plus a fixed spread."[23] These are not distinctions that create separate markets; rather, they are the unifying characteristics of this entire asset class.

14. More importantly, Prof. Smith further concedes that all Credit Suisse AT1 bonds share a single, overarching risk factor: the possibility of being written down following a "contingency" or

[19] Smith Report ¶ 28.

[20] Smith Report ¶ 32.

[21] Smith Report ¶ 44.

[22] Smith Report ¶ 21.

[23] Smith Report ¶ 21.

"viability" event.[24] Because all nine Credit Suisse AT1 bonds are exposed to this single dominant risk—regulatory intervention if the issuer becomes non-viable—and act together as a single block of loss-absorbing capital, they cannot be treated as independent, idiosyncratic securities.[25]

15. This crucial point is further underscored by the fact that AT1 bonds (also known as Contingent Convertible Capital Instruments, or CoCos) were specifically designed under Basel III,[26] an international regulatory framework established after the 2008 financial crisis to strengthen bank capital requirements, to function as a unified class of loss-absorbing capital.[27] Their primary, first-order risk is issuer-level regulatory intervention, not minor differences in coupon structure or reset features.[28] According to a study from the Bank for International Settlements (BIS) that Prof. Smith also cites in his report, "[t]he main determinants of the pricing of CoCos are their position in the bank's capital structure, the loss absorption mechanism and the trigger."[29] The nine AT1 bonds issued by Credit Suisse all shared the same risk factors: they occupied the same position in the bank's capital structure, and most importantly, they were all exposed to the same exact loss absorption

---

[24] Smith Report ¶ 22.

[25] *See*, *e.g.*, Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56, at 44, explaining that "CoCos have two main defining characteristics – the loss absorption mechanism and the trigger that activates that mechanism […]. CoCos can absorb losses either by converting into common equity or by suffering a principal writedown. The trigger can be either mechanical (ie defined numerically in terms of a specific capital ratio) or discretionary (ie subject to supervisory judgment)."

[26] *See* The Basel Framework, Basel Committee on Banking Supervision, Bank for International Settlements, Version effective as of 15 Dec 2019, Additional Tier 1 capital, pp. 56-72.

[27] *See*, *e.g.*, Shearman & Sterling LLP (2011). *PLC Global Finance update for February 2011: United States*. Thomson Reuters Practical Law. https://uk.practicallaw.thomsonreuters.com/8-504-9257. ("The Basel III 'loss absorbency' requirement is specifically designed to ensure that holders of Additional Tier 1 and Tier 2 instruments would fully absorb losses before taxpayers in the event government assistance is provided to the issuing bank.").

[28] *See*, *e.g.*, an analyst report, relied upon by Prof. Smith, explains that "FINMA has considerable discretion to decide outcomes for bondholders. It can decide to turn off payments on AT1 coupons […]. It can decide to declare a 'Viability Event', which would entail loss of principal for AT1 holders, if it has in its sole discretion determined this is essential to restore the solvency of the bank […]. **In the absence of more information on deposits, the risk of a regulatory intervention is too large, in our view, for AT1 instruments to be a compelling investment at this stage, even at low valuations**." *See*, Bank of America, "Feedback Loops," March 15, 2023; (emphasis added).

[29] *See*, *e.g.*, Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56, at 51.

mechanism—the risk of a complete, discretionary write-down by regulators.[30]

16. Consequently, during the Class Period, Credit Suisse's AT1 bonds were subject to a shared information environment that reflects the market's view of the likelihood of regulatory intervention, particularly the type of intervention that imposes total and complete losses upon investors. This environment is shaped by issuer-specific factors such as overall financial health, internal controls, and perceived creditworthiness. These factors affect all AT1 bonds of a given issuer, including the Credit Suisse AT1 bonds. As I explained in my Efficiency Report, AT1 bonds react to issuer-specific news—such as earnings announcements or regulatory interventions—because all holders are exposed to the same underlying information.[31] Prof. Smith himself acknowledges that, "[g]iven their greater exposure to the financial performance of the issuing bank," AT1 bonds "are typically more sensitive to information about the bank's financial position […]."[32]

17. For example, a significant source of risk for Credit Suisse's AT1 bonds during the Class Period was that of a discretionary write-down by Swiss regulators in response to the bank's growing liquidity concerns. This is corroborated by the fact the returns of all Credit Suisse AT1 bonds were uniformly negative on two critical event dates that conveyed information about the risk of the bank's viability as a going concern (and hence the risk of a discretionary write-down in value). Specifically, on November 23, 2022, when Credit Suisse reported that customers had withdrawn approximately 10% of all assets under management, the eight Credit Suisse AT1 bonds which had a return on that day, dropped in value by an average of 2.8%.[33] And, on March 14, 2023, when Credit Suisse reported

---

[30] While the trigger varied across the nine Credit Suisse AT1 bonds between 5.125% and 7% Common Equity Tier 1 (CET1) ratio, this difference is not relevant for the pricing of Credit Suisse's AT1 bonds *in this environment* because Credit Suisse's capital adequacy metrics significantly exceeded these thresholds during the Class Period and, therefore, the probability of a mechanical trigger was close to zero for all nine Credit Suisse AT1 bonds. Indeed, Credit Suisse's CET1 ratio was 14.1% at the end of the fourth quarter of 2022, and 20.3% at the end of first quarter of 2023. Credit Suisse's financial distress in this case was primarily caused by lack of liquidity rather than capital inadequacy. This is why the Swiss regulators employed the discretionary mechanism to write down the bonds rather than the mechanical trigger. *See* https://www.sec.gov/Archives/edgar/data/1159510/000137036823000042/a230424-6k.htm.

[31] Efficiency Report ¶ 137.

[32] Smith Report ¶ 17, referencing Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56.

[33] *See* Efficiency Report, Exhibit 9. *See also* https://www.sec.gov/Archives/edgar/data/1159510/000137036822000096/a221123-6k_4q22outlook.htm: ("In

material weaknesses in internal control over financial reporting ("ICFR"), the eight AT1 bonds which had a return on that day, dropped an average of 8.9% and all drops were statistically significant at the 99% confidence interval.[34]

18. Analyst commentary supports the existence of a common information environment. For example, two analyst reports upon which Prof. Smith relies for his opinion, confirm that Credit Suisse's AT1 bonds were treated by market participants as a fundamentally homogeneous instrument. For example:

> Bank of America (December 5, 2022): "We see AT1 as most sensitive to negative surprises on operational performance, capital or the phasing of restructuring costs, which at this stage cannot be ruled out, in our view. The **CS complex** no doubt has lots of value, but also lots of uncertainties."[35]
>
> Autonomous (December 20, 2022): "Following Credit Suisse's November trading update we reduced our exposure by removing the bank's **AT1s** from our pick list […] we still see **AT1s** as vulnerable to new negative headlines and do not find the Credit Suisse story compelling longer term."[36]

19. Finally, the regulatory treatment of AT1 bonds corroborates their homogeneity. The Swiss financial market regulator (FINMA), treated all nine Credit Suisse AT1 bonds as a uniform class, consistent with the market's view that these instruments respond collectively to issuer-level risks rather than to individual bond features. At the March 19, 2023, press conference announcing the UBS–Credit Suisse resolution, FINMA Chairwoman Marlene Amstad emphasized the use of AT1 bonds as a single, unified policy instrument in explaining why shareholders received compensation while AT1 holders were fully written down:

> …the AT1, the **whole package** has the intention to stabilize the financial system and to assure the stability of the financial system, and for this transition phase we needed the capital. And the foreseen instrument in such a situation, as in the Too

Wealth Management, these outflows have reduced substantially from the elevated levels of the first two weeks of October 2022 although have not yet reversed and were approximately 10% of assets under management at the end of the third quarter of 2022.").

34 *See* Backup Materials of my Efficiency Report, "Cammer_5.xlsx".

35 Bank of America, "Improving liquidity reduces tail risks," December 5, 2022 (emphasis added).

36 Autonomous, "The cost of repairing the LCR ratio," December 20, 2022 (emphasis added).

> Big To Fail instrument, is the AT1. And so this is why we've chosen to stick to this Too Big To Fail framework and to trigger only the AT1.[37]

20. In summary, the approach I applied does not assume the nine Credit Suisse AT1 bonds are economically identical; it aggregates responses to common information in a shared policy-risk environment.

## 5 THE POOLED *CAMMER* FACTOR 5 ANALYSIS IS STATISTICALLY SOUND

21. My analysis of the *Cammer* factor 5 in my Efficiency Report rests on a statistically robust methodology. I compared the proportion of News Days with significant price movements to the proportion of Least News Days with such movements, pooling all available observations across the nine Credit Suisse AT1 bonds. I then tested the statistical significance of the difference between these two proportions.[38] This is not a novel approach; it is the identical statistical method used by the plaintiff's expert for the Credit Suisse Notes in the *Diabat* case,[39] which the Court approved when certifying that class.[40]

22. Pooling the Credit Suisse AT1 bonds increases the power of the statistical test. As I explain in my Efficiency Report, and Prof. Smith does not dispute, "AT1 bonds are traded in over-the-counter ("OTC") markets, where transactions occur through bilateral negotiations between dealers—usually large global banks—and their clients. The bond market is decentralized and geographically dispersed, with participants linked electronically through platforms such as Bloomberg, Tradeweb, or MarketAxess. Unlike common stocks, which trade continuously in high volume on centralized exchanges, most bonds trade far less frequently, often only when a particular holder decides to buy or sell. As a result, pricing is less transparent, and liquidity is fragmented

[37] The Swiss Federal Council. (2023, March 19). *19.03.23 - BP Berset - BR Keller-Sutter zu: Finanzplatz Schweiz* [Video]. YouTube. https://www.youtube.com/watch?v=gmT0-w_0Ex4, at 1:35:11-53 (emphasis added). Note also the use of the "instrument" in singular, rather than plural form.

[38] Efficiency Report ¶ 159.

[39] *See* Cain Report ¶ 162. As the Expert Reply Report of Matthew D. Cain, PhD, dated January 28, 2025 ("Cain Reply Report"), *Ali Diabat. v. Credit Suisse Group AG et al*, No. 1:23-cv-05874 (Doc. No. 135-1) highlights, and I agree, performing an event study "for each of the Credit Suisse Notes" separately, as I did for the Credit Suisse AT1 bonds, explicitly controls for the "distinct economic features," such as different coupon rates, that Prof. Smith asserts. *See*, Cain Reply Report ¶ 127.

[40] *See Credit Suisse*, 2025 WL 1866293, at *11.

across different dealers and instruments."[41] This market structure introduces noise in measured bond returns, which, in turn, makes it less likely to detect abnormal returns even when there is a fundamental change in the market value of the security.[42]

23. Pooling the Credit Suisse AT1 bonds for *Cammer* factor 5 analysis is not only statistically sound,[43] but also appropriate here in view of legal precedence and case law. As I detail in my Efficiency Report, and Prof. Smith does not dispute, courts endorse a flexible and holistic assessment reflecting how bond markets function.[44] Analysing the nine Credit Suisse AT1 bonds collectively is a sound approach to conduct this holistic assessment and is consistent with how market participants, including regulators, view this asset class.

24. In contrast, Prof. Smith's alternative bond-by-bond approach has statistical limitations. My aggregate analysis employed a sample of 39 News Day bond pairs, whereas Prof. Smith's approach divides this data into nine separate tests.[45] Prof. Smith's fragmentation reduces the statistical power of the analysis, making it more difficult to detect a significant relationship even if one exists.[46] As is well understood by statisticians, a null result from an underpowered test does not necessarily indicate the absence of a relationship.[47]

25. In his report, Prof. Smith cited two particular dates when the prices of Credit Suisse AT1 bonds "did not move in tandem:"[48] March 15, 2023, and March 16, 2023. Considering my previous

---

[41] Efficiency Report ¶ 39 (footnotes omitted).

[42] *See, e.g.,* Bessembinder, H., Kahle, K.M., Maxwell, W.F, and Xu, D. (2009). Measuring Abnormal Bond Performance. *Review of Financial Studies, 22*(10), 4219-4258. The authors, in particular, are critical of the view that multiple bonds issued by the same firm should be treated as independent observations.

[43] As explained in the Cain Reply Report, and I agree, "[p]ooling non-identical data to perform hypothesis tests is a standard practice." *See* Cain Reply Report ¶¶ 127-28.

[44] Efficiency Report ¶ 64.

[45] Smith Report ¶ 56. *See also* Efficiency Report ¶ 158.

[46] *See, e.g.*, Cohen, J. (1977). The concepts of power analysis. In J. Cohen, *Statistical power analysis for the behavioral sciences* (pp. 1–17). Academic Press., at 7 ("As is intuitively obvious, increases in sample size increase statistical power, the probability of detecting the phenomenon under test.").

[47] Altman, D. G., and Bland, J. M. (1995). Statistics notes: Absence of evidence is not evidence of absence. *BMJ, 311*(7003), 485.

[48] Smith Report ¶ 52.

arguments, this is precisely the type of randomness I would expect to find during *some* of the trading days in the sample, which underscores the reason for pooling the bonds for the purpose of the statistical analysis. I say randomness because Prof. Smith (i) bases his argument on only two trading days from the entire class period without explaining how these days were selected, and (ii) does not provide fundamental explanations on *why* some of the bond returns diverged from others during these two days. In the absence of such explanatory information, one is left to conclude that the observed cross-bond dispersion in abnormal returns is random noise, which further corroborates my argument about pooling the bonds to increase statistical power.

26. Ignoring the facts above, and relying on his flawed opinion regarding the heterogeneity of the Credit Suisse AT1 bonds, Prof. Smith contends that the pooled approach applied in my Efficiency Report is flawed. His position, therefore, stands in direct contradiction to established precedent. This Court has already resolved this precise methodological issue, and Prof. Smith offers no principled basis for distinguishing the current case from the *Diabat* case. In addition, bond-level tests are underpowered in OTC markets; pooling improves test power without changing the null hypothesis.

## 6 Prof. Smith's "Hindsight Bias" Argument is Unfounded and Ignores the Unfolding Liquidity Crisis Preceding the Write-Down

27. Prof. Smith contends that my selection of News Days is "unscientific and biased."[49] His main argument is that the inclusion of March 19, 2023,[50] as a News Day suffers from "hindsight bias" because I knew, when I began my analysis, that the write-down event has actually occurred.[51] Prof. Smith's argument is flawed for two reasons: (i) the write-down event was preceded by an unfolding crisis of confidence that had placed Credit Suisse within the risk zone for regulatory intervention, and (ii) even when one accepts Prof. Smith's flawed argument to exclude March 19, 2023, as a News

[49] Smith Report ¶ 49.

[50] I note that the regulatory intervention to write-down all Credit Suisse AT1 bonds to zero was announced on March 19, 2023. As this day was a Sunday, I used the next trading day, March 20, 2023, to assess the market impact of this news (*see* Efficiency Report ¶ 156 and Exhibit 9). The approach of using March 20, 2023, to assess the impact of the news released on March 19, 2023, was also used by the Cain Report in *Diabat* (*see* Cain Report, n. 220).

[51] Smith Report ¶ 61.

Day from the *Cammer* factor 5 analysis, the results still point clearly toward market efficiency.[52] I elaborate on each of these arguments in Sections 6.1 – 6.3 that follow.

### 6.1 Prof. Smith Ignores Judicial Precedent in the *Diabat* Case

28. Prof. Smith misrepresents the objective methodology I employed in my *Cammer* factor 5 analysis. My selection of News Days followed a pre-defined, objective set of criteria, including earnings releases, earnings guidance updates, credit rating changes, and the regulatory intervention to write-down all Credit Suisse AT1 bonds to zero on March 19, 2023.[53]

29. I further note that Prof. Smith fails to recognize this exact same approach has already been validated by this Court in the *Diabat* case, where the Plaintiff's expert treated this same date (March 20, 2023) as a News Day for the Credit Suisse Notes, and the Court subsequently certified the class, affirming the soundness of the methodology.[54] The approach I used aligns closely with the approach used by the Plaintiff's expert in *Diabat*.

30. To analyze the *Cammer* factor 5, I examined the cause-and-effect relationship between value-relevant information and price movements for Credit Suisse's AT1 bonds. I regressed the daily return of each Credit Suisse AT1 bond on the daily return of the overall market, the industry, the risk-free rate, and the AT1 asset class.[55] I used these results to calculate the abnormal returns for each day of the Class Period and tested their statistical significance.[56]

31. I then compared the proportion of significant price movements of the Credit Suisse AT1 bonds on days with news ("News Days") to the proportion of significant price movements on days with little or no news ("Least News Days"). I objectively identified News Days based on public news announcements during the Class Period that were likely to contain new information relevant

[52] Prof. Smith also identified a stray reference to "stock" in my original report. (Smith Report, ¶ 46). That reference was inadvertent. The security at issue is Credit Suisse's Additional Tier 1 ("AT1") bonds. All datasets, event windows, and statistical tests were performed on the nine Credit Suisse AT1 bonds; no equity securities were analyzed. This drafting artifact had no effect on my analysis or conclusions.

[53] Efficiency Report ¶ 156.

[54] *See* Cain Report ¶ 160. *See also Credit Suisse*, 2025 WL 1866293, at *11.

[55] Efficiency Report ¶ 151.

[56] Efficiency Report ¶¶ 152-53.

to AT1 investors: earnings releases, earnings guidance updates, credit rating changes and the regulatory intervention to write-down all Credit Suisse AT1 bonds to zero on March 19, 2023.[57]

32. This objective methodology for identifying news days is well-established and accepted by courts.[58] The reliability of this approach is further reinforced by its application in the *Diabat* case, where March 19, 2023, was included in the definition of news days.

33. The result of my *Cammer* factor 5 analysis supports market efficiency. Among the 39 News Days bond pairs, 41% exhibited statistically significant price movements, compared to only 11% of the 471 Least News Days bond pairs.[59] The results from a Fisher's exact test confirmed that this difference is statistically significant at the 99% confidence level, providing strong evidence of a cause-and-effect relationship between public information and Credit Suisse AT1 bond price movements.[60]

### 6.2 Prof. Smith's "Hindsight Bias" Argument Ignores the Crisis of Confidence that Unfolded During the Class Period Placing Credit Suisse Within the Risk Zone for Regulatory Intervention

34. Prof. Smith's claim that analyzing the market reaction to the March 19, 2023, write-down event constitutes "hindsight" bias fundamentally misinterprets the information environment surrounding Credit Suisse AT1 bonds, including the public crisis of confidence that preceded the write-down event.

35. For banks, a crisis of confidence is precisely the type of environment that could trigger regulatory intervention to prevent failure. In a crisis of confidence, depositors flee, depriving banks of liquidity. This is because banks—operating under a fractional reserve system—do not hold sufficient cash to pay every single depositor who wants to leave the bank. When the deposit flight

---

[57] Efficiency Report ¶¶ 156-57.

[58] *See, e.g.*, *Teva*, at *29 ("[I]t is a virtue that [the expert] does not analyze the news' content before running his tests. By reducing subjectivity in that way, [the] tests give me confidence that [the expert] has not intentionally (or unconsciously) influenced the outcome of his tests results" and noting that "[n]umerous other courts have also credited non-directional event studies.").

[59] Efficiency Report ¶ 159.

[60] Efficiency Report ¶ 159.

exceeds a critical threshold, banks are forced to either sell illiquid assets at a loss,[61] or sell long-maturity securities, which, in the interest rate environment of the class period, would also be sold at a loss.[62] In turn, this forced sale can cause a bank run—a self-fulfilling destruction of a bank triggered by the simultaneous exodus of a large number of depositors. Bank runs, especially runs on major banks, can cause contagion throughout the financial sector, leading to multiple bank failures.[63] Such banking crises can be costly to society, necessitating significant taxpayer assistance, as was the case in the aftermath of the Great Financial Crisis of 2008-2009. For this reason, the Basel III framework requires regulators to intervene *before* the crisis of confidence degenerates into an unstoppable bank run. And, a primary tool of such regulatory intervention is to write down the value of the AT1 bonds, thereby imposing losses on bond investors rather than society at large.

36. Thus, any event, or information, that signals loss of confidence in a bank is directly relevant to the market value of AT1 bonds. The higher the loss of confidence, the higher the risk of a bank run, and the higher the probability that the regulator will choose to invoke the AT1 write-down mechanism just before the run on the bank is about to start. This is precisely what happened in the case of Credit Suisse.

37. Investors in AT1 bonds understand, from the bonds' offering documents, that complete loss of capital resulting from regulatory intervention is a core feature of AT1 securities and a primary risk—a fact well anchored in the Basel III framework.[64] This framework creates a binary, catastrophic risk: a full write-down when authorities perceive that the bank cannot survive as a going

---

[61] Diamond, D. W., and Dybvig, P. H. (1983). Bank runs, deposit insurance, and liquidity. *Journal of Political Economy, 91*(3), 401-419.

[62] Drechsler, I, Savov, A., Schnabl, P. and Wang, O. (2023). *Deposit Franchise Runs*. National Bureau of Economic Research Working Paper No. 31138.

[63] *See*, *e.g.*, Allen F. and Gale, D. (2000). Financial Contagion. *Journal of Political Economy, 108*(1), 1–33.

[64] *See, e.g*., Avdjiev, S., Bogdanova, B., and Kartasheva, A. (2013). CoCos: A Primer. *BIS Quarterly Review*, 43-56, at 45, 46, explaining that "[U]nless the conditions under which regulators will exercise their power to activate the loss absorption mechanism are made clear, such power could create uncertainty about the timing of the activation." *See also,* Kind, A., Oster, P., and Peter, F. J. (2022). The determinants of banks' AT1 CoCo spreads. *European Financial Management*, *28*(2), 567-604, at 572, noting that "European member states enjoy a margin of discretion in deciding on a PoNV event and triggering CoCos' conversion or write-down. Both from a systemic and an individual risk perspective, the independent scope of action by national regulators will bring advantages (e.g., the situational management of a local crisis), but also disadvantages (e.g., the impracticality of an accurate probability analysis for the likelihood of PoNV events)." This confirms that material uncertainty exists regarding the trigger conditions for intervention.

concern. Because AT1 bond prices depend heavily on the likelihood of such an intervention, a rational investor would necessarily monitor regulatory posture, liquidity news, and public confidence in the bank, as the key drivers of value. Information about these conditions allows investors to update their probability assessments of intervention. As Prof. Smith himself concedes, these securities have a "greater exposure to the financial performance of the issuing bank," and are therefore "typically more sensitive to information about the bank's financial position."[65]

38. The crisis of confidence affecting Credit Suisse in March 2023 grew out of events pre-dating the Class Period. On March 11, 2022, Reuters published an article titled "Swiss gov't proposes public liquidity backstop for big banks," suggesting that the Swiss government stood ready to intervene with "state-guaranteed cash should one of the country's big banks fail."[66] Credit Suisse, at that time was one of only two large Swiss banks that could have been affected by such policy.

39. In July 2022, the U.S. Securities and Exchange Commission (SEC) inquired into potential deficiencies related to internal controls for financial reporting (ICFR) at Credit Suisse and asked for information regarding material weaknesses dating back to April 2021.[67]

40. After Credit Suisse attempted to address the SEC's concerns, the SEC followed up in October 2022, asking the Bank to "explain in more detail each of the control deficiencies it had previously identified, and to explain how [Credit Suisse] concluded that those control deficiencies did not rise to the level of a material weakness."[68] In other words, the SEC "did not buy [the Bank's] initial explanation for why its ICFR was inadequate."[69]

41. During the months that followed, a series of news related to deposit outflows contributed to the increase in the loss of confidence and placed the bank within the risk zone of regulatory intervention. For example, on October 27, 2022, the bank acknowledged "a significant level of

---

[65] Smith Report ¶ 17.

[66] *See* Reuters, "Swiss gov't proposes public liquidity backstop for big banks," March 11, 2022, https://www.reuters.com/business/finance/swiss-govt-proposes-public-liquidity-backstop-big-banks-2022-03-11/.

[67] *See Diabat v. Credit Suisse Grp. AG* ("Diabat I"), 2024 WL 4252502, at *99, *131-32 (S.D.N.Y. Sept. 19, 2024).

[68] *Id.* at *134.

[69] *Id.* at *133.

deposit in AUM outflows."[70] On November 23, 2022, Reuters published an article titled "Credit Suisse flags hefty loss as rich clients pull out."[71] And, on February 9, 2023, Credit Suisse reported "customer outflows of 110.5 billion Swiss francs in the final three months of 2022, a figure which far exceeded market expectations."[72] These events collectively raised the possibility of regulatory intervention. For example, on February 20, 2023, Reuters stated that

> "The Swiss financial regulator is reviewing remarks made by Credit Suisse Group [] Chairman Axel Lehmann about outflows from the lender having stabilized in early December, two people with knowledge of the matter have told Reuters. Finma is seeking to establish the extent to which Lehmann, and other Credit Suisse representatives, were aware that clients were still withdrawing funds when he said in media interviews that outflows had stopped, said the two people, who asked to remain anonymous because the matter was not public."[73]

42. The final week of the Class Period accelerated the crisis of confidence and placed the bank more solidly into the risk zone of a regulatory intervention that could result in a write-down of AT1 bonds. On March 15, 2023, news emerged that Credit Suisse was unable to secure a loan from the Saudi National Bank (one of its main investors) and instead was forced to borrow, on an emergency basis, from the Switzerland's central bank, the Swiss National Bank.[74] The following day, on March 16. 2023, the Swiss Federal Council (the executive branch of the country's government) issued a formal emergency ordinance that created the framework for extraordinary liquidity assistance—it authorized the Swiss National Bank to make additional emergency loans to Credit Suisse and guaranteed that such loans would be protected by the Swiss government in the event of default.[75] The process escalated over the weekend when, on Sunday, March 19, the Swiss Federal Council,

[70] Complaint ¶ 66.

[71] Complaint ¶ 72.

[72] Complaint ¶ 80.

[73] Complaint ¶ 81.

[74] *See* Financial Times, "Swiss central bank offers Credit Suisse liquidity backstop," March 15, 2023, https://www.ft.com/content/0324c5a6-cecd-4fb3-85b3-7cdc99a33e4e.

[75] *See* "Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National Bank to Systemically Important Banks" 952.3, published by the Swiss Federal Council, dated March 16, 2023, Section 3, Article 4.

having observed significant loss of confidence and deposit outflows the previous Friday, March 17[76], amended the March 16 ordinance to grant FINMA explicit authority to order the write-down of the AT1 capital.[77] FINMA announced its decision to do so that same day. Since the announcement occurred on a Sunday, the market's reaction necessarily appeared on the next trading day, March 20, 2023.

43. In sum, Prof. Smith's "hindsight bias" argument fails. The write-down was not a random event selected after the fact; it was within the range of probabilities that a reasonable investor would have considered and monitored throughout the class period. The news on prior days (such as the emergency loan on March 15) informed investors about the foreseeable possibility of such intervention. The March 19, 2023, announcement, however, was new, material information because it resolved this uncertainty, confirming a certain 100% loss. This shift from a possibility of loss to the fact of loss is precisely the "value-relevant regulatory event" my objective methodology was designed to capture *ex-ante*, not a product of hindsight. Prof. Smith's argument implicitly categorizes the March 19, 2023, write-down event as an "act of God"—a natural event like an earthquake, hurricane, lightning, or sudden flood that occurs without human agency and could not have been prevented or avoided by reasonable foresight, care, or prudence. Excluding such "act of God" events from my *Cammer* factor 5 analysis would have been, indeed, appropriate. But in this case the event in question is endogenous to the firm's deteriorating financial condition and its inclusion in the *Cammer* factor 5 analysis is justifiable and appropriate *ex-ante*.

### 6.3 Prof. Smith's Own Sensitivity Test Supports Market Efficiency

44. Prof. Smith contends that if I exclude the March 19, 2023, write-down event from my

[76] *See* The Swiss Federal Council. (2023, March 19). *19.03.23 - BP Berset - BR Keller-Sutter zu: Finanzplatz Schweiz* [Video]. YouTube. https://www.youtube.com/watch?v=gmT0-w_0Ex4, at 00:03:30-. The President of the Swiss Confederation, Mr. Alain Berset, said: "Vendredi [17 mars] nous [le Conseil Fédéral] avons constaté que les sorties de liquidité et la volatilité des marchés démontraient que la confiance nécessaire ne pourrait plus être restaurée et qu'une solution rapide et garante de stabilité était indispensable" (translated as "on Friday [March 17], we [the Federal Council] observed that the liquidity outflows and market volatility demonstrated that the necessary confidence could no longer be restored and that a rapid solution guaranteeing stability was essential.").

[77] *See* "Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National Bank to Systemically Important Banks" Amendment of March 19, 2023, Article 5a: "At the time of the credit approval in accordance with Article 5, FINMA may order the borrower and the financial group to write down additional Tier 1 capital."

*Cammer* factor 5 analysis, my conclusion of market efficiency is no longer supported. Aside from the fact that there is no scientific basis to exclude this event (as discussed above in Section 6.2), Prof. Smith's own analysis inadvertently reinforces the conclusion of market efficiency. Considering his flawed approach for the sake of argument, *Cammer* factor 5 analysis shows that nearly a quarter (23.3%) of News Days are associated with significant price movements, compared to just one in ten (10.6%) of Least News Days.[78] This still represents a more than two-fold difference, demonstrating a clear cause-and-effect relationship between new company-specific information and Credit Suisse AT1 bonds' price movements.

45. Prof. Smith's removal of nearly a quarter (23%) of the observations artificially depresses the statistical power of the Fisher's exact test, resulting in a p-value of 0.066.[79] In other words, Prof. Smith's own test shows a difference in the average price movements between News and Least News Days with a confidence level of (1-0.066) = 93.4%. This still demonstrates meaningful evidence of a cause-and-effect relationship between new company-specific information and Credit Suisse AT1 bonds' price movements.

46. In sum, Prof. Smith's unsupported decision to exclude March 19, 2023, from the set of News Days does not alter my opinion on market efficiency. The fact that my finding remains robust even under Prof. Smith's flawed methodology underscores the strength of my original conclusion.

# 7 PROF. SMITH'S CONTENTION THAT THE MARCH 20 PRICE REACTION WAS UNRELATED TO THE MARCH 19 ANNOUNCEMENT APPEARS TO MISS THE FACT THAT MARCH 19 WAS A SUNDAY

47. As a side argument, Prof. Smith also contends that no price inflation was left on March 20, 2023, considering the fact that the write-down event had happened the previous day. Prof. Smith

[78] Smith Report, Exhibit 5.

[79] Smith Report, Exhibit 5. A p-value between 0.05 and 0.10 denotes that the difference is marginally significant, which is an accepted standard in academic studies when the power of the statistical test is known to be low. I note that Prof. Smith appears to use a two-sided Fisher's exact test ("are there *more*/*less* News Days with statistically significant abnormal returns than Least News Days?"), whereas I performed a one-sided Fisher's exact test ("are there *more* News Days with statistically significant abnormal returns than Least News Days?"). I re-ran the test performed by Prof. Smith using my one-sided Fisher's exact test, resulting in a p-value of 0.042. This further undermines the conclusion of a clear cause-and-effect relationship between new company-specific information and Credit Suisse AT1 bonds' price movements.

states that "the price of the [Credit Suisse] AT1 Bonds should no longer reflect the alleged misrepresentations" after March 19, 2023, and that "based on Plaintiff's alleged timing of when the truth was revealed or undisclosed risks allegedly materialized, no price inflation would remain on March 20, 2023."[80]

48. In this argument, Prof. Smith appears to miss the fact that March 19, 2023, was a Sunday, and thus a non-trading day.[81] Therefore, assessing the market impact on the nine Credit Suisse AT1 bond prices through an event study analysis can only be done on the next trading day, which was March 20, 2023. The Plaintiff's expert in the certified *Diabat* case also applied this approach of measuring the market impact on the first trading following the March 19, 2023, disclosure.[82]

## 8 CONCLUSION

49. For the reasons set out above and in my original Efficiency Report, it is my opinion that the market for the nine Credit Suisse AT1 bonds was informationally efficient during the Class Period, and that damages may be measured using a class-wide, common methodology. The indirect *Cammer* factors (trading activity, analyst and market-maker attention, issuer eligibility and related market metrics) all point in the same direction. And the direct *Cammer* factor 5 test—properly specified for bonds and applied to the pooled AT1 return series—demonstrates a clear cause-and-effect relationship between value-relevant public information and price movements.

50. Prof. Smith's criticisms do not undermine those conclusions. His analysis rests on a "fundamental" efficiency standard (requiring prices to react fully, rapidly, and in the correct direction) that is not the legal test for invoking *Basic*'s presumption of reliance. The Supreme Court in *Halliburton II* reaffirmed that courts need not embrace any particular economic model of how "quickly and completely" information is reflected in price; the presumption rests on the modest premise that market professionals generally consider most publicly announced material statements and that such information is incorporated into market prices. That is the informational efficiency

[80] Smith Report ¶ 65.

[81] Again, the weekday confusion seems to be limited to this specific paragraph, which appears otherwise disjoint from the rest of his arguments. Elsewhere in the report, Prof. Smith does indeed recognize that March 19, 2023, was a Sunday and that the correct day to measure the price reaction was March 20, 2023.

[82] Cain Report, n. 220.

standard I apply here.

51. Economically, Prof. Smith's bond-by-bond approach also misapprehends the common information environment for AT1 bonds. Under Basel III, AT1 instruments sit in the same place in the capital structure, share the same loss-absorption mechanisms, and are designed to transmit issuer-level regulatory action into investor losses when regulators determine that banks cannot continue as going-concerns. Those are precisely the determinants the BIS identifies as first-order drivers of CoCo pricing; they are shared across the nine Credit Suisse AT1 bonds and dominate minor coupon or reset differences. Treating the nine issues as if they were idiosyncratic equity-like series issued by different firms, obscures this common, policy-driven risk.

52. Methodologically, pooling the abnormal return series of the nine Credit Suisse AT1 bonds is both economically justified and statistically necessary. AT1s trade in OTC markets whose microstructure frictions reduce power in bond-level event studies and increase the risk of false negatives. Aggregating across securities exposed to the same dominant risk factor increases power without biasing the test, and it is consistent with how market participants and regulators viewed Credit Suisse's AT1 capital during the Class Period. The pooled *Cammer* factor 5 result—substantially higher rates of statistically significant moves on News Days than on Least News Days—accordingly provides probative evidence of informational efficiency.

53. Nor does Prof. Smith's "hindsight" critique of including March 20, 2023 (the first trading day following FINMA's March 19 action), withstand scrutiny. AT1s are a policy tool whose principal, disclosed risk is a complete write-down upon regulatory determination of non-viability. News of accelerating confidence and liquidity stress—culminating in extraordinary official-sector measures—was public before March 19, 2023; in that context the regulatory write-down was a foreseeable manifestation of the very risk AT1 investors monitor *ex-ante*. That is why the date qualifies as a News Day under my objective criteria, and why the market impact properly appears on March 20, 2023 (the next trading day). Even setting that day aside per Prof. Smith's sensitivity, his own tabulations still show a roughly two-to-one gap in the frequency of significant moves on News versus Least News Days—evidence that remains consistent with an efficient response to public information.

54. In sum, under the *Halliburton II* standard, the record shows that Credit Suisse's AT1 bond prices generally incorporated new, material public information during the Class Period. Prof. Smith's alternative legal standard is incorrect, his economic premise overlooks the common regulatory-risk channel that unifies these nine instruments, and his methodological critiques are neither consistent with market structure nor supported by his own sensitivities. My opinions therefore remain unchanged: the market for Credit Suisse AT1 bonds was efficient for purposes of class certification, and damages are measurable on a class-wide basis using a common methodology.

I declare under penalty of perjury that the foregoing is true and correct.

*RESPECTFULLY SUBMITTED THIS October 24, 2025*

Sorin M. Sorescu, Ph.D.

# APPENDIX A


**SORIN M. SORESCU**

*Foreman R. and Ruby Bennett Chair in Business Administration*
Professor and Director of the *Adam C. Sinn `00 Center for Investment Management*
Mays Business School at Texas A&M University College Station, Texas 77843-4113
Email: ssorescu@tamu.edu


October 24, 2025

**AREAS OF RESEARCH AND TEACHING INTEREST**

- Market Efficiency
- Asset Management and Asset Allocation
- Banking and Macro Finance

**EDUCATION**

| | | |
|---|---|---|
| • University of Florida | Ph.D. in Finance | 1996 |
| *Dissertation topic: The Effect of Options on Stock Prices.* | | |
| • McGill University | Master of Business Administration | 1991 |
| • McGill University | Bachelors of Electrical Engineering | 1988 |

**EXPERIENCE**

**Academic:**

| | | |
|---|---|---|
| • Director of the *Adam C. Sinn `00 Center for Investment Management* | *Texas A&M University* | *since 2023* |
| • Executive Associate Dean | Texas A&M University | 2020-2023 |
| • Head of the Department of Finance | Texas A&M University | 2009-2021 |
| • Professor (tenured) | Texas A&M University | since 2009 |
| • Associate Professor (tenured) | Texas A&M University | 2002 to 2009 |
| • Assistant Professor | University of Houston | 1996 to 2002 |
| • Research Assistant | University of Florida | 1992 to 1996 |
| • Teaching Assistant | McGill University | 1990 to 1992 |

**Non Academic:**

| | | |
|---|---|---|
| • Electrical Engineer | CAE Electronics (Montreal, Canada) | 1988 to 1990 |

**REFEREED PUBLICATIONS**

- Baratsas, Stefanos. G., Alexander M. Niziolek, Onur Onel, Logan R. Matthews, Christodoulos A. Floudas, Detlef R. Hallermann, Sorin M. Sorescu, and Efstratios N. Pistikopoulos, 2021, "A framework to predict the price of energy for the end-users with applications to monetary and energy policies," **Nature Communications** 12 (18).

- Sorescu, Alina, Sorin Sorescu, William Armstrong, and Bart Devoldere, 2018, "*Two Centuries of Innovations and Stock Market Bubbles,"* winner of an MSI Research Competition Grant, 2013, winner of the Best Paper Award at the Strategic Management Conference, Lausanne, 2013, winner of Mays Business School interdisciplinary research proposal, **Marketing Science**, 37 (4), 507-529.

- Akbas, Ferhat, Ekkehart Boehmer, Bilal Erturk and Sorin Sorescu, 2017, "*Short Interest, Returns, and Information*," **Financial Management**, 46(2), 455-486.

**REFEREED PUBLICATIONS (continued)**

- Sorescu, Alina and Sorin Sorescu, 2016, "*Customer Satisfaction and Long-Term Stock Returns*," **Journal of Marketing**, 80 (September), 110-115.
- Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2016, "*Capital Markets Efficiency and Arbitrage Efficacy,"* **Journal of Financial and Quantitative Analysis**, 51 (2), 387-413.
- Akbas, Ferhat, William Armstrong, Sorin Sorescu, and Avanidhar Subrahmanyam, 2015, "*Smart Money, Dumb Money, and Equity Return Anomalies,"* **Journal of Financial Economics**, 118 (2), 355-382.
- Johnson, Shane, Theodore Moorman, and Sorin M. Sorescu, 2009, "*A Reexamination of Corporate Governance and Equity Prices,*" **Review of Financial Studies**, 22 (11), 4753-4786.
- Boehme, Rodney D., Bartley R. Danielsen, Praveen Kumar, and Sorin M. Sorescu, 2009, "*Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) Meets Miller (1977),"* **Journal of Financial Markets**, 12 (3), 438-468.
- Kumar, Praveen, Sorin M. Sorescu, Rodney D. Boehme, and Bartley R. Danielsen, 2008, "*Estimation Risk, Information, and the Conditional CAPM,*" **Review of Financial Studies**, 21 (3), 1037-1076. Leading article.
- Kolari, Jim, Theodore Moorman, and Sorin M. Sorescu, 2008, "*Foreign Exchange Risk and the Cross- Section of Stock Returns,*" **Journal of International Money and Finance**, 27 (7), 1074-1097.
- Boehme, Rodney D., Bartley R. Danielsen, and Sorin M. Sorescu, 2006, "*Short-sale Constraints, Dispersion of Opinion and Overvaluation,*" **Journal of Financial and Quantitative Analysis**, 41 (2), 455-487.
- Sorescu, Sorin M., and Avanidhar Subrahmanyam, 2006, "*The Cross-Section of Analyst Recommendations*," **Journal of Financial and Quantitative Analysis**, 41 (1), 139-168.
- Boehme, Rodney, and Sorin M. Sorescu, 2002, "*The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?*," **Journal of Finance**, 57 (2), pp. 871-900.
- Danielsen, Bartley, and Sorin M. Sorescu, 2001, "*Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints*," **Journal of Financial and Quantitative Analysis**, 36 (4), pp. 451-484.
- De Young, Robert, William Lang, Mark J. Flannery, and Sorin M. Sorescu, 2001, "*The Information Content of Bank Exam Ratings and Subordinated Debt Prices*," **Journal of Money, Credit and Banking**, 33 (4), pp. 900-925.
- Sorescu, Sorin M., 2000, "*The Effect of Options on Stock Prices: 1973-1995*," **Journal of Finance**, 55 (1), pp. 487-514.
- Flannery, Mark J., and Sorin M. Sorescu, 1996, "*Evidence of Bank Market Discipline in Subordinated Debenture Yields: 1983-1991*," **Journal of Finance**, 51 (4), pp. 1347-1377.

**WORKING PAPERS**

- Flannery, Mark J. and Sorin M. Sorescu, 2024, *Partial Effects of Fed Tightening on U.S. Banks' Capital*.
- Kim, Hwagyun, Adam C. Kolasinski, Sang-Ook Shin, Sorin M. Sorescu, 2023, *Bank Runs, Ambiguity, and Stock Prices.*

**WORKING PAPERS (continued)**

- Kang, Le, Hwagyun Kim, Ju Hyun Kim, Seongjin Kim, and Sorin M. Sorescu, 2023, *How to (Properly) Compete Credit Default Swap Returns*.

**WORK IN PROGRESS**

- Large Language Models and Stock Returns (with Boone Bowles, Avanidhar Subrahmanyam, and Raymond Duch)
- US national debt and the value of the US dollar seigniorage
- Ownership form and outcomes in the healthcare industry
- Time series return predictability and asset allocation

**APPLIED RESEARCH – ENERGY PRICE INDEX**

- Baratsas, Stefanos, Christodoulos Floudas, Efstratios Pistikopoulos, and Sorin M. Sorescu, 2018, *Texas A&M Energy Price Index* (TEPI). Comprised of 56 different energy products, the TEPI measures changes in the price level of a representative basket of energy consumption from the perspective of the aggregate US consumer. In addition to the broader TEPI, we developed four sector-specific sub- indices, each of them focused on measuring changes in energy prices that are relevant to specific sectors of the economy:
    - Residential Energy Price Index
    - Transportation Energy Price Index
    - Commercial Energy Price Index
    - Industrial Energy Price Index.

**AWARDS AND HONORS**

- 2018 — *Foreman R. and Ruby Bennett Chair in Business Administration*, Mays Business School, Texas A&M University
- 2016-2018 — *Ruby and Earle A. Shields Jr. '41 Chair in Investment Advising,* Mays Business School, Texas A&M University
- 2017 — *Selfless Service Resolution* passed by the Student Senate of Texas A&M University in recognition of 15 years of service to the university and its student body
- 2013 — *Dan H. Robertson Outstanding MBA Faculty Member Award*, selected by MBA students as best teacher in the MBA Program, Texas A&M University
- 2007-2016 — *Patricia and Bookman Peters Research Professorship*, Mays Business School, Texas A&M University
- 2003-2007 — *Mays Research Fellow*, Mays Business School, Texas A&M University
- 2001-2002 — *Bauer Faculty Fellow*, C.T. Bauer College of Business, University of Houston
- 2000 — *MidCon Award* for Best Teaching Performance in the Executive MBA Program, C.T. Bauer College of Business, University of Houston
- 2000 — *Melcher Teaching Fellow*, College of Business Administration, University of Houston
- 1999 — *Melcher Research Fellow*, College of Business Administration, University of Houston
- 1998 — *Melcher Teaching Fellow*, College of Business Administration, University of Houston
- 1998 — *MidCon Award* for Best Teaching Performance in the Executive MBA Program, College of Business Administration, University of Houston
- 1996 — *Presidential Recognition* for outstanding student, University of Florida
- 1995 — *Doctoral Student Consortium Fellow*, Financial Management Association
- 1995 — *Competitive Paper Award* for Best Paper in Financial Institutions, FMA.
- 1992-1995 — *Competitive Doctoral Fellowship* from the Social Sciences and Humanities Research Council of Canada
- 1991 — *McGill Associates Medal and Fellowship* for Best MBA Student, McGill University.

**INVITED PRESENTATIONS ACADEMIC**

- Federal Deposit Insurance Corporation, Spring 2023
- Office of the Comptroller of the Currency, Spring 2023
- Texas Tech University, Spring 2013
- University of Georgia, Spring 2010
- Florida State University, Spring 2010
- Tilburg University, Spring 2008
- University of Florida, Spring 2007
- University of Texas San Antonio, Fall 2006
- University of Kansas, Spring 2003
- Texas Christian University, Spring 2003
- Texas A&M University, Fall 2001
- Stockholm School of Economics, Fall 2000
- Swedish School of Economics and Business Administration, Fall 2000
- University of Houston, Spring 1996
- Rutgers University, Spring 1996
- University of Wisconsin – Milwaukee, Spring 1996
- Federal Reserve Bank of Chicago, Spring 1996
- Michigan State University, Fall 1995
- Laval University, Spring 1995.

**INVITED PRESENTATIONS – INVESTMENT PROFESSIONALS**

- National Association of State Retirement Administrators, Fort Lauderdale, FL, 2007
- The Chicago Quantitative Alliance spring meeting, Las Vegas, NV, 2008
- The Super Bowl of Indexing, Phoenix, AZ, 2008
- Macquarie Securities Seminar, New York, NY, 2009

**CONFERENCE PROCEEDINGS**

- De **Young**, Robert, William Lang, Mark J. Flannery, and Sorin M. Sorescu, 1998, "*Could Publications of Bank CAMEL Ratings Improve Market Discipline?* " Proceedings of the 34th Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, pp. 402-421.
- Flannery, Mark J., and Sorin M. Sorescu, 1995, "*Pricing Bank Default Risk in Subordinated Debenture Yields*," Proceedings of the 31st Annual Conference on Bank Structure and Competition, Federal Reserve Bank of Chicago, pp. 459-482.

**CONFERENCE PRESENTATIONS**

- Akbas, Ferhat, William Armstrong, Sorin Sorescu and Avanidhar Subrahmanyam, "*Smart Money, Dumb Money, and Equity Return Anomalies,"* presented at the 2015 meetings of the American Finance Association, Boston, MA, January 2015.
- Akbas, Ferhat, William Armstrong, Sorin Sorescu and Avanidhar Subrahmanyam, "*Time Varying Market Efficiency,"* presented at the 2013 annual meetings of the American Finance Association, San Diego, CA, January 2013.
- Kumar, Praveen, Sorin M. Sorescu, Rodney D. Boehme and Bartley R. Danielsen, 2007, "*Estimation Risk, Information, and the Conditional CAPM,*" presented at the 2007 annual meetings of the Western Finance Association, Big Sky, Montana, 2007.
- Johnson, Shane, Theodore Moorman and Sorin M. Sorescu, 2006, "*Governance, Stock Returns, and Market Efficiency,*" presented at the 2007 annual meetings of the American Finance Association, Chicago, IL, January 2007.

**CONFERENCE PRESENTATIONS (continued)**

- Kolari, Jim, Theodore Moorman and Sorin M. Sorescu, 2006, "*Foreign Exchange Risk and the Cross-Section of Stock Returns,*" presented at the 2006 meetings of the Financial Management Association, Salt Lake City, UT, October 2006.
- Boehme, Rodney D., Bartley R. Danielsen Praveen Kumar, and Sorin M. Sorescu, 2006, "*Idiosyncratic Risk and the Cross-Section of Stock Returns: Merton (1987) meets Miller (1977),"* presented at the 2006 annual meetings of the Western Finance Association, Keystone, CO, June 2006.
- Boehme, Rodney D., Bartley R. Danielsen, and *Sorin M. Sorescu, 2003, "Short Sale Constraints and Overvaluation," presented at the 2003 meeti*ngs of the American Finance Association, Washington, DC, January 2003.
- Boehme, Rodney D., Bartley R. Danielsen, and Sorin M. Sorescu, 2002, "*Long-Term Performance after Stock Splits: Underreaction or Market Friction?*" presented at the 2002 meetings of the Financial Management Association, San Antonio, TX, October 2002.
- Boehme, Rodney, and Sorin M. Sorescu, 2000, "*The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?*," presented at the October 2000 Annual Meetings of the Financial Management Association, Seattle, Washington.
- Boehme, Rodney, and Sorin M. Sorescu, 2000, "*The Long-Run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance?*," presented at the August 2000 Annual Meetings of the European Finance Association, London, United Kingdom. on SSRN's Top Ten download lists for *Capital Markets: Market Efficiency*, *FEN Conferences and Meetings*, and *European Finance Association Meetings 2000*
- Danielsen, Bartley, and Sorin M. Sorescu, 2000, "*Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints*," presented at the October 2000 Annual Meetings of the Financial Management Association, Seattle, Washington.
- Ramchand, Latha, and Sorin M. Sorescu, 2000, "*Long Run Stock Returns Following Equity Offerings: A Study of Global Equity Offers by U.S. Firms*," presented at the October 2000 Annual Meetings of the Financial Management Association, Seattle, Washington.
- Danielsen, Bartley, and Sorin M. Sorescu, 2000, "*Why do Option Introductions Depress Stock Prices? An Empirical Study of Diminishing Short Sale Constraints*," presented (by co-author) at the April 2000 Annual Meetings of the Midwest Finance Association, Chicago, Illinois.
- DeYoung, Robert, Mark J. Flannery, William Lang, and Sorin M. Sorescu, 1998, "*The Informational Advantage of Specialized Monitors: The Case of Bank Examiners*," presented at the June 1998 Annual Meetings of the Western Economic Association, Lake Tahoe, Nevada.
- DeYoung, Robert, Mark J. Flannery, William Lang, and Sorin M. Sorescu, 1998, "*Could Publications of Bank CAMEL Ratings Improve Market Discipline*?," presented at Federal Reserve Bank of Chicago 34th Annual Conference on Bank Structure and Competition, May 1998, Chicago, Illinois.
- Sorescu, Sorin M., 1996, "*The Price Effect of Option Introductions*: 1973-1992," presented at the 1996 Annual Meetings of the Financial Management Association, New Orleans, Louisiana.
- Flannery Mark J., and Sorin M. Sorescu, 1995, "*Evidence of Bank Market Discipline in Subordinated Debenture Yields: 1983-1991*," presented at the October 1995 Annual Meetings of the Financial Management Association, New York City, New York, Winner of the 1995 FMA Award for Best Paper in Financial Institutions.
- Flannery, Mark J., and Sorin M. Sorescu, 1995, "*Pricing Bank Default Risk in Subordinated Debenture Yields,"* presented at the Federal Reserve Bank of Chicago 31st Annual Conference on Bank Structure and Competition, May 1995, Chicago, Illinois.

## TEACHING EXPERIENCE

### Undergraduate Level

- Hedge Funds (includes managing of a $4 million student-managed fund), 2024-2025
- Study-Abroad European Investment Management Class, 2023-2025
- Financial Markets and Institutions, Texas A&M University, 2017, 2018, 2020, 2023
- Aggies on Wall Street, Texas A&M University, 2014, 2015, 2016
- Trading and Active Management, Texas A&M University, 2008
- Introduction to Trading and Investments, Texas A&M University, 2011
- Investments, Texas A&M University, 2006, 2008
- Advanced Corporate Finance, University of Florida, 1995-1996
- Financial Markets and Institutions, University of Houston, 1996-2002.
- Maroon Fund, 2013-2015.

### MBA Level

- Macro-Economics, Texas A&M University, 2012
- Investments, Texas A&M University, 2010
- Advanced Corporate Finance, University of Houston, 1998
- Financial Markets, University of Houston, 1996-2001.

### MS Level

- Advanced Corporate Finance, Texas A&M University, 2002-2004.
- Energy Finance, Texas A&M University, 2024-2025

### Executive and Professional MBA Level

- Executive Seminar in Commercial Banking, Texas A&M University, 2023
- Investments, Texas A&M University, 2010
- Corporate Finance and Financial Markets, University of Houston, 1998-2002.
- Corporate Finance, Texas A&M University, 2013, 2014
- Corporate Finance and Valuation, Texas A&M University, 2015

### Doctoral Level

- Empirical Research Seminar in Financial Markets, University of Houston, 1999, 2001.
- Empirical Research Seminar in Asset Pricing, Texas A&M University, 2004, 2006.

## ADMINISTRATIVE EXPERIENCE

- Director of the *Adam C. Sinn '00 Center for Investment Management*, since February 2023
    - Supports high-impact educational programs in the department that are related to investment management.
    - Supports academic research in all areas of investment management with an emphasis on AI.
    - Oversees a student-managed hedge fund that is authorized to trade short positions, options, and futures; the fund offers a laboratory for students and faculty to test new investment strategies.

**ADMINISTRATIVE EXPERIENCE (continued)**

- Interim Executive Associate Dean, September 2020 to January 2023
  - Assisted the Head of the Department of Finance with raising $20 million from Mr. Adam C. Sinn `00.
  - Facilitated recruitment of 11 new tenured/tenure-track faculty positions and nine new academic professional track faculty at Mays.
  - Prepared a five-year BBA enrollment growth plan for the university and obtained funding for the first of the five years
  - Assisted with the building expansion of the Mays Business Education Complex
  - Worked collaboratively with relevant stakeholders to recommend an optimal allocation of space in our existing building as well as in the proposed building expansion
  - Worked with the Provost's Office to secure over $2 million in increased base funding for Mays during FY2022
  - Worked with the Dean to rewrite the Mays Faculty Evaluation Guidelines
  - Facilitated an estate gift in the amount of $1.2 million for the Center for Retailing Studies
  - Improved work efficiency at Mays by implementing several electronic workflows using DocuSign, including memos addressed to the Provost or Dean of Faculties, Entry/Exit Forms, and External Employment authorizations
  - Managed Mays' compliance with COVID guidelines, including Alternate Work Locations
  - Managed Mays' compliance with university guidelines about Conflict of Commitment
  - Worked with relevant stakeholders to select an architect and construction manager for the Mays building expansion
  - Facilitated the review process for the following Mays centers: CMIS, CHRM, CIBS, CED, CRS
  - Facilitated the review process for several endowed positions including renewals and new appointments
  - Conducted several training sessions with Mays staff pertaining to the use of Interfolio for faculty hires and for promotion and tenure cases
- Head of the Department of Finance, January 2009 to August 2020
  - Increased departmental budget from $4 million to $10 million per year
  - Hired 13 tenured/tenure track and 14 academic professional track faculty members
  - Increased the departmental endowment by over $12 million
  - Initiated or facilitated the creation of new revenue programs, industry partnerships, and philanthropic giving, resulting in significant new additional revenues for the department
- Director of the Finance Ph.D. Program, Mays Business School, Texas A&M University, Sept 2003 - June 2006, and January 2008 to December 2008

**PROFESSIONAL SERVICE**

- Member of the advisory board of the Texas A&M Energy Institute (2018 to present)
- Member of the team that created the Energy Price Index, in cooperation with the Energy Institute (2016-2021)

**PROFESSIONAL SERVICE (continued)**

- Member of the advisory board of the Innovation Partners (2019 to present)
- Member of a university committee charged with establishing a faculty code of conduct at Texas A&M University (2019-2020)
- Member of the advisory board of ADVANCE, a unit of Texas A&M University whose mission is to promote improvement of workplace climate, recruitment, and retention of faculty (2020 to present)
- Member of the task force charged with developing the Program of Requirements for the Mays Business Education Complex (2018-2020)
- Chair or co-chair of the PhD Advisory Committee for Ferhat Akbas (2008-2011), Alex Petkevich (2008-2011), Ted Moorman (2003-2005), Bilal Erturk (2003-2006), and Will Armstrong (2009-2012)
- Member of the Ph.D. Advisory Committee for Daniel Chi (2003-2005) and Ariel Viale (2003-2006)
- Regents Scholar Mentor, Mays Business School, Texas A&M University (2006-2007)
- Chair of the faculty search committee, Mays Business School, Texas A&M University (2002-2003)
- Member of the faculty search committee, Finance Department, Mays Business School, Texas A&M University (2003-2007)
- Organized the Finance seminar series, Finance Department, Mays Business School (2002-2003)
- Doctoral student initial placement
    - *Will Armstrong,* Texas Tech
    - *Ferhat Akbas,* Kansas
    - *Bilal Erturk,* Oklahoma State
    - *Ted Moorman*, University of New Hampshire
- Referee for peer-reviewed journals
    - *Journal of Finance*
    - *Review of Financial Studies*
    - *Journal of Financial Markets*
    - *Journal of Money, Credit, and Banking*
    - *Journal of Financial Intermediation*
    - *Journal of Financial and Quantitative Analysis*
    - *Financial Management*
    - *Financial Review*
    - *Quarterly Review of Economics and Finance*
    - *Journal of Financial Research*
- Member of the program committee
    - *Eastern Finance Association, 1999-2001*
    - *Financial Management Association, 2003, 2005, 2009-2014*
    - *Western Financial Association 2011-2014, 2016-2017*
- Conference discussant:
    - *American Finance Association*
    - *NBER*
    - *Eastern Finance Association*
    - *European Finance Association*
    - *Financial Management Association*
    - *ITAM Asset Pricing Conference, Mexico City*

**EXECUTIVE TRAINING AND PRESENTATIONS**

- Presented a session on market risk to commercial banking executives as part of a seminar sponsored jointly by Mays Business School and the Risk Management Association, 2023
- Prepared and presented a course in Energy Finance for King Abdulah Petroleum Studies and Research Center (KAPSARC) in Riyadh, Saudi Arabia, September 2023
- Gerson Lehrman Group, 2007-2009
- El Paso Energy, Houston, TX, 2000-2002
- Shell Oil, Houston, TX, 1998-2000

**EXPERT WITNESS / CONSULTING EXPERIENCE**

- *PWCM Master Fund Ltd., Pentwater Equity Opportunities Master Fund Ltd., LMA SPC for and on behalf of MAP 98 Segregated Portfolio, and Pentwater Unconstrained Master Fund Ltd., v. The Boeing Company, Dennis A. Muilenburg, and Gregory D. Smith (2025)* - consulting expert in a security fraud litigation, retained by counsel for the plaintiff to advise on matters related to market efficiency and damages.

- *Continental General Insurance Company and Percy Rockdale, LLC, Individually and on Behalf of All Others Similarly Situated v. Sigurdur Olafsson, Bryan M. Reasons, and Paul Bisaro (2025)* - consulting expert in a class action lawsuit, retained by counsel for the plaintiff to determine if the stock price of Mallinckrodt traded in an efficient market.

- *Oklahoma Firefighters Pension and Retirement System et al v. Six Flags Entertainment Corporation (2024)* - consulting expert in a class action lawsuit, retained by counsel for the plaintiff to determine if the stock price of Six Flags traded in an efficient market.

- *Mohammed Usman Ali et al. v. Franklin Wireless Corp., O.C. Kim, and David Brown (2022)* – consulting expert in a class action lawsuit, retained by counsel for the plaintiff to determine if the stock price of Franklin Wireless traded in an efficient market.

- *ForesTech Energy, LLC v. German Pellets Texas LLC, German Pellets Holding USA, Inc, and German Pellets GmbH (2015)*—consulting expert on valuation of a wood pellet mill and associated equity claims. Attorneys: Orgain, Bell, & Tucker, Beaumont, TX. Retained by counsel for the plaintiff to prepare expert report. Case settled before deposition.

- *Houston Police Officers Pension System v. State Street Bank and Trust (2009-2012)*—consulting expert on matters related to disclosure in a case involving subprime mortgage-backed securities. Attorneys: Ropes and Gray, Boston, MA. Retained by counsel for the defendant to prepare expert report. Testified at deposition in May 2010. Case settled before trial.

- *Memorial Hermann Hospital System v. State Street Bank and Trust (2009-2012)*—consulting expert on matters related to disclosure in a case involving subprime mortgage-backed securities. Attorneys: Ropes and Gray, Boston, MA. Retained by counsel for the defendant to prepare expert report. Testified at deposition in May 2010. Case settled before trial.

- *Securities and Exchange Commission v. Rose et al. (2006-2007)*—consulting expert in a case involving manipulation of security prices by traders. Attorneys: SEC Central Regional Office, Denver, CO. Retained by counsel for the plaintiff. Prepared expert report and testified in Federal Court (Houston, TX) in April 2007.

**PERSONAL**

- Married, two children
- US Citizen
- Foreign languages: fluent in French and Romanian, conversational in Spanish, beginner Italian

## APPENDIX B

**Materials Considered**

**Case Documents:**

- Decision and Order Disposing of Pending Motions to Dismiss, *Ali Diabat. v. Credit Suisse Group AG et al* (Doc. No. 83), September 19, 2024.
- Expert Report of David C. Smith, Ph.D. (Doc. No. 53-1), October 10, 2025.
- Expert Reply Report of Matthew D. Cain, PhD, *Ali Diabat. v. Credit Suisse Group AG et al* (Doc. No. 135-1), January 28, 2025.
- Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Doc. No. 52), October 10, 2025.

**Court Decisions and Securities Law:**

- Brief of Financial Economists as Amici Curiae in Support of Respondents for the Supreme Court of the United States, *Halliburton Co. v. Erica P. John Fund, Inc.* 573 U.S. 258 (2014).
- *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 370 (S.D.N.Y. 2016).
- *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).
- *In re VeriFone Sec. Litig.*, 784 F. Supp. at 1479 (N.D. Cal. 1992).
- *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005).
- *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017).

**Academic Literature:**

- Allen F. and Gale, D. (2000). Financial Contagion. *Journal of Political Economy, 108*(1), 1–33.
- Altman, D. G., and Bland, J. M. (1995). Statistics notes: Absence of evidence is not evidence of absence. *BMJ, 311*(7003), 485.
- Bessembinder, H., Kahle, K.M., Maxwell, W.F, and Xu, D. (2009). Measuring Abnormal Bond Performance. *Review of Financial Studies, 22*(10), 4219-4258.
- Cohen, J. (1977). The concepts of power analysis. In J. Cohen, *Statistical power analysis for the behavioral sciences* (pp. 1–17). Academic Press.
- Diamond, D. W., and Dybvig, P. H. (1983). Bank runs, deposit insurance, and liquidity. *Journal of Political Economy, 91*(3), 401-419.
- Drechsler, I, Savov, A., Schnabl, P. and Wang, O. (2023). *Deposit Franchise Runs*. National Bureau of Economic Research Working Paper No. 31138.
- Kind, A., Oster, P., and Peter, F. J. (2022). The determinants of banks' AT1 CoCo spreads. *European Financial Management*, *28*(2), 567-604.

**Analyst Reports:**

- Autonomous, "The cost of repairing the LCR ratio," December 20, 2022.
- Bank of America, "Improving liquidity reduces tail risks," December 5, 2022.
- Bank of America, "Feedback Loops," March 15, 2023.

**Data Sources:**

- SEC Edgar Online.

**Other:**

- Financial Times, "Swiss central bank offers Credit Suisse liquidity backstop," March 15, 2023, https://www.ft.com/content/0324c5a6-cecd-4fb3-85b3-7cdc99a33e4e.
- Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National Bank to Systemically Important Banks" 952.3, published by the Swiss Federal Council, dated March 16, 2023.
- Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National Bank to Systemically Important Banks" Amendment of March 19, 2023.
- Reuters, "Swiss gov't proposes public liquidity backstop for big banks," March 11, 2022, https://www.reuters.com/business/finance/swiss-govt-proposes-public-liquidity-backstop-big-banks-2022-03-11/.
- The Basel Framework, Basel Committee on Banking Supervision, Bank for International Settlements, Version effective as of 15 Dec 2019, Additional Tier 1 capital.
- The Swiss Federal Council. (2023, March 19). *19.03.23 - BP Berset - BR Keller-Sutter zu: Finanzplatz Schweiz* [Video]. YouTube. https://www.youtube.com/watch?v=gmT0-w_0Ex4.
- Shearman & Sterling LLP (2011). *PLC Global Finance update for February 2011: United States*. Thomson Reuters Practical Law.
- All other documents cited or referred to within this report.