UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————— x

In re: CREDIT SUISSE SECURITIES
FRAUD CLASS ACTIONS

This matter relates to:

    *Core Capital*
——————————————————————————— x

23-cv-9287 (CM)
23-cv-5874 (CM)

**OPINION AND ORDER GRANTING LEAD PLAINTIFF CORE CAPITAL'S MOTION
FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
REPRESENTATIVES AND CLASS COUNSEL**

McMahon, J.:

Lead Plaintiff Core Capital Partners, Ltd. ("Core Capital") brought this securities fraud

class action against Credit Suisse Group AG ("Credit Suisse") and the remaining Credit Suisse

Individual Defendants Axel P. Lehman, Ulrich Körner, and Dixit Joshi (collectively,

"Defendants")[1] – individually and on behalf of all similarly situated purchasers of Credit Suisse's

additional tier-one bonds ("AT1 Bonds") – asserting claims under Section 10(b), and Rule 10b-5

thereunder, and under Section 20(a) of the Exchange Act. *See* Core Capital Dkt. No. 1.[2]

Core Capital alleges that Credit Suisse repeatedly misrepresented and misled investors

about its financial condition while facing significant and sustained asset outflows, which

precipitated its collapse and subsequent merger with UBS Group AG ("UBS") in March 2023 (the

---

[1] The Court previously dismissed Core Capital's claims against Thomas Gottstein and David R. Mathers after Core Capital indicated that it had "no intention of prosecuting its case against" them by properly effecting service. *In re Credit Suisse Sec. Fraud Class Actions*, No. 23-CV-5874 (CM), 2025 WL 1866293, at *4 (S.D.N.Y. July 7, 2025).

[2] Citations to "Dkt. No." are to the docket in *In re Credit Suisse Securities Fraud Class Actions* ("*Credit Suisse*"), No. 23-cv-5874-CM (S.D.N.Y.). Citations to "Core Capital Dkt. No." are to the docket in *Core Capital Partners, Ltd. v. Credit Suisse Group AG, et al.* ("*Core Capital*"), No. 23-cv-9287-CM (S.D.N.Y.), prior to the Court's consolidation of *Core Capital* with *Credit Suisse* for all pre-trial matters. *See* Dkt. No. 138.

"Merger"). *Id.* at 2–7. When Credit Suisse disclosed the truth about its dire financial condition, the Swiss Financial Market Supervisory Authority ("FINMA"), perceiving that a "Viability Event" had been triggered, wrote down the nominal value of all AT1 Bonds to the value of zero. *Id.* at 37.

Core Capital seeks damages on behalf itself and all other purchasers of Credit Suisse's AT1 Bonds in domestic U.S. transactions resulting from Defendants' alleged material misrepresentation and omissions concerning Credit Suisse's financial condition, risk management practices, and internal controls. Accordingly, Core Capital moves for class certification under Federal Rule of Civil Procedure 23 and for appointment of class representatives and class counsel. Core Capital Dkt. No. 48.

## I.    BACKGROUND

### a.  Factual Background

Before its Merger with UBS, Credit Suisse provided a range of financial services across Switzerland, Europe, the Middle East, Africa, the Americas, and the Asia-Pacific region. *Id.* at 2. Credit Suisse's securities offerings included, among other instruments, additional tier-one bonds ("AT1 Bonds"), also known as "contingent convertibles" or "CoCo" bonds, which form part of the capital buffer that regulators require banks to maintain to absorb losses in times of market stress. Under the terms of these instruments, FINMA may direct Credit Suisse to write down the AT1 Bonds in the event of a "Viability Event," particularly if the government provides extraordinary financial support. *Id.*; Core Capital Dkt. No. 29-1, Information Memorandum on Credit Suisse's Contingent Write-Down Capital Notes, at 8. When FINMA orders such a write-down in response to a bank's financial turmoil, "the full principal amount of the Notes will automatically and permanently be written-down to zero," while the bank's liabilities decrease by a corresponding amount, thereby strengthening its underlying capital position, which serves "to

prevent [the bank] from becoming insolvent, bankrupt or unable to pay a material part of its debts as they fall due." Core Capital Dkt. No. 29-1, at 7–8. By purchasing Credit Suisse's AT1 Bonds, investors agree "to be bound by and consent[] to the application of the Write-down." *Id.* at 9.

According to the Financial Industry Regulatory Authority's ("FINRA") Trade Reporting and Compliance Engine ("TRACE"), the total trading volume of the series of Credit Suisse AT1 Bonds purchased by Plaintiff during the putative Class Period[3] – from February 18, 2021 to March 20, 2023 – exceeds $1.2 billion. The bonds are identified by the following International Securities Identification Numbers ("ISIN"): USH3698DDD33 ("Series DD33"), USH3698DBZ62 ("Series BZ62"), and USH3698DCV40 ("Series CV40"). *Id.* at 3.

Prior to its eventual collapse and Merger, Credit Suisse experienced weaknesses in its internal controls over financial reporting ("ICFR"), defined as "a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes." Dkt. No. 92-4, Konstandt Decl., Ex. 4, 2022 Annual Report, at 257. In July 2022, the United States Securities and Exchange Commission ("SEC") issued a comment letter to Credit Suisse concerning potential ICFR deficiencies dating back to April 2021. *See Diabat v. Credit Suisse Grp. AG* ("*Diabat I*"), 2024 WL 4252532, at *99, *131–32 (S.D.N.Y. Sept. 19, 2024). After reviewing Credit Suisse's initial response, the SEC asked the bank to "explain each of the control deficiencies in more detail, as well as how [it] concluded that they did not rise to the level of a material weakness given the nature of the control deficiencies (at least several mapping rule errors) and the fact that they led to quantitative errors exceeding 10% of the

---

[3] To be clear, there is no reason to depart from this Court's previous holding in *Diabat I* that alleged misstatements made before October 2022 are inactionable. *See Diabat I*, 2024 WL 4252502, at *92, *133.

3

respective line items for several periods." Dkt. No. 85-14, Matuschak Decl., Ex. 14, at 2. The SEC did not accept Credit Suisse's initial explanation and sought further clarification.

A week later, on October 27, 2022 – before Credit Suisse responded to the SEC's follow-up inquiry – Credit Suisse held a call with investors to announce and discuss its third quarter 2022 results. Core Capital Dkt. No. 1, at 25. During the call, Individual Defendants Körner and Joshi discussed Credit Suisse's financial condition, operations, and outlook into the future, but they did not disclose the SEC investigation or its inquiry into potential material weaknesses in Credit Suisse's ICFR. *See id.* at 25–26; *Diabat I*, 2024 WL 4252502, at *133–34.

During that same call, Defendants Körner and Joshi acknowledged "continued challenging market and macroeconomic conditions," "heightened market volatility," "weak customer flows," and "ongoing client deleveraging." Core Capital Dkt. No. 1, at 25. Nonetheless, Körner sought to reassure investors, stating: ". . . let me say here very clearly, and to the largest extent possible, [these are] factually incorrect rumors. . . . the overall situation has come in and down very significantly in the last couple weeks, actually." *Id.* at 26. The next month, on December 1, 2022, Defendant Axel P. Lehmann, Chairman of Credit Suisse, similarly projected stability, telling the *Financial Times* that "withdrawals had flattened across the group and had started to reverse in the Swiss domestic business." *Id.* at 29. The next day, in an interview with *Bloomberg Television*, Lehmann further stated that, as of November 11, 2022, customer outflows in assets had "basically stopped" and that the episode was a "two-to-three week event." *Id.* at 30.

A few months later, on February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results, which disclosed significant customer outflows. The release reported

4

that, in the final three months of 2022, the bank had experienced customer withdrawals totaling

110.5 billion Swiss francs. *Id.* at 32.

On March 14, 2023, Credit Suisse filed an Annual Report on Form 20-F with the SEC,

which reported its financial results for the 2022 year, ending on December 31, 2022 (the "2022

Form 20-F"). The 2022 Form 20-F included the following disclosure concerning the bank's ICFR

practices:

> Management . . . has concluded that, as of December 31, 2022, the Group's internal
> control over financial reporting was not effective because of the material
> weaknesses described below. For the same reasons, management has also
> reassessed its conclusion as to the effectiveness of internal control over financial
> reporting as of December 31, 2021, and concluded that internal control over
> financial reporting was also not effective as of such date.
>
> Management did not design and maintain an effective risk assessment process to
> identify and analyze the risk of material misstatements in its financial statements
> and did not design and maintain effective monitoring activities relating to (i)
> providing sufficient management oversight over the internal control evaluation
> process to support the company's internal control objectives; (ii) involving
> appropriate and sufficient management resources to support the risk assessment and
> monitoring objectives; and (iii) assessing and communicating the severity of
> deficiencies in a timely manner to those parties responsible for taking corrective
> action. These material weaknesses contributed to an additional material weakness,
> as management did not design and maintain effective controls over the
> classification and presentation of the consolidated statement of cash flows.
> Specifically, certain control activities over the completeness and the classification
> and presentation of non-cash items in the consolidated statement of cash flows were
> not performed on a timely basis or at the appropriate level of precision.

Dkt. No. 92-4, Konstandt Decl., Ex. 4, 2022 Annual Report, at 257.

The following day marked a critical turning point. On March 15, 2023, Reuters published

an article quoting Ammar Al Khudairy, Chairman of the Saudi National Bank – Credit Suisse's

largest shareholder – as stating that it "would not buy more shares in the Swiss bank on regulatory

grounds." Core Capital Dkt. No. 1, at 6 (citing Rachna Uppal, *Credit Suisse's biggest backer says*

*can't    put    up    more    cash:    share    down    by    a    fifth*,    Reuters    (Mar.    15,    2023),

5

https://www.reuters.com/business/finance/credit-suisses-saudi-backer-happy-with-transformation-plan-doesnt-think-extra-2023-03-15).  That same day, Credit Suisse's AT1 Bonds plummeted in value: the Series DD33 AT1 Bond price fell $18.262, or 39.77%, to close at $27.662; Credit Suisse's Series BZ62 AT1 Bond price fell $30.232, or 52.11%, to close at $27.782; and Credit Suisse's Series CV40 AT1 Bond price fell $21.712, or 44.16%, to close at $27.455.  Core Capital Dkt. No. 1, at 6–7.

A few days later, on March 19, 2023, FINMA announced that it had approved UBS's takeover of Credit Suisse via merger and that,"The extraordinary [Swiss] government support [for the Merger] will trigger a complete write-down of the nominal value of all AT1 debt of Credit Suisse in the amount of around CHF 16 billion," given that the AT1 Bonds' "contractual conditions [for being written down] were met."  Core Capital Dkt. No. 1, at 36.  On the same day, the Swiss Federal Council enacted the *Emergency Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans by the Swiss National Bank to Systematically Important Banks*, which authorized FINMA to carry out the write-down of Credit Suisse's AT1 Bonds.  *Id.* at 37.  Pursuant to that authority, FINMA directed Credit Suisse to write down all outstanding AT1 Bonds in full (the "March 2023 Write-Down").  As a result of the March 2023 Write-Down, Credit Suisse AT1 bondholders saw "investments worth 16 billion Swiss francs ($17 billion) become worthless." *Id.* (citing Sophie Kiderlin, *The $17 Billion Wipeout of Credit Suisse Bondholders Has Not Gone Down Well in Europe*, CNBC (Mar. 20, 2023), https://www.cnbc.com/2023/03/20/17-billion-of-credit-suisse-bonds-worthless-following-ubs-takeover.html).

### b.    Procedural History

Core Capital initially moved for appointment as lead plaintiff in an action later consolidated into Credit Suisse, on behalf of all purchasers of Credit Suisse securities, including AT1 Bonds, in domestic transactions in the United States. *See Calhoun v. Credit Suisse Group AG*, No. 1:23-cv-06023-CM (S.D.N.Y.) ("Calhoun Dkt. No."), Dkt. Nos. 19-2, Core Capital's Mem. Supp. Mot. for Appointment as Lead Pl., at 6; 25, Core Capital's Am. Mem. Supp. Mot. for Appointment as Lead Pl., at 6. The Court denied Core Capital's amended motion, citing loss-causation issues unique to Core Capital arising from FINMA's specific actions in connection with the Merger and the write-down of the bonds, and consolidated several securities class actions into a single proceeding with Ali Diabat ("Mr. Diabat") as lead plaintiff.. Dkt. No. 58, at 13:3–14:8, 16:25–17:2.

On October 5, 2023, Mr. Diabat filed an amended complaint that omitted any reference to AT1 Bonds. *See* Dkt. No. 65. Then, on October 20, 2023, Core Capital filed its Complaint, specifically on behalf of AT1 bondholders. Core Capital Dkt. No. 1. On September 19, 2024, the Court issued *Diabat I*, denying in part Defendants' motion to dismiss. *Diabat I*, 2024 WL 4252502, at \*138 n.21. On October 17, 2024, Defendants moved to dismiss Core Capital's Complaint. *See* Core Capital Dkt. Nos. 28-31. And, on December 13, 2024, Mr. Diabat moved to certify a class of (i) equity holders of Credit Suisse American Depository Shares ("CS ADSs"), (ii) debt holders of seven Credit Suisse notes ("CS Notes"), and (iii) holders of options on the CS ADSs ("CS Options"). Dkt. No. 127 at 1 n.1. Core Capital informed the Court that Mr. Diabat's proposed class did not include AT1 bondholders. *See* Core Capital Dkt. No. 32.

On July 7, 2025, the Court denied in part Defendants' motion to dismiss the Core Capital Complaint. *Credit Suisse*, 2025 WL 1866293, at \*1. Relying on *Diabat I*, the Court held that Core Capital had adequately alleged five actionable misstatements made by Defendants with scienter.

7

*See id.* at \*4–\*6. The Court further held that Core Capital sufficiently pled loss causation, finding that Credit Suisse's March 14, 2023, disclosure of material weaknesses in ICFR was plausibly a corrective disclosure. *Id.* at \*6; *see also Diabat I*, 2024 WL 4252502, at \*150. The Court further held that the March 19, 2023 announcement of the Merger was sufficiently alleged to be a materialization of a concealed risk because Core Capital had alleged that the write-down of AT1 Bonds to zero was "a downstream consequence of the alleged fraud," not "an independent, intervening event." *Id.* at \*7. The Court explained that Credit Suisse's prior disclosures of FINMA's authority to write down the AT1 Bonds did not adequately convey "the likelihood of [the write-downs being] within the zone of risk concealed by defendants' alleged misrepresentations." *Id.* at \*8. In other words, the failure to disclose the material weaknesses in Credit Suisse's ICFR plausibly prevented investors from "arriv[ing] at a valuation of the securities that more accurately reflected the risk" to Credit Suisse. *See Diabat I*, 2024 WL 4252502, at \*153. As this Court emphasized, "mere disclosure of the possibility of [a write-down] does not immunize Credit Suisse from 'the likelihood of [the write-down's being] within the zone of risk concealed by defendants' alleged misrepresentations." *Credit Suisse*, 2025 WL 1866293, at \*8.

The Court next held that Mr. Diabat satisfied the requirements of class certification under Rule 23(a). *See Credit Suisse*, 2025 WL 1866293, at \*9. Class certification was also appropriate under Rule 23(b), as common questions of law and fact predominated over individual issues and a class action was a superior method for "fairly and efficiently adjudicating the controversy." *See id.* at \*9–10. In reaching that conclusion, the Court described both the *Core Capital* and *Diabat* actions as "straightforward securities fraud class actions" and found that Mr. Diabat's expert, Dr. Matthew D. Cain, had proposed a sound methodology for calculating class-wide damages that "will have no trouble accounting for inflation with respect to the CS Options and addressing how

8

the alleged fraud impacted the values of the CS Notes." *Id.* at *10. The Court also held that price movements in the ADSs on disclosure dates and contemporaneous media discussions of Credit Suisse's ICFR weaknesses sufficiently alleged price impact. *See id.* (concluding that Defendants failed to demonstrate a lack of price impact "for the reasons explained in Dr. Cain's reports and Diabat's Reply Brief"). Finally, the Court determined that the markets for CS Options and Notes were efficient, notwithstanding that two of the seven CS Notes fell below the 1% threshold for a "substantial presumption" of efficiency under the first *Cammer* factor. *See id.* at *11.

Because no investor with larger holdings of AT1 Bonds sought appointment as lead plaintiff within the applicable 60-day period, *see* 15 U.S.C. § 78u-4(a)(3)(A)(ii), Core Capital automatically became lead plaintiff for its proposed class of AT1 bondholders. *Id.* at *13. Core Capital now moves for class certification under Federal Rule of Civil Procedure 23 and for the appointment of class representatives and lead counsel. Core Capital Dkt. No. 48. Core Capital seeks certification of the following Class:

All persons and entities other than Defendants,[4] current or former officers and directors of Credit Suisse, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest, that purchased or otherwise acquired additional tier-one bonds ("AT1 Bonds")[5] of Credit Suisse in a domestic transaction in the U.S. between October 27, 2022 and March 20, 2023, inclusive (the "Class Period"),[6] who seek to recover damages caused by Defendants' violations of

---

[4] The Defendants are Credit Suisse Group AG, Axel P. Lehmann, Ulrich Körner, and Dixit Joshi.

[5] The AT1 Bonds included in the proposed Class are the nine Credit Suisse AT1 bonds issued pursuant to Rule 144A and Regulation S, and traded in the United States, as listed in Section 3.2 of the Expert Report of Sorin Sorescu, Ph.D. ("Sorescu Report"). Core Capital Dkt. No. 50-1, Calandra Decl., Ex. 1.

[6] While Core Capital's complaint alleges a class period beginning on February 18, 2021, the first misstatement or omission sustained by this Court occurred on October 27, 2022. *Credit Suisse*, 2025 WL 1866293, at *5 (S.D.N.Y. July 7, 2025). Accordingly, the Class Period for which certification is sought starts on October 27, 2022.

9

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

Core Capital Dkt. No. 49, Core Capital's Mem. Supp. Mot. for Class Certification, at 8.

For the reasons set forth below, Core Capital's motion is GRANTED.

## II.    LEGAL STANDARD

A district court may certify a class only after determining that the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a). *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Those requirements are that: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law and fact common to the class"; (3) "the claims or defenses of the representative parties are typical' of those of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." *Id.* (quoting Fed. R. Civ. P. 23(a)).

Additionally, the district court must ensure that the proposed class is appropriate under at least one subsection of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). At issue here, Rule 23(b)(3) permits certification if both (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Although "a court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," courts may consider merits questions only to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013). The party seeking class certification bears the burden of establishing, by a preponderance

of the evidence, that each of Rule 23's requirements has been met. *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

## III.   DISCUSSION

The Court first addresses each of the Rule 23(a) requirements and concludes that Core Capital has demonstrated that the proposed class satisfies those prerequisites. The Court will then consider whether certification is appropriate under Rule 23(b)(3).

### a.   Core Capital Satisfies Each Rule 23(a) Requirement

#### i.   Numerosity

Numerosity may be presumed where a proposed class consists of forty or more members, *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), but plaintiffs need not allege the exact class size or identity of class members to satisfy the numerosity requirement since a court may make common sense assumptions to support a finding of numerosity, *Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, No. 14CV09764KPFSN, 2018 WL 739580, at \*9 (S.D.N.Y. Jan. 10, 2018). "In a securities class action, numerosity can be demonstrated by showing that a large number of shares were outstanding and traded during the class period." *Martinek v. AmTrust Fin. Servs., Inc.*, No. 19 CIV. 8030 (KPF), 2022 WL 326320, at \*5 (S.D.N.Y. Feb. 3, 2022).

Although Core Capital does not estimate the proposed class's exact size, it has submitted data from Bloomberg indicating that at least 229 financial institutions held one or more of the AT1 Bonds during the Class Period. Dkt. No. 50-1, Expert Report of Sorin Sorescu, Ph.D. ("Sorescu Report"), at 32–33, 76–79. Defendants argue that this data merely identifies entities holding AT1 Bonds and is not evidence that they purchased them during the Class Period. Core Capital Dkt. No. 52, Defs.' Mem. Opp'n Mot. for Class Certification, at 13–14. Although that argument is not without merit, it is undermined by Defendants' own acknowledgment that "over 270 U.S.

11

individuals or entities" have sought to challenge the March 2023 write-down in separate Swiss proceedings. *Id.* at 16.

Even apart from any presumption of numerosity based on the forty-member threshold, the Court finds the requirement satisfied given the substantial trading volume of Credit Suisse's AT1 Bonds during the Class Period. *See, e.g., In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 445 (S.D.N.Y. 2013) (holding that numerosity was satisfied where there were "over \$1.88 billion in Winstar bonds outstanding during the class"). During the Class Period, Credit Suisse had thirteen AT1 Bonds with a total notional value of approximately \$17.2 billion. Sorescu Report, at 16. Of that amount, Core Capital avers that roughly \$15.65 billion were outstanding and actively traded. Core Capital Dkt. No. 52, at 16. The Court previously held that Mr. Diabat had adequately established numerosity based on the hundreds of millions of CS ADSs traded on the New York Stock Exchange and the millions of dollars in CS Notes outstanding during the class period. *Credit Suisse*, 2025 WL 1866293, at \*9. Given the substantially greater amount at issue here, the same reasoning applies with even greater force. Accordingly, Core Capital satisfies the numerosity requirement.

#### ii. Common Questions of Law and Fact

Commonality "does not mean that all issues must be identical to each [class] member," rather, it requires only that a plaintiff "identify some unifying thread among the members' claims that warrants class treatment." *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 153 (S.D.N.Y. 2002). In securities fraud cases, where putative class members are injured by similar material misrepresentations and omissions, the commonality requirement is satisfied. *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 44 (S.D.N.Y. 2012).

12

Core Capital's central claim is that Defendants' alleged misrepresentations and omissions regarding customer outflows and weaknesses in Credit Suisse's ICFR practices caused injury to all AT1 bondholders by artificially inflating the bonds' prices. Common questions of law and fact include: (i) whether Defendants' statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether Credit Suisse's AT1 Bonds were artificially inflated during the Class Period; (iv) whether Defendants' misrepresentations and omissions caused Class members to suffer economic losses; and (v) the proper measure of the proposed Class members' damages. Core Capital Dkt. No. 1, at 43.

Under these circumstances, courts consistently find that commonality is satisfied. *See, e.g.*, *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 206 (S.D.N.Y. 2012) ("Commonality is plainly satisfied ... [because] the existence and materiality of such misrepresentations obviously present important common issues.") (internal quotation marks and citations omitted); *Velez v. Majik Cleaning Serv., Inc.*, No. 03 CIV. 8698 (SAS), 2005 WL 106895, at *2 (S.D.N.Y. Jan. 19, 2005) ("A single common question may be sufficient to satisfy the commonality requirement."). Core Capital has demonstrated by a preponderance of the evidence that several common questions of law and fact exist.

### iii. Typicality

A plaintiff's claims are "typical" under Rule 23(a)(3) when they arise from the same course of events as the class members' claims and rely on similar legal theories to establish the defendants' liability. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Typicality is satisfied even where there are "minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir. 1993) (citations omitted).

13

The commonality and typicality requirements of Rule 23(a) often merge. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

Core Capital purchased Credit Suisse's AT1 Bonds in the United States during the same period of time as the putative class members purchased or held those bonds. *See* Core Capital Dkt. No. 1; Calhoun Dkt. No. 25-2, 25-4, at 2–3. Its claims, like those of all other Class members, derive from the same theories of liability and the same alleged material misrepresentations concerning customer outflows and alleged material omissions of the weaknesses in Credit Suisse's ICFR. Core Capital Dkt. No. 1, 25–26, 29–30. Accordingly, Core Capital satisfies the typicality requirement. *See In re Bank of Am. Corp. Sec.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012).

### iv. Adequacy of Representation

The final element of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing adequacy, the Court considers (1) whether Plaintiff's attorneys are qualified, experienced, and able to conduct the litigation and (2) whether Plaintiff's interests are antagonistic to those of the proposed class. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

*First,* Pomerantz LLP ("Pomerantz") is qualified, experienced, and capable of serving as class counsel. The firm has substantial experience in securities class actions, including in this District, and has been found adequate in numerous cases. *See, e.g.*, *Armstrong v. Med. Props. Tr., Inc.*, No. 23-CV-8597, 2024 WL 3784445, at *5 (S.D.N.Y. Aug. 13, 2024); *Workman v. Namaste Techs., Inc.*, No. 18-CV-10830 (GHW), 2019 WL 280948, at *3 (S.D.N.Y. Jan. 22, 2019) (collecting cases). Having reviewed Pomerantz LLP's firm résumé, Core Capital Dkt. No. 50-3, Calandra Decl., Ex. 3, the Court finds that Core Capital's chosen counsel will adequately and

14

effectively represent the interests of the Class. For substantially the same reasons – and because Pomerantz has demonstrated diligence in representing AT1 bondholders, including by promptly filing a complaint on their behalf when the *Diabat* action did not assert claims for AT1 holders – the Court also concludes that Pomerantz satisfies the Rule 23(G) prerequisites for appointment as Class Counsel. To avoid a "lawyer-driven" lawsuit, however, the Court declines to appoint Bronstein, Gewirtz & Grossman, LLC to serve as "additional counsel." *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) (citing S. Rep. No. 104–98, at 4 (1995), U.S. Code Cong. & Admin. News 1995, at 679, 683).

*Second,* Core Capital's interests are not antagonistic to those of the proposed class. In fact, Core Capital "possess[es] the same interest and suffer[ed] the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (citation omitted). Core Capital and all Class members allege to have suffered losses from purchasing Credit Suisse's AT1 Bonds at artificially inflated prices as a result of Defendants' alleged misrepresentations and omissions. Moreover, Defendants have not identified any actual or potential conflicts. *See generally* Core Capital Dkt. No. 52. Core Capital has been involved in this litigation, has communicated with counsel throughout the course of this action, is willing to serve as a Class Representative, and understands its duties as representative. *See* Calandra Decl., Ex. 2. The Court concludes that Core Capital is an adequate Class Representative.

### b.  Core Capital Satisfies the Rule 23(b)(3) Requirements

Federal Rule of Civil Procedure 23(b)(3) requires that (1) common questions of law or fact predominate over individual questions and that (2) a class action is superior to other available methods of adjudication.

### i. The Proposed Class Satisfies Rule 23(b)(3)'s Predominance Requirement

Predominance is often "readily met" in cases alleging securities fraud. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This element demands that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001) (internal quotation marks omitted), *abrogated on other grounds by Miles v. Merrill Lynch & Co.*, 471 F.3d 24 (2d Cir. 2006). The inquiry centers on whether "liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Id.* at 139. The predominance requirement is satisfied when plaintiffs are unified by a common legal theory. *Clark v. Ecolab Inc.*, No. 04CIV.4488PAC, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010).

Core Capital will seek to prove the elements of their § 10(b) and § 20(a) claims with the Class Members based on a common legal theory of reliance. The elements of a § 10(b), and Rule 10b-5, claim are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). At the class certification stage, Core Capital need not prove that the alleged misrepresentations and omissions were material. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 119 (2021). Instead, whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*); *see Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013)

16

(stating that the fraud-on-the-market theory of reliance "has particular significance in securities-fraud class actions").

The reliance element ensures that there is a proper "connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). The traditional way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and purchased a security based on that specific misrepresentation. The Supreme Court recognized in *Basic*, however, that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would" prevent such plaintiffs "from proceeding with a class action, since individual issues" would "overwhelm[] the common ones." *Id.* at 242. The Court in *Basic* sought to alleviate that concern and held that a plaintiff may invoke a rebuttable presumption of reliance based on the "fraud-on-the-market" theory. *Id.* at 241–47.

### A. Plaintiffs Satisfy the Requirements for the *Basic* Presumption of Reliance Under the Fraud-on-the-Market Theory

Under the fraud-on-the-market theory, an investor is presumed to rely on a misrepresentation when it is reflected in the market price at the time of the transaction. *Halliburton I*, 563 U.S. at 813. To invoke *Basic*'s presumption of reliance, a plaintiff must show that: (1) the alleged material misrepresentation was publicly known, (2) the stock traded in an efficient market, and (3) the plaintiff traded the stock between the time the misrepresentation was made and the time the truth was revealed. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (*Halliburton II*). The Court concludes that Core Capital satisfies each requirement and is therefore entitled to the *Basic* presumption of reliance.

As to the first requirement, there is no dispute that the alleged misrepresentations and omissions were publicly known. *See generally* Dkt. No. 52, Defs.' Mem. Opp'n to Pl.'s Mot. for

17

Class Certification. Core Capital alleges that these statements were made through multiple public channels, including: (1) an October 27, 2022 press release; (2) an October 27, 2022 earnings call with investors; (3) a December 1, 2022 interview with the *Financial Times*; (4) a December 1, 2022 *Financial Times* article; and (5) a December 2, 2022 interview with *Bloomberg Television*. Core Capital, Dkt. No. 1, at 25–26, 29–30. Accordingly, the alleged misrepresentations and omissions were publicly known.

As to the second requirement, each of the five factors established in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989) support a finding that Credit Suisse's AT1 Bonds traded in an efficient market. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."); *In re Dynex Cap., Inc. Sec. Litig.*, No. 05 CIV. 1897 HB, 2011 WL 781215, at \*4 (S.D.N.Y. Mar. 7, 2011) (applying the *Cammer* factors to determine efficiency of bond market). The five *Cammer* factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of stock price caused by unexpected corporate events or financial releases.

*Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989).

Courts also consider three additional factors established in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) to determine efficiency. *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017). The three *Krogman* factors are:

> (1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders.

18

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Krogman*, 202 F.R.D. at 477–78 (N.D. Tex. 2001)). Although the Court considers each of the *Cammer/Krogman* factors, it notes that the factors are merely tools that guide the Court's analysis, in light of the Second Circuit's consistent refusal to adopt a particular test for market efficiency. *See, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017). The Court's ultimate determination of market efficiency does not depend on any single factor or combination of factors, but rather on whether, based on the "totality of the evidence presented," it is more likely than not that the AT1 Bonds traded in an efficient market during the proposed Class Period. *In re Petrobras Sec.*, 862 F.3d 250, 277 (2d Cir. 2017).

### *Cammer* Factors Support a Finding of Market Efficiency

#### 1. *Average Weekly Trading Volume of the Bonds*

A large weekly trading volume suggests a more efficient market because it reflects significant investor interest and, consequently, a higher likelihood that trades incorporate newly available public information. *Cammer*, 711 F. Supp. at 1286. The AT1 Bonds consists of nine different Credit Suisse AT1 bonds issued pursuant to Rule 144A and Regulation S, and traded in the United States, as listed in Section 3.2 of the Expert Report of Sorin Sorescu, Ph.D. ("Sorescu Report"). Core Capital Dkt. No. 50-1, Calandra Decl., Ex. 1, at 16–18.

During the Class Period, each of the nine AT1 bonds traded in two tranches: (1) Regulation S ("Reg S"), offered outside the United States, and (2) Rule 144A, offered to qualified institutional buyers ("QIBs") in the United States. *Id.* at 15. This results in a total of 18 tranches. For purposes of calculating trading volume, the tranches are fungible because "the Reg S and Rule 144A AT1

tranches . . . represent[] the same claim, the same risk, and the same loss-absorption potential." *Id.* at 16.

Dr. Sorescu concludes in his report that, "After combining the two tranches of each AT1 bond, eight of the nine bonds have trading volumes larger than 2.0% during the class period." *Id.* at 24. Because the trading volume exceeds 2 percent, there is a "strong presumption" that the market for the eight AT1 Bonds was an efficient one. *Cammer*, 711 F. Supp. at 1286. The remaining ninth AT1 Bond had a trading volume of 1.4 percent, Sorescu Report, at 24, which warrants a "substantial presumption" of market efficiency, *Cammer*, 711 F. Supp. at 1286. Accordingly, the trading volumes of Credit Suisse's AT1 Bonds support a finding of market efficiency.

### 2. *Coverage by Securities Analysts*

A significant number of securities analysts covering a security suggests a more efficient market because their analysis helps incorporate newly available information into the price of a security more quickly. *Cammer*, 711 F. Supp. at 1286. During the Class Period, 21 firms – including firms such as J.P. Morgan, Jeffries, and Morgan Stanley – published 102 analyst reports on Credit Suisse, overall. Sorescu Report, at 26. Several of these reports addressed Credit Suisse's AT1 Bonds, specifically.

For example, on June 17, 2022, Barclays issued a report titled, "*AT1 issuance costs and SNB charges*," which discussed Credit Suisse's call of an existing and issuance of a new AT1 bond. *Id.* at 27. On June 24, 2022, J.P. Morgan's European Credit Research issued a report discussing the same topic. *Id.* On October 5, 2022, J.P. Morgan's European Credit Research issued a report titled "*Debit Suisse*" which discusses the volatility of spreads in Credit Suisse debt

securities and related investor concerns. *Id.* On October 28, 2022, J.P. Morgan's European Credit Research issued a report titled "*Trade Idea: Value In Short-Call AT1 And Short-End HoldCoSenior*," discussing recent Credit Suisse communications and the investment attractiveness of AT1 bonds. *Id.* In addition, independent bond rating agencies – DBRS Morningstar, Fitch, Moody's, and Standard & Poor's – provided overall assessments of the AT1 Bonds. *Id.* at 28. Together, this coverage activity supports a finding of market efficiency for Credit Suisse's AT1 Bonds. *See Winstar*, 290 F.R.D. at 446 (finding that factor supported market efficiency because "at least three analysts" had reported about Winstar's bonds specifically).

Moreover, the Court previously held that Mr. Diabat had "more than sufficiently demonstrated efficiency of" the markets for Credit Suisse's other securities, including its Options and Senior Notes. *See Credit Suisse*, 2025 WL 1866293, at *11 (S.D.N.Y. July 7, 2025). In support of his motion for class certification, Mr. Diabat had submitted an expert report from Matthew D. Cain, Ph.D. (the "Cain Report"). Dkt. No. 128-1, Miller Decl., Ex. A. Dr. Cain concluded that Credit Suisse's ADSs traded in a highly efficient market, in part, because Credit's Suisse's analyst coverage "placed it in the top 25% of all companies listed on the NASDAQ and the NYSE," Cain Report, at 23, "which courts presume to be an efficient market," *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 217 (S.D.N.Y. 2021). Although bonds and equity securities trade in distinct markets, the information environment surrounding Credit Suisse's American Depository Shares was similar to Credit Suisse's AT1 Bonds, especially in light of the severity of Credit Suisse's financial situation, and the fact that all Credit Suisse investors were exposed to the same underlying information. Sorescu Report, at 20. Accordingly, the Court's prior conclusion that Credit Suisse securities traded in an efficient market further supports the conclusion that the AT1 Bonds also traded in an efficient

market. *See In re Vale S.A. Sec. Litig.*, No. 19CV526RJDSJB, 2022 WL 969724, at *5 (E.D.N.Y. Mar. 31, 2022) (stating that "denying the *Basic* presumption for a debt security . . . because they do not behave the way equity securities behave" is akin to "throwing out oranges because they are not apples" (citation omitted)).

### 3. Market Makers for the Bonds

The existence of numerous market makers transacting a security suggests a more efficient market because market makers "react swiftly to company news and reported financial results by buying or selling stock," thereby driving the market to incorporate new information more quickly. *Cammer*, 711 F. Supp. at 1287. The SEC defines "market maker" as

> a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and, (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.

17 C.F.R. § 240.15c3–1(c)8 (2025). During the Class Period, there were between two and nineteen market makers that actively traded Credit Suisse AT1 Bonds with other brokers or dealers. Sorescu Report, at 31 & Ex. 4. On average, the AT1 Bonds had over eight different market makers. *Id.* Because "anywhere between six and twenty market makers is sufficient to support a finding of market efficiency," *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015), the third *Cammer* factor supports the conclusion that the AT1 Bonds traded in an efficient market.

### 4. Eligibility to File Registration Statement SEC Form S–3

The SEC permits a company to file Form S–3 when, in the SEC's judgment, the market for the security is already reasonably efficient at processing information. As *Cammer* emphasized,

the Form S–3 is "*predicated on the Commission's belief that the market operates efficiently for these companies* [that file Form S–3s], *i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.*" *Id.* at 1284 (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41,902 (1981) (emphasis in original)). Therefore, a company's eligibility to file a SEC Form S–3 Registration Statement in connection with a security "is an important factor weighing in favor of a finding that a market is efficient." *Id.* at 1285, 1287.

Although Credit Suisse was ineligible to file Form S–3 because it was a foreign company, it was eligible to file a Form F–3. Form F–3 is functionally identical to Form S–3, as both permit streamlined registration for seasoned issuers whose securities trade in markets that efficiently process public information. Both forms impose substantially the same eligibility requirements – most notably, that the market value of the company's outstanding non-convertible securities, other than common equity, exceed $750 million. *Compare* U.S. Securities & Exchange Commission, *Form S–3: Registration Statement under the Securities Act of 1933*, at 5, https://www.sec.gov/files/formS–3.pdf ("Form S–3"), *with* U.S. Securities & Exchange Commission, *Form F–3: Registration Statement Under the Securities Act of 1933*, at 6, https://www.sec.gov/files/formF–3.pdf ("Form F–3"). In addition, both forms require that the company have a class of securities eligible for coverage under the Exchange Act, have submitted all necessary filings with the SEC in a timely manner for the past 12 months, and have not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases. *Compare* Form S–3, at 3–4, *with* Form F–3, at 3–4. As several courts have observed, "Form F–3 is the equivalent of a Form S–3 for foreign companies." *See, e.g.*, *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 365 (S.D.N.Y. 2016), *aff'd in part and vacated in part on*

*other grounds*, 862 F.3d 250 (2d Cir. 2017); *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 52 (S.D.N.Y. 2019).

Because Credit Suisse was eligible to file the SEC Form F–3 throughout the Class Period, this factor supports a finding that the AT1 Bonds traded in an efficient market.

### 5. *Price Reaction to Unexpected Corporate Events or Financial Releases*

A key consideration in assessing market efficiency is whether there is a cause-and-effect relationship between "unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287; *cf. Halliburton II*, 573 U.S. at 272 ("'That the . . . price [of a stock] may be inaccurate does not detract from the fact that false statements affect it, and cause loss,' which is 'all that *Basic* requires.'") (citing *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010)). This factor is often described as "the most important *Cammer* factor" because it most directly demonstrates whether the market efficiently incorporates public information into a security's price. *Bombardier*, 546 F.3d at 207 (quoting *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005)). An event study finding a correlation between unexpected disclosures to corresponding price changes in security is prima facie evidence of such a causal relationship. *Id.*

Core Capital offers such an event study prepared by Dr. Sorescu. His study examines both (1) the relationship between AT1 Bond prices and Credit Suisse's bond-specific information environment, and (2) the relationship between AT1 Bond prices and broader firm-level information expected to affect Credit Suisse's securities as a whole. *See* Sorescu Report, at 43–47. According to Dr. Sorescu, subordinated instruments like Credit Suisse's AT1 Bonds respond to firm-specific news – especially when under financial stress – because these instruments are

specifically designed to "absorb losses" and thus "respond to news such as earnings announcements or regulatory interventions," events that "directly affect the likelihood that subordinated [AT1 Bond] creditors will bear losses." *Id.* at 42. His report concludes that the cause-and-effect relationship between information and price movements for Credit Suisse's AT1 bonds is robust across both the narrow bond-specific and the broader firm-specific contexts. *Id.*

Dr. Sorescu's report estimates the AT1 Bonds' "abnormal return," or the portion of the daily AT1 Bonds' return that is not attributable to market- or industry-wide movements. His methodology involves identifying five "News Days" during the Class Period – days on which Credit Suisse released earnings announcements, guidance updates, and FINMA's March 19, 2023 write-down – and compared AT1 Bond performance on those days with non–News Days. *Id.* at 47. Finding a higher proportion of days with statistically significant abnormal returns on News Days than on non-News Days indicates that the bonds respond promptly to new information, supporting a finding of market efficiency. Dr. Sorescu found that almost half of the News-Days-bond pairs showed statistically significant abnormal price. *Id.* at 48. His report thus finds a statistically significant causal relationship between Credit Suisse-specific information and AT1 Bond price movements, supporting the conclusion that the AT1 Bonds traded in an efficient market.

Defendants challenge the conclusion of Dr. Sorescu's event study, arguing that Dr. Sorescu improperly treats the market for Credit Suisse's AT1 Bonds as a single market, despite there being nine distinct series of AT1 Bonds. Dkt. No. 52, at 22. This objection to Dr. Sorescu's "pooling" approach fails to persuade, for two reasons.

*First,* for purposes of calculating trading volume, the tranches in which the nine AT1 Bonds traded are properly treated as fungible, because "the Reg S and Rule 144A AT1 tranches . . . represent[] the same claim, the same risk, and the same loss-absorption potential." Sorescu Report at 16. The Reg S and Rule 144A tranches of the AT1 Bonds also share nearly identical contractual terms. *Id.* For example, all of the Credit Suisse AT1 Bonds were "perpetual," offered fixed-to-floating rates that paid a fixed coupon until a specified date, and thereafter paid a variable rate tied to an index plus a fixed spread. Dkt. No. 55-1, Sorescu Reply Report, at 11. Moreover, they all share the same principal risk factor: the possibility of being completely written down following a "Viability Event." This shared exposure to a complete, discretionary write-down by Swiss regulators strongly supports Dr. Sorescu's treatment of Credit Suisse's AT1 Bonds as a unified, loss-absorbing asset class.

*Second,* FINMA's own conduct confirms this conclusion. During FINMA's March 19, 2023 press conference announcing the UBS–Credit Suisse merger, FINMA Chairwoman Marlene Amstad described the use of AT1 Bonds as a single, unified policy instrument in explaining why Credit Suisse shareholders would receive compensation while AT1 bondholders would see their investments fully written down:

> The AT1, the whole package has the intention to stabilize the financial system and to assure the stability of the financial system, and for this transition phase we needed the capital. And the foreseen instrument in such a situation, as in the Too Big To Fail instrument, is the AT1. And so this is why we've chosen to stick to this Too Big To Fail framework and to trigger only the AT1.

Dkt. No. 55-1, at 14–15. FINMA itself treated all nine Credit Suisse AT1 Bonds as a uniform class – consistent with the market's understanding that these instruments respond collectively to issuer-level risks rather than to individual bond characteristics. This Court therefore finds no fault

26

with Dr. Sorescu's approach of aggregating responses within this shared policy- and issuer-risk environment.

*Third,* pooling non-identical data to conduct hypothesis testing is a well-established and widely accepted econometric method. Aggregating the Credit Suisse AT1 Bonds enhances the statistical strength and reliability of the analysis, as each bond on its own trades too infrequently to yield statistically robust results. Analyzing them separately would diminish statistical power, increase noise from confounding factors, and hinder the detection of price movements not attributable to market-wide effects. Sorescu Reply Report, at 15–16. What is more, this Court has already rejected Defendants' identical objection to a pooling methodology when it granted class certification for several Credit Suisse securities in *Diabat*, where Dr. Cain's event study likewise pooled at least six distinct Credit Suisse Notes within a single regression model. *See Credit Suisse*, 2025 WL 1866293, at *11 ("Dr. Cain's selection of event dates and "pooling" approach are not "facially insufficient."); Dkt. No. 128-1, Cain Report, at 72. In short, the pooling of non-identical data is not only a standard econometric practice and a statistically necessary approach, but one this Court has already endorsed in this very litigation.

Finally, Defendants argue that Dr. Sorescu's selection of March 20, 2023, as a News Day is an example of "hindsight bias," claiming it amounts to a kind of "cherry-picking" intended to exaggerate the market's sensitivity for AT1 Bonds. Dkt. No. 52, at 23. Although selecting an appropriate event window is not an exact science, the primary goal is to choose a period long enough to capture the market's full and contemporaneous reaction to the relevant disclosure. *See In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 600 n.5 (S.D.N.Y. 2010).

27

*First,* Defendants' objection to Dr. Sorescu's treatment of March 20, 2023, as a News Day concerns the weight of the evidence, not its sufficiency. *See, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) (rejecting *Daubert* challenge based on similar date selection methodology). An expert conducting an event study inevitably exercises some degree of subjectivity when defining selection criteria, as these decisions are essential for performing a meaningful multivariate regression analysis. *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 163 (S.D.N.Y. 2012) (stating that selection of News Days "necessarily requires a researcher to make an independent determination").

Even assuming that Dr. Sorescu improperly included March 20, 2023 as a News Day, 23% of News Day bond pairs still show statistically significant price movements at either the 90% or 95% confidence level. *See* Sorescu Report, at 82–83. This implies there is at most a 10% chance that the price volatility in AT1 Bonds during the Class Period is due to random chance. Therefore, Defendants' objection to a specific aspect of Dr. Sorescu's event study does not undermine its core finding: that there is a statistically significant relationship between Credit Suisse-specific information and AT1 Bond price movements, supporting market efficiency. *See Billhofer*, 281 F.R.D. at 163 (stating that "While [an expert's] analysis is necessarily subjective, that does not mean his opinion is speculative or without any methodological constraints"). And market efficiency, after all, is ultimately "a matter of degree." *Halliburton II*, 573 U.S. at 272.

*Second,* Defendants offer no credible reason why the single most consequential market-moving event – the March 2023 Write-Down, which marked the ultimate materialization of the previously concealed risk and resulted in abnormal returns on certain AT1 Bonds of up to -83.08% – should be excluded from the analysis. Defendants' suggestion that Dr. Sorescu's event study also should have excluded FINMA's March 19, 2023 announcement approving UBS's takeover

of Credit Suisse – a decision that triggered a full write-down of the nominal value of all AT1 Bonds, totaling roughly $17 billion – is absurd on its face, and is a proposition this Court categorically rejects. In fact, this Court already recognized the March 19, 2023 announcement as a valid News Day in *Diabat* and will not depart from that ruling here. *See Credit Suisse*, 2025 WL 1866293, at *11.

In sum, Dr. Sorescu's report identifies a statistically significant causal relationship between Credit Suisse-specific information and AT1 Bond price movements, supporting the conclusion that Credit Suisse's AT1 Bonds traded in an efficient market.

### *Krogman* Factors Further Confirm Market Efficiency

In addition to the *Cammer* factors, each of the three *Krogman* factors provides further support that the AT1 Bonds traded in an efficient market.

*1. Market Capitalization*

A high market capitalization support market efficiency because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Credit Suisse's market capitalization, when measured by par value, ranged between $1 billion and $2.5 billion during the Class Period, with an average of $1.7 billion. Sorescu Report, at 36 & Ex. 7. While par value is not the same metric as market value, courts evaluating debt securities look to the economic size of the bonds as an analogue to equity market capitalization. For example, in *Teva*, 2021 WL 872156, at *20, the court observed that Teva's debt securities' average market value of outstanding bonds ranged from nearly $1.5 billion to over $3 billion and treated that amount as probative under the *Krogman* framework for bonds. Applying the same rationale in

*Teva*, the Court concludes that the AT1 Bonds debt market capitalization of $ 1.7 billion, when measured by par value, supports a finding of market efficiency.

### 2. *Relative Size of the Bid-Ask Spread for AT1 Bonds*

A small bid-ask spread – "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares," *Krogman*, 202 F.R.D. at 478 – indicates low transaction costs, which facilitates increased trading activity and, in turn, supports a finding of market efficiency. Although bid-ask spreads are not publicly disseminated in the bond market, the mean bid–ask spreads for the AT1 bonds, based on Bloomberg BVAL data, ranged from 0.85% to 1.76%, with median spreads between 0.35% and 0.80%. Sorescu Report, at 38 & Ex. 8.

In *Teva*, 2021 WL 872156, at *17, the court held that an average bid-ask spread of 2.66% for a Teva bond "weighs moderately in favor of market efficiency." With even greater reason, then, the AT1 Bonds' median spread between 0.35% and 0.80% weighs in favor of a finding of market efficiency. *See also Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015) (holding that average bid-ask spread of 2.91 and 2.2 percent "supports Plaintiffs' case . . . but not strongly"); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (holding that average daily bid-ask spread of 2.44 percent "weighs in favor of market efficiency"). Nevertheless, the Court notes that this factor should be afforded less weight because the analysis relies on Bloomberg BVAL estimates rather than actual bid and ask quotes, which would be available in an equities market.

### 3. *Float, or the Degree to Which Shares of AT1 Bonds Are Held by the Public*

Public float refers to the notional value of a security that is not held by corporate insiders. *See Krogman*, 202 F.R.D. at 478. A high ratio of public float to total notional value outstanding

indicates that a large portion of the bond is held by public investors and therefore can be traded without restrictions, thus supporting a finding of market efficiency. *See id.* Courts have adapted this factor for debt markets by focusing on the amount of debt available for trading by outside investors in the open market rather than on share counts. *See, e.g.*, *In re Glob. Brokerage, Inc.*, No. 17-CV-916 (RA) (BCM), 2021 WL 1160056, at *18 (S.D.N.Y. Mar. 18, 2021), *report and recommendation adopted sub nom.* 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021).

Consistent with the methodology employed in *Diabat I*, *see* Dkt. No. 128-1, Cain Report, at 80–81, Dr. Sorescu, relying on Bloomberg data, concludes that the number of AT1 Bonds held by insiders never exceeded 0.58% of the notional value outstanding for each Credit Suisse AT1 Bond during the Class Period. Sorescu Report, at 40 & Ex. 7. Accordingly, because at least 99.42% of the notional value of each Credit Suisse AT1 Bond was held by the public in the open market, this factor weighs in favor of a finding that the AT1 Bonds traded in an efficient market.

Having found that each *Cammer* and *Krogman* factor supports this conclusion – and mindful of the differences between bond markets and equity markets – the Court concludes that Credit Suisse's AT1 Bonds traded in an efficient market.

The Court turns to the final, third *Basic* requirement to invoke *Basic*'s presumption of reliance. There is no dispute that Core Capital traded Credit Suisse's AT1 Bonds between the time the alleged misrepresentations were made and the time the truth was revealed given that all members of the proposed Class did so by definition. *See* Dkt. No. 49, at 8 (defining the proposed Class as all persons other than Defendants who purchased AT1 Bonds in a domestic transaction in the U.S. between October 27, 2022 and March 20, 2023). Accordingly, the Court concludes that

Core Capital, having satisfied all three *Basic* requirements, is entitled to a presumption of reliance on Defendants' alleged misrepresentations under the "fraud-on-the-market" theory.

B. Plaintiffs Satisfy the Requirements for the *Affiliated Ute* Presumption

Reliance is presumed in securities actions "involving primarily a failure to disclose." *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). This presumption applies when plaintiffs allege "an omission of a material fact by one with a duty to disclose." *Stoneridge Inv. Partners, LLC*, 552 U.S. at 159. Plaintiffs are entitled to this presumption because their claims rest on Credit Suisse's alleged failure to disclose material weaknesses in its internal control over financial reporting. Specifically, Plaintiffs' §§ 10(b) and 20(a) claims concern Credit Suisse's and the Individual Defendants' alleged omissions regarding known and material ICFR deficiencies repeatedly probed by the SEC beginning as early as July 2022. Core Capital Dkt. No. 1, at 25–26, 45; Dkt. No. 85-10, Matuschak Decl., Ex. 10.

That Plaintiffs also allege material misrepresentations does not defeat the *Affiliated Ute* presumption inapplicable. *See Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014). Defendants identify no authority – and none exists – holding that the Second Circuit has adopted an "either/or" rule requiring plaintiffs to choose between *Basic* and *Affiliated Ute*. *See* Core Capital Dkt. No. 52, Defs.' Opp'n Pl.'s Mot. for Class Certification, at 23 n.6. To the contrary, the Second Circuit has declined to impose any categorical bar on invoking *Affiliated Ute* where both omissions and misstatements are alleged. Defendants' effort to force such a false dichotomy finds no support in the law.

The decision in *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 178 (S.D.N.Y. 2005) is illustrative. There, the plaintiffs' Section 10(b) claims involved both affirmative

misrepresentations – alleging that Lehman Brothers, Goldman Sachs, and Morgan Stanley falsified their equity analyst reports on a publicly listed company – and omissions – alleging that defendants failed to disclose analysts' undisclosed relationships with the companies they covered, which created conflicts of interest. *Fogarazzao*, 232 F.R.D. at 178. The court held that even though the plaintiffs' claims rested on both misstatements and omissions, they "may use either presumption" of reliance. *Id.* at 187. *Fogarazzo* thus confirms that the presence of misrepresentations does not preclude applying *Affiliated Ute* when omissions are central to the alleged fraud.

The Second Circuit's decision in *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) does not compel a different result. In *Waggoner*, § 10(b) plaintiffs sued Barclays for making allegedly false and misleading statements concerning "LX," a subset of its alternative trading systems known as "dark pools," which allow investors to trade securities anonymously to avoid the manipulative tactics of high-frequency traders. 875 F.3d at 86. The plaintiffs claimed that Barclays's statements misrepresented the protection offered by its "Liquidity Profiling" system. *Id.* at 87. Although the Court held that the *Affiliated Ute* presumption did not apply, its reasoning turned on the fact that the allegations were "primarily . . . affirmative misrepresentations, not omissions." *Waggoner*, 875 at 95 (citing *Affiliated Ute*, 406 U.S. at 153). The Court explained that the alleged omission was merely "the inverse" of the alleged misrepresentation because: (1) Barclays's failure to disclose that Liquidity Profiling would not effectively protect significant portion of LX trades was simply a restatement of Barclay's alleged misrepresentation that Liquidity Profiling would effectively protect LX traders; and (2) the alleged omission depended on, and was derived from, the misrepresentations themselves. *Id.* at 96. Neither rationale applies here.

Unlike in *Waggoner*, Plaintiffs' alleged misstatements and omissions here arise from distinct theories of liability and different factual predicates. The alleged misstatements primarily concern Defendant Lehman's December 2022 statements to *Financial Times* and *Bloomberg Television* that customer outflows had "flattened" and "basically stopped." *See* Core Capital Dkt. No. 1, 30–32. The alleged omissions, by contrast, primarily concern Defendants Körner's and Joshi's October 2022 failure to disclose material ICFR weaknesses when announcing Credit Suisse's third quarter 2022 results. *See id.* at 25–27. Although there is some factual overlap, the misstatements and omissions in this case implicate distinct conduct, timing, and actors and thus are neither "mere inverses" nor interdependent, as were the tautological statements at issue in *Waggoner*.

Because Plaintiffs' complaint is not "based primarily on allegations of affirmative misrepresentations," *Waggoner*, 875 F.3d at 95, but instead asserts both misstatements and omissions grounded in separate factual and legal theories, Plaintiffs may invoke the *Affiliated Ute* presumption with respect to their omission-based claims for purposes of class certification. *See, e.g.*, *Puddu v. NYGG (Asia) Ltd.*, No. 15CV8061 (DLC), 2022 WL 2304248, at \*4 (S.D.N.Y. June 27, 2022) (collecting cases).

This conclusion accords with the Second Circuit's reminder that the core rationale of *Affiliated Ute* is pragmatic, not formalistic: "positive proof of reliance is not a prerequisite to recovery" *Affiliated Ute*, 406 U.S. at 153, because "reliance as a practical matter is impossible to prove" in omission-based claims. *Waggoner*, 875 F.3d 79, 95–96. That pragmatic rationale is especially compelling here, where Defendants' alleged omissions presumably concealed information investors could not have independently discovered – the very scenario *Affiliated Ute* was designed to address. Thus, to require plaintiffs to reconstruct a hypothetical chain of

34

reasoning – speculating how they might have acted had omitted information been disclosed – would impose an unrealistic and inequitable evidentiary burden contrary to the remedial purposes of the securities laws. *See Affiliated Ute*, 406 U.S. at 151 ("Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" (citing *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 195 (1963)).

Accordingly, the Court declines to preclude Plaintiffs from invoking the *Affiliated Ute* presumption merely because their complaint also includes allegations of affirmative misrepresentations – consistent with the approach taken by other courts in this District. *See, e.g., In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47–48 (S.D.N.Y. 2013).

## C. Individual Damages Issues Do Not Predominate

In *Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 38 (2013), the Supreme Court held that to satisfy predominance, class action plaintiffs must "establish[] that damages are capable of measurement on a classwide basis." At the class certification stage, the temporal focus of the damages inquiry centers on whether plaintiffs will be able to prove their case through common proof *at trial*. *See* Fed. R. Civ. P. 23(c)(1)(A) (contemplating that certification orders issue "[a]t an early practicable time"). The concern in *Comcast*, 569 U.S. at 36–37 was twofold: (1) the proposed model measured damages unrelated to the plaintiff's particular theory and (2) the proposed model could not isolate those damages from theory-specific harm. These problems – key to the Court's holding in *Comcast* – are not present here.

Dr. Sorescu's model directly ties damages to Plaintiffs' theory that Defendants fraudulently inflated Credit Suisse AT1 bond prices during the Class Period. Specifically, Dr. Sorescu's "out-

of-pocket" method calculates damages for each member of a class as the artificial inflation at purchase minus the artificial inflation at sale. Sorescu Report, at 50. By focusing on price reactions to materialization of risk events – including the March 2023 Write-Down – the model isolates damages attributable to Defendants' misrepresentations and omissions from market-wide or industry-wide effects. *Id.* If Credit Suisse is found liable, the model can mechanically compute individual class members' damages across the Class based on the proposed common "out-of-pocket" methodology, which courts have repeatedly held to be consistent with the securities laws and capable of being applied on a class-wide basis. *See, e.g.*, *Waggoner*, 875 F.3d at 106; *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105–06 (S.D.N.Y. 2016).

Courts consistently find class treatment appropriate where damages can be calculated class-wide, even if calculations have not yet been performed. *See, e.g.*, *In re Nat'l Instruments Sec. Litig.*, No. 23CV10488 (DLC), 2025 WL 2682172, at \*5–6 (S.D.N.Y. Sept. 19, 2025); *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025). Moreover, it is well-established that "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Consistent with this Court's prior class certification order, the Court concludes that Dr. Sorescu's model is capable of mechanically computing individual Class members' damages across the Class. *See Credit Suisse*, 2025 WL 1866293, at \*10.

Defendants separately maintain that plaintiffs have not satisfied Rule 23's predominance requirement because (1) plaintiffs purportedly cannot demonstrate that domesticity is capable of class-wide proof, and (2) the positions taken by certain AT1 bondholders in parallel litigation allegedly create additional individualized issues, particularly regarding whether class members

36

may be judicially estopped from advancing specific arguments in future proceedings. For the reasons that follow, the Court rejects both arguments.

### D. Individual Domesticity Issues Do Not Predominate

This Court recognizes that Section 10(b) of the Exchange Act and Rule 10b–5 apply only to domestic transactions. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010). This limitation stems from the text of § 10(b) and its reference to "interstate commerce," which is defined to include "trade, commerce, transportation, or communication . . . between any *foreign* country and any State." 15 U.S.C. § 78c(a)(17) (emphasis added). The Supreme Court held that this language is insufficient to overcome the presumption against extraterritoriality unless Congress provides an affirmative and unmistakable instruction to the contrary. *Morrison*, 561 U.S. at 263. Thus, to assert claims under federal securities laws, Plaintiffs must demonstrate that they purchased their AT1 Bonds domestically.

The core issue is whether individual inquiries into domesticity – whether each investor's transaction falls under U.S. securities laws – would overwhelm the common issues for class certification. Defendants argue that the need for individualized proof regarding the domestic nature of each transaction will prevent Plaintiffs from satisfying Rule 23(b)(3)'s predominance requirement. In Defendants' view, unlike the American Depository Shares in *Diabat*, which traded on the New York Stock Exchange, Credit Suisse's AT1 Bonds traded exclusively over-the-counter ("OTC") in the U.S. market. As such, Defendants contend that class certification would be unmanageable because determining whether each transaction was domestic would require countless inquiries into the specific circumstances of each investor's transaction. Core Capital Dkt. No. 52, at 9–13.

37

Before certifying a class in a securities fraud action, the Court must carefully assess whether individual questions of domesticity under Morrison would overwhelm the common issues. *In re Petrobras Sec.*, 862 F.3d at 271–73. Transactions executed on a centralized exchange in the U.S. are presumed domestic. *See Morrison*, 561 U.S. at 267. For transactions that are not traded on a U.S.-based exchange, as is the case here, domesticity is demonstrated if (1) the purchaser incurred irrevocable liability in the U.S., or (2) legal title passed within the U.S. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67–68 (2d Cir. 2012).

Applying *Morrison* and its progeny, the Court concludes that, even if determining domesticity requires individualized inquiry, these inquiries do not predominate over class-wide issues. *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015) (noting that the "text of Rule 23(b)(3) itself contemplates that such individual questions will be present," but Rule 23(b)(3) "requires only that those questions not predominate over the common questions affecting the class as a whole." (citation omitted)).

Defendants' reliance on *Petrobras* to argue otherwise is misplaced. *See* Core Capital Dkt. No. 52, at 8–13. Properly understood, *Petrobras* strengthens, rather than undermines, Plaintiffs' position, by reaffirming that predominance is a "robust" yet flexible inquiry focused on whether common questions outweigh individual ones. The Second Circuit did not hold that the existence of individual domesticity inquiries automatically defeats predominance. To the contrary, it held only that the district court had erred in certifying a class without first analyzing (1) whether domesticity could be shown through common proof; (2) and, if not, whether common issues nonetheless predominated. *See id.* at 271; *see also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015) ("The presence of individual questions does not per se rule out a finding of predominance.").

38

In *Petrobras*, the plaintiffs neither alleged that they purchased securities on a U.S. exchange nor meaningfully addressed how domesticity could be shown for off-exchange transactions. *See In re: Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 192–193 (S.D.N.Y. 2016). The Second Circuit expressly cautioned that its reversal was "limited to" the particular record and "should not be taken as expressing an opinion on the wide range of conceivable circumstances in which plaintiffs may assert class claims in connection with foreign-issued securities that do not trade on a domestic exchange." *In re Petrobras Sec.*, 862 F.3d at 274 n.27; *see also id.* at 274–75 ("We take no position as to whether, on remand, the district court might properly certify [the relevant classes] . . . Our purpose is merely to outline the contours of the robust predominance inquiry that Rule 23 demands."). The Court further observed that certification may still be proper so long as the district court "carefully weigh[s] the relationship between common and individual questions" and determines that any variation "is, on balance, insufficient to defeat predominance." *Id.*

The *Petrobras* decision reinforces two important principles: (1) individual domesticity inquiries do not automatically defeat predominance, *see id.* at 274–75, and (2) the predominance inquiry is a flexible, comparative test, where the court must balance the weight of common and individual issues, *see id.* at 274 n.27.

Consistent with the Second Circuit's caution that *Petrobas* should not be viewed as dispositive in all cases involving foreign-issued securities, given the "wide range of conceivable circumstances in which plaintiffs may assert class claims," the Court will not attribute the *Petrobas* plaintiffs' particular shortcomings in addressing domesticity to the Plaintiffs in this case. 862 F.3d at 27. Unlike the *Petrobas* plaintiffs, Core Capital has identified at least two reliable methods of proving domesticity. *See* Core Capital Dkt. No. 54, at 7–10.

*First,* Core Capital has identified a method for demonstrating domesticity that the Second Circuit itself endorsed in *Petrobras. See* Core Capital Dkt. No. 54, at 7. In its decision, the Second Circuit recognized that "records routinely produced by the modern financial system" can reliably establish domesticity, particularly when the purchaser was located in the U.S., placed the order in the U.S., and purchased the securities directly from U.S. underwriters. *In re Petrobras Securities*, 862 F.3d at 272. These are deemed "easy" cases. *Id.*

*Second,* Core Capital has suggested that domesticity can be established using ordinary trading documents, such as purchase orders, brokerage statements, or trade confirmations, supplemented by expert declarations. Core Capital Dkt. No. 54, at 7. This approach is well-supported by case law. In *In re Deutsche Bank AG Securities Litigation*, 328 F.R.D. 71, 75–76, 78 (S.D.N.Y. 2018), plaintiffs sued on behalf of themselves and all similarly situated purchasers of two different securities issued by the Germany-based Deutsche Bank AG, alleging, *inter alia*, that Deutsche Bank had misrepresented and omitted material facts, including that it held approximately €20 billion in exposure to high-risk subprime and nonprime residential mortgage-backed securities ("RMBS"). The court required Plaintiffs to provide "definitive evidence" that plaintiffs' transactions occurred in the U.S., clarifying that merely showing that plaintiffs or underwriters were located in the U.S. would not suffice. *Id.* at 83.

In response, plaintiffs provided trade confirmations and an expert declaration from former SEC Chairman Harvey L. Pitt, which detailed, *inter alia*, the locations of the securities' underwriters and the banks from which they purchased the securities. *Id.* at 83–84. Based on this evidence, the court found the plaintiffs had adequately shown that their transactions occurred domestically. *See id.* at 84 ("[W]e also find that the securities later being listed and traded on the New York Stock Exchange is irrelevant."). Accordingly, under *In re Deutsche Bank AG Securities*

40

*Litigation*, documentation generated in the ordinary course of trading – supplemented by expert declarations – can provide an alternative means of proving domesticity, even where the securities at issue were not traded on a centralized U.S. exchange. The decision underscores the broader principle that domesticity is not only ascertainable but can be proven in a relatively straightforward manner without overwhelming the common issues – notwithstanding the fact that the securities were not listed on a centralized U.S. exchange. *See id.*

These methods show that domesticity is both ascertainable and provable through reliable, standardized evidence, undermining Defendants' claim that individualized domesticity issues will predominate. Of course, every transaction will have to be analyzed to establish which ones were domestic transactions and which were not, but that is no more complicated than applying a standardized damages formula to each Class Member's holdings. That being so, the Court concludes that individualized domesticity issues do not predominate over the common issues in this case.

Defendants' only evidence supporting their claim that domesticity issues will predominate is that 132 of the 229 institutional holders of AT1 Bonds are domiciled overseas. Core Capital Dkt. No. 52, at 8. But this overlooks the thousands of non-institutional Class Members, many of whom purchased AT1 Bonds domestically. While it is true that each non-institutional holder's transactions must be analyzed to determine domesticity, this is only a single, discrete inquiry and does not overwhelm the central, common issues in this case: whether Defendants misrepresented or omitted material information about the AT1 Bonds, whether those misstatements or omissions caused losses, and how damages are calculated. Even assuming a substantial portion of non-institutional holders were overseas, enough domestic transactions remain to satisfy numerosity and support predominance.

Moreover, as Defendants concede, a foreign investor may transact in the United States, making domicile not dispositive. By Defendants' own admission, "purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States." Core Capital Dkt. No. 52, Defs.' Mem. Opp'n to Pl.'s Mot. for Class Certification, at 11. Defendants assert that purchasers' domicile is irrelevant to the domesticity inquiry, while also arguing that the institutional holders' domicile proves that individual domesticity issues will predominate. Defendants may not maintain mutually incompatible positions to suit their convenience. *Equitable Tr. Co. of New York v. Connecticut Brass & Mfg. Corp.*, 290 F. 712, 725 (2d Cir. 1923).

Accordingly, the Court declines to credit Defendants' unsupported claim that the existence of 132 overseas institutional holders demonstrate that individual domesticity issues will predominate. Nor will the Court deny certification under Rule 23(b)(3) simply because the case *may* be unmanageable based on the unknown domiciles of the remaining class members, even though that group is numerous. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 140.

Even assuming *arguendo* individual domesticity determinations prove more complex than anticipated, Plaintiffs need not, at this stage, provide "adequate assurance that there can be 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *In re Petrobras Sec.*, 862 F.3d at 267 (quotations omitted). Courts routinely defer such individualized issues to later phases. *See also In re WorldCom, Inc. Sec. Litig.*, No. 2-cv- 3288 (DLC), 2005 WL408137, at *5 (S.D.N.Y. Feb. 22, 2005) (reserving individualized issues for proceedings to follow after the conclusion of a plenary trial on

defendants' liability). And if complexities arise, the Court remains "authorized to implement management strategies tailored to the particularities of [the] case" to ensure that foreign transactions are excluded from the class. *In re Petrobras Sec.*, 862 F.3d at 274; *cf. In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) (describing numerous tools for managing individualized issues).

Defendants conveniently overlook the fact that Class Members can submit proof of domesticity during claims administration, just as they did in *In re Petrobras Sec. Litig.*, 317 F. Supp. 3d 858, 865–66 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 10 (2d Cir. 2019), where the certified class included "any transaction in a Petrobras Security to which the United States securities laws apply, including as applicable pursuant to the Supreme Court's decision in *Morrison*." *See In re Petrobras Sec. Litig.*, 317 F. Supp. 3d at 865–66. The Court is confident that it has ample tools at its disposal to address individual domesticity issues efficiently, such that they will not predominate over common issues. And if subsequent developments show otherwise, the Court may always decertify the class. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir. 1982).

In sum, Core Capital has offered a class definition that permits only domestic transactions to proceed. *See* Core Capital Dkt. No. 49, at 8. While some investor-specific inquiries may arise, they do not defeat predominance, particularly given the established methods for determining domesticity with relative ease. Because Plaintiffs invoke the *Basic* presumption, reliance is established on a class-wide basis. Thus, common issues such as materiality, scienter, price impact, and loss causation substantially outweigh individualized domesticity inquiries.

43

Absent evidence that foreign transactions are so numerous or unmanageable that they would "overwhelm" the domestic ones, *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996), the Court will not rely on Defendants' mere *ipse dixit* to conclude that predominance is defeated. Defendants' speculative allegations that purportedly intractable, individual domesticity inquiries may arise fall far short of showing that they would predominate over the common issues. *See In re Vale S.A. Sec. Litig.*, No. 19-CV-526-RJD-SJB, 2022 WL 122593, at *17 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, No. 19-CV-526RJDSJB, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022).

### E.  Hypothetical Estoppel Defenses Do Not Predominate

Defendants contend that several other lawsuits asserting different theories of liability have been brought against Credit Suisse in both the United States and Switzerland. Core Capital Dkt. No. 52, 16–18. In particular, Defendants note that approximately 273 individuals or entities with primary addresses in the United States[7] are allegedly participating in proceedings before Swiss courts challenging the Swiss Financial Market Supervisory Authority's ("FINMA") March 19, 2023 directive to write down all of Credit Suisse's AT1 Bonds. Core Capital Dkt. No. 53, Matuschak Decl., at 2. Defendants argue that "judicial estoppel bars some class members from asserting that FINMA's write-down directive was an inevitable consequence of Defendants' alleged fraud," Core Capital Dkt. No. 52, 20–21, because those same investors have asserted in

---

[7] The Court again notes that Defendants have taken several mutually inconsistent positions regarding the significance of the AT1 bondholders' domicile: (1) that purchasers' domicile is irrelevant to the domesticity inquiry; (2) that the institutional holders' foreign domiciles show individual domesticity issues will predominate; and now (3) that purchasers' U.S. domicile demonstrates that hypothetical estoppel defenses will predominate. Defendants' shifting views on the relevance of domicile – depending on which argument they seek to advance – undermine the persuasive force of their position.

the Swiss proceedings that their losses resulted from FINMA's allegedly unlawful write-down, rather than Defendants' alleged misrepresentations and omissions.

At this point in the litigation, Defendants' judicial estoppel argument rests on a chain of speculation concerning overlapping parties, hypothetical defenses, and uncertain rulings in foreign jurisdictions, rather than any concrete conflict or individualized issue that is presently before the Court. Layers of speculation about possible individual issues arising out of whether judicial estoppel may apply cannot defeat predominance. *See George v. Shamrock Saloon II, LLC*, No. 17CIV6663RAHBP, 2019 WL 8106153, at \*10 (S.D.N.Y. Aug. 7, 2019), *report and recommendation adopted*, No. 17-CV-6663 (RA), 2020 WL 133621 (S.D.N.Y. Jan. 13, 2020). Moreover, Defendants' argument introduces several additional layers of speculation.

*First,* judicial estoppel is an equitable doctrine "intended to protect the integrity of the judicial process" and applied solely at a court's discretion. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Whether this court would ultimately invoke judicial estoppel is thus inherently uncertain and entirely speculative.

*Second,* judicial estoppel is an affirmative defense that must be timely pleaded and proven, or it is waived. *See* Fed. R. Civ. P. 8(c); *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 116 n.10 (2d Cir. 1987), *cert. denied*, 108 S. Ct. 455 (1987). To prevail, Defendants must show that (1) a class member's position is "clearly inconsistent" with an earlier position; (2) the class member persuaded a court to adopt the earlier position such that acceptance of the later one would create the impression that the court was misled; and (3) the class member would derive an unfair advantage or impose an unfair detriment on Defendants if not estopped. *New Hampshire*, 532 U.S. at 750–51 (2001).

45

Here, the record contains no information about the substance of any Swiss proceedings, the positions taken by these putative class members, or whether those proceedings are sufficiently developed to permit a meaningful estoppel analysis. Moreover, it is impossible to conclude today that the assertion of the March 2023 Write-Down's illegality in a Swiss court would be "clearly inconsistent" with a Class Member's contention that Defendants' alleged non-disclosures were responsible for their losses – at least in part, since the write-down, lawful or not, occurred at the end of the Class Period, while the alleged non-disclosures spanned a much longer time. Pleading in the alternative is a well-established practice in American courts, and it would not mislead this Court for class members to assert that their losses resulted both from Defendants' misstatements and omissions and from the write-down, should the latter ultimately prove unlawful. Conversely, if a Swiss court were to conclude that the Swiss Government acted within its rights in writing down the AT1 bonds, the fact that certain putative class members had argued otherwise would not necessarily preclude them from seeking relief here on an alternative theory of liability.[8] On the present record, there appears to be no basis for concluding that judicial estoppel would apply at all.

But that is an issue for another day. For present purposes, Defendants' argument that any putative class member would be judicially estopped from participating in this lawsuit is entirely hypothetical. Hypothetical arguments, however, are not a bar to class certification—particularly on predominance grounds. What matters for class certification is the status of the plaintiffs at the time the motion is filed. *See White v. Mathews*, 559 F.2d 852, 857 (2d Cir. 1977).

---

[8] One of the ironies inherent in Defendants' argument is that, while they claim class treatment is unmanageable, they will undoubtedly defend against liability on the common ground that the Swiss Government – not they – caused the Class Members' losses by writing down the AT1 Bonds.

It also bears noting that putative class members are just that: putative. Any putative class member has the right to opt out of this class action and pursue other remedies individually and elsewhere. *See* Fed. R. Civ. P. 23(c)(2)(B) (requiring the court to "exclude from the class any member who requests exclusion"). It is impossible at this stage to predict who may opt out, or for what reasons. Any such opt-outs could reduce or eliminate the possibility that inconsistent positions would predominate in this action. That, too, is an issue for another day.

In short, the possibility that Defendants might one day invoke judicial estoppel against unidentified class members, either here or in some foreign proceedings, is thus too speculative today to undermine predominance – especially where, as here, the common issues – falsity, materiality, scienter, reliance, and loss causation – plainly unite a class of persons that relies on securities fraud for recovery.

The Court thus concludes that Core Capital has satisfied the predominance requirement of Federal Rule of Civil Procedure 23(b)(3).

## ii. Superiority

Federal Rule of Civil Procedure 23(b)(3) also requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating" Plaintiffs' claims. Fed. R. Civ. P. 23(b)(3). The relevant considerations include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

47

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D). In general, securities actions "easily satisfy the superiority requirement of Rule 23." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008) (citation omitted). This is because securities violations "inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *Id.*

Defendants reiterate a familiar argument, claiming Plaintiffs cannot meet the superiority requirement because numerous lawsuits have been brought against Defendants in the United States and Switzerland. According to Defendants, the participation of certain proposed Class Members in these proceedings allegedly reflects a preference to pursue their claims individually rather than through a single class action. *See* Core Capital Dkt. No. 52, at 15–18. Core Capital Dkt. No. 15–18. This argument is unpersuasive. As noted above, putative class members may always opt out, but that does not mean a class action is not a superior method of adjudicating the claims of those who choose to proceed via class action. And in this case, the superiority analysis is compelling.

With respect to the Swiss AT1 Bond proceedings, their "extent and nature," Fed. R. Civ. P. 23(b)(3)(B), are sufficiently distinct to avoid management difficulties, Fed. R. Civ. P. 23(b)(3)(D). As Defendants acknowledge, those suits are brought against the Swiss Government challenging the legality of FINMA's write-down directive under Swiss law. Core Capital Dkt. No. 52, at 16. They do not assert U.S. securities fraud claims against Credit Suisse or its officers and directors, and thus pose no risk of conflicting judgments. *See id.* Nor have Defendants

suggested that the Swiss proceedings bear on the proposed Class's ability to recover in this case. *See* Core Capital Dkt. No. 52, at 14–18.

In short, the Swiss actions are irrelevant to the claims at issue here. The underlying causes of action supporting any such hypothetical recovery in Switzerland are wholly distinct from Plaintiffs' claims under the U.S. securities laws. And, even if they were not, the mere possibility that some overlapping investors might later recover from the Swiss Government "is not an adequate reason to deny class determination." *See Bryan v. Amrep Corp.*, 429 F. Supp. 313, 318–19 (S.D.N.Y. 1977).[9]

For the same reasons, *Creditincome Ltd. v. Swiss Confederation*, No. 24-cv-4316 (DEH), 2025 WL 2782320 (S.D.N.Y. Sept. 30, 2025) – in which plaintiffs have sued the Swiss Government for directing Credit Suisse to write down the AT1 Bonds – does not undermine superiority. That action was also dismissed for lack of subject-matter jurisdiction because the court found the Swiss Confederation immune under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* Therefore, *Creditincome Ltd.* poses no risk of duplicative recovery or conflicting judgments.

The Court concludes that the mere fact that some proposed Class Members may have participated in other AT1 Bond-related suits against different defendants on distinct theories of liability is not a basis to defeat superiority.

Turning to the remaining U.S. AT1 Bond proceedings, only two cases brought by potential Class Members involve substantively similar claims, and neither undermines the superiority of

---

[9] For all we know at this stage, the Swiss court might disallow recovery to any plaintiff who has already recovered losses as a member of this class. Alternatively, if the Swiss court permits recovery, this Court would prevent double recovery, since proof of any damages already recovered would have to be submitted in mitigation at the damages stage. Mitigation, however, is not a predominating issue.

class treatment here. The first is the parallel action brought by Mr. Diabat in *In re Credit Suisse Securities Fraud Class Actions*, No. 23-cv-5874-CM (S.D.N.Y.). Mr. Diabat, however, serves as a Class Representative solely for (i) equity holders of CD ADSs, (ii) debt holders of CS Notes, and (iii) holders of CS Options. Dkt. No. 127 at 1 n.1. Because his class does not include AT1 bondholders, there are no "competing interests" between Mr. Diabat's Class and Core Capital's proposed class. *See New Jersey Carpenters Health Fund v. Residential Cap., LLC*, 272 F.R.D. 160, 171 (S.D.N.Y. 2011), *aff'd sub nom. New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*, 477 F. App'x 809 (2d Cir. 2012). Moreover, because this Court, which presides over both actions, previously consolidated *Core Capital* with *Credit Suisse* for all pretrial purposes, *see* Dkt. No. 138, there is minimal risk of inconsistent judgments or unmanageable case administration. Indeed, this Court has already described the overall scope of the Credit Suisse cases as relatively "straightforward." *Credit Suisse*, 2025 WL 1866293, at *10.

The second case, *Palomino Master Ltd. v. Credit Suisse Group AG*, No. 1:25-cv-08264-CM (S.D.N.Y.), was transferred from the District of New Jersey and assigned to this Court. *See* Palomino Dkt. No. 19. The Court anticipates that *Palomino* will be similarly consolidated with *Credit Suisse*, assuming it survives dismissal. As with the other actions, there is no meaningful risk of inconsistent outcomes or administrative burden. Moreover, *Palomino* alleges different misrepresentations and a different class period – further supporting class certification. *See Rosenfield v. Integrated Container Serv. Indus. Corp.*, 50 F.R.D. 237, 238–39 (S.D.N.Y. 1970) (holding superiority satisfied because parallel class action arising from similar facts relied on a different set of alleged misrepresentations).

Finally, Defendants assert that purportedly overwhelming res judicata concerns expose them to duplicative lawsuits in Switzerland and other foreign jurisdictions. According to the

argument, without the preclusive effect of a United States judgment in Switzerland, Plaintiffs could litigate their claims here, lose, and then relitigate them overseas. Defendants conclude that Plaintiffs have failed to demonstrate that a judgment in this action would be enforceable in Switzerland or any other foreign jurisdiction, and therefore a class action cannot be a superior method of adjudicating Plaintiffs' claims. Core Capital Dkt. No. 52, at 18–20.

This argument misconstrues both the law and the facts. As courts in this Circuit have long recognized, res judicata concerns arise only where the claims at issue involve foreign transactions, or non-domestic conduct. *Compare In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 93 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) (acknowledging potential res judicata concerns involving foreign transactions), *with Foley v. Transocean Ltd.*, 272 F.R.D. 126, 133 (S.D.N.Y. 2011) (finding no res judicata concerns involving domestic transactions). That distinction is dispositive here, since only U.S. transactions are at issue.

Under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 265–66 (2010), § 10(b) of the Exchange Act applies only to "purchases and sales of securities in the United States," not to foreign transactions. Accordingly, the Supreme Court held that § 10(b) provides no cause of action for foreign transactions, and expressly abrogated the Second Circuit's earlier decision in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 996 (2d Cir. 1975). *Morrison*, 561 U.S. at 257. Thus, Defendants' reliance on *Bersch* and similar pre-*Morrison* authorities is not only misplaced but obsolete.

Because Plaintiffs' claims are based solely on domestic AT1 Bond transactions, res judicata concerns are entirely absent. Plaintiffs expressly seek certification on behalf of investors who "purchased or otherwise acquired additional tier-one bonds ('AT1 Bonds') of Credit Suisse

in a *domestic transaction*." Dkt. No. 49, at 8 (emphasis added). No foreign purchasers or foreign transactions fall within this definition.

To the extent Defendants' argument implicitly reasserts or incorporates their contention that determining domesticity requires individualized inquiries, that issue has already been addressed – and rejected – in the Court's prior discussion of predominance. *See supra* Section III(b)(i)(D). There, the Court explained that individualized domesticity questions do not defeat predominance under Rule 23(b)(3), particularly where, as here, Plaintiffs have identified standardized, reliable methods of demonstrating domestic transactions through trade confirmations, brokerage records, and expert testimony. *See In re Petrobras Sec.*, 862 F.3d 250, 272–74 (2d Cir. 2017); *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 83–84 (S.D.N.Y. 2018).

Accordingly, because the certified class is limited to domestic AT1 Bond transactions, and because *Morrison* forecloses any application of U.S. securities law to foreign purchases, there is no plausible risk of duplicative or inconsistent judgments abroad. The Court therefore rejects Defendants' speculative res judicata argument as unsupported by both law and fact. Eliminating these res judicata concerns further confirms that a single, coordinated adjudication in this forum is the most efficient and fair method of resolving Plaintiffs' claims, thereby satisfying Rule 23(b)(3)'s superiority requirement.

Trying this case collectively allows for a cost-effective adjudication of common disputes and avoids the impracticality and expense of duplicative litigation. *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010). Given the potentially thousands of Class Members, *see supra* Numerosity, Section III(a)(i), class treatment promotes both efficiency and fairness. The Court concludes that Core Capital has satisfied the predominance and superiority requirements of Federal Rule of Civil Procedure 23(b)(3).

## Conclusion

For the foregoing reasons, Plaintiff's motion for class certification and appointment of class

representatives and class counsel, Core Capital Dkt. No. 48, is GRANTED. The Court orders as

follows:

1. This action is certified as a class action and the Class is defined as:

> All persons and entities other than Defendants, current or former officers and directors of Credit Suisse, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest, that purchased or otherwise acquired additional tier-one bonds ("AT1 Bonds") of Credit Suisse in a domestic transaction in the U.S. between October 27, 2022 and March 20, 2023, inclusive (the "Class Period"), who seek to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Core Capital is hereby appointed as Class Representative.

3. Pomerantz LLP is hereby appointed as Class Counsel.

The Clerk of Court is directed to terminate the motion at Core Capital Dkt. No. 48 and to

remove it from the Court's list of open motions.

This constitutes the decision and order of the Court. It is a written decision.

Dated: November 13, 2025

U.S.D.J.

BY ECF TO ALL COUNSEL