# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

~~UNITED STATES DISTRICT COURT~~
~~SOUTHERN DISTRICT OF NEW YORK~~

In re: CREDIT SUISSE SECURITIES FRAUD CLASS ACTIONS

No. 1:23-cv-5874-CM
No. 1:23-cv-9287-CM
No. 1:23-cv-934-CM

~~CORE CAPITAL PARTNERS, LTD., Individually and on Behalf of All Others Similarly Situated,~~

~~Plaintiff,~~

~~v.~~

~~CREDIT SUISSE GROUP AG, AXEL P. LEHMANN, ULRICH KÖRNER, DIXIT JOSHI, THOMAS GOTTSTEIN, DAVID R. MATHERS, ANTÓNIO HORTA-OSÓRIO, and PRICEWATERHOUSECOOPERS AG,~~

~~Defendants.~~

THIS DOCUMENT RELATES TO:

*Core Capital*

~~Case No.~~

~~CLASS ACTION COMPLAINT~~

**[PROPOSED] AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

## Contents


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 8

III. PARTIES ........ 9

IV. SUBSTANTIVE ALLEGATIONS ........ 11

A. Background ........ 11

B. Defendants concealed Credit Suisse's true financial condition, leading to a historic merger that wiped out the value of the AT1 Bonds. ........ 12

C. Defendants continued to paint a misleadingly rosy picture while regulators scrambled to force a historic merger. ........ 28

D. Credit Suisse also concealed a months-long correspondence with the SEC regarding the effectiveness of internal control over financial reporting. ........ 30

E. The PInC Report Finds Defendants "Obscured" the True Financial Condition of Credit Suisse via a "Regulatory Filter." ........ 45

V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........ 49

A. May 31, 2022 ........ 49

B. July 27, 2022 ........ 51

C. July 27, 2022 ........ 53

D. October 27, 2022 ........ 56

E. October 31, 2022 ........ 67

F. November 2, 2022 ........ 68

G. November 23, 2022 ........ 72

H. December 1, 2022 ........ 74

I. December 2, 2022 ........ 77

J. December 5, 2022 ........ 81

K. February 9, 2023 ........ 84

L. March 14, 2023 ........ 97

M. March 15, 2023 ........ 104

N. March 16, 2023 ........ 107

VI. THE TRUTH EMERGES ........ 109

VII. SCIENTER ALLEGATIONS ........ 122

A. The PInC Report Supports a Strong Inference of Scienter ..... 123

B. The SEC Inquiry Into Credit Suisse's Financial Reporting Supports a Strong Inference of Scienter ..... 127

C. The Timing of Defendants' Statements Supports an Inference of Scienter ..... 132

D. The Individual Defendants' Admissions Support a Strong Inference of Scienter ..... 133

E. The Individual Defendants' High-Level Positions and Access to Non-Public Information Contrary to Their Public Statements Support a Strong Inference of Scienter ..... 134

F. The Core Operations Doctrine Further Supports a Strong Inference of Scienter ..... 136

G. The Individual Defendants and Other High-Level Credit Suisse Personnel Had Both Motive and Opportunity to Commit Fraud ..... 136

H. Corporate Scienter is Established ..... 139

VIII. PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY ..... 140

IX. THE 2022 ANNUAL REPORT OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN UNDER ITEM 5 OF FORM 20-F ..... 140

X. THE PRESUMPTION OF RELIANCE ..... 142

XI. CONTROL PERSON ALLEGATIONS ..... 144

XII. CLASS ACTION ALLEGATIONS ..... 145

XIII. COUNT I ..... 148

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ..... 148

XIV. COUNT II ..... 152

(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants). 152

XV. PRAYER FOR RELIEF ..... 153

XVI. DEMAND FOR TRIAL BY JURY ..... 153

Lead Plaintiff Core Capital Partners, Ltd. ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Credit Suisse AG ("CS AG") and Credit Suisse Group AG ("Credit Suisse" or the "Company"),[1] analysts' reports and advisories about the Company, ~~and~~news articles, information readily obtainable on the Internet~~.~~, and documents produced by the Company to date in discovery. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Credit Suisse additional tier-one bonds ("AT1 Bonds") in a domestic transaction in the U.S. between ~~February 18, 2021~~May 31, 2022 and March 20, 2023, both dates inclusive (the "Class Period~~"),~~") seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against ~~the Company and certain of its top officials.~~ defendants Credit Suisse, former Chairman Axel P. Lehmann ("Lehmann"); former Chief

[1] CS AG is the parent company of the majority of Credit Suisse's divisions, including Wealth Management and the Swiss Bank. CS AG is often referred to as the "parent bank" even though it is a subsidiary of Credit Suisse Group AG.

Executive Officer ("CEO") Ulrich Körner ("Körner"); former Chief Financial Officer ("CFO") Dixit Joshi ("Joshi"); former CEO Thomas Gottstein ("Gottstein"); and former CFO David R. Mathers ("Mathers") (collectively, "Defendants").

2. Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific. The Company offers wealth management solutions, including investment advice and discretionary asset management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services.

3. Prior to its eventual takeover by UBS Group AG ("UBS"), Credit Suisse's securities offerings included, among other types of investments, AT1 Bonds, also known as "contingent convertibles" or "CoCo" bonds, which act as shock absorbers if a bank's capital levels fall below a certain threshold. AT1 Bonds can be converted into equity or written off, and they make up part of the capital cushion that regulators require banks to hold to provide support in times of market turmoil. According to the Swiss Financial Market Supervisory Authority ("FINMA"), in a press release dated March 23, 2023, entitled "FINMA provides information about the basis for writing down AT1 capital instruments" (the "AT1 Bond Advisory"), Credit Suisse's AT1 Bonds "contractually provide that they will be completely written down in a 'Viability Event', in particular if extraordinary government support is granted."

4. As reported to the Financial Industry Regulatory Authority ("FINRA") via FINRA's Trade Reporting and Compliance Engine ("TRACE"), which helps FINRA track domestic trading in certain securities, including AT1 Bonds, during the Class Period, the total U.S. trading volume of the series of Credit Suisse AT1 Bonds that Plaintiff purchased (ISINs: USH3698DDD33 ("Series DD33"), USH3698DBZ62 ("Series BZ62"), and USH3698DCV40

("Series CV40")) exceeded ***$1.2 billion***.[2] -This represents merely a subset of the various Credit Suisse AT1 Bonds that were traded by the Class during the Class Period, meaning that the total domestic trading volume for all AT1 Bonds traded during the Class Period is even larger.

5. Before the start of the Class Period, Credit Suisse's financial condition and reputation had been negatively impacted by a variety of high-profile scandals. -More recently, the failure of Credit Suisse's funds structured in collaboration with U.K.-based financier Lex Greensill ("Greensill Funds") and the collapse of Archegos Capital Management ("Archegos"), a hedge fund for which Credit Suisse had significant, undisclosed exposure, forced Credit Suisse to incur substantial losses and reveal critical risk management and control governance failures in March 2021. -During the Class Period, Defendants assured investors and the market that the Company would remediate deficiencies in its risk management and/or control governance procedures and/or policies.

6. According to a report on Credit Suisse's collapse that was published on December 17, 2024, by a special parliamentary investigation committee of Switzerland's Parliament (the "PInC"), however, 1) multiple Swiss regulators stepped up their supervision of Credit Suisse in the summer of 2022 due to concerns about its capital and liquidity, meeting frequently with Defendants Lehmann, Körner, and other high level Credit Suisse management; 2) by the fall of 2022, regulators began considering a sale of Credit Suisse to be the likely solution to the Company's financial issues; and 3) Credit Suisse used a "regulatory filter" to mislead the public as to the Company's actual financial condition until its collapse.

[2] *See* Financial Industry Regulatory Authority (FINRA) Trade Reporting and Compliance Engine (TRACE), via Bloomberg Finance L.P.

~~6.~~7. In October 2022, Credit Suisse began experiencing a sharp increase in customer outflows, or withdrawals of client funds, after a series of quarterly losses and risk and compliance failures. In the months following these outflows, Defendants reassured investors that the rate of customer outflows had either reversed or else completely stopped.

~~7.~~8. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the sharp increase in customer outflows that Credit Suisse began experiencing in October 2022 remained ongoing; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and risk and compliance failures on liquidity and its ability to retain client funds; (iii) the Company maintained deficient disclosure controls and procedures, and there were material weaknesses in the Company's internal controls over financial reporting; (iv) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; (v) contrary to Defendants' representations, Credit Suisse failed to implement meaningful changes to its risk management and/or control governance procedures and/or policies, which were severely lacking throughout and prior to the Class Period; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.

~~8.~~9. On November 23, 2022, Credit Suisse issued a media release announcing its preliminary financial results for the fourth quarter of 2022, which it filed with the SEC on a Form 6-K the same day, announcing, *inter alia*, that customers had withdrawn approximately 10% of all assets under management as of the end of the third quarter of 2022, and that the Company expected

to incur a substantial loss of approximately CHF[3] 1.5 billion in the fourth quarter of 2022. -The Company also issued a media release the same day announcing shareholder approval of proposed capital increases announced on October 27, 2022.

~~9.~~10. In response, *Reuters* published an article entitled "Credit Suisse flags hefty loss as rich clients pull out", reporting that "shareholders and analysts were disturbed by the bank's sobering assessment of the scale of its problems, as well as the pace at which rich clients pulled out savings and investments."

~~10.~~11. Likewise, in an article entitled "Credit Suisse Warns of $1.6 Billion Loss After Clients Pull Money," published the same day, the *Wall Street Journal* reported that "Credit Suisse Group AG warned it would lose around $1.6 billion in the fourth quarter after customers pulled their investments and deposits over concerns about the bank's financial health," that "Switzerland's No. 2 bank by assets said outflows were around 6% of its total $1.47 trillion assets, or around $88.3 billion, between Sept. 30 and Nov. 11," and that "the fast pace of withdrawals meant the bank's liquidity fell below some local-level requirements.

~~11.~~12. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $1.408, or 2.45%, to close at $56.00 on November 23, 2022; Credit Suisse's Series BZ62 AT1 Bond price fell $2.235, or 2.87%, to close at $75.693 on November 23, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $1.872, or 3.17%, to close at $57.162 on November 23, 2022.

~~12.~~13. On December 1, 2022, Credit Suisse's Chairman, Defendant Axel P. Lehmann ("Lehmann"), stated in an interview with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

[3] All references to "CHF" herein are to the Swiss franc, which is the currency and legal tender of Switzerland and Liechtenstein

~~13.~~14. The following day, in an interview with *Bloomberg Television*, Defendant Lehmann reiterated his previous statements, reassuring investors that as of November 11, 2022, customer outflows had "basically stopped".

~~14.~~15. On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results. The press release revealed that, contrary to Defendant Lehmann's prior statements, large customer outflows had continued through year-end 2022. Specifically, the press release reported customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

~~15.~~16. On February 20, 2023, *Reuters* reported that FINMA was reviewing Defendant Lehmann's previous comments regarding customer outflows.

~~16.~~17. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $2.517, or 4.09%, to close at $58.978 on February 21, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $3.616, or 4.67%, to close at $73.876 on February 21, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.454, or 3.79%, to close at $62.214 on February 21, 2023.

~~17.~~18. On March 14, 2023, during pre-market hours, Credit Suisse filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 20-F"), which identified material weaknesses in the Company's internal controls and procedures.

~~18.~~19. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $2.29, or 4.75%, to close at $45.924 on March 14, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $4.679, or 7.46%, to close at $58.014 on March 14, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.824, or 5.43%, to close at $49.167 on March 14, 2023.

~~19.~~20. On March 15, 2023, during pre-market hours, *Reuters* published an article entitled "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth" citing Saudi National Bank ("SNB") would not buy any more of the Company's shares on regulatory grounds.

~~20.~~21. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $18.262, or 39.77%, to close at $27.662 on March 15, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $30.232, or 52.11%, to close at $27.782 on March 15, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.712, or 44.16%, to close at $27.455 on March 15, 2023.

~~21.~~22. On Sunday, March 19, 2023, FINMA revealed, *inter alia*, that it had approved a takeover of Credit Suisse by UBS via a merger (the "Merger"), and that "[t]he extraordinary [Swiss] government support [for the Merger] will trigger a complete write-down of the nominal value of all AT1 debt of Credit Suisse in the amount of around CHF 16 billion[.]" FINMA would later defend its decision to completely write down the AT1 Bonds in its AT1 Bond Advisory on the basis that "Credit Suisse was granted extraordinary liquidity assistance loans secured by a federal default guarantee on 19 March 2023" and, therefore, the AT1 Bonds' "contractual conditions [for being written down] were met[.]"

~~22.~~23. Then, on March 20, 2023, before market hours, Credit Suisse issued an *ad hoc* announcement on Form 6-K confirming the Merger. As reported by *CNBC* that day, the Company's AT1 Bondholders would "see investments worth 16 billion Swiss francs ($17 billion) become worthless" as a result of AT1 Bonds being written down to zero in connection with the Merger. *CNBC* also quoted Goldman Sachs' credit strategists as advising that the decision "can be interpreted as an effective subordination of AT1 bondholders to shareholders" and "represents the largest loss ever inflicted to AT1 investors since the birth of the asset class post-global financial crisis[.]"

~~23.~~24. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $20.530, or 83.21%, to close at $4.143 on March 20, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $25.468, or 88.1%, to close at $3.441 on March 20, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.422, or 86.15%, to close at $3.443 on March 20, 2023.

~~24.~~25. All the foregoing disclosures caused a sharp decline in the market value of Credit Suisse's AT1 Bonds, ultimately culminating in the eventual write-down of all Credit Suisse AT1 bonds to a value of ***zero***, damaging investors in these bonds.

~~25.~~26. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's AT1 Bonds, Plaintiff and other Class members have suffered significant losses and damages.

## II. <u>JURISDICTION AND VENUE</u>

~~26.~~27. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

~~27.~~28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

~~28.~~29. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered and the subsequent damages took place in this Judicial District. Credit Suisse's AT1 Bonds were traded in the U.S. throughout the Class Period, as FINRA's TRACE data reflects. Accordingly, there are investors in Credit Suisse's AT1 Bonds located within the U.S., some of whom undoubtedly reside in this Judicial District.

~~29.~~30. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

~~30.~~31. Plaintiff, as set forth in the attached Certification, acquired Credit Suisse AT1 Bonds in domestic transactions in the U.S. at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

~~31.~~32. Defendant Credit Suisse was organized under the laws of Switzerland with principal executive offices located at Paradeplatz 8, 8001 Zurich, Switzerland. The Company had branch offices in the United States and around the globe. During the Class Period, substantially all of Credit Suisse's operations were conducted through its Wealth Management, Investment Bank, Swiss Bank, and Asset Management divisions. The parent company of these divisions was Credit Suisse subsidiary Credit Suisse AG. The names of both Credit Suisse Group AG and Credit Suisse AG appeared on the covers of each of the Forms 6-K and 20-F filed during the Class Period. Prior to the Merger and Credit Suisse's subsequent delisting, the Company's AT1 Bonds traded in an efficient market in the U.S. After the merger, UBS succeeded to all rights and obligations of Credit Suisse. UBS is organized under the laws of Switzerland with its principal executive office located at Bahnhofstrasse 45, 8001 Zurich, Switzerland.

~~32.~~33. Defendant Lehmann served as Credit Suisse's Chairman of the Board of Directors from January 2022 until June 2023.

~~33.~~34. Defendant Ulrich Körner ("Körner") ~~served as~~joined the Credit ~~Suisse's Chief~~Suisse Executive ~~Officer ("~~Board in March 2021 and served as the Company's CEO~~")~~ from August 2022 until June 2023.

~~34.~~35. Defendant Dixit Joshi ("Joshi") served as the Company's CFO and a member of Credit Suisse's ~~Chief Financial Officer ("CFO")~~ Executive Board from October 2022 until June 2023.

~~35. Defendant António Horta Osório ("Horta Osório") served as Credit Suisse's Chairman of the Board of Directors from April 2021 until his "resignation" in January 2022.~~

36. Defendant Thomas Gottstein ("Gottstein") ~~served as Credit Suisse's~~ joined the Credit Suisse Executive Board in October 2015 and served as the Company's CEO from ~~before the start of the Class Period until his "resignation" in~~ February 2020 until July 2022.

37. Defendant David R. Mathers ("Mathers") served as ~~Credit Suisse's~~the Company's CFO, and a member of Credit Suisse's Executive Board, from ~~before the start of the Class Period~~October 2010 until ~~his "resignation" in August~~September 30, 2022.

~~38.~~ Defendants Lehmann, Körner, Joshi, ~~Horta Osório,~~ Gottstein, and Mathers are collectively referred to herein as the "Individual Defendants". The Individual Defendants and Credit Suisse are collectively referred to herein as the "~~Credit Suisse Defendants".~~

~~39. The Individual Defendants possessed the power and authority to control the contents of Credit Suisse's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Credit Suisse's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Credit Suisse, and their access to material information available to them but not to the public,~~

~~the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.~~

~~40. Defendant PricewaterhouseCoopers AG ("PwC") is an international accounting and consulting firm. PwC was engaged by Credit Suisse to provide "independent" auditing, accounting, and management consulting services, tax services, examination and review of filings with the SEC, audits and/or reviews of financial statements which were included in Credit Suisse's SEC filings, including audited and unaudited information, and annual reports, since 2020.~~

~~41.~~38. ~~The Credit Suisse Defendants and PwC are collectively referred to herein as "~~Defendants".

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

~~42.~~39. Credit Suisse, together with its subsidiaries, provides various financial services in Switzerland, Europe, the Middle East, Africa, the Americas, and Asia Pacific. The Company offers wealth management solutions, including investment advice and discretionary asset management services; risk management solutions, such as managed investment products; and wealth planning, succession planning, and trust services.

~~43.~~40. Prior to its eventual takeover by UBS, Credit Suisse's securities offerings included, among other types of investments, AT1 Bonds, also known as "contingent convertibles" or "CoCo" bonds, which act as shock absorbers if a bank's capital levels fall below a certain threshold. AT1 Bonds can be converted into equity or written off, and they make up part of the capital cushion that regulators require banks to hold to provide support in times of market turmoil. AT1 Bonds are the riskiest type of bond a bank can issue and, accordingly, carry a higher coupon.

If AT1 Bonds are converted into equity, this supports a bank's balance sheet and helps it to stay afloat. -They also pave the way for a "bail-in", or a way for banks to transfer risks to investors and away from taxpayers if they get into trouble. -According to FINMA's AT1 Bond Advisory, Credit Suisse's AT1 Bonds "contractually provide that they will be completely written down in a 'Viability Event', in particular if extraordinary government support is granted."

~~44.~~41. According to the TRACE system, which helps FINRA track domestic trading in certain securities, including AT1 Bonds, during the Class Period, the total U.S. trading volume of the Series DD33, BZ62, and CV40 Credit Suisse AT1 Bonds that Plaintiff purchased exceeded ***$1.2 billion***. -This represents merely a subset of the AT1 Bonds that were traded by the Class during the Class Period, meaning that the total domestic trading volume for all AT1 Bonds during the Class Period is even larger.

**B. Defendants concealed Credit Suisse's true financial condition, leading to a historic merger that wiped out the value of the AT1 Bonds.**

42. Before the start of the Class Period, Credit Suisse's financial condition and reputation had been negatively impacted by a variety of high-profile scandals, including, *inter alia*, ~~when,~~ in 2017, when Credit Suisse agreed to pay USD $5.28 billion to resolve a probe by the U.S. Department of Justice relating to its conduct in the packaging, securitization, issuance, marketing, and sale of residential mortgage-backed securities between 2005 and 2007. -More recently, the failure of the Greensill Funds and the collapse of Archegos, a hedge fund for which Credit Suisse had significant~~,~~ undisclosed exposure, forced Credit Suisse to incur substantial losses and reveal critical risk management and control governance failures in March 2021.

~~45.~~43. During the Class Period, Defendants assured investors and the market that the Company would remediate deficiencies in its risk management and/or control governance procedures and/or policies.

44. On March 19, 2023, however, Credit Suisse announced it would no longer operate as an independent entity and would merge into its former rival, UBS Group AG ("UBS"). With approximately CHF (*i.e.*, Swiss francs) 1.25 trillion in assets under management at the time of the merger, Credit Suisse was potentially the largest and most significant bank to fail or require a forced takeover since the 2008 financial crisis. The public was shocked by the news of this historic merger, which *appeared* to be hastily brokered by the Swiss government over a weekend. But in reality, Defendants had been concealing regulators' concerns about Credit Suisse's severe capital and liquidity issues and the effectiveness of Credit Suisse's internal controls for months, because they "wanted to present the image of a solid bank." PInC Report at 245. By November 2022, after Credit Suisse failed to staunch the liquidity drain from months of customer outflows, Swiss regulators saw the writing on the wall and encouraged Credit Suisse to begin preparing for a sale of the company. Meanwhile, Defendants falsely continued to assure the public that outflows had "stabilized" (or even "reversed") and tout Credit Suisse's "robust balance sheet" and a strategy that they claimed would usher in a "new Credit Suisse." And as the global banking giant teetered for months on the verge of complete collapse, the Credit Suisse Board and management—including the Individual Defendants—continued collecting exceptionally high compensation and bonuses, which FINMA found, "encouraged an inappropriate risk culture" that contributed to the Company's downfall. FINMA Report at 49.

45. Eventually, Defendants could no longer keep up the charade, and the Swiss Government had no choice but to step in. By Wednesday, March 15, 2023, multiple Swiss governmental bodies began facilitating earnest negotiations for the emergency sale of Credit Suisse to UBS, fearing a global financial catastrophe if a sale was not completed before the markets opened the following Monday. UBS purchased Credit Suisse for just CHF 3 billion.

46. As reported by *CNBC* on March 20, 2023, the Company's AT1 Bondholders would "see investments worth 16 billion Swiss francs ($17 billion) become worthless" as a result of AT1 Bonds being written down to zero in connection with the Merger. *CNBC* also quoted Goldman Sachs' credit strategists as advising that the decision "can be interpreted as an effective subordination of AT1 bondholders to shareholders" and "represents the largest loss ever inflicted to AT1 investors since the birth of the asset class post-global financial crisis[.]" Duped into investing in AT1 Bonds by Defendants' false and misleading statements about the Company, including its stability, capital needs, liquidity, and customer outflows, Plaintiff and Class Members saw their AT1 Bond holdings vaporized in an instant.

47. The week before the Class Period began, on May 23, 2022, FINMA sent Credit Suisse an assessment letter addressed to Defendants Lehmann and Gottstein (the "May 2022 Assessment Letter"). Assessment letters are the result of formal assessments performed by FINMA at regular intervals wherein FINMA details a bank's risk rating, any weaknesses that have been identified, and the actions that need to be taken. These assessment letters—as well as all other correspondence between FINMA and Credit Suisse—are non-public and considered highly confidential. *See, e.g.*, FINMA Report at 49 ("FINMA was also bound by legal restrictions regarding the provision of information to the public."). In the May 2022 Assessment Letter, FINMA called [redacted] CS-Diabat_00203075-76. FINMA explained: [redacted] CS-Diabat_00203076.

48. On May 31, 2022, the first day of the Class Period, *Reuters* reported, based on two sources with knowledge, that Credit Suisse was in the early stages of weighing options to bolster its capital after a string of losses had eroded financial buffers. The market swiftly reacted to this negative news. For example, Jefferies analysts wrote in a research note: "The news, if confirmed, points to potentially more pain than we currently expect." Credit Suisse issued a prompt response that same day, in the same article, which denied the statements of the two *Reuters* sources: "Credit Suisse is currently not considering raising additional equity capital." Yet non-public correspondence between FINMA and Credit Suisse reveals that Credit Suisse had, in fact, participated in various meetings with FINMA between mid-May and mid-June 2022 about raising additional capital. Further, in stark contrast to the Swiss regulators' recently relayed concerns regarding the deteriorating capital position at Credit Suisse, the Company stated: "The Group is robustly capitalised with a CET1 ratio of 13.8% and a CET1 leverage ratio of 4.3%." CET1 is high quality capital, and a financial institution's CET1 ratio is a measure of its capital strength. As described in further detail below, the PInC Report found that Credit Suisse used a regulatory filter to mislead the public about the parent bank's true CET1 ratio, further obscuring the Company's financial condition and ability to withstand financial distress. Around the same time, May 2022, Swiss regulators, including FINMA, the Swiss National Bank ("SNB"), and the Federal Department of Finance ("FDF") began discussing "Credit Suisse's delicate situation" in various non-public meetings. PInC Report at 184. Topics at a May 31, 2022, meeting of the Steering Committee ("SC"), a consortium body formed by FINMA, the SNB, and the FDF, included "the capital situation of Credit Suisse's parent company," and the SNB stated that "action [was] needed to strengthen [CS AG's] capital base" because "***capital reserves are low, so that the next incident could be critical***." *Id.* (emphasis added).

49. Knowing that one more incident could ruin Credit Suisse and have disastrous effects on the Swiss economy, FINMA began calling on the Company in non-public meetings and correspondence to implement concrete plans to rapidly stabilize its financial condition in the event of another scandal. In a letter dated April 11, 2022, FINMA asked Credit Suisse [redacted] CS-Diabat_00203087.

50. In a follow up letter dated July 14, 2022, however, FINMA stated [redacted] *Id.* Credit Suisse [redacted], but again, [redacted], [redacted], FINMA found [redacted] CS-Diabat_00203095.

V. IN THIS SAME AUGUST 5, 2022, LETTER [redacted] FINMA STATED: [redacted] Materially False and Misleading Statements Issued During the Class Period

46. The Class Period begins on February 18, 2021, when Credit Suisse issued a press release announcing the Company's fourth quarter and full year 2020 results. The press release quoted Defendant Gottstein, stating, in relevant part:

> Despite a challenging environment for societies and economies in 2020, we saw a strong underlying performance across Wealth Management and Investment Banking, while addressing historic issues. We remained focused on serving our clients around the globe and on delivering value to our shareholders. The steady execution of the strategic initiatives we announced last July supports our growth agenda and allows for further investment in our businesses. Looking forward into 2021 and beyond, we aim to further accelerate growth in Wealth Management and deliver sustainable returns in Investment Banking. We remain strongly committed to positioning Credit Suisse as a leader in sustainability and driving digitalization and automation to generate positive operating leverage. I would like to thank all our employees for their outstanding commitment and loyalty.

47. On April 6, 2021, Credit Suisse filed a Form 6-K with the SEC, appended to which as exhibits were an update to the Company's 2020 compensation report (the "2020 Compensation Update"), a media release regarding Board of Directors announcements (the "Board of Directors Update"), and another media release regarding preliminary first quarter 2021 earnings (the "Preliminary 1Q21 Earnings Update"). The Preliminary 1Q21 Earnings Update stated, in relevant part:

While our financial results are still subject to detailed finalization and review, *we* would expect to report a pre tax loss for 1Q 2021 of approximately CHF 900 million. This includes a charge of CHF 4.4 billion in respect of the failure by a US-based hedge fund to meet its margin commitments as we announced on March 29, 2021.

* * *

With regard to the four supply chain finance funds, where we continue to see cash inflows, we will distribute a separate update on further repayments within the next few days.

We acknowledge that both the US hedge fund and the supply chain finance fund matters require substantial further review and scrutiny. The Board of Directors has launched investigations into both of these matters which will not only focus on the direct issues arising from each of them, but also reflect on the broader consequences and lessons learned. We have also undertaken senior management changes within the Investment Bank division and within the Risk and Compliance organization as separately announced today.

[Defendant] Gottstein, CEO of Credit Suisse Group said: "The significant loss in our Prime Services business relating to the failure of a US based hedge fund is unacceptable. In combination with the recent issues around the supply chain finance funds, I recognize that these cases have caused significant concern amongst all our stakeholders. Together with the Board of Directors, we are fully committed to addressing these situations. Serious lessons will be learned. Credit Suisse remains a formidable institution with a rich history."

48. The Board of Directors Update stated, in relevant part:

Following the significant US-based hedge fund matter, Brian Chin, CEO of the Investment Bank is stepping down from his role on the Executive Board, effective April 30, 2021. Lara Warner, Chief Risk and Compliance Officer, is stepping down from her role on the Executive Board, effective April 6. Both of them will leave the bank.

* * *

In March 2021, the tactical crisis committee of the Board of Directors consisting of the Chairman, the Chairs of the Audit Committee and Risk Committee and the Chair of the Conduct and Financial Crime Control Committee was activated to exercise close oversight and ensure timely decision making with respect to the resolution of the issues in connection with the Credit Suisse Asset Management managed supply chain finance funds. The mandate of this committee has in the meanwhile been expanded to include the significant US based hedge fund matter.

The tactical crisis committee works closely with the CEO and the rest of the management team.

The Board of Directors has launched two investigations, to be carried out by external parties, into the supply chain finance funds matter and into the significant US-based hedge fund matter. These investigations will be supervised by a special committee of the Board of Directors and will not only focus on the direct issues arising from those matters, but also reflect on the broader consequences and lessons learned.

49. The 2020 Compensation Update stated, in relevant part:

**Recent developments**
Since the publication of the Compensation Report on March 18, 2021, the Board of Directors (Board) has assessed the recent significant developments in connection with the US-based hedge fund.

**Withdrawal of the previously proposed Executive Board variable compensation amounts and other actions**
Under the current circumstances, the Board has resolved to withdraw its proposals regarding the variable compensation for the Executive Board, comprising the 2020 short-term incentive compensation (STI), which was determined based on 2020 performance, and the 2021 long-term incentive opportunities (LTI), for which payout would have been determined based on prospective performance over the three-year period 2021 – 2023.

Overall, the previously proposed Executive Board compensation will be reduced by the entire previously proposed variable compensation amount of CHF 40.8 million. Of this reduction, CHF 15.7 million will relate to the withdrawn 2020 STI and CHF 25.1 million to the withdrawn 2021 LTI.

* * *

The Compensation Committee will continue to monitor developments closely and will determine, based on the results of any investigation, any appropriate actions to be applied, including the application of the Group's existing malus and clawback provisions on variable compensation awards to any applicable employees.

50. Also on April 6, 2021, Defendant Gottstein was interviewed by the Swiss, German-language newspaper *Neue Zürcher Zeitung*. *Reuters* summarized the interview in an article published that day, entitled "Credit Suisse's investment banking to be scrutinized by new chairman: CEO." The article stated, in relevant part:

> ~~The structure of Credit Suisse's investment bank will be scrutinised closely by incoming chairman Antonio Horta Osorio, CEO Thomas Gottstein told a newspaper, as the bank aims to boost risk management after billions in losses on U.S. fund Archegos.~~
>
> ~~"That is with certainty one of the core strategic themes that the board under the new chairman, together with the bank's executive leadership, will be focusing on," Gottstein told Neue Zuercher Zeitung on Tuesday.~~
>
> * * *
>
> ~~"There are no sacred cows," Gottstein added in the interview. "What we can already say is, we will be taking risks out of certain parts of investment banking. That certainly includes the Prime Services business" that serves hedge funds like Archegos.~~
>
> * * *

51. ~~In the NZZ interview, Gottstein blamed Credit Suisse's failings to adequately manage risks at least partly on the lack of face-to-face meetings with clients during the COVID-19~~ [redacted] CS-Diabat_00203093 (emphasis added). Likewise, in a July 16, 2022, email, addressed [redacted] CS-Diabat_00203115 (emphasis added).

52. Despite privately acknowledging to FINMA on July 25, 2022, [redacted] Defendants publicly contradicted those private acknowledgements just two days later. On July 27, 2022, when a CNBC interviewer asked Defendant Lehmann if Credit Suisse was planning to do a capital raise, Lehmann denied the claim and stated, "I think we are good on this one." In an

earnings call that same day, Defendant Mathers, in response to a specific question about whether Credit Suisse needed to raise capital, made positive statements about Credit Suisse being in a "strong capital position" and being "well funded," and he denied that Credit Suisse needed to raise capital as a result.

53. FINMA's worries about the occurrence of another "significant event" were realized just a few months later. On the evening of Friday, September 30, 2022, a memo from Defendant Körner to Credit Suisse employees was leaked to the public. The memo stated that the bank was at a "critical moment," noting recent declines in stock price and issues with the Group's credit spreads.[4] Then, on Saturday, October 1, 2022, a journalist from ABC tweeted, "Credible source tells me a major international investment bank is on the brink."[5] In light of the negative tone of Körner's memo leaked the day before, the public assumed the tweet was referencing Credit Suisse. This sentiment significantly exacerbated already ongoing customer outflows, particularly in Credit Suisse's Wealth Management division.

54. In response to these outflows, Credit Suisse activated the first two levels of its contingency funding plan ("CFP"), a multi-tiered plan for responding to a potential liquidity shortfall, on October 3 and 6, 2022, respectively. Around this time, the Swiss Committee on Financial Crises (the "CFC," another joint initiative of FINMA, the SNB, and the FDF) escalated the Credit Suisse situation to "Red Phase," meaning it "detect[ed] an immediate threat to the Swiss economy or to the functioning of the Swiss or international financial system." FINMA Report at 16. In mid-October, fearing that "the bank would soon reach the point of non-viability due to a

---

[4] Marion Halftermeyer, "Credit Suisse Market Turmoil Deepens After CEO Memo Backfires," *Bloomberg*, Oct. 3, 2022

[5] Emma Rapaport, "ABC reporter deletes tweet claiming investment bank 'on the brink,'" *Financial Review*, Oct. 3, 2022.

lack of liquidity," FINMA encouraged Credit Suisse to take Emergency Liquidity Assistance ("ELA") from the SNB, yet Credit Suisse refrained from taking ELA, because it did "not want to send any negative signals to the market before the announcement of its new strategy on October 27." PInC Report at 216. These facts were all unknown to the public at the time and were not revealed until months after the Class Period, when the FINMA and PInC Reports were published.

55. Then, on October 24, 2022, FINMA sent a harshly worded, non-public letter to [redacted] CS-Diabat_00203098.

56. On October 27, 2022, Credit Suisse publicly announced a new strategic plan. There were two main parts of the plan: (1) replenishing capital through two new share issuances, one for the Saudi National Bank and one for existing shareholders, for a combined total of CHF 4 billion; and (2) slimming down the core businesses of the Group through the spin-off of Credit Suisse's Investment Bank business and sale of its Securitized Products Group ("SPG").

57. The announcement of the strategic plan also partially corrected Defendants' previous misleading statements that Credit Suisse was not considering and would not require a capital raise. Upon learning of this new revelation, the market reacted strongly, and the price of Credit Suisse securities fell precipitously. For example, an analyst from J.P. Morgan stated, "We believe the main driver of negative share price reaction was the announcement of a CHF 4bn capital raise to 'clear the deck' and such a material dilution should have been avoided in our view.

On our forecasts CSG CET1 ratio does not fall below 13.5% through the restructuring period post capital raise completion." But while Credit Suisse disclosed its capital raises, Defendants characterized them as measures to "further strengthen the Group's capital base and support its new strategic direction," rather than truthfully disclosing that the capital raises were required to support its precarious financial condition, which Defendants continued to conceal. Defendants further concealed that FINMA, concerned about Credit Suisse's "capital situation," had not only urged Credit Suisse to raise capital, but to ensure the capital raise was "substantial" and enough to act as a "sufficient buffer for further negative developments."

58. On the same day, October 27, 2022, Credit Suisse published its earnings report for the third quarter of 2022 ("3Q22"), and held an earnings call to discuss the results. While the results were undeniably poor, and Defendants had no choice but to address the massive outflows that had occurred earlier in the month, management's statements were misleadingly positive given the true state of affairs at Credit Suisse and the Company's behind-the-scenes discussions with FINMA.. Thus, the market was unable to factor this material information into the pricing of Credit Suisse's stock.

59. On October 30, 2022, just days after the October 27 announcement of Credit Suisse's strategic plan, which Defendants touted as the beginning of a "new Credit Suisse," Credit Suisse privately informed FINMA that the Company would likely need to take ELA the following week should outflows continue. PInC Report at 219. After FINMA pressed Credit Suisse for a plan to address the potential continuing outflows, on October 31, 2022, Defendant Lehmann presented FINMA with an analysis of potential counterparties if a sale of Credit Suisse became necessary. *Id*. In the event outflows continued, "CS regarded the sale of the entire Group as the

best option, and FINMA called on the bank to make concrete headway in moving ahead with preparations for this scenario." FINMA Report at 35.

60. This same day, Defendant Lehmann appeared for an interview on *Bloomberg TV*, in which he falsely stated that outflows had "clearly stabilized," and in fact, Credit Suisse was seeing "some inflows coming [in]." In reaction to these statements, the price of Credit Suisse's AT1 Bonds stayed essentially flat on October 31, 2022.

61. One day later, on November 1, 2022, Defendant Körner activated the third and final level of Credit Suisse's CFP, which required authorization by the Group CEO to activate. FINMA Report at 63.

62. On November 2, 2022, FINMA informed the other Swiss financial regulators that Credit Suisse had prepared again to take ELA, but again withdrew the request because it "wanted to present the image of a solid bank." PInC Report at 245. The same day, November 2, 2022, Credit Suisse released its 3Q22 Quarterly Report, in which Defendants misleadingly emphasized once again that the measures outlined in its strategic plan would remediate the outflows. However, the 3Q22 Quarterly Report neither mentioned Credit Suisse's withdrawn application for ELA nor FINMA's concerns that continuing outflows may require a sale of the Company. But it did reveal, contrary to Defendant Lehmann's prior statement, that outflows had "stabilized to lower levels but have ***not yet reversed***." (Emphasis added).

63. Fearing there would be no legal basis to bail out Credit Suisse in an emergency, the FDF began preparing a proposal to the Swiss legislature to create a public liquidity backstop ("PLB"), which legislation would be general and not specifically name Credit Suisse. PInC Report at 245. However, on November 4, 2022, Defendant Lehmann personally requested that these preparations be stopped, because he "fear[ed] that a direct link [would] be made between such a

decision and the situation of Credit Suisse" and would "suggest that the bank is in a desperate situation." PInC Report at 244-46. Just days later, on November 10, 2022, Credit Suisse informed FINMA that it could not meet the regulator's liquidity requirements. PInC Report at 221. By the end of November 2022, considering a turnaround of Credit Suisse's dire financial condition to be unlikely, Swiss regulators agreed that all authorities should discuss possible alternative solutions with Credit Suisse, including a sale of the Company. PInC Report Summary at 14. Yet none of these material facts were disclosed in Credit Suisse's November 23, 2022, announcement of its preliminary 4Q22 results, which optimistically concluded, "The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused and more stable bank – a new Credit Suisse."

64. Then, in early December 2022, Defendant Lehmann told multiple media outlets that outflows had "started to reverse" and "basically stopped," knowing, or recklessly disregarding, that this statement was false. Internal emails among members of Credit Suisse's SOX Steering Committee (a group that managed Credit Suisse's ICFR and quarterly reviewed and attested to the accuracy of the Company's financial reporting), one of whom was also a member of Credit Suisse's Executive Board, revealed that [redacted] CS-Diabat_00089853. The Executive Board member stated [redacted] *Id.*

65. On December 5, 2022, FINMA informed the CFC, based on monitoring it conducted with the assistance of Credit Suisse management, that "***Credit Suisse's capital outflows were not drying up*** and that a substantial improvement in the situation in this respect could not be expected by the end of the year." PInC Report at 259 (emphasis added). ***The same day***, December

5, 2022, contrary to the non-public statements of FINMA, Defendant Lehmann told Swiss broadcaster *SRF* that client outflows had "definitely stabilized," and "the situation has calmed."

66. On December 6, 2022, FINMA wrote another letter to [redacted] CS-Diabat_00203105 (emphasis added). Pillar 1 refers to minimum capital requirements for a financial institution, whereas Pillar 2 is additional capital meant to act as a buffer, in the case of additional bank-specific risks. FINMA concluded: [redacted] CS-Diabat_00203106. FINMA emphasized, [redacted] *Id.*

67. Around this same time, "FINMA insisted even more emphatically that preparations be made for a merger." PInC Report Summary at 14. In a non-public letter dated December 7, 2022, [redacted] CS-Diabat_00203128 (certified

translation). In order to prepare for such a scenario, FINMA "instructed CS to develop a short- and medium-term sale scenario by early January." PInC Report Summary at 15.

68. By December 22, 2022, Swiss regulators concluded "that the chances of Credit Suisse saving itself have diminished," and "the most likely solution seems to be a sale." PInC Report at 262. While Credit Suisse had presented FINMA with a "long list of potential buyers," FINMA concluded that UBS was the only viable buyer if an emergency sale was required. *Id*. On December 28, 2022, FINMA's Chairman alerted SNB's Chairman that Credit Suisse "was in an extremely dire condition and its liquidity situation had once again deteriorated significantly." PInC Report Summary at 16. FINMA noted, "the bank only had a few billion in liquid assets left, which is why a default on payment could have a domino effect." PInC Report at 266.

69. On December 29, 2022, "FINMA made clear demands that CS complete preparations for a sale by early January," including demands that the Company "devise a short-term scenario in which CS would be taken over by UBS." PInC Report Summary at 16. CS complied by mid-January. *Id*. The PInC found: "In general, all those present at [the December 29 meeting] agree that the Chairman of the Board of Directors of Credit Suisse appears optimistic, and sometimes even overly optimistic. In his answers to the questions asked by the authorities, he mainly highlights the positive aspects. For them, it has become clear that ***the chairman of the board of directors of Credit Suisse is underestimating and embellishing the situation, particularly to create an impression of security***." PInC Report at 241 (emphasis added).

70. Amidst the continuing turmoil, on February 9, 2023, Credit Suisse released its earnings report for 4Q22 and held an earnings call to discuss the Company's fourth quarter and fiscal year 2022 results. Defendants continued to paint a picture of a Company that had faced some struggles but was secure and on track to regaining stability, particularly due to its adequate

capitalization and liquidity. There was no mention of either FINMA's significant concerns regarding Credit Suisse's capital and liquidity or its calls to finalize preparations for an emergency sale of the Company.

### C. Defendants continued to paint a misleadingly rosy picture while regulators scrambled to force a historic merger.

71. On March 15, 2023, at a conference in Saudi Arabia, Ammar Al Khudairy—the chairman of the Saudi National Bank—bluntly stated in a response to *Bloomberg* reporter about whether the Saudi National Bank would be willing to provide additional financial "assistance" to Credit Suisse: "The answer is absolutely not, for many reasons outside the simplest reason, which is regulatory and statutory."[6] The market reacted strongly to this statement, assuming Al Khudairy knew insider information about the Group's financial condition.

72. For almost a year, unknown to the public, FINMA had been urging Credit Suisse to prepare a recovery plan in the case of another incident. Yet when crisis hit, there was only one available solution—the last-resort, emergency sale with UBS. Indeed, Colm Kelleher, the Chairman of UBS, would later comment, after reviewing letters between FINMA and Credit Suisse, that "[t]he fact that Credit Suisse received these letters and did nothing, or not enough, is inconceivable."[7]

73. Starting on March 15, 2023, "events unfolded rapidly…. authorities immediately realised that urgent measures were now required to prevent the systemically important CS from being liquidated. They therefore set up a crisis unit at the main office of the FDF." PInC Report

[6] Yousef Gamal El-Din, "Credit Suisse Reels After Top Shareholder Rules Out Raising Stake," *Bloomberg*, Mar. 15, 2023

[7] Christian Kolbe, "'At Credit Suisse, there were cowboys who only thought about their own interests,'" *Blick*, Oct 1, 2024

Summary at 18 (emphasis added). "Given the urgency of the situation, [the Swiss Government was] determined to come up with a viable solution by Sunday evening at the latest to calm the markets before global stock markets opened for trading on Monday [March 20, 2023]." *Id.*

74. The same day, March 15, 2023, Defendant Körner publicly stated in an interview that Credit Suisse's capital and liquidity basis were "very very strong." In another interview on the same day, Defendant Lehmann stated Credit Suisse had "strong capital ratios, a strong balance sheet," and that state aid was "not a topic" for the Group. Not only were these statements materially false or misleading because they were made while the Swiss Government was actively negotiating a sale of Credit Suisse in order to prevent its imminent collapse, Defendant Lehmann's statement was materially misleading because that same day, only about 12 hours after his statements were made, Credit Suisse finally requested CHF 50 billion in ELA from the SNB—which request was granted just hours later and announced on the morning of March 16, 2023. PInC Report at 300. The market reacted positively to this announcement, assuming the additional liquidity would be sufficient to counteract the deposit outflows in 4Q22 (which they wrongly believed, based on Defendants' statements, had concluded). But Credit Suisse's announcement of the aid was misleading in itself, both because it omitted mention that the Group was on the brink of collapse, and because, according to several people interviewed by the PInC, "it was already clear at that time that this aid in the form of cash would not be enough." *Id.*

75. Moreover, the statements of Defendants Körner and Lehmann were materially false or misleading because, the week of March 13, 2023, Credit Suisse was experiencing massive outflows. The FINMA Report revealed critical details about the massive outflows at Credit Suisse on each day of the final week before the bank collapsed:

| **Date** | **Outflows** |
|---|---|
| March 13, 2023 | CHF 1.6 billion |

| | |
|---|---|
| March 14, 2023 | CHF 2.7 billion |
| March 15, 2023 | CHF 13.2 billion |
| March 16, 2023 | CHF 17.1 billion |
| March 17, 2023 | CHF 10.1 billion |

FINMA Report at 36-37.

76. After several days of negotiations, and after the Swiss Government agreed to certain legal concessions and guarantees against losses, UBS agreed to a deal in the evening of Saturday, March 18, 2023. PInC Report at 351. The head of the FDF called Defendant Lehman and urged him to accept the offer from UBS, stating: "***there was no viable plan B and that it was now necessary to think about Switzerland's interests***." *Id*. at 353 (emphasis added).

77. The merger was announced in a press conference on the evening of Sunday, March 19, 2023, and in a press release filed by Credit Suisse with the SEC on March 20, 2023.

78. For months leading up to Credit Suisse's collapse, Defendants had publicly painted a portrait of a beleaguered company whose strong fundamentals rendered it capable of turning around to create a "new Credit Suisse." The announcement of the merger, forced by the Swiss Government, finally shattered this illusion and revealed the full truth about Credit Suisse's financial condition. When the truth was revealed, it decimated the price of Credit Suisse's AT1 bonds, which fell from $24.67 for H3698DDD33, $28.91 for H3698DBZ62, and $24.87 for H3698DCV40 at market close on Friday, March 17, 2023, to $4.14 for H3698DDD33, $3.44 for H3698DBZ62, and $3.44 for H3698DCV40—***declines of 83.21%, 88.10%, and 86.15%, respectively***.

**D. Credit Suisse also concealed a months-long correspondence with the SEC regarding the effectiveness of internal control over financial reporting.**

79. During the Class Period, Defendants knowingly or recklessly failed to disclose to investors that their ongoing risk management and control governance issues led the SEC to believe

Credit Suisse had deficiencies in its ICFR, leading to a months-long correspondence and the eventual delay of the filing of Credit Suisse's 2022 Annual Report.

80. On July 15, 2022, the SEC initiated private comment letter correspondence with Credit Suisse through its then-CFO Defendant Mathers (subsequent letters were addressed to Defendant Joshi), requesting more information about the Company's "revision" of its financial statements for the years ending December 31, 2020, and December 31, 2019, as reflected in the 2021 Annual Report. Specifically, in its July 15, 2022, letter, the SEC asked:

81. In light of your accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, please provide us with your analysis supporting your conclusion that there were no material changes to ICFR.

82. The maintenance of effective ICFR is an essential duty of senior management of a corporation, particularly the CFO and CEO, in order to ensure that the information reported in the company's financial statements is accurate and does not contain any material misstatement. Continuing to revise and maintain effective ICFR is a crucial foundation for all public companies, particularly large and globally significant companies like Credit Suisse. The fact that the SEC was questioning Credit Suisse's ICFR put Defendants on notice that further assessment and revisions to the ICFR were necessary. This is particularly true for Defendants Lehmann, Körner, and Joshi, who were specifically brought in to adequately assess risk after the failures of their predecessors. Likewise, Defendants' touting of new risk-reduction plans and strategies to investors while omitting mention of the SEC's concerns was highly material and misleading.

83. Nor was the SEC the first regulator to question Credit Suisse's ICFR. In the non-public May 2022 Assessment Letter, [redacted]

[redacted] CS-Diabat_00203075-76. FINMA stated: [redacted] *Id.* FINMA directed [redacted] CS-Diabat_00203080. And around the same time, mid-May 2022 (just before the beginning of the Class Period), the UK's financial regulator, the Financial Conduct Authority ("FCA"), placed Credit Suisse on a "watchlist of institutions requiring tougher supervision," based on concerns that it had "not done enough to improve its culture, governance and risk controls."[8]

84. Nevertheless, on August 22, 2022, Credit Suisse responded to the SEC that, while it acknowledged the existence of several "accounting issues," "operational incidents" (including the Archegos incident), and changes in business structure and senior management, these factors "did not materially affect, and were not reasonably likely to materially affect, the ICFR at the Group or the Bank."

85. Credit Suisse's August 22, 2022, response did not satisfy the SEC. It sent the Company follow-up questions on October 20, 2022. In particular, the SEC asked the Company to

[8] "UK regulator puts Credit Suisse on watchlist after scandals," *Financial Times*, Jun. 12, 2022

explain in more detail each of the control deficiencies previously identified, and to explain how the Company concluded that those deficiencies did not rise to the level of a material weakness.

86. Credit Suisse responded on November 18, 2022, explaining that it had identified several control deficiencies, which mainly affected the way Credit Suisse reported its cash flow, but had determined they were not material or significant, individually or in combination with other control deficiencies, based on a series of qualitative and quantitative factors.

87. Far from quelling concerns in Washington, Credit Suisse's explicit admission of control deficiencies led the SEC to raise even more questions "as to the actual control(s) that were deficient." It sent these questions in a letter to the Company dated January 17, 2023. The SEC requested that the Credit Suisse, among other things: (1) identify the deficient controls, provide a description of how each control was designed to address the related risk of material misstatement, and explain whether the deficiency related to the design or operating effectiveness of the control; (2) provide Company management's root cause analysis; (3) discuss any remediation efforts; (4) describe the factors that affected the magnitude of the misstatement that might result from the deficiency, and quantify the magnitude; and (5) explain in more detail how the Company performed the severity analysis for each of the control deficiencies related to the errors.

88. Credit Suisse responded to the SEC's questions on February 13, 2023. The Company stated that it "continued to believe that [its] control activities were selected and established to foster effective internal control over financial reporting as of December 31, 2021." Discussions between Credit Suisse and the SEC continued late into the evening on March 8, 2023, the day before Credit Suisse had planned to file its Form 20-F for the period ending December 31, 2022 ("2022 Annual Report"). As a consensus could not be reached, the SEC asked Credit Suisse to delay the filing of the 2022 Annual Report.

89. Credit Suisse issued a press release on March 9, 2023, announcing that it was delaying the publication of the 2022 Annual Report "in relation to certain open SEC comments" about its "controls." Nothing in that press release reported the serious questions raised by the SEC over the past several months or the existence of material weaknesses in Credit Suisse's ICFR. Instead, Credit Suisse characterized the delay as "prudent" "following a late call" by the SEC. While the price of Credit Suisse's H3698DDD33 AT1 bond declined 2.36%, H3698DBZ62 AT1 bond declined 2.95%, and H3698DCV40 decline 2.70% on March 9, 2023, in reaction to the news about the late filing, Defendants' misleading characterization significantly cushioned the blow. Notably, Credit Suisse's correspondence with the SEC was not made public until April 11, 2023—after the merger with UBS had already been announced.

90. Still dissatisfied with Credit Suisse's responses, the SEC sent yet another series of questions on March 10, 2023, commenting that it would like to better understand how Credit Suisse had concluded that a broader risk assessment entity-level control material weakness and a broader monitoring entity-level control material weakness did not exist as of December 31, 2022 and 2021. Just two days later, in a letter to the SEC dated March 12, 2023, Credit Suisse finally admitted that there had been material weaknesses in its ICFR dating back to the 2021 Annual Report.

> Specifically, Credit Suisse stated: "[W]e have, and have had, a material weakness in internal control over financial reporting as it relates to COSO Principle 7," and "management has concluded that there was a material weakness in the Group's internal control over financial reporting as of December 31, 2021 and which continued as of December 31, 2022, related to COSO Principle 17." The.
>
> ~~"It's a challenge to manage a global bank during a pandemic over Zoom," Gottstein told the newspaper. "I'm convinced that in the era of COVID-19 the scrutiny of risk business, whether for banks or insurers, has grown more difficult."~~

51. On April 22, 2021, Credit Suisse issued a press release announcing the Company's first quarter 2021 financial results. The press release quoted Defendant Gottstein, stating, in relevant part:

> Our results for the first quarter of 2021 have been significantly impacted by a CHF 4.4 bn charge related to a US based hedge fund. The loss we report this quarter, because of this matter, is unacceptable. Together with the Board of Directors, we have taken significant steps to address this situation as well as the supply chain finance funds matter. Among other decisive actions, we have made changes in our senior business and control functions; we have enhanced our risk review across the bank; we have launched independent investigations into these matters by external advisors, supervised by a special committee of the Board; and we have taken several capital related actions. We will work to ensure Credit Suisse emerges stronger. However, it is also important to recognize that our underlying 1Q21 financial performance[], across all divisions, was strong, supported by solid results in Switzerland, and strong growth in APAC and investment banking. We expect that our successful MCN placement today will further strengthen our balance sheet and enable us to support the momentum in our core franchises. Our underlying result is a testament to the earnings power of Credit Suisse and to the commitment of our employees. And it makes it all the more important that we quickly and decisively resolve the issues we are currently dealing with.

52. On April 30, 2021, Credit Suisse held its Annual General Meeting of Shareholders in Zurich, Switzerland, during which Defendant Gottstein stated, in relevant part:

> I recognize that Credit Suisse is currently surrounded by negative events, news and commentary. These events have caused great anxiety among employees, clients and shareholders alike, and they substantially weakened our share price. Let me address this directly. The significant loss in our prime services business relating to the failure of a U.S. prime brokerage client is unacceptable. We deeply regret that these cases, in combination with the supply finance funds matter, have caused significant and understandable concerns among our stakeholders, including you, our valued shareholders.
>
> We have taken decisive actions, which include the following: first, significant personnel and organizational changes at the Executive Board level and the echelons directly below them; second, the withdrawal of proposals for the Executive Board variable compensation comprising both their short-term incentive awards based on 2020 performance and their 2021 long term incentive awards. At the same time, variable compensation from previous years that has not yet been paid out will be retained for relevant employees. This measure will ensure that we are able to reevaluate variable compensation for 2020 and apply malus or clawbacks where appropriate.

Third, the strengthening of risk controls, including forensic analysis of the 2 incidents. In addition, we are conducting an overall review of risk systems, processes and culture across the bank and are significantly reducing our risk positions in the prime services business. Fourth, we have further strengthened our balance sheet by means of a capital increase, as recently announced, in which we raised a total of CHF 1.7 billion. Fifth, the Board of Directors has launched 2 independent investigations carried out by external parties. These will also reflect on the broader consequences and lessons learned. We will work closely with the relevant regulators, including our domestic supervisor, FINMA, which has opened enforcement proceedings in both cases.

These events represent real setbacks. I'm confident that we will draw the right conclusions with the aim of making sure that events of this kind never happen again. We are dedicated to ensuring that Credit Suisse will emerge stronger from the situation. However, I would like to reassure you that even as we diligently address these issues, we remain well positioned to support our clients globally.

* * *

Ladies and gentlemen, Credit Suisse remains a formidable institution. We have thrived for 165 years through external crises and our own challenges. I've been at Credit Suisse for 22 years now through many ups and downs, and I am self critical with regard to the recent developments which have left their mark on me as well. I see my role now, together with the new Chairman and the rest of the Board of Directors and my colleagues of the Executive Board, is to steer Credit Suisse back into calmer waters. I'm proud to lead this bank, and I am confident about the future. At the heart of this confidence are the close relationships that we have with our clients, our earnings power and the dedication of our employees around the world. I therefore assure you that my management team and I, together with our employees, will do everything we can to bring back the best of the bank to you, our valued shareholders, ladies and gentlemen.

53. At the same meeting, Defendant Horta-Osório then stated, in relevant part:

Any company that has been around as long as this company will have experienced its fair share of ups and downs. Indeed, over 3.5 decades, I have personally worked at and led several banks in different countries and have lived through many crises. What has happened with Credit Suisse over the last 8 weeks with the U.S.- based hedge funds and the supply chain finance funds matters certainly goes beyond that. Important lessons have to be learned and decisions taken accordingly in a transparent, thoughtful and decisive way. In the months to come, my focus will be on 3 areas.

First, risk management. The current and potential risk of Credit Suisse need to be a matter of immediate and close scrutiny. I firmly believe that any banker should be,

> at heart, a risk manager. Together with the Board and management, I will have a thorough look at how risks are being assessed, managed and controlled. Second, strategy. Credit Suisse has an outstanding franchise and client base and has outstanding people. I see it as my duty as Chairman to ensure that Credit Suisse continues to excel where it has its strengths and competitive advantages. We will take the time required for an in-depth assessment of the bank's strategic options. This will be done with a long term perspective not losing sight of the short term needs. Then we will decide on a course of action and closely oversee the execution. Third, culture. Credit Suisse's rich heritage has been built by women and men over many decades. The bank is associated with excellency, creativity and an entrepreneurial spirit as well as long-standing commitment to its customers, the economy and society at large. However, a series of setbacks has been holding us back, and we need to reflect on what led us to the issues we face today.
>
> It is my firm ambition and determination to listen into the organization and to engage in dialogue with all relevant stakeholders in order to get a deep understanding of our strengths and weaknesses. We need to foster a culture that reinforces the importance of risk management, ensures that we have the right incentives in place including on remuneration and focuses on personal responsibility and accountability, a culture where every single employee can be proud of what we stand for and how we act. The Board and I will do this together with the management team led by Thomas Gottstein. Thomas has the Board's confidence, and I'm looking forward to working with him and the Executive Team.

54. On May 6, 2021, Credit Suisse filed its first quarter 2021 Quarterly Report on a Form 6-K with the SEC, signed by Defendants Gottstein and Mathers. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated, *inter alia*:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of March 31, 2021 . . . . Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.
>
> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Group as of December 31, 2020 . . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, ***is*** fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

* * *

We conducted our review in accordance with the standards of the PCAOB.

55. On July 1, 2021, Defendant Horta-Osório was interviewed by *Neue Zürcher Zeitung*. *Reuters* summarized the interview in an article published that day, entitled "Credit Suisse to realign strategy this year, chairman says." The article stated, in relevant part:

> Credit Suisse (CSGN.S) expects to decide on a new strategy by the end of the year, Chairman Antonio Horta-Osorio said in his first interview since assuming the role at the troubled lender.
>
> * * *
>
> Describing his first seven weeks in the job – during which he met with employees, as well as Swiss politicians and Swiss, U.S. and British regulators – as "intensive," Horta-Osorio said the bank needed a realignment that would clear up short-term crises but also position it for the long term.
>
> "I have a clear picture of the direction the bank must take," he said in the interview with Swiss newspaper Neue Zuercher Zeitung published on Thursday. "For me the question isn't, 'what do we need to do to ensure it works this time?' The question is much more, 'why isn't the bank making progress, despite having a fantastic group of wealth management clients in Switzerland, Europe and high-growth Asia?'" he said, adding the bank's major strength lay in serving entrepreneurs and wealthy families.
>
> "We need to agree on how we can best serve these customers and on where we are most competitive – on what that means for the bank as a whole," he said. To ensure success, the bank would need not only the right strategic direction, but also "the right people in the right place," he added.
>
> Describing the recent failings at Switzerland's second-largest bank as unacceptable, Horta-Osorio compared the 165-year-old lender to a racecar driving on a highway with its wheels on wrong and promised no quick fixes, saying cultural shifts take time.
>
> * * *
>
> Asked about the future of the investment bank, Horta-Osorio said it was too soon to anticipate the outcome of the board's discussions. "We're in the beginning phase of a new strategic positioning," he said.

(Emphases added.)

56. On July 29, 2021, Credit Suisse issued a press release announcing the Company's second quarter 2021 financial results. The press release quoted Defendant Gottstein, stating, in relevant part:

> Credit Suisse delivered resilient underlying second quarter results and strong capital ratios as we are benefitting from having taken decisive actions to address the challenges raised by the Archegos and Supply Chain Finance Funds matters. We take these two events very seriously and we are determined to learn all the right lessons. We have significantly reduced our RWA and leverage exposure and improved the risk profile of our Prime Services business in the Investment Bank, as well as strengthened the overall risk capabilities across the bank. Our underlying business performance remains solid with a record level of assets under management in our Wealth Management and Asset Management businesses, supporting strong growth in recurring commissions and fees. Together with our more conservative approach to risk and a less favorable trading environment compared to the second quarter of 2020, we delivered a resilient underlying performance in the Investment Bank. We continue to invest in people and technology across Wealth Management, notably in APAC, as well as Asset Management and the Investment Bank. Over the coming months, we will continue to develop our long-term vision for the bank that will serve as our compass for the years ahead. Our objectives are clear: whilst we aim to further strengthen our risk culture, we remain committed to serving all our private, corporate and institutional clients with best-in-class service and advice and to creating value for our shareholders.

57. Also on July 29, 2021, Credit Suisse filed its second quarter 2021 Quarterly Report on a Form 6-K with the SEC, signed by Defendants Gottstein and Mathers. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated, *inter alia*:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse Group AG and its subsidiaries (the "Group") as of June 30, 2021 . . . . Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Group as of December 31, 2020 . . . . In our opinion, the information set forth in the accompanying consolidated balance sheet as of December 31, 2020, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.
>
> * * *
>
> We conducted our review in accordance with the standards of the PCAOB.

(Emphases added.)

58. On November 4, 2021, Credit Suisse issued a press release announcing the Company's third quarter 2021 financial results. The press release quoted Defendant Gottstein, stating, in relevant part:

> Credit Suisse reported strong third quarter pre-tax income and a CET1 ratio of 14.4 percent.
>
> Wealth Management businesses returned to robust net new assets and higher transaction revenues sequentially, while recurring commissions & fees and client business volumes demonstrated strong year on year momentum. Our Swiss Universal Bank had a record third quarter performance. Our Asia Pacific business had a resilient performance notwithstanding deleveraging by clients and we continue to invest in the region, including in relationship managers and building out our mainland China presence. Our Investment Bank delivered solid profitability driven by strong performance across Advisory, Capital Markets, Securitized Products and Equity Derivatives. Asset Management reported a further improved underlying performance driven across all revenues lines.
>
> We have also taken decisive actions to strengthen our overall risk & controls foundation, continued our remediation efforts on the Supply Chain Finance Funds matter, with our priority to return cash to investors, and made significant progress in resolving legacy issues. Our objectives are clear: we want to become a stronger, more customer-centric bank that puts risk management at the very core of its DNA to deliver sustainable growth for investors, clients and colleagues.

59. On March 10, 2022, Credit Suisse filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended

December 31, 2021 (the "2021 20-F"). With respect to the Company's controls and procedures, the 2021 20-F stated, in relevant part:

> **Evaluation of disclosure controls and procedures**
>
> The CEO and CFO concluded that, as of December 31, 2021, the design and operation of the Group's ***disclosure controls and procedures were effective, in all material respects, to ensure that information required to be disclosed in reports filed and submitted under the Exchange Act is recorded, processed, summarized and reported as and when required***.
>
> * * *
>
> Based upon its review and evaluation, management, including the Group CEO and CFO, ***has concluded that the Group's internal control over financial reporting is effective as of December 31, 2021***.
>
> The Group's independent registered public accounting firm, PricewaterhouseCoopers AG, has issued an unqualified opinion on the effectiveness of the Group's internal control over financial reporting as of December 31, 2021, as stated in their report.
>
> **Changes in internal control over financial reporting**
>
> ***There were no changes in the Group's internal control over financial reporting during the period covered by this report that have materially affected, or are reasonably likely to materially affect, the Group's internal control over financial reporting***.

(Emphases in bold and italics added.)

60. Attached to the 2021 20-F was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG" (the "2021 Audit Letter"). The 2021 Audit Letter stated, *inter alia*:

> We have audited the accompanying consolidated balance sheets of Credit Suisse Group AG and its subsidiaries (the "Group") as of December 31, 2021 and 2020 . . . . We also have audited the Group's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (("COSO).

> In our opinion, the consolidated financial statements referred to above ***present fairly, in all material respects***, the financial position the Group as of December 31, 2021 and 2020, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. ***Also in our opinion, the Group maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control – Integrated Framework (2013) issued by the COSO.***

* * *

> The Group's management is responsible for these consolidated financial statements, for ") is a framework of principles for developing and maintaining effective internal control over financial reporting, and for its controls. Principle 7 "[i]dentifies and analyzes risks." Principle 17 "[e]valuates and communicates deficiencies. [redacted] of the effectiveness of internal control over financial reporting, included in the accompanying Management's report on internal control over financial reporting. ***Our responsibility is to express opinions on the Group's consolidated financial statements and on the Group's internal control over financial reporting based on our audits.***

> ***We conducted our audits in accordance with the standards of the PCAOB.*** Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

61.91. Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an [redacted] *See, e.g.*, CS-Diabat_00203081 [redacted]

[redacted] internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. ***We believe that our audits provide a reasonable basis for our***

[redacted] CS-Diabat 00203080

[redacted]

(Emphases added.)

92. The 2021 Audit Letter also listed several "Critical Audit Matters," defined as matters which "(i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments." These Critical Audit Matters included "Fair value of Certain Level 3 Financial Instruments"; "Allowance for Credit Losses – Collectively Evaluated Corporate and Institutional Loans – Investment Bank"; "Litigation provisions"; and "Income Taxes – Realization of the tax benefit of the loss related to Archegos." The identified cash flow issue, which required a "revision" of the prior years' statements, however, was not listed as a "Critical Audit Matter." AS Credit Suisse did not disclose the existence of these material weaknesses to investors for another two days.

93. When the Form 20-F was eventually filed on March 14, 2023, it revealed to the public for the first time that Credit Suisse had "identified certain material weaknesses in internal control over financial reporting as of December 31, 2021 and, consequently, December 31, 2022."

94. During the period from July 15, 2022, through March 14, 2023, Defendants made repeated pronouncements about Credit Suisse's financial condition while failing to apprise the market about the serious inquiries from the SEC that would eventually lead the Company to admit there were material weaknesses in its ICFR, thus casting these statements about its financial condition in a half-true light. Had the Company revealed that it was under persistent questioning by the SEC regarding its ICFR, investors could have arrived at a valuation of Credit Suisse's securities that more accurately reflected its true condition.

95. After the March 9, 2023, announcement of the delay in the publication of Credit Suisse's annual report, Swiss authorities "discuss[ed] the measures taken by Credit Suisse to prevent this from happening again and are of the opinion that these are described in a very summary manner by the bank." PInC Report at 292. "From the authorities' point of view, the postponement of the publication of the Credit Suisse annual report has further destabilized the markets." *Id.* And just five days after admitting there had been material weaknesses in its ICFR dating back to the 2021 Annual Report, Credit Suisse collapsed.

96. But the adverse effects of the weaknesses in Credit Suisse's ICFR did not cease with the merger. On March 17, 2025, UBS revealed that its auditor, Ernst & Young, "expressed an 'adverse opinion' on internal controls over financial reporting related to legacy Credit Suisse matters."[9] "The issue relates to 'material weaknesses' originally discovered at Credit Suisse when it was still a standalone bank…. 'Although Credit Suisse AG is no longer a separate legal entity, numerous of its booking, accounting and risk management systems remain in use for activities that have not yet been exited or migrated to UBS systems,' UBS said." *Id.*

---

[9] Noele Illien, "UBS Auditor Issues Adverse Opinion Over Credit Suisse Controls," *Bloomberg*, Mar. 17, 2025

### E. The PInC Report Finds Defendants "Obscured" the True Financial Condition of Credit Suisse via a "Regulatory Filter."

97. The PInC Report further revealed another way in which Credit Suisse was able to "obscure[] the true financial condition of [the Group]." PInC Report Summary at 7. The PInC found, that to the detriment of investors, Defendants utilized a "regulatory filter" "to maintain the appearance of sufficient capitalisation until the very end." *Id*. This revelation answered a question that had been plaguing experts and analysts: how could Credit Suisse have been on the brink of failing when its CET1 ratio appeared to meet or exceed regulatory requirements?[10]

98. CET1 ratio is a measure of a financial institution's capital strength and ability to withstand financial distress. CET1 capital is a financial institution's highest quality capital: capital that can absorb losses immediately when they occur. If a financial institution's CET1 ratio is high, it is more likely that the institution would have sufficient liquid capital to cover outflows in the event of a run on the bank. FINMA supervises financial institutions to ensure compliance with applicable regulations. Starting in 2019, FINMA required Credit Suisse to have a CET1 ratio of at least 10%. At Credit Suisse's request, purportedly to assist in its touted strategic transformation process, FINMA lowered this requirement to 9.28% as of September 30, 2022.

99. However, as explained in the PInC Report, FINMA allowed Credit Suisse to use a "regulatory filter" which let CS AG report an artificially higher CET1 ratio. The regulatory filter allowed CS AG to account for certain overvalued assets using their higher book value rather than their lower fair market value. For example, if CS AG paid $10 for an asset, but current value on the open market was only $6, the regulatory filter would allow CS AG to value the asset at $10

[10] *See* Yvan Lengwiler, "Global Lessons from the demise of Credit Suisse," VoxEU Centre for Economic Policy Research, Sept. 4, 2023 ("One of the puzzles of Credit Suisse's failure is that it comfortably [met] all regulatory capital and liquidity requirements.").

when calculating its CET1 ratio. This was supposed to be counterbalanced by a "value reserve" in the book value of other undervalued assets. If applied properly, these provisions would have ensured CS AG always held sufficient capital. However, as outflows continued throughout the Class Period, the Company did not have sufficient undervalued assets to counterbalance the overvalued assets—yet, CS AG continued to use the filter. Urs Birchler, a former SNB official and the author of an expert report commissioned by the PInC during its investigation into the collapse of Credit Suisse (the "Birchler Report"), used the following visual to explain:




100. According to the Birchler Report, the filter remained relatively stable from 2019 through 3Q21. However, when the overhang from the Archegos and Greensill Funds scandals caused the Group to begin performing poorly in 4Q21, the filter started becoming a larger and larger portion of CS AG's CET1 capital, eventually accounting for over 50% of its reported CET1 capital in 3Q22. *See* Birchler Report at 12. Throughout the Class Period, CS AG's CET1 ratio was only able to remain above regulatory minimum requirements because of the filter. *Id.* at 13. Without the filter, CS AG's CET1 ratio would have dipped as low as 5% in 3Q22. *Id.*

101. CS AG's misleading use of the filter created an impression that it had ready access to far more capital than it actually had. At a meeting with FINMA on December 6, 2022, the SNB noted, "the precarious capitalization of the parent company prevents the elimination of risks." PInC

Report at 260. "For the PInC, this statement is all the more remarkable given that at the end of 2022, the parent company Credit Suisse AG benefited from the regulatory filter to the tune of 14.5 billion francs. This sum represented almost half of its regulatory capital." *Id.*

102. Throughout the Class Period, in quarterly and annual financial reports filed with the SEC, Credit Suisse reported CS AG's CET1 ratio with the filter, but never reported CS AG's CET1 ratio without the filter. The filter was also not discussed in Credit Suisse's "Pillar 3 and Regulatory Disclosures" document, which it filed quarterly on Form 6-K. Instead, these documents pointed investors, in a much smaller font, to a document only available on Credit Suisse's website, also titled "Regulatory Disclosures," which contained figures from which the ratio without the filter potentially could have been calculated. "These figures [were] not published with the other important figures, i.e., in the table dedicated to capital requirements and capital indicators in Switzerland, but in text form," and there was no comparison to previous periods. PInC Report at 166-67. The PInC Report explained, "CS's parent company reported the amount of the filter in a manner that was hardly comprehensible to outsiders." PInC Report Summary at 7. The PInC Report continued, "The regulatory filter obscured the true situation of CS AG. As a result, CS was not forced to strengthen its equity situation at a time when it might have been easier to do so. ***If the capital ratio of CS AG had been public without the filter, this could have given capital markets, financial analysts and the media more transparent information on which to base their decisions.***" *Id.* (emphasis added).

103. Many sophisticated investors and analysts and investors were misled by the use of this filter. For example, on March 15, 2023, just days before Credit Suisse collapsed, the chairman

of Credit Suisse's largest shareholder, the Saudi National Bank, stated: "I don't think [Credit Suisse] will need extra money; if you look at their ratios, they're fine."[11]

104. Notably, UBS would later confirm that Credit Suisse had "in fact been undercapitalized for a long time," and that "the collapse of Credit Suisse was driven by years of…reliance on substantial regulatory concessions."[12] According to UBS, "without the merger agreement, Credit Suisse would have collapsed and shareholders would have faced a total loss."[13]

105. The effect of the regulatory filter was one of the biggest bombshells revealed in the PInC Report, with many news outlets reporting on the finding. For example, a *Bloomberg* article stated: "The concession would later enable Credit Suisse to report a capital level, expressed as CET1 ratio, that continued to exceed the required minimum while the lender was already careening toward its demise."[14]

106. Had the Company disclosed the details about the regulatory filter in a non-misleading manner that was comprehensible to reasonable investors, investors could have arrived at a valuation of Credit Suisse's securities that more accurately reflected the then-existing financial condition of Credit Suisse and reflected the risk the Company was suffering from financial problems, such as insufficient capitalization, not reflected on its balance sheets.

[11] Dominic Lau, "Everything Fine at Credit Suisse, Saudi National Bank Head Says," *Bloomberg*, Mar. 16, 2023; *see also* Kian Abouhossein et al., "Where do we go from here?: Scenario analysis," J.P. Morgan, Mar. 16, 2023 ("[I]n our view, CSG's capital position is not the issue."); Alastair Ryan, "Choices and Implications," BofA Global Research, Mar. 16, 2023 ("Switzerland has unique capital requirements…the group already has a significant [capital] surplus to requirements.").

[12] "Credit Suisse collapse probe slams banking regulator," *France24*, Dec. 20, 2024.

[13] "Complaints from CS Shareholders: Dispute Advances to Next Round," *Finews*, Aug. 30, 2024.

[14] Levin Stamm, "Swiss Bank Watchdog Blundered on Credit Suisse, Report Finds," *BNN Bloomberg*, Dec. 20, 2024

107. Instead, the public discovered the truth about the Company's financial condition when Credit Suisse collapsed and was forced to merge with its biggest competitor, sending the price of its securities plummeting.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. May 31, 2022

108. The Class Period begins on May 31, 2022, when Reuters published an article, titled "EXCLUSIVE Credit Suisse weighs options to strengthen capital – sources," in which it reported, based on two sources with knowledge, that "Credit Suisse [was] in the early stages of weighing options to bolster its capital after a string of losses [had] eroded its financial buffers," that "[s]elling shares to some of its existing investors is the preferred option, but Credit Suisse has not ruled out tapping all shareholders," and that "[a] sale of a business, such as Credit Suisse's asset management division, [was] also a possibility." The same article quoted a Credit Suisse spokesperson, who outright denied these sources, claiming the Company was "robustly capitalized": "'Credit Suisse is currently not considering raising additional equity capital,' the bank said in a statement. 'The Group is robustly capitalised with a CET1 ratio of 13.8% and a CET1 leverage ratio of 4.3%.'"

109. The statements contained in ¶108 were materially false or misleading, or omitted information necessary to make them not misleading, because it was inconsistent with and/or failed to disclose that eight days earlier, FINMA had sent an assessment letter [redacted] CS-Diabat_00203075-76; *see also* PInC Report at 134, 140 (summarizing the May 2022

Assessment Letter).. The regulator also explained: [redacted] CSDiabat_00203076. In addition, The statements contained in ¶108 were further materially false or misleading and/or omitted information necessary to make them not misleading, because, as stated by the two sources in the Reuters article, Credit Suisse was, in fact, considering the possibility of raising additional capital as early as May 2022, and had recently participated in meetings with FINMA concerning capital raises. Specifically, a July 14, 2022, letter from FINMA to [redacted] CS-Diabat_00203088.

110. Further, the PInC found, without the effects of the regulatory filter, "Credit Suisse would already have had difficulty meeting the legal capital requirements in 2021 and would have been completely unable to do so from 2022." PInC Report at 485-86; see also Birchler Report at 12. The PInC explained that the use of the filter "obscured the real situation" of CS AG's undercapitalization from the public. Id. at 411. As such, the characterization that Credit Suisse was "robustly capitalized" was materially false or misleading. Further, the PInC Report found that, without the filter, Credit Suisse would have been "forced to strengthen its capital position in a timely manner by carrying out a capital increase" at an earlier time. Id. While use of the filter allowed CS to delay raising capital, Defendants knew or recklessly disregarded the truth that, by

May 2022, the parent bank was already severely undercapitalized and a capital raise would likely be the only way to remedy the situation.

**B. July 27, 2022**

111. On July 27, 2022, Defendant Lehmann gave an interview with CNBC Squawk Box Europe, which was published online with the title, "Credit Suisse's departing CEO Thomas Gottstein wasn't forced out of the bank, chairman says." This interview further addressed the topic of whether Credit Suisse needed to raise additional capital:

> **CNBC:** And can we just nail a couple of boxes here? One is the market's been speculating about a capital raise. Two, the market's been speculating about a partnership or probably a loss of independence for the bank. I know that was that quite amusing State Street rumor that was doing the rounds thanks to one of the financial blogs here. Just tell us ultimately whether any of these rumors will turn out to be true.
>
> **Lehmann:** Look, on capital we'll report despite the loss today, a CET1 ratio of 13.5%. I'm happy to see that number and we will guide the market also in light of the uncertainty that we certainly are going to defend a CET1 ratio until the end of the year between 13 to 14%. So I think we are good on this one and we will manage that very, very tightly. I cannot comment to know all the speculations and some of them, as you said, seem to be quite ridiculous.
>
> **CNBC:** But I do feel you need to address that because the market won't take that answer as a comprehensive no. Is it a no? There is no plan at this stage to partner with another business or indeed perhaps sell the company.
>
> **Lehmann:** That's a clear no.
>
> **CNBC:** That's a clear no. Okay. Thank you very much indeed for that.

Lehman's denial that a capital raise would be necessary was disseminated further into the market by other publications. For example, the same day, a *Financial Magnates* article entitled "Credit Suisse Says 'Clear No' to Bank's Possible Sale or Capital Raise" stated that Credit Suisse "has denied claims that the firm wants to sell its business or raise capital to support its financial losses. The Chairman of Credit Suisse, Axel Lehmann told broadcaster CNBC on Wednesday: 'a clear no' when asked about the rumors making the rounds in recent months."

112. Defendant Lehmann's statements in ¶111 when asked if Credit Suisse needed to raise capital were materially false or misleading because, at this time, he knew or recklessly disregarded that Credit Suisse was already planning a "substantial" capital raise to be announced on October 27, 2022. FINMA stated, [redacted] CS-Diabat_00203115. And in a letter [redacted] r dated August 5, 2022, which [redacted] FINMA stated:

[redacted]

CS-Diabat_00203093-94. In addition, a July 14, 2022, letter from FINMA [redacted] CS-Diabat_00203088. Thus, not only had Credit Suisse been planning a [redacted] capital raise for months before Defendant Lehmann's denials, at the time of this interview, they had already [redacted]

113. Further, the PInC found, without the effects of the regulatory filter, "Credit Suisse would already have had difficulty meeting the legal capital requirements in 2021 and would have been completely unable to do so from 2022." PInC Report at 485-86; *see also* Birchler Report at

12. The PInC explained that the use of the filter "obscured the real situation" of CS AG's undercapitalization from the public. *Id.* at 411. The PInC Report also found that, without the filter, Credit Suisse would have been "forced to strengthen its capital position in a timely manner by carrying out a capital increase" at an earlier time. *Id.* While use of the filter allowed CS to delay raising capital, Defendants knew or recklessly disregarded the truth that, by the time this statement was made, the parent bank was already severely undercapitalized and a capital raise would likely be the only way to remedy the situation.

**C. July 27, 2022**

114. On July 27, 2022, Credit Suisse held a conference call with analysts and investors to discuss the Company's second quarter 2022 earnings (the "2Q22 Earnings Conference") for the period ended June 30, 2022. During this conference call, Daniele Brupbacher, an analyst at UBS, asked, "[A]t this point in time, are you ready and able to exclude capital increase to—if you go into this strategic review?" Defendant Mathers responded, "I think the first point I'd make is, I've been CFO for 12 years and 13.5% CET1 is one of the highest CET1 ratios we've actually ever reported. So, you know, we are in a strong capital position. And our leverage ratio is equally strong in terms of that. So, I think the bank is well funded in terms of that."

115. The statements in ¶114 concerning Credit Suisse having the highest CET1 ratios ever reported, being in a "strong capital position," and being "well funded," in response to questions about whether Credit Suisse needed to raise additional capital were materially false or misleading and/or omitted information necessary to make them not misleading because Defendant Mathers knew or recklessly disregarded that FINMA had previously [redacted] For example, on July 12, 2022, [redacted]

[redacted]. And on July 25, 2022, two days before the 2Q22 Earnings Conference took place, Credit Suisse again [redacted] CS-Diabat 00203093-94. Moreover, in contradiction to Mathers' statements about Credit Suisse's "strong capital position," the PInC Report found that without the effects of the regulatory filter, which "obscured" Credit Suisse's true financial condition from the public, Credit Suisse would have been unable to meet legal capital requirements by early 2022. PInC Report at 485-86; *see also* Birchler Report at 12. The PInC Report also found that, without the filter, Credit Suisse would have been "forced to strengthen its capital position in a timely manner by carrying out a capital increase" at an earlier time. *Id.* While use of the filter allowed CS to delay raising capital, Defendants knew or recklessly disregarded the truth that, by the time this statement was made, the parent bank was already severely undercapitalized and a capital raise would likely be the only way to remedy the situation.

116. During the same call, JPMorgan analyst Kian Abouhossein asked, concerning the Credit Suisse's CET1 ratio, "have you had discussions with FINMA and how would FINMA see potentially capital going below 13%?" Gottstein replied, "On the FINMA capital side, you know, clearly, as it was said by David, the [13.5%] is a very solid capital base…. We are obviously always also in contact with FINMA. But this is very consistent with the spirit there." Lehmann added, "The question obviously, you know, with FINMA, we are in very close contact and I think [have] their support on the general strategic direction and our intent."

117. In addition, the statements in ¶114 were also materially false or misleading, or omitted facts necessary to make them not misleading because FINMA did not believe Credit Suisse

had a "very solid capital base." For example, in an assessment letter dated May 23, 2022, [redacted] CS-Diabat_00203075-76. In addition, shortly before this call, in a letter dated July 14, 2022, [redacted] CSDiabat_00203087-88.

118. Also on July 27, 2022, the Company issued an earnings release (the "2Q22 Earnings Release") and a media release, along with slides accompanying its presentation to investors (the "2Q22 Media Release") announcing financial results for the second quarter of 2022, which were filed with the SEC on a Form 6-K. The Form 6-Ks were signed by Gottstein and Mathers on behalf of both Credit Suisse AG and Credit Suisse Group AG. The 2Q22 Earnings Release stated: "Credit Suisse AG (Bank parent company)'s Swiss CET1 ratio decreased from 11.8% as of 1Q22 to 11.4% as of the end of 2Q22, primarily driven by net losses and an adverse foreign exchange impact, despite capital distributions from its UK participations." And the 2Q22 Media Release stated: "Parent CET1 ratio of 11.4% vs. 11.8% at 1Q22, driven by net losses and adverse FX impact, partially offset by USD 1.2bn capital distribution from CSSEL." These statements were highly material to investors. On August 30, 2022, Deutsche Bank Research published a report titled, "Darkest Before Dawn." The report noted: "The parent CET1 ratio of 11.4% (vs a 12% target by end-2022) has attracted a lot of attention over the last few quarters. However, we do not believe that it is the binding constraint for the group."

119. The statements in ¶118 were false and misleading and/or omitted material information necessary to make them not misleading because per the PInC Report, the effects of the regulatory filter on CS AG's CET1 ratio were disclosed in a misleading way that allowed Credit Suisse to maintain the appearance of sufficient capitalization. Without the effects of the regulatory filter, CS AG's CET1 ratio decreased to 7.6% in 2Q22 (see Birchler Report at 12), far below the 10% minimum required by regulators, which would have fundamentally changed analysts' outlook on Credit Suisse's capital.

**D. October 27, 2022**

120. October 27, 2022, when Credit Suisse held its 2022 Strategy Update Presentation with investors (the "2022 Strategy Update Presentation"). During the 2022 Strategy Update Presentation, Defendant Lehmann stated, in relevant part:

> ***[We] intend to significantly derisk and reduce our Investment Bank, focusing on core parts of sustainable value. This means we plan to transfer certain investment banking and capital market capabilities into a separate entity, revitalization, the CS First Boston brand. Credit Suisse intends to remain a long-term investor, creating equity ownership and a partner-like culture to tap the right talent and attract external capital. Going forward, this business will be advisory-led and have a reduced risk profile.*** We expect to access external credit facilities for the leveraged finance business. I will be delighted when Michael Klein is appointed CEO-designate of Credit Suisse First Boston. He will lead this transformation towards Credit Suisse First Boston's more independent future.
>
> * * *
>
> And finally, we have entered into a framework agreement and exclusivity

agreement to transfer a significant portion of our Securitized Products business to an investor group led by Apollo Global Management. ***This proposed transaction will support our transformation. It will derisk and reposition Securitized Products***

62. ***to***No. 5 explains, "A direct relationship exists between the degree of risk that a material weakness could exist in a particular area of the company's internal control over financial reporting and the amount of audit attention that should be devoted to that area." As such, failure to give particular attention to the cash flow issues further indicated that PwC's audit was not "in accordance" with PCAOB standards.

63. Appended as an exhibit to the 2021 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Gottstein and Mathers certified that "[t]he [2021 20-F] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act] and the information contained in th[e 2021 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Compan[y] for such period presented."

64. On April 27, 2022, Credit Suisse issued a press release announcing the Company's first quarter 2022 results. The press release quoted Defendant Gottstein, stating, in relevant part:

> The first quarter of 2022 has been marked by volatile market conditions and client risk aversion. These conditions, together with the impact from our reduction in risk appetite in 2021 as we took decisive actions to strengthen our overall risk and controls foundation, had an adverse impact on our net revenues. Our operating expenses were higher year on year, driven in particular by higher previously reported litigation expenses of CHF 703 mn for the quarter as we continued our proactive approach to resolving litigation matters. Against this backdrop, we reported a pre-tax loss for the quarter; however, on an adjusted* basis, we reported a pre-tax income of CHF 300 mn, including the adverse impact of CHF 206 mn of losses related to Russia's invasion of Ukraine. 2022 is a transition year, and our clear focus remains on the disciplined execution of our new Group strategy as announced in November 2021: strengthening our core, simplifying our organization and investing for growth. We went live with our new structure in January; have reduced the allocated capital in the IB by USD 2.5 bn, 82% of our ambition of more than USD 3.0 bn; and have made significant progress on various other strategic priorities. I am confident that we are well positioned to build a stronger and client-

centric bank that puts risk management at the core to deliver sustainable growth and value for investors, clients and colleagues.

On July 27, 2022, Credit Suisse issued a press ***release*** announcing the Company's second quarter 2022 results. The press release quoted Defendant Gottstein, stating***capital.***

(Emphasis added).

65.121. Defendant Körner then stated, in relevant part, as follows:

Our results for the second quarter of 2022 are disappointing, especially in the Investment Bank, and were also impacted by higher litigation provisions and other adjusting items. The bank's performance was significantly affected by a number of external factors, including geopolitical, macroeconomic and market headwinds. These challenging circumstances led to results which overshadow the strength of our leading client franchises in all four divisions of the bank. ***The urgency for decisive action is clear and a comprehensive review to strengthen our pivot to the Wealth Management, Swiss Bank and Asset Management businesses, supported by a fundamental transformation of our Investment Bank, is underway. Further, we have now launched a broader cost efficiency and digital transformation program to reduce our absolute cost base to less than CHF 15.5 bn in the medium term***.

We are creating a new Credit Suisse with a simpler, more stable, more focused business model built around our leading franchises in Wealth Management and in our Swiss home market, complemented by our strong capabilities in Asset Management and Markets. ***We will radically restructure our Investment Bank and reduce risk by around 40%.*** We will create a resized connected Markets business as an integral part of new Credit Suisse.

* * *

> We currently have USD 90 billion of risk-weighted assets in the Investment Bank,
> down from historic levels but still accounting for about 1/3 of the group. And they
> are not generating sufficient value in the current setup. ***With the actions announced today, we will reduce our risk exposure by around 40%, both in terms of risk-weighted assets and leverage exposure.***
>
> (Emphasis added.)).

122. The statements contained in ¶¶120-21 were materially false and/or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat v. Credit Suisse Grp. AG ("Diabat I")*, 2024 WL 4252502, at *134-36 (S.D.N.Y. Sept. 19, 2024) (internal citations omitted).[15] That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made

[15] As the Court observed in denying in part Defendants' motion to dismiss the Class Action Complaint (Dkt. No. 1), *Core Capital* and *Diabat [v. Credit Suisse Grp. AG*, 23-cv-5874 (S.D.N.Y.] arise out of the same facts and the parties and the Court liberally referenced the court's decision in *Diabat I* in the motion to dismiss briefing and opinion. *See, e.g., In re Credit Suisse SEC. Fraud Class Actions*, 2025 WL 1866293, at *4 (S.D.N.Y. July 7, 2025). Therefore, where allegations from *Diabat I* have been mirrored in this complaint, the complaint cites to the Court's reasoning in *Diabat I* for upholding the statements as actionable.

available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* In addition, statements contained in ¶¶120-21 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

~~66.~~123. On October 27, 2022, Credit Suisse issued a press release announcing the Company's third quarter 2022 results~~.~~ (the "3Q22 Media Release"). The press release quoted Defendant Körner, stating, in relevant part:

> The third quarter, and more broadly 2022 so far, have been significantly impacted by the continued challenging market and macroeconomic conditions, leading to a weaker performance for our Investment Bank in particular. Our recent Group level performance has been disappointing for our stakeholders. From today, we are taking a series of decisive actions to re-focus Credit Suisse around the needs of our clients and stakeholders. Our new, integrated model will be focused on Wealth Management, the Swiss Bank, as well as Asset Management, and we will radically restructure the Investment Bank, strengthen capital, and accelerate our cost transformation. We believe these actions will lead Credit Suisse to a more stable performance and generate lasting value for our shareholders.

(Emphasis added).

124. The 3Q22 Media Release further stated, in relevant part:

> Credit Suisse's performance in the third quarter of 2022 continued to be challenged by the current economic and market environment. ***The combination of the geopolitical situation as well as the significant monetary tightening by major central banks worldwide in response to the continued and significant increase in***

> ***inflation have resulted in continued heightened market volatility, weak customer flows and ongoing client deleveraging***.
>
> * * *
>
> We reported a net loss attributable to shareholders of CHF 4.0 bn, compared to net income attributable to shareholders of CHF 434 mn in 3Q21. Our reported net loss attributable to shareholders included an impairment of deferred tax assets related to our strategic review of CHF 3.7 bn. ***The challenging market conditions in 3Q22 were the main driver of the decline in Group AuM which stood at CHF 1.4 trn, down CHF 53 bn from CHF 1.45 trn at the end of 2Q22. This included Group net asset outflows of CHF 12.9 bn in 3Q22, compared to NNA of CHF 5.6 bn in 3Q21.***
>
> * * *
>
> ***[D]uring the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced a significant level of deposit and assets under management outflows. While these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters through, among other things, accessing capital markets after October 27 and executing the strategic initiatives we announce today***. We would note that the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the Group.

(Emphasis added).

125. The statements contained in ¶¶123-24 were materially false and/or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat I*, 2024 WL 4252502, at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of

information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* Additionally, the statements contained in ¶¶123-24 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized"; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022

126. On October 27, 2022, the Company also issued its earnings release announcing financial results for the third quarter of 2022 (the "3Q22 Earnings Release") for the period ended, September 30, 2022, which it filed with the SEC as an exhibit to a Form 6-K the same day. The 3Q22 Earnings Release stated, in relevant part, as follows:

> **Liquidity issues in October 2022**
> ***During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits. These outflows have since stabilized to much lower levels but have not yet reversed.*** As is normal practice, we also limited our access to the capital markets in the period immediately preceding our upcoming strategy announcements. ***While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entitylevel regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times.*** The Group's average daily LCR for the month of October through October 25 was 154%, with lower spot rates over this period that remained below this average through that date. ***Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required***.

These circumstances have exacerbated the risks we described under "Liquidity Risk" in our Risk Factors contained in our 2021 Annual Report.

**Outflows in assets under management in October 2022**
***During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced client asset outflows at levels that substantially exceeded the rates incurred in 3Q22.*** These asset outflows primarily impacted our Wealth Management and Swiss Bank divisions. ***These outflows have reduced significantly since mid-October but have not yet reversed.*** It is premature to estimate the impact on net new asset flows for 4Q22 but, coupled with reductions in asset values due to adverse market movements in client portfolios in 3Q22, this reduction in assets under management may lead to decreased fee revenues for the Group, thereby leading to reduced profitability.

* * *

As of the end of 3Q22, assets under management of CHF 1,400.6 billion decreased CHF 53.3 billion compared to the end of 2Q22. The decrease was mainly driven by unfavorable market movements and net asset outflows of CHF 12.9 billion. Net asset outflows of CHF 12.9 billion in 3Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 6.4 billion in Wealth Management reflected mainly outflows across the Middle East, Asia Pacific and Swiss ultra-high-net-worth businesses, partially offset by inflows in the European businesses. Net asset outflows of CHF 4.2 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in index solutions, equities and fixed income, and alternative investments, primarily related to outflows in credit, partially offset by inflows from investments and partnerships, primarily related to an emerging markets joint venture. Net asset outflows of CHF 1.5 billion in Swiss Bank reflected outflows in the private clients business, partially offset by inflows in institutional clients business.

(Emphasis added).

127. The statements contained in ¶126 were materially false and/or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,'

[which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat I*, 2024 WL 4252502, at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* In addition, the statements contained in ¶126 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" or "reduced significantly since mid-October"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022..

~~67.~~128. Also on October 27, 2022, Credit Suisse held a conference call with analysts and investors to discuss the Company's third quarter 2022 results. During the conference call, Defendant Joshi began by stating, in relevant part:

> As you all know, challenging conditions continue during the third quarter with heightened market volatility, weak customer flows, and ongoing client deleveraging. And our financial performance reflects these challenges . . . . I would like to provide some additional context and commentary on asset flows at the start of the fourth quarter. ***We did see a significant level of deposit in AUM outflows during the first two weeks of October. Whilst these outflows have stabilized since this period, they have not yet reversed. We have plans to address these matters after 27th of October through, among other things, accessing capital markets and***

> ***executing the strategic initiatives we have announced today. We would note that the execution of these measures is also expected to generate liquidity and reduce the funding requirements of the group.***

(Emphasis added.)

~~68.~~129. When questioned by an analyst on the call regarding "what drove" the customer outflows, Defendant Joshi responded:

> You know, as you know, the negative social media news around our name at the beginning of October, you know, did lead to outflows, you know, across our franchise. You know, it's something that we're looking to address today through the strategic announcements that we're making, including the 4 billion capital raise and ensuring that, you know, we're well capitalized through this transformation period, while we make the transformational announcements and restructuring across our investment bank and other business areas.

(Emphasis added).

~~69.~~130. When questioned by another analyst on the call regarding "what actually happened during the quarter" regarding the outflows in order "for us to be able to assess . . . how to look at them going forward," Defendant Körner responded:

> So, if we look at the wealth management situation, you've seen the outflows of 6.4 billion for the quarter. And you rightly put it, which you then see reflected in the transaction-based income line as well, our wealth management business is very strong, as you know, in APAC and emerging markets. That has impacted that clearly, as we said. ***If you look at the 6.4 billion, it's a combination in the third quarter of, you know, deleveraging and derisking, if you want to. So, about 3 billion comes from deleveraging and other like 2 billion is proactive, call it derisking, and then some additional deposit outflows. I think that's the right way to think about that one.***

(Emphasis added.)

~~70.~~131. When questioned by another analyst on the call regarding whether Defendants "could give us a sense of scale of a similar run rate to" the outflows seen in the third quarter of 2022, Defendant Körner responded:

> What we have seen – and thanks for the question, what we have seen, particularly at the beginning of October, certainly, a heightened level of outflows, which was very much based on what you have seen in the media and the press rumors. ***And let me say here very clearly, to the largest extent possible, factually incorrect rumors. But, obviously, that, you know, the overall situation that has come in and down very significantly in the last couple of weeks, actually.***

(Emphasis added.)

132. The statements contained in ¶¶128-31 were materially false and/or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat I*, 2024 WL 4252502, at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* In addition, the statements contained in ¶¶128-31 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual

customer and/or asset outflows that had not "stabilized" and were not chiefly the result of "deleveraging" and "derisking"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

**E. October 31, 2022**

133. On October 31, 2022, Defendant Körner was interviewed on *Bloomberg TV*. During the interview, when asked if he was expecting outflows to "reverse," Körner responded that ***outflows had* "*clearly stabilized*."**

134. The statements contained in ¶133 were materially false and/or misleading because, according to this Court, "[s]aying that [a situation] has 'clearly stabilized' suggests that there is no doubt [it is not getting any worse]. However, only five days after this interview, in its Third Quarter Report, Credit Suisse would reveal that 'stabilized' did not mean 'it is not getting any worse;' rather, it meant 'the adverse developments are continuing but have slowed down'…Outflows had not stopped, it seems; the Bank was still experiencing a decrease to assets under management, just less of one that it had earlier in the month." *Diabat I*, 2024 WL 4252502, at *107. In addition, the statements contained in ¶133 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company was experiencing significant and unusual customer and/or asset outflows that had not "clearly stabilized."

**F. November 2, 2022**

135. On November 2, 2022, Credit Suisse filed its with the SEC its financial report for the third quarter of 2022 (the "3Q22 Quarterly Report"), on Form 6-K with the SEC, signed by Defendants Körner and Joshi. Attached to the Form 6-K was a "Report of Independent Registered Public Accounting Firm" addressed "to the Board of Directors and shareholders of for the period ended September 30, 2022. Credit Suisse disclosed in the 3Q22 Quarterly Report that:

71. The accompanying unaudited condensed consolidated financial statements of Credit Suisse Group AG" and signed by "PricewaterhouseCoopers AG." The letter stated, *inter alia*:

> We have reviewed the accompanying consolidated balance sheet of Credit Suisse (the Group AG and its subsidiaries (the "Group") as of September 30, 2022 . . . . Based on our reviews, we are not aware of any material modifications that should be made to the accompanying interim financial statements for them to be in conformity with ) are prepared in accordance with accounting principles generally accepted in the United States of America.
>
> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the US (US GAAP) and are stated in Swiss francs (CHF). These condensed consolidated balance sheet of the Group as of December 31, 2020 . . . . In our opinion, the information set forth in the accompanying financial statements should be read in conjunction with the consolidated balance sheet as of financial statements and notes thereto for the year ended December 31, 2021, is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived included in the Credit Suisse Annual Report 2021.

* * *

~~We conducted our review in accordance with the standards of the PCAOB.~~

136. The statements ~~referenced~~contained in ~~¶¶ 46-70~~¶135 were materially false and ~~misleading because Defendants~~ /or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat I*, 2024 WL 4252502, at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made ~~false and/or misleading~~ available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.*

137. The 3Q22 Quarterly Report further stated:

> In 3Q22, we reported net revenues of CHF 3,804 million, which decreased 30% compared to 3Q21, primarily reflecting lower net revenues in the Investment Bank and Wealth Management. The decrease in the Investment Bank was driven by significantly reduced capital markets revenues and lower equity and fixed income sales and trading revenues, reflecting challenging operating conditions and the Group's relative underperformance The decrease in Wealth Management mainly reflected lower transaction- and performance-based revenues, lower recurring commissions and fees and lower other revenues, partially offset by higher net interest income.

138. With regards to Outflows, the 3Q22 Quarterly Report stated:

> During the first two weeks of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time

deposits. ***These outflows have since stabilized to much lower levels but have not yet reversed.*** As is normal practice, we also limited our access to the capital markets in the period immediately preceding our strategy announcements. While these outflows have partially utilized liquidity buffers at the Group and legal entity level, and we have fallen below certain legal entity-level regulatory requirements, ***the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times***….Remediation plans have been prepared to reverse these outflows, including accessing the public and private markets following our announcements on October 27 together with certain asset disposals, including the transfer of a significant portion of SPG [Securitized Products Group] to an investor group led by Apollo, and other measures. We would note that the execution of the strategic measures that we have announced is also expected to generate liquidity and reduce the funding requirements of the Group. We also continue to have access to central bank funding sources if required.

* * *

**Outflows in assets under management in October 2022**

During the month of October 2022, following negative press and social media coverage based on incorrect rumors, Credit Suisse experienced client asset outflows at levels that substantially exceeded the rates incurred in 3Q22. These asset outflows primarily impacted our Wealth Management and Swiss Bank divisions. These outflows have reduced since mid-October but have not yet reversed. It is premature to estimate the impact on net new asset flows for 4Q22 but, coupled with reductions in asset values due to adverse market movements in client portfolios in 3Q22, this reduction in assets under management may lead to decreased fee revenues for the Group, thereby leading to reduced profitability.

139. The statements~~, as well as~~ contained in ¶¶137-38 were materially false and/or misleading because they misrepresented and failed to disclose ~~material~~ adverse facts ~~about~~ pertaining to the Company's business, operations, and ~~compliance policies.~~ prospects, which were known to Defendants or recklessly disregarded by them. Specifically, ~~Defendants made false and/or misleading statements and/or failed to disclose that:~~ (i) the ~~sharp increase in customer outflows that Credit Suisse began~~Company was experiencing ~~in October 2022 remained ongoing;~~significant and unusual customer and/or asset outflows that had not "stabilized"; (ii) ~~accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and~~ the Company did not maintain a "sufficient" liquidity pool and its liquidity and funding

profile, policy, and/or risk and compliance failures on liquidity and its ability to retain client funds; (iii) the Company maintained parameters were not "conservative" and were materially deficient disclosure controlsat all times; and procedures, and(iii) there wereexisted material weaknesses in the Company's internal controls over financial reporting; (iv) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; (v) contrary to Defendants' representations, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

72.140. The 3Q22 Quarterly Report also stated: "Credit Suisse AG (Bank parent company)'s Swiss CET1 ratio decreased from 11.4% as of 2Q22 to 9.7% as of the end of 3Q22, primarily driven by estimated participation impairments as a result of the comprehensive strategic review announced on October 27, 2022, net losses and an adverse foreign exchange impact, partially offset by a capital repatriation from a UK participation." Additionally, Credit Suisse failed to implement meaningful changes to its risk management and/or control governance procedures and/or policies, which were severely lacking throughout and prior to the Class Period; and (vi) as a result, the Company's public had announced on October 27, 2022, its intention to raise approximately CHF 4 billion in capital. The 3Q22 Quarterly Report stated, after this capital raise: "the Bank parent company's CET1 ratio is estimated to increase by approximately 130-140 basis points on a pro-forma basis to 11.0-11.1%." These statements were materially false and misleading at all relevant times.or misleading, or omitted information necessary to make them not misleading, because, as noted in the PInC Report, CS AG's CET1 ratio was disclosed in a misleading way that allowed Credit Suisse to maintain the appearance of sufficient capitalization. Without the effects of the regulatory filter, CS AG's CET1 ratio would have fallen to 4.9% (*see* Birchler Report at 12)—almost half of the 9.28% requirement. This figure severely calls into question Credit Suisse's

ability to access sufficient CET1 capital to withstand further capital outflows, which, by its own admission, it was continuing to experience. The misleading nature of these statements is confirmed by UBS's later statements that Credit Suisse had "in fact been undercapitalized for a long time" and that "the collapse of Credit Suisse was driven by years of … reliance on substantial regulatory concessions."

## ~~VI.~~ NOVEMBER 23, 2022~~The Truth Begins to Emerge~~

**G.**

141. On November 23, 2022, Credit Suisse issued a media release announcing its preliminary financial results for the fourth quarter of 2022~~,~~ (the "Preliminary 4Q22 Media Release"), which it filed with the SEC on a Form 6-K the same day~~, announcing, *inter alia*,~~. The Preliminary 4Q22 Media Release stated, in relevant part, as follows:

> In its Outlook statement on October 27, 2022, the bank highlighted that ~~customers~~the challenging economic and market environment has had ~~withdrawn~~an adverse impact on client activity across its divisions. In particular, the Investment Bank has been impacted by the substantial industry-wide slowdown in capital markets and reduced activity in the Sales & Trading businesses, exacerbating normal seasonal declines, and the Group's relative underperformance. In addition, client activity remains subdued in the Wealth Management and Swiss Bank divisions, and the bank expects these market conditions to continue in the coming months.
>
> As previously disclosed, ***Credit Suisse began experiencing deposit and net asset outflows in the first two weeks of October 2022 at levels that substantially exceeded the rates incurred in the third quarter of 2022. At the Group level, as of November 11, 2022, net asset outflows were approximately ~~10~~6% of ~~all~~ assets under management ~~as of~~at the end of the third quarter of 2022~~, and that the Company~~. In Wealth Management, these outflows have reduced substantially from the elevated levels of the first two weeks of October 2022 although have not yet reversed and were approximately 10% of assets under management at the end of the third quarter of 2022. In the Swiss Bank, these client balances have stabilized and were approximately 1% of assets under management at the end of the third quarter of 2022.***
>
> ***As announced on October 27, 2022, these outflows have led the bank to partially utilize liquidity buffers at the Group and legal entity level, and while the bank has***

***fallen below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level have been maintained at all times.***

***Credit Suisse is executing on its strategic commitments to strengthen its balance sheet and reduce risk, engaging clients proactively and accessing the public and private markets***, including the recent issuance of approximately USD 5 billion through two bond sales, which saw strong investor demand. Key steps taken include the recently announced sale of a significant part of Credit Suisse's Securitized Products Group (SPG) and other related financing businesses to Apollo Global Management….***These actions and other deleveraging measures including, but not limited to, in the non-core businesses, are expected to*** ~~incur a substantial~~ ***strengthen liquidity ratios and reduce the funding requirements of the Group.***

* * *

***Strategic actions taken to significantly reduce the Group's risk profile are expected to be reflected in near-term financial results….Lower deposits and assets under management are expected to lead to reduced net interest income and recurring commissions and fees; this is likely to lead to a loss*** ~~of approximately CHF 1.5 billion~~***for Wealth Management in the fourth quarter of 2022.*** ~~The Company also issued a media release~~***Together with the*** ~~same day announcing shareholder approval of proposed capital increases~~***adverse revenue impact from the previously disclosed exit from the non-core businesses and exposures, and as previously announced on October 27, 2022***~~. In response, *Reuters* published an article entitled "~~***, Credit Suisse*** ~~flags hefty~~ ***would expect the Investment Bank and the Group to report a substantial loss*** ~~as rich clients pull out", reporting that "shareholders and analysts were disturbed by the bank's sobering assessment of the scale of its problems, as well as the pace at which rich clients pulled out savings and investments."~~
~~On this news, Credit Suisse's Series DD33 AT1 Bond price fell $1.408, or 2.45%, to close at $56.00 on~~ ***before taxes in the fourth quarter 2022, of up to CHF ~1.5 billion for the Group….***

***The Group continues to execute on the decisive strategic actions detailed on October 27, 2022, to create a simpler, more focused and more stable bank – a new Credit Suisse.***

(Emphasis added).

142. The statements contained in ¶141 were materially false and/or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat I*, 2024 WL 4252502, at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* In addition, the statements contained in ¶141 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

**H. December 1, 2022**

~~73.~~ On~~November 23, 2022~~; ~~Credit Suisse's Series BZ62 AT1 Bond price fell $2.235, or 2.87%, to close at $75.693 on November 23, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $1.872, or 3.17%, to close at $57.162 on November 23, 2022. Despite these declines in Credit Suisse's AT1 Bond prices, the Company's AT1 Bonds continued trading at artificially~~

inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding, *inter alia*, the significance and impact of customer and asset outflows the Company was experiencing.

74.143. For example, on December 1, 2022, Credit Suisse's Chairman, Defendant Lehmann, stated in an interview streamed online with *Financial Times* that customer outflows had not only "completely flattened out," but had, in fact, "partially reversed."

75.144. That same day, *Financial Times* published an article entitled "Credit Suisse chair says outflows have reversed since 'social media storm.'" –The article, which quoted Defendant Lehmann, stated, in relevant part:

> The chair of Credit Suisse said clients had started to return to the bank after pulling tens of billions of dollars of assets following a "social media storm" at the start of October.
>
> Axel Lehmann said withdrawals had flattened across the group and had started to reverse in the Swiss domestic business, but the scale of the outflows had caught the Swiss lender off-guard.
>
> "It ***was*** a real storm," said Lehmann at the Financial Times' Global Banking Summit on Thursday. "It ***was*** a storm in the retail and partially in the wealth management segment, in particular in Asia, ***where we had really massive outflows for two to three weeks.***
>
> "The good part of the sad story is we had very few clients leaving. They are still with us, they still continue to do business with us."
>
> He said clients had been taking up to a third of the assets they held with the bank and transferring them to rivals. "I have anecdotes from clients and I know that the money will certainly come back over time."
>
> Credit Suisse revealed last month that rich clients had withdrawn about SFr63.5bn ($67.4bn) since the start of October — equivalent to 10 per cent of wealth management assets — following a spate of social media rumours about its financial health.

Spreads on the group's credit default swaps surged in early October, which indicated investors were becoming increasingly bearish on the group, after a stream of rumours were posted on social media and web forums about the bank's imminent collapse.

* * *

Lehmann and Körner, who worked as senior executives at UBS, have since set about devising a radical plan for Credit Suisse that will involve the bank cutting SFr2.5bn of costs, jettisoning 9,000 jobs and retreating from investment banking over the next three years.

* * *

Lehmann added that the company had several "offers on the table" from companies that were willing to back the new venture and was in discussions with the US Federal Reserve over its balance sheet, structure and governance.

Credit Suisse had previously said an unnamed investor had pledged $500mn.

(Emphasis added).

145. The statements contained in ¶¶143-44 were materially false and/or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat I*, 2024 WL 4252502, at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were

less than reliable." *Id.* In addition, the statements contained in ¶¶143-44 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "flattened"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022. .

**I. December 2, 2022**

76.146. On December 2, 2022, in an interview with *Bloomberg Television*, Lehmann reiterated his statements from the previous day, reassuring investors that as of November 11, 2022, customer outflows had "basically stopped". ." In the same interview, Lehmann characterized the October increase in customer outflows as simply a "two-to-three-week event."

77. OnAlso on December 82, 2022, Credit Suisse issued a press release "announce[ing] [a] successful rights offering." The press release quoted Defendant Ulner, stating, in relevant part:

> Over recent weeks we have made important strides towards implementing the strategic actions outlined at our October 27 strategic review. The successful completion of the capital increase is a key milestone for the new Credit Suisse. It will allow us to further support our strategic priorities from a position of capital strength and create a simpler, more stable and more focused bank built around client needs, and generating value for shareholders.

78.147. In response to this announcement, several market analysts published articles reporting on the impact of the successful rights offering. For example, *Bloomberg* published an article entitled "Credit Suisse Offering Set to Sail ThroughGains Most Since 2020 After Wild

Ride," which stated,Asset Outflows Halted" quoting Lehmann's assurances regarding the Company's financial stability. The article stated in relevant part:

> Banks handling Credit Suisse Group AG's rights offer expect nearly all of those rights to be exercised, spelling success for a capital raise that looked shaky as recently as last week.
>
> Lenders arranging the deal currently expect investors to take up well above 90% of the stock on offer, the people said, asking not to be identified because the information is private. The banks don't currently anticipate needing to hold a sizeable amount of Credit Suisse stock on their books afterwards, according to the people.
>
> Any remaining amount is expected to be small enough that banks will be able to slowly sell the shares in the market, the people said. If needed, they will also be able to lean on sub underwriters, major investors that have agreed to snap up a certain amount of unsold stock.
>
> * * *
>
> The bank is raising 4 billion francs in two steps to shore up its balance sheet as it seeks to put to rest concerns about its financial position after billions in losses over the past two years, recent client defections and asset outflows. The Saudi National Bank was an anchor investor in the capital raise, committing to invest about 1.5 billion francs, mostly through a private placement last month.
>
> * * *
>
> Credit Suisse needs the funds to help pay for the exit of large parts of its investment bank and 9,000 job cuts. The bank has warned that it will have a fifth straight quarter of losses as it reels from years of scandals and missteps that have eroded investor confidence and sent clients fleeing.
>
> * * *
>
> A successful rights offer spells the end of a wild ride for the troubled Swiss bank's stock over the past weeks, when at one point a 13-day losing streak took the shares down to near the price of what had supposed to be a heavily discounted offer. ***Comments by*** AG Chairman Axel Lehmann ***on Friday that the bank had stopped massive outflows provided some relief, only for the stock to resume its downward slide on Tuesday***.
>
> * * *

***Investors late last week took comfort from comments by Chairman Axel Lehmann that***said the ***main indicators of the bank's financial stability were strong*** and that its level of liquidity ***was***is improving ***after declines in recent weeks. The Zurich based bank's liquidity coverage ratio, which measures the quantity of easily-sold assets available to meet obligations, is currently at 140%, Lehmann said***.

(Emphasesafter declines in recent weeks.

* * *

***In October, outflows of assets and the subsequent use of liquidity buffers had caused the bank to fall below certain regulatory levels at some of its entities. Credit Suisse saw 84 billion francs ($89.7 billion) of client asset withdrawals in the first few weeks of the fourth quarter amid persistent rumors about the bank's stability.*** Credit spreads and the cost to insure the bank's debt against

default have surged to above 400 basis points, far above peers. ***The outflows have "basically stopped," Lehmann said.***

* * *

Credit Suisse shares slumped to record lows in recent days and approached the price

of the rights offer that's part of the bank's $4 billion capital increase, signaling

investor skepticism.

***Yet the stock rebounded after Lehmann's comments on Friday, helping to arrest the losing streak.*** It traded up as much as 6.73% to 2.86 Swiss francs in Zurich.

(Emphasis added.))

148. The statements referencedcontained in ¶¶ 74-77146-47 were materially false and/or misleading because Defendants made , according to this Court, "[w]hile it may be true that the Company's level of liquidity [was] improving after the declines in recent weeks, to say that the main indicators of the bank's financial stability were strong while Credit Suisse was in the midst of a liquidity crisis could well be considered a misrepresentation of existing facts." *Diabat I*, 2024 WL 4252502, at *115 (citations omitted). Also, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false and/or misleadingimpression of the company's risks and holdings." *Id.* at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.*

149. Following Defendant Lehmann's statements, as well as Credit Suisse's AT1 bond prices remained climbed 6.25% for H3698DDD33, 3.57% for H3698DBZ62, and 7.19% for H3698DCV40 on December 2, 2022.

150. The statements contained in ¶¶146-47 were also materially false and/or misleading because they misrepresented and failed to disclose material adverse facts aboutpertaining to the Company's business, operations, and compliance policies. prospects, which were known to

Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the sharp increase in customer outflows that Credit Suisse beganCompany was experiencing in October 2022 remained ongoing;significant and unusual customer and/or asset outflows which had not "basically stopped"; (ii) accordingly, Credit Suisse had downplayed the impact of the Company's recent series of quarterly losses and the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk and compliance failures on liquidity and its ability to retain client funds; (iii) the Company maintainedparameters, were materially deficient disclosure controlsat all time; and procedures, and(iii) there wereexisted material weaknesses in the Company's internal controls over financial reporting; (iv) as a result, Credit Suisse had overstated the Company's financial position and/or prospects; (v) contrary to Defendants' representations, , of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022."

**J. December 5, 2022**

79.151. On December 5, 2022, Defendant Lehmann was interviewed on Swiss broadcaster *SRF*. *Reuters* reported on the interview in an article published that day titled, "Credit Suisse failed to implement meaningful changes to its risk management and/or control governance procedures and/or policies, which were severely lacking throughout and prior to the Class Period; and (vi) as a result, the Company's public statements were materially false and misleading at all relevant times.business is stable, chairman tells broadcaster SRF."

**VII. The Truth Fully Emerges**

80. On February 9, 2023, Credit Suisse issued a press release announcing its 2022 financial results and which revealed large customer outflows through year end 2022. The press release reported customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

81.152. On February 20, 2023, during post-market hours, *Reuters* published an article entitled "Exclusive Credit Suisse chairman's comments draw scrutiny from financial watchdog- sources". The The article stated, in relevant part:

> The Credit Suisse (CSGN.S) is "***definitely stable,"*** Chairman Axel Lehmann told Swiss
> broadcaster SRF on Monday, adding that ***the embattled bank had seen a stabilisation in the outflows of client funds***.
>
> * * *
>
> "When you have a capital raising, which has a big dilution effect, that creates a lot
> of uncertainty and that leads to high volatility," Lehmann said in the interview.
>
> "***But I believe the situation has calmed***. ***The business is definitely stable***," he said.
> Still, he expected 2023 and 2024 to be years of transformation for the bank as it
> seeks to stabilise after years of mishaps.
>
> "It's -true, the whole group will not be profitable next year," Lehmann said. "What
> is important is the progress we make.
>
> "What is the earnings power of the Swiss business, wealth management, asset

management and the part of the investment bank we retain, and then
from 2024
produce positive numbers."

(Emphasis added).

153. The statements contained in ¶152 were materially false and/or misleading because, according to this Court, "Lehmann stated that Credit Suisse was 'definitely stable' at a time when he was aware or should have been aware of contrary information – the information about the Company's financial ~~regulator is reviewing remarks~~condition contained in many of the preceding challenged statements, or that would be disclosed in short order. [Thus,] Plaintiff has adequately pleaded that this statement misrepresents existing facts and would have misled a reasonable investor." *Diabat I*, 2024 WL 4252502, at *116 (citations omitted). Also, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Id.* at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* In addition, the statements contained in ¶152 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the

Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by Credit Suisse Group [] Chairman Axel Lehmann about outflows from the lender having them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "stabilized in early "; and (ii) there existed material weaknesses in the Company's internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022 and October 20, 2022.

**K. February 9, 2023**

82.154. On February 9, 2023, Credit Suisse issued its earnings release announcing financial results for the fourth quarter and fiscal year of 2022 (the "FY22 Earnings Release") for the period and year ended December, two people with knowledge of the matter have told Reuters. 31, 2022, which it filed with the SEC on a Form 6-K the same day. The FY22 Earnings Release stated, in relevant part, as follows:

> Finma is seeking to establish the extent to which Lehmann, and other Credit Suisse representatives, were aware that clients were still withdrawing funds when he said in media interviews that outflows had stopped, said the two people, who asked to remain anonymous because the matter was not public.
>
> The development sent the embattled bank's shares down as much as 5% on Tuesday. The bank's stock, at roughly 2.62 Swiss francs, is around its lowest in decades. The cost of insuring exposure to the bank also rose following the news.
>
> A spokesperson for Finma declined to comment. A Credit Suisse spokesperson said the bank did "not comment on speculation." Lehmann did not reply to an email seeking comment.
>
> Lehmann told the Financial Times in an interview streamed online on Dec. 1 that after strong outflows in October, they had "completely flattened out" and "partially reversed".
>
> The following day he told Bloomberg Television that outflows had "basically stopped."
>
> Credit Suisse shares rose 9.3% on Dec. 2.

~~The regulator is reviewing whether Lehmann's statements were potentially misleading, said the people, with one adding that Lehmann may not have been briefed correctly before he made those comments.~~

~~Luzerner Kantonalbank described the inquiry, although not a formal investigation, as another blow for Credit Suisse.~~

~~"Was Axel Lehmann insufficiently informed or did he consciously or did he deliberately gloss over the matter?" said analyst Daniel Bosshard.~~

~~"Whatever the case, this is yet another inglorious chapter in the history of Credit Suisse."~~

~~Credit Suisse said on Feb. 9, when it reported its annual results, that clients withdrew 110.5 billion Swiss francs ($119.65 billion) from Switzerland's second-largest bank in the last three months of 2022.~~

~~Those outflows exceeded market expectations and rounded off a weak set of results that led to the stock falling about 15% on the day.~~

~~In response to a question on the distribution of withdrawals in the period, Chief Executive Ulrich Koerner told analysts that day that more than 85% of the outflows in the last quarter were in October and November, according to a transcript of the call.~~

~~That led analysts at Citigroup to conclude in a note to clients that management effectively indicated 15% of the outflows happened in December. Finma's scrutiny adds to the challenges faced by Credit Suisse, which has been rocked by scandals in recent years. The lender has embarked on a sweeping overhaul to restore profitability by exiting certain investment banking activities and focusing on managing money for the wealthy. In early October a social media storm triggered by an unsubstantiated report about the bank's financial health prompted wealthy customers to move deposits elsewhere. The bank said at the time it was pushing ahead with its restructuring and remained close to its clients.~~

~~Responding to a Reuters request for comment on the Feb. 9 results, Finma said in a statement that while Credit Suisse's~~ **Liquidity issues in 4Q22**

As previously disclosed, during early 4Q22, Credit Suisse began experiencing

significantly higher withdrawals of cash deposits as well as nonrenewal of maturing

time deposits. However, ***as the quarter progressed, these outflows stabilized to***

***much lower levels but had not yet reversed by year end, and customer deposits declined by CHF 138 billion in 4Q22.*** As is normal practice, we also limited our access to the capital markets in the period immediately preceding the strategy announcements we made on October 27, 2022. ***While these outflows led us to partially utilize*** ***liquidity buffers*** ~~had a stablizing effect,~~***at*** ***the*** ~~regulator “monitors banks very closely during such situations,” referring to~~ ***Group and legal entity level, and we fell below certain legal entity-level regulatory requirements,*** ***the*** ***core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level were maintained at all times.*** The Group's three-month average daily LCR was 144% as of the end of 4Q22, improved from lower levels earlier in the quarter.

Remediation plans were prepared, initiated and implemented to mitigate these outflows, including accessing the public and private markets. We issued over USD 5 billion through three bond sales in November and December 2022, which ~~“were indeed~~saw strong investor demand, and an additional CHF 4 billion through our capital increases. Other steps also include certain asset disposals, including the announced sale of a significant” portion of SPG and other related financing businesses. ***We would note that the execution of these actions and other deleveraging measures, including, but not limited to, in the non-core businesses, is also expected to***

***strengthen liquidity ratios and, over time, reduce the funding requirements of the Group.*** As is common for banks, we also continue to have access to central bank funding sources if required.

* * *

**Outflows in assets under management in 4Q22**

As previously disclosed, Credit Suisse began experiencing deposit and net asset outflows in early 4Q22 at levels that substantially exceeded the rates incurred in 3Q22. At the Group level, net asset outflows in 4Q22 were approximately 8% of assets under management as of the end of 3Q22, with approximately two-thirds of these net asset outflows in the quarter concentrated in October 2022. In ***Wealth Management, these outflows in*** ~~the~~***4Q22 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22***, but had not reversed, and represented approximately 15% of assets under management reported as of the end of 3Q22. ***In the Swiss Bank, these outflows in 4Q22 broadly stabilized after the elevated levels of early 4Q22***, and represented approximately 2% of assets under management reported as of the end of 3Q22. In Asset Management, these outflows in 4Q22 represented 3% of assets under management reported as of the end of 3Q22.

* * *

As of the end of 4Q22, assets under management of CHF 1,293.6 billion decreased

As of the end of 4Q22, assets under management of CHF 1,293.6 billion decreased

CHF 107.0 billion compared to the end of 3Q22. ***The decrease was mainly driven by net asset outflows of CHF 110.5 billion and foreign exchange-related movements, partially offset by favorable market movements of CHF 27.6 billion***.

Net asset outflows of CHF 110.5 billion in 4Q22 mainly reflected outflows across the following businesses. Net asset outflows of CHF 92.7 billion in Wealth Management were driven by outflows across all regions. ***Approximately two-thirds of the outflows were concentrated in October 2022. The outflows in 4Q22 had reduced substantially in the rest of the quarter from the elevated levels of early 4Q22 but had not reversed.*** Net asset outflows of CHF 11.7 billion in Asset Management were driven by outflows from traditional investments, primarily related to outflows in multi-asset solutions, index solutions and fixed income, from investments and partnerships, primarily related to an emerging markets joint venture, and from alternative investments, primarily related to outflows in credit.

Net asset outflows of CHF 8.3 billion in Swiss Bank mainly reflected outflows in

the private clients business.

(Emphasis added).

155. The statements contained in ¶154 were materially false and/or misleading because, according to this Court, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Diabat I*, 2024 WL 4252502, at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* In addition, the statements contained in ¶154 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i)the Company was experiencing significant and unusual customer and/or asset outflows that had not "stabilized" or "reduced substantially in the rest of the quarter from the elevated levels of early 4Q22"; (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's internal controls

over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022, October 20, 2022, and January 17, 2023.

156. On February 9, 2023, Credit Suisse held a conference call with analysts and investors to discuss the Company's fourth quarter. It did not elaborate and fiscal year 2022 earnings (the "FY21 Earnings Conference") for the period ended December 31, 2023. During the FY22 Earnings Conference, Defendant Körner stated, in relevant part:

> 2022 was an extremely challenging year for Credit Suisse with the group posting a net loss of CHF 7.3 billion. ***Nonetheless, it was also a year which marked the beginning of the important and necessary transformation for our organization. On October 27, we presented a targeted plan to create the new Credit Suisse, a simpler, more focused bank built around client needs. And today, we reaffirm all of the targets we announced in October.***
>
> * * *
>
> ***We have a robust balance sheet, and we are executing on our transformation from a position of strength.*** We reported a year-end CET1 ratio of 14.1% and a
>
> Tier 1 leverage ratio of 7.7%. ***Our liquidity position also improved following the impact of the events of October.*** The average liquidity coverage ratio was at 144% at the end of the fourth quarter with further.
>
> On improvements this news, year.
>
> * * *
>
> Now let me be clear, our teams continue to work relentlessly on serving our clients. Since October, we have proactively engaged with more than 10,000 wealth management clients and over 50,000 clients in the Swiss bank. ***As previously mentioned, we are seeing the first positive signs, comprehensive global initiatives to regain deposits, as well as assets under management. In January, we saw deposit inflows at group level in Wealth Management and the APAC, as well as net new assets in APAC and to Swiss Bank. Importantly, clients remain overwhelmingly supportive, and we remain very thankful for that.*** To remind you of the strength of our Wealth Management business, we are the No. 2 wealth manager outside the U.S. with a deep client franchise balance between ultra and high net risk clients.
>
> * * *

***We are building a unified culture from the top of the organization with a strong focus on risk management, collaboration, and accountability. We remain disciplined on strategic execution, strengthening and reallocating capital delivering our cost ambitions, and most importantly, supporting our clients globally. As I mentioned, we have acted decisively to address the impact of the outflows experienced in the fourth quarter, and we have seen deposit inflows at the group level, in wealth management and APAC, as well as net new assets in APAC and the Swiss Bank. We are also, making progress with the carve-out of CS First Boston and are creating a more focused markets business that will deliver innovative solutions and products for our Wealth Management and our institutional clients. In short, we are determined to make this transformation a success, restore trust with all stakeholders and ultimately create sustainable value for our shareholders.***

(Emphasis added).

157. Defendant Joshi then stated, in relevant part:

***The group took clear strides forward despite the challenging fourth quarter. We delivered the strategy update alongside our third quarter earnings and started immediately on implementation.*** We made good progress reducing noncore-related exposures on cost reduction measures and on balance sheet reductions relating to the Capital Release Unit. ***We proactively managed our liquidity position following the outflows in the fourth quarter. We executed a successful series of capital and funding measures, including raising around CHF 4 billion in equity and*** completing around CHF 6 billion of debt issuance in the fourth quarter. We

***strengthened our CET1 ratio to 14.1%, and we remain resolutely focused on execution and on supporting our clients. As you can see from this morning's announcement regarding the acquisition of the Investment Banking business of M. Klein & Company and the completion of the first closing of our securitized products transaction with Apollo, we are executing rapidly on the strategy and were ahead of plan.***

* * *

I'll touch on the impact of the client asset outflows during the fourth quarter on

Slide 15. Our assets under management were impacted by significant net asset

outflows early in the quarter which affected both our revenues and our liquidity position for the fourth quarter. ***Approximately two-thirds of the net asset outflows in the fourth quarter occurred in October, and they reduced considerably in November and December….Since the start of the fourth quarter, we strengthened our balance sheet, including through the capital raises to set the group on a stronger trajectory.***

***We're now three months into our transformation journey and we saw the first signs of the benefits of these and other proactive initiatives in January with positive deposit inflows at the group level and specifically in wealth management. Net asset flows in the Swiss Bank were positive and the net asset outflows in wealth management in January were at a reduced level compared to December with net asset in flows in Asia Pacific.***

* * *

Moving on to our liquidity coverage ratio. ***Although the group's liquidity position*** was impacted by deposit outflows in the fourth quarter, our average liquidity ***coverage ratio at the end of December stood at 144%, well above the group's minimum regulatory requirements and comparing favorably with our peer group. This represents an improvement from the lower levels in the quarter and was a result of a series of proactive measures, including the capital raises, debt issuances, and deleveraging. We have continued to see the improvement in the ratio since the start of the year and were main focused on maintaining our LCR at a prudent level. The disciplined execution of our strategy, including our simplification program should lead to further liquidity improvements and more efficient liquidity management across the group.***

* * *

***To summarize, our financial performance for the fourth quarter reflects the decisive actions we have taken against a difficult market backdrop. Looking forward, we expect that the strategic actions taken to reduce the group's risk profile and the challenging market conditions will continue to be reflected in our*** financial results.

(Emphasis added).

158. When questioned by an analyst about the "commentary around being proactive on flaws and winning back some of the client money" and how [] you [are] going about winning back that business," Defendant Körner responded:

> So, as we are alluding to, and I'd like to reiterate that because it's really, I think, important for where we are now, where we are going throughout the year. ***So, this client outreach program, which I was talking about is really unprecedented. That is at least what the colleagues here in the firm tell me being here longer than 30 years. And I think it has shown, has developed very good momentum and hence, the figures I gave for January***…. So, what is the fact, and I think that is something which all my colleagues in the bank and myself felt in the many, many clients in the actions which we had nearly on a daily basis, ***I would say that the client support which we get from them is really overwhelming. And I mean this I'm saying, which is absolutely for me and my colleagues is absolutely fantastic. So, the clients, in other words, the clients want us to be successful, and that is something which we can feel and therefore, we are so, focused on delivery***.

(Emphasis added).

159. When questioned by an analyst about how the Company saw "flows, deposits, custody assets, [and] loans" "developing…over the next 12 months," Defendant Körner responded:

> So, I would say with respect to your Wealth Management question, what is important, that's why we gave these indications from January. ***The group overall, as I said, is positive on deposits, Wealth Management, globally, positive on deposits, Asia Pac, positive on deposits. And I'm reiterating that because as you are fully aware of, the deposits are these kind of assets.*** So, to say, which leave first and have the fungibility to reenter first. And I think that is important to bear in mind. As you immediately understand [], we do not give your business plan figures, but ***you can assume that in the best mention is a fair chunk of rewinning lost volumes lost business with our clients. And important to note here is as well that we hardly lost any client. I think that is also important that shows you something about what I said before in terms of the relationship which we may have with our clients.***

(Emphasis added).

160. When questioned by an analyst about outflows and the "split between November and December," as well as what management meant by a "reduced level" of outflows in January, Defendant Körner responded:

> [W]e said like two-thirds in October. ***If you look into October and November together, it's more than 85% and of the outflows stemming from these two months***, and that was exactly the reason…. ***With respect to your second question, net new assets, in particular, we said we are positive, which is very good because that's a very proactive region, growth region, we are positive in APAC with a good number for January also, in comparison to other years. We are positive in Switzerland, also, with a good number overall here. We are positive in a couple of smaller other geographies, but we are also, still having some outflows in other regions, and that's why we gave this guidance…. That's how you should read it. But again, as I said, in my eyes, the situation has completely changed from last year.***

(Emphasis added).

161. When questioned by an analyst about what amount of the "over 90 billion of outflows in Wealth Management…you see as a realistic number to come back" and "what clients are open to returning based upon what they see in terms of progression around your restructuring plan," Defendant Körner responded:

> ***So, to your concrete question, how much is coming back, I would like to know that as well, as you can imagine. As I said, the wealth management colleagues are pretty hopeful that we bring a fair part of the outflows back already in 2023. And the rest will come later. And as I said also, earlier, obviously, our target is to*** bring all and everything back and then go beyond that.

(Emphasis added).

162. The statements contained in ¶¶156-61 were materially false and/or misleading because, according to this Court, "some of Körner's statements about the Company's current situation – notably, that it had 'a robust balance sheet' and that it was 'executing on [its] transformation from a position of strength'…are contradicted by the then-existing financial distress at Credit Suisse." *Diabat I*, 2024 WL 4252502, at *123 (citations omitted). "Plaintiff has

alleged – and prior disclosures confirm – that the Defendants already knew that the Company was facing significant liquidity issues when they made these statements about the Company's business health." *Id.* Also, "the SEC questioning the Company repeatedly [starting with the SEC's initial Comment Letter in July 2022 through March 23] about its representations regarding [potential material weaknesses in its] ICFR suggests that, at the very least from October 20, 2022 – the date when the SEC first indicated that it was not accepting Credit Suisse's ~~Series DD33 AT1 Bond price fell \$~~explanations – regulatory questions about possible deficiencies in the Company's ICFR were more than 'routine,' [which], in turn, raises the question about whether failure to disclose that such questions were being asked left investors with a false impression of the company's risks and holdings." *Id.* at *134-36. That the adequacy of a failing Company's ICFR was being seriously questioned is something that could have significantly altered the 'total mix' of information made available, and could result in a reasonable investor concluding that the Company's representations about its overall financial health (*e.g.*, the Company's stability) were less than reliable." *Id.* In addition, the statements contained in ¶¶156-61 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was not "seeing positive signs" with respect to "regain[ing] deposits, as well as assets under management," and "the situation" had *not* "completely changed from last year, as Credit Suisse was experiencing significant and unusual customer and/or asset outflows; (ii) the Company did not experience "liquidity improvements" but instead did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (iii) there existed material weaknesses in the Company's

internal controls over financial reporting, of which the Company had been put on notice by SEC Comment Letters dated July 15, 2022, October 20, 2022, and January 17, 2023.

163. In this same FY22 Earnings Conference, Defendant Joshi also stated, "Our parent capital ratio was around 250 basis points higher compared to the end of September at 12.2.517, or 4.09%, to close at $58.978 on February 21, 2023;%." This statement was materially false or misleading or omitted facts necessary to make it not misleading because, as noted in the PInC Report, they were disclosed in a misleading way that allowed Credit Suisse to maintain the appearance of sufficient capitalization. Without the effects of the regulatory filter, CS AG's CET1 ratio was just 7.8%, 4.4% lower than reported and far below both Credit Suisse's Series BZ62 AT1 Bond price fell $3.616, or 4.67%, to close at $73.876stated target of 12% and the 10% required by regulators. The misleading nature of these statements is confirmed by UBS's later statements that Credit Suisse had "in fact been undercapitalized for a long time" and that "the collapse of Credit Suisse was driven by years of . . . reliance on substantial regulatory concessions."

83.164. Also on February 21, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.454, or 3.79%, to close at $62.214 on February 21, 2023.9, 2023, Defendant Körner was interviewed on *Bloomberg TV*. During the interview, Körner stated that Credit Suisse was "making really good progress" toward "creating a new Credit Suisse," it had a "clear plan," and was in "full execution" of it. Körner further stated with respect to outflows that they "***have reduced very significantly and we are seeing new money coming back in different parts of the firm." He said that "we have launched a very well organized client reachout…[that] has generated*** very positive momentum…[which] will travel with us in 2023." (Emphasis added). When asked if it was "still the plan…to be profitable for 2024 onwards," Körner responded: "That's absolutely the plan. The plan is unchanged."

165. The statements contained in ¶¶163-64 were materially false and/or misleading because, according to this Court, "Körner's claim that the Company's outflows 'have reduced very significantly,'…when read in context, could plausibly have misled a reasonable investor about the nature of the investment, as it makes the financial performance of the Company appear better than it actually was." *Diabat I*, 2024 WL 4252502, at *125 (citations omitted). "By this time, Credit Suisse had been hemorrhaging assets for months." *Id.* The statements contained in ¶¶163-64 were also materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was experiencing significant and unusual customer and/or asset outflows which had not "reduced very significantly.".

**L. March 14, 2023**

~~84.~~166. On March 14, 2023, during pre-market hours, Credit Suisse filed ~~the 2022~~ with the SEC its 2022 annual report (the "2022 Annual Report") on Form 20-F ~~with the SEC.~~ for the year ended December 31, 2022. The 2022 Annual Report was signed by Defendants Körner and Joshi, attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting. With respect to the Company's controls and procedures, the 2022 ~~20-F~~Annual Report stated, in relevant part:

> We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021
>
> Management has identified certain material weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, ***the Group's internal control over financial reporting was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report. Management has also accordingly concluded that our disclosure controls and procedures were not effective***.

The material weaknesses that have been identified relate to the failure to design and maintain an effective risk assessment process to identify and analyze the risk of material misstatements in its financial statements and the failure to design and maintain effective monitoring activities relating to (i) providing sufficient management oversight over the internal control evaluation process to support the Group's internal control objectives; (ii) involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives; and (iii) assessing and communicating the severity of deficiencies in a timely manner to those parties responsible for taking corrective action. These material weaknesses contributed to an additional material weakness, as management did not design and maintain effective controls over the classification and presentation of the consolidated statement of cash flows. This material weakness resulted in the revisions contained in our previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report.

Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. ***Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date***. ***While we are taking steps to address these material weaknesses, which could require us to expend significant resources to correct the material weaknesses or deficiencies, any gaps or deficiencies in our internal control over financing reporting may result in us being unable to provide required financial information in a timely and reliable manner and/or incorrectly reporting financial information, which could reduce confidence in our published information, impact access to capital markets, impact the trading price of our securities or subject us to potential regulatory investigations and sanctions. In addition, there can be no assurance that these measures will remediate the material weaknesses in our internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Any of the foregoing could materially and adversely affect our business, results of operations and financial condition***.

~~(Emphases added.)~~

(Emphases added.)

167. The 2022 Annual Report further stated:

For Credit Suisse, ***2022 was an important year that marked a decisive break from the past and the beginning of our journey to become a simpler, more focused bank built around the needs of our clients***. In October, we announced a clear strategy that builds on our core strengths and addresses current challenges, and we have since been executing it at pace. ***Our strategic, cultural and operational transformation aims to re-establish Credit Suisse as a solid, reliable and trusted partner with a strong value proposition for all our stakeholders***.

* * *

Culturally, we want to build on our core values of entrepreneurship, inclusion, meritocracy, partnership, accountability, client focus and trust – values that have shaped the bank since 1856 when it was founded by entrepreneur Alfred Escher. ***As part of our cultural transformation, we want to ensure that our people act as prudent and professional risk managers at all times, are part of a diverse and inclusive environment and always feel confident to speak up. As one of the milestones in this respect, all our people, including ourselves, completed a dedicated risk culture training during 2022.***

* * *

Regarding legacy issues, we have also taken decisive action, as demonstrated by the settlements we have reached relating to our residential mortgage-backed securities, foreign exchange and French legacy cases. ***Our regulatory remediation program is advancing, and we have rolled out a comprehensive plan to strengthen and improve risk management across the Group, including putting additional measures and safeguards in place.***

* * *

***Our liquidity and funding profile reflects our strategy and risk appetite and is driven by business activity levels and the overall operating environment. We continuously adapt our liquidity and funding profile to reflect changes in our business strategy and regulatory developments.***

* * *

***Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse. To address short-term liquidity stress, we maintain a liquidity pool, as described below, that covers unexpected outflows in the event of severe market and idiosyncratic stress. Our liquidity risk parameters reflect various liquidity stress assumptions. We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit.***

(Emphasis added).

168. The statements contained in ¶¶166-67 were materially false and/or misleading because, according to this Court, "it paints too rosy a picture of Credit Suisse's financial condition just days before it would enter into a merger designed to stave off its collapse…[i]t is simply not plausible to infer, just six days before the Bank collapsed, Credit Suisse's management was not aware of the scope of the Company's parlous financial condition. *Diabat I*, 2024 WL 4252502, at *127. Also, the "Company's statements about is liquidity gave comfort to investors that it was managing its liquidity issues – and perhaps could cause a reasonable investor to make an overly optimistic assessment of the Company's current state of affairs. Additionally, the disclosure of any merger discussions that were then under way was necessary to render statements that were made about the Company's financial posture not misleading. *Id.* Also, "the fact that material weaknesses had been identified (and were disclosed to have existed at least during the previous fiscal year) casts a pall over the hopeful characterization of the Bank's financial picture." *Id.* The statements contained in ¶¶166-67 were also materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company was *not* "developing a remediation plan to address the material weaknesses" it belatedly identified after engaging in a lengthy comment letter process with the SEC, but was instead presently engaged in discussions with Swiss authorities regarding the sale or liquidation of Credit Suisse; and (ii) the Company did not maintain an adequate liquidity pool and its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

169. The 2022 Annual Report also stated, "The Bank parent company's Swiss CET1 ratio increased to 12.2% as of December 31, 2022 from 11.7% as of December 31, 2021, primarily

reflecting significantly reduced RWA levels… partially offset by capital contributions from Credit Suisse Group AG relating to the capital increases executed in the fourth quarter of 2022." This statement was materially false or misleading or omitted facts necessary to make them not misleading because, as of the end of 2022, CS AG had a CET1 ratio of just 7.8% when adjusted for the impact of the regulatory filter, far below both Credit Suisse's target of 12% and the 9.28% required by regulators. The misleading nature of these statements is confirmed by UBS's later statements that Credit Suisse had "in fact been undercapitalized for a long time" and that "the collapse of Credit Suisse was driven by years of . . . reliance on substantial regulatory concessions."

170. Credit Suisse disclosed in its 2022 Annual Report filed on Form 20-F with the SEC on March 14, 2023, that:

> The accompanying consolidated financial statements of Credit Suisse Group AG (the Group) are prepared in accordance with accounting principles generally accepted in the US (US GAAP) and are stated in Swiss francs (CHF). The financial year for the Group ends on December 31. Certain reclassifications have been made to the prior year's consolidated financial statements to conform to the current presentation which had no impact on net income/(loss) or total shareholders' equity.

171. The statements contained in ¶170 were materially false or misleading, or omitted information necessary to make them not misleading, because Credit Suisse's 2022 Annual Report did not comply with GAAP but rather resulted from a series of decisions by Defendants designed to conceal the truth regarding Credit Suisse's actual financial position and operating results. Defendants caused the Company to violate GAAP and SEC rules by, among other things, presenting inaccurate balance sheet and cash flow positions for both assets and liabilities relating to certain securities lending and borrowing activities. As a result, Defendants materially misstated the Company's financial results throughout the Class Period.

172. In connection with the filing of Credit Suisse's 2022 Annual Report on Form 20-F with the SEC, Defendants Gottstein, Mathers, Körner, and Joshi all executed certifications

pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that attested to the purported accuracy and completeness of the Company's financial and operational reports as well as statements concerning Credit Suisse's internal controls and procedures, as follows:

> 1. I have reviewed this annual report on Form 20-F of Credit Suisse Group AG and Credit Suisse AG;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report;
>
> 4. The registrants' other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrants and we have:
>
> > a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrants, including their consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> > b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
> >
> > c) evaluated the effectiveness of the registrants' disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > d) disclosed in this report any change in the registrants' internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is likely to materially affect, the registrants' internal control over financial reporting; and

> 5. The registrants' other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrants' auditors and the audit committee of each of the registrant's board of directors (or persons performing the equivalent functions):
>
> > a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrants' ability to record, process, summarize and report financial information; and
> >
> > b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting.

173. Defendants Körner and Joshi's SOX Certifications contained in ¶172 were materially false and/or misleading because, according to this Court, "Credit Suisse's simultaneous disclosure of material weaknesses in ICFR would seem to make the representations found in paragraph 4 of the SOX Certifications suspect, if not outright false." *Diabat I*, 2024 WL 4252502, at *129.

174. Also on March 14, 2023, Defendant Körner spoke at the Morgan Stanley European Financials Conference in London. During the conference, Defendant Körner stated that ***Credit Suisse did not have "material risk"*** in the wake of SVB's recent collapse because Credit Suisse had "***materially different standards***" ***in capital strength, funding and liquidity.*** (Emphasis added).

175. The statements contained in ¶174 were materially false and/or misleading, according to this Court, because of "the context – *i.e.*, the preceding disclosures that addressed the Company's capital strength, funding, and liquidity – as well as the fact that the Bank would collapse in just a few more days." *Diabat I*, 2024 WL 4252502, at *130. In addition, the statements contained in ¶[] were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Company did, in fact,

have "material risk" and did not have "materially different standards" in capital strength, funding, and liquidity, as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times.

176. On March 14, 2023, Defendant Körner was interviewed by *Bloomberg*. When asked about inflows, Körner said that things at the bank were "calm" and, in fact, there had been "***material good inflows***" ***the previous day***, which was a "***positive sign***." Körner also said that ***outflows had*** "***significantly moderated***." (Emphasis added).

177. With respect to the recent collapse of SVB, Körner said that "was a very different situation" than Credit Suisse, because Credit Suisse was "following ***materially different and higher standards when it comes to capital funding, liquidity, and so on***." (Emphasis added).

178. The statements contained in ¶¶176-77 were materially false and/or misleading, according to this Court, because "Körner made these statements as assets continued to drain out of Credit Suisse – or, in other words, when outflows had not abated but had only 'moderated' (and were no longer being described as having 'stabilized'). *Diabat I*, 2024 WL 4252502, at *130. In addition, the statements contained in ¶¶176-77 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did not "follow[] materially different and higher standards when it comes to capital funding, [and] liquidity," as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (ii) the Company was experiencing significant and unusual customer and/or asset outflows which had not "significantly moderated."

**M. March 15, 2023**

179. On March 13, 2023, Defendant Lehmann spoke at the Financial Sector Conference in Saudi Arabia. The speech was reported in an article published that day by *Bloomberg* titled

"Credit Suisse Chair Says State Assistance 'Not a Topic' for Bank." The article states, in relevant part:

> Credit Suisse Group AG Chairman Axel Lehmann said government assistance "isn't a topic" for the lender as the Swiss bank seeks to shore up confidence among clients, investors and regulators after a series of missteps.
>
> Speaking at the Financial Sector Conference in Saudi Arabia on Wednesday, Lehmann said ***it wouldn't be accurate to compare Credit Suisse's current problems with the recent collapse of Silicon Valley Bank, particularly because the banks are regulated differently***.
>
> ***"We have strong capital ratios, a strong balance sheet," Lehmann said. "We already took the medicine," he said, referring to the extensive restructuring program announced in October.***

(Emphasis added).

180. The statements contained in ¶179 were materially false and/or misleading because, according to this Court, Lehmann "characterized the Company's current and future business health in extremely positive terms at a time when he allegedly knew or should have known that the contrary was true [as the] Bank was literally about to fail." *Diabat I*, 2024 WL 4252502, at *125. In addition, the statements contained in ¶179 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, (i) the Company did not "have strong capital ratios," as its liquidity and funding profile, policy, and/or risk parameters, were materially deficient at all times; and (ii) the "restructuring" of Credit Suisse was fundamentally flawed, as it was predicated on unsustainable investment approaches that contravened risk management and/or control governance best practices.

181. On March 15, 2023, Defendant Körner was interviewed by *CNA*, a Singapore news channel. The interview was reported by *Reuters* in an article published that day titled "Credit Suisse CEO said bank's liquidity basis is "'very very strong.'"

182. The article stated, in relevant part:

> Credit Suisse (CSGN.S) Chief Executive Ulrich Koerner spoke of the strength of the Swiss lender's liquidity basis in an interview with CNA on Wednesday, after its share price dropped more than 30% following comments by the company's lead investor.
>
> ***"Our capital, our liquidity basis is very very strong***," Koerner said. "***We fulfill and overshoot basically all regulatory requirements***."

(Emphasis added).

183. The statements contained in ¶¶181-82 were materially false and/or misleading, according to this Court, because they did not align with information, of which Körner "had to be aware" including that 1) "'[i]t was widely reported to the press that Credit Suisse's largest shareholder, the Saudi National Bank, would not buy any more of the Company's shares for 'regulatory' reasons'"; 2) "[l]ater that very day, 'FINMA and the Swiss National Bank (SNB) announced that Credit Suisse met capital and liquidity requirements, and that SNB would provide liquidity to Credit Suisse if necessary'"; and 3) "'Credit Suisse than announced later that night that it would not be borrowing up to CHF 50 billion from the SNB and also buying back various debt instruments for approximately CHF 3 billion.'" *Diabat I*, 2024 WL 4252502, at *131. In addition, the statements contained in ¶¶181-82 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Credit Suisse's liquidity was not "very very strong," and Credit Suisse did not "fulfill

and overshoot basically all regulatory requirements," as its liquidity and funding profile, policy, and/or risk parameters were materially deficient at all times.

**N. March 16, 2023**

184. On March 16, 2023, prior to NYSE market open, Credit Suisse published a media release titled, "Credit Suisse Group takes decisive action to pre-emptively strengthen liquidity and announces public tender offers for debt securities." Later, after market open, Credit Suisse filed this media release on Form 6-K with the SEC. The media release stated:

> **Credit Suisse is taking decisive action to pre-emptively strengthen its liquidity by intending to exercise its option to borrow from the Swiss National Bank (SNB) up to CHF 50 billion under a Covered Loan Facility as well as a short-term liquidity facility, which are fully collateralized by high quality assets. Credit Suisse also announces offers by Credit Suisse International to repurchase certain OpCo senior debt securities for cash of up to approximately CHF 3 billion.**
>
> * * *
>
> CEO Ulrich Koerner said: "These measures demonstrate decisive action to strengthen Credit Suisse as we continue our strategic transformation to deliver value to our clients and other stakeholders. We thank the SNB and FINMA as we execute our strategic transformation. My team and I are resolved to move forward rapidly to deliver a simpler and more focused bank built around client needs."
>
> * * *
>
> Following the Group's strategy announcement on October 27, 2022, Credit Suisse has made significant progress toward this transformation and on an accelerated schedule to build the foundation for the new Credit Suisse. Its strategy includes decisive actions to radically restructure the Investment Bank, including the substantial exit from the Securitized Products Group where the bank has already achieved more than 70% of the targeted asset reduction. The bank has also accelerated its cost transformation and is well on track to deliver CHF ~2.5 billion of cost base reductions by 2025, including CHF ~1.2 billion in 2023.

(Emphasis in Original).

185. The statements in ¶184 were materially false or misleading or omitted information necessary to make them not misleading. According to several people interviewed by the PInC, "it

was already clear at that time that this aid in the form of cash would not be enough, as Credit Suisse had not prepared well enough and was therefore unable to fully exploit the potential of the ELA." PInC Report at 300. By the time this statement was published, Swiss authorities had already approached CS and UBS to prepare for a merger, as they feared the "drastic deterioration" of Credit Suisse's situation "would trigger an international financial crisis." PInC Report at 294-95. Moreover, Lehmann himself would later admit in his remarks on April 4, 2023, that as of "the beginning of the fateful week"-i.e., March 13, three days before this statement was made-a turnaround would not be successful.

186. Analysts reacted positively to this announcement. Analysts from J.P. Morgan stated: "Credit Suisse announced that it intended to access a liquidity facility with the Swiss National Bank of up to CHF50bn, a critical factor, in our opinion, that will allay some of the market concerns on liquidity given the focus on deposit outflows not only in Q4'22, but also as a result of the failure of smaller US banks."[16] An analyst from HSBC stated: "CS's actions serve both to demonstrate access to funding, also through it loan assets, as well as an attempt to normalise senior debt spreads through the tender offer. Comments made by the CEO on Tuesday indicating an improving trend on deposit flows are reaffirmed with LCR said to have risen from 144% in 4Q to 150% QTD and higher on a spot basis."[17] And an analyst from BofA Global Research stated: "Bank closures are permanent and historically significant events. Forbearance measures are inherently temporary. We think that buying time for CS to deliver is likely appealing compared

[16] Roberto Henriques, "A Central Bank Bazooka," *J.P. Morgan*, Mar. 16, 2023

[17] Piers Brown, "Hold: Swiss authorities provide support," *HSBC*, Mar. 16, 2023.

with the alternatives. We re-iterate our Buy rating based on the earnings potential of the franchise over time."[18]

187. As is clear from these statements, analysts interpreted Credit Suisse's statements as an indication that Credit Suisse was buying the time necessary to complete its restructuring plan, not that Credit Suisse was mere days away from collapse.

## VI. THE TRUTH EMERGES

188. As alleged herein, during the Class Period, Defendants made numerous material misstatements and omissions regarding the sufficiency of Credit Suisse's risk management and control governance, the strength of its internal controls over financial reporting, the significance and impact of customer and asset outflows, the lack of "material risk" confronting the Company, and its current financial condition and its outlook, that were widely disseminated to the securities market, investment analysts, and the investing public. Defendants' misrepresentations concealed the true financial condition of Credit Suisse, along with FINMA's increased involvement in Credit Suisse's business and FINMA's growing concern that Credit Suisse's capital and liquidity positions could not withstand any further negative market news or events. Plaintiff and other members of the Class purchased or acquired Credit Suisse securities at artificially inflated prices, relying upon the integrity of the market price for Credit Suisse securities and market information relating to Credit Suisse, and they were damaged when the price of Credit Suisse securities fell as a result of the truth being revealed. The relevant truth about Credit Suisse was revealed through a series of events and disclosures on: (1) September 22, 2022, (2) March 14, 2023, and (3) March 19, 2023.

[18] Alastair Ryan, "Choices and Implications," *BofA Global Research*, Mar. 16, 2023.

189. On September 22, 2022, *Reuters* published an exclusive report, based on two people familiar with the matter, that Credit Suisse, despite its prior denials on May 31, 2022, and July 27, 2022, was seeking to raise capital: "Credit Suisse is sounding out investors for fresh cash… as it attempts a radical overhaul of its investment bank." In response to this new *Reuters* report, a Credit Suisse spokesperson neither confirmed nor denied the news: "We have said we will update on progress on our comprehensive strategy review when we announce our third-quarter earnings. It would be premature to comment on any potential outcomes before then." As a result, the price of Credit Suisse AT Bonds declined on September 23, 2022, with H3698DDD3 falling $0.865 per bond, or 1.30%, to close at $65.774 per bond, H3698DCV4 falling $0.942 per bond, or 1.38%, to close at $67.346 per bond, and H3698DBZ6 falling $0.672 per bond, or 0.82%, to close at $81.721 per bond.

190. Because Credit Suisse did not confirm the report of a capital raise at this time, the price reaction following the September 22, 2022, *Reuters* article did not fully reveal the truth that the Company was, in fact, planning to raise new capital. Likewise, because Credit Suisse did not issue a denial at this time (unlike their response to the May 31, 2022, *Reuters* article), the market gave more credibility to this article and began speculating as to what a "potential capital raise" would mean for existing shareholders. Analysts disagreed whether a capital raise would be necessary. On October 3, 2022, a BofA Global Research report stated: "The debate over whether additional equity capital is needed at a group level has been largely settled, we think, by the rise in debt costs: an equity raise now looks a core part of the restructuring." However, on October 5, 2022, an analyst from J.P.Morgan wrote: "[W]e do not see a capital increase as a given outcome. While recent negative newsflow and market reaction may impact franchise value near-term, we expect this to be resolved post clarity on restructuring."

191. Then, on October 27, 2022, among other news, the Company confirmed, in its Rights Offering Media Release, that, despite its prior denials, it did, in fact, intend to approve "two separate share capital increases" consisting of new share issuances for the Saudi National Bank and existing shareholders, for a combined total of CHF $4 billion (approximately USD $4.4 billion). But even though this disclosure revealed the falsity of Credit Suisse's May 31, 2022, and July 27, 2022, misstatements regarding whether Credit Suisse was considering or needed to raise capital, Credit Suisse's announcement continued to conceal material information concerning the true scope of its financial condition. It framed the capital raise as "further stengthen[ing] the Group's capital base and support[ing] its new strategic direction," rather than truthfully disclosing that [redacted] CS-Diabat_00203093.

192. The price of Credit Suisse AT1 bonds remained artificially inflated, however, because Defendants continued to conceal materially false or misleading information from the public. The same day, October 27, 2022, Credit Suisse revealed a new strategic plan, which it claimed would remediate the liquidity issues caused by recent outflows that Defendants claimed were due to "incorrect rumors." These statements were materially false or misleading because outflows had actually been ongoing for months due to clients' lack of confidence in the Group, FINMA had been pressing Credit Suisse's Board and management to implement concrete plans to improve capital and liquidity and had expressed frustration that the proffered plans were inadequate, FINMA had granted regulatory concessions which allowed CS AG to report a much higher than accurate CET1 ratio, and a key element of the strategic plan was not even possible

without CS AG breaching regulatory capital requirements. Defendant Lehmann also touted Credit Suisse's "significant progress" in improving Credit Suisse's risk management control processes while concealing the fact that Credit Suisse had already received multiple letters from the SEC questioning the adequacy of the Group's ICFR.

193. On February 9, 2023, before market hours, the Company issued its FY22 Earnings Release in which it disclosed a $1.5 billion loss, customer outflows of CHF 110.5 billion in the final three months of 2022, and a dramatic decrease in assets under management. This Earnings Release also stated, "as the [fourth] quarter progressed, these outflows stabilized to much lower levels but ***had not yet reversed by year end***." Thus, due to Defendants' prior misleading statements about the state of outflows, the FY22 Earnings Release, which partially revealed the true state of affairs at Credit Suisse, fell far short of what the market expected, resulting in the dissipation of artificial inflation and causing investor damages. For example, this disclosure revealed that that the bank's outflows had not, in fact, "reversed" or "basically stopped," as Defendant Lehmann stated on December 1 and 2, 2022, but had only "stabilized to much lower levels but had not yet reversed by year end."

194. "[A]nalysts were alarmed by the scale of losses and outflows," reported *Reuters* in a February 9 article titled "Credit Suisse warns of more losses, drawing regulatory attention." For example, analysts at Barclay's released a research report that day titled "Credit Suisse AG: Q422 First Look: Much weaker than we anticipated," stating that the announced results were "worse than our expectations, with far larger outflows in wealth management." Deutsche Bank analysts, in a research report titled "Credit Suisse: 4Q22 – Capital & liquidity issues checked; material impact on businesses," observed that "operational momentum in Wealth Management and Investment Bank came in significantly worse than expected," and that "the impact on the

businesses has been worse than expected." Kepler Cheuvreux analysts, in a research report titled "Credit Suisse: Q4 2022 first reaction: Very significant outflows in Wealth Management," stated: "There is little positive to be found in CS Q4 results and the outlook for 2023 is grim."

195. Following the revelations of these previously undisclosed facts by Credit Suisse on February 9, 2023, the price of Credit Suisse AT1 Bonds declined. H3698DDD3 fell $0.585 per bond, or 0.87%, to close at $66.657 per bond, H3698DCV4 fell $0.573 per bond, or 0.81%, to close at $70.208 per bond, and H3698DBZ6 fell $0.636 per bond, or 0.77%, to close at $82.245 per bond

196. But even though this February 9, 2023, disclosure corrected Defendant Lehmann's specific misstatements on December 1 and 2, 2022, that outflows had "reversed" and "basically stopped," Defendants' statements continued to conceal the bank's perilous financial position, including FINMA's growing concerns about Credit Suisse, continued to conceal that the SEC was raising serious questions about the adequacy of Credit Suisse's ICFR, and continued to conceal material weaknesses in the Company's ICFR. The truth about the bank's internal controls would not be revealed until March 14, 2022, when the Company filed its 2022 Annual Report, and the truth about the bank's financial condition would not be fully revealed until the announcement of the merger on March 19, 2023, which was designed to stave off the bank's collapse.

197. On March 14, 2023, during pre-market hours, Credit Suisse filed with the SEC the 2022 Annual Report, which was signed by Defendants Körner and Joshi, attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting. With respect to the Company's controls and procedures, the 2022 Annual Report stated, in relevant part:

> We have identified material weaknesses in our internal control over financial reporting as of December 31, 2022 and 2021

Management has identified certain material weaknesses in our internal control over financial reporting as a result of which management has concluded that, as of December 31, 2022, ***the Group's internal control over financial reporting was not effective, and for the same reasons, management has reassessed and has reached the same conclusion regarding December 31, 2021, as more fully described in this Annual Report. Management has also accordingly concluded that our disclosure controls and procedures were not effective***.

The material weaknesses that have been identified relate to the failure to design and maintain an effective risk assessment process to identify and analyze the risk of material misstatements in its financial statements and the failure to design and maintain effective monitoring activities relating to (i) providing sufficient management oversight over the internal control evaluation process to support the Group's internal control objectives; (ii) involving appropriate and sufficient management resources to support the risk assessment and monitoring objectives; and (iii) assessing and communicating the severity of deficiencies in a timely manner to those parties responsible for taking corrective action. These material weaknesses contributed to an additional material weakness, as management did not design and maintain effective controls over the classification and presentation of the consolidated statement of cash flows. This material weakness resulted in the revisions contained in our previously issued consolidated financial statements for the three years ended December 31, 2021 as disclosed in the 2021 Annual Report.

Notwithstanding these material weaknesses, we confirm that our consolidated financial statements as included in this Annual Report fairly present, in all material respects, our consolidated financial condition as of December 31, 2022 and 2021, and our consolidated results of operations and cash flows for the years ended December 31, 2022, 2021 and 2020, in conformity with US GAAP. ***Management is developing a remediation plan to address the material weaknesses referred to above, including strengthening the risk and control frameworks, and which will build on the significant attention that management has devoted to controls to date***. ***While we are taking steps to address these material weaknesses, which could require us to expend significant resources to correct the material weaknesses or deficiencies, any gaps or deficiencies in our internal control over financing reporting may result in us being unable to provide required financial information in a timely and reliable manner and/or incorrectly reporting financial information, which could reduce confidence in our published information, impact access to capital markets, impact the trading price of our securities or subject us to potential regulatory investigations and sanctions. In addition, there can be no assurance that these measures will remediate the material weaknesses in our internal control over financial reporting or that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Any of the foregoing could materially and adversely affect our business, results of operations and financial condition***.

(Emphases added.)

198. In addition to revealing the truth concerning the problems with Credit Suisse's internal controls, and the corresponding issues in the 2021 Annual Report and prior quarter financial certifications, the disclosure of additional systemic problems at Credit Suisse further eroded the market's confidence in the Company and Defendants' representations of the bank's stability. The media reported on this dramatic announcement and quoted extensively from the Annual Report.[19] Ultimately, the media attributed Credit Suisse's downfall, in part, to the announcement of the material weaknesses.[20]

~~85.~~199. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $2.29, or 4.75%, to close at $45.924 on March 14, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $4.679, or 7.46%, to close at $58.014 on March 14, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $2.824, or 5.43%, to close at $49.167 on March 14, 2023.

~~86. On March 15, 2023, during pre-market hours, *Reuters* published an article entitled "Credit Suisse's biggest backer says can't put up more cash; share down by a fifth" citing SNB would not buy any more of the Company's shares on regulatory grounds.~~

~~87. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $18.262, or 39.77%, to close at $27.662 on March 15, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $30.232, or 52.11%, to close at $27.782 on March 15, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.712, or 44.16%, to close at $27.455 on March 15, 2023.~~

---

[19] *See, e.g.*, Margot Patrick, "Credit Suisse Finds Material Weaknesses in Financial Reporting," *The Wall Street Journal*, Mar. 14, 2023; Julia Kollewe & Graeme Wearden, "Credit Suisse warns of 'material weaknesses' in financial reporting," *The Guardian*, Mar. 14, 2023.

[20] *See, e.g.*, Michael J. de la Merced et al., "UBS Agrees to Buy Rival Credit Suisse," *The New York Times*, Mar. 19, 2023).

200. Thereafter, Defendants continued to make materially false and misleading statements, particularly with respect to the bank's liquidity and financial health, concealing the Company's true state of affairs at a time when FINMA was actively brokering a merger between Credit Suisse and its historic rival, UBS. On the day the 2022 Annual Report was released, Defendant Körner spoke at Morgan Stanley's European Financials Conference, reassuring the public with respect to Credit Suisse's liquidity and outflows, and representing that the restructuring was progressing rapidly. Analysts at BofA Global Research, in a report titled "Credit Suisse Group: CEO comments supportive," noted Körner's comments favorably and maintained its "buy" rating. Similarly, Kepler Cheuvreux released an analyst report that day titled "Credit Suisse: CEO gives relatively reassuring message," noting that Körner's "message was reassuring on liquidity, outflows, and costs" that the improvements in liquidity and outflows "can help stem the very negative newsflow around CS and stop the negative spiraling," and that Credit Suisse was "forcefully tackling the issue related to the material weakness in the financial reporting process."

201. On Sunday, March 19, 2023, FINMA revealed, *inter alia*, that it had approved a takeover of Credit Suisse by UBS via a merger, and that "[t]he extraordinary [Swiss] government support [for the Merger] will trigger a complete write-down of the nominal value of all AT1 debt of Credit Suisse in the amount of around CHF 16 billion[.]" -As FINMA would later assert in its AT1 Bond Advisory, "Credit Suisse was granted extraordinary liquidity assistance loans secured by a federal default guarantee on 19 March 2023" and, therefore, the AT1 Bonds' "contractual conditions [for being written down] were met[.]" -Indeed, according to FINMA, "[o]n 19 March 2023, the [Swiss] Federal Council enacted the Emergency Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans by the Swiss National Bank to Systemically Important Banks", which authorized FINMA to, *inter*

*alia*, order Credit Suisse to write down its AT1 Bonds and, "[b]ased on the [AT1 Bonds'] contractual agreements and the Emergency Ordinance, FINMA instructed Credit Suisse to write down the AT1 bonds."

~~88.~~202. In the press release, Defendant Lehmann was quoted as saying, in stark contrast to the statements he made just a few days prior, that "Given recent extraordinary and unprecedented circumstances, the announced merger represents the best available outcome. This has been an extremely challenging time for Credit Suisse and while the team has worked tirelessly to address many significant legacy issues and execute on its new strategy, we are forced to reach a solution today that provides a durable outcome."

~~89.~~203. Then, on March 20, 2023, during pre-market hours, Credit Suisse issued an *ad hoc* announcement on Form 6-K confirming the Merger with UBS. -The announcement stated, in relevant part:

> Credit Suisse and UBS have entered into a merger agreement on Sunday following the intervention of the Swiss Federal Department of Finance, the Swiss National Bank and the Swiss Financial Market Supervisory Authority FINMA ("FINMA"). UBS will be the surviving entity upon closing of the merger transaction. Under the terms of the merger agreement all shareholders of Credit Suisse will receive 1 share in UBS for 22.48 shares in Credit Suisse. Until consummation of the merger, Credit Suisse will continue to conduct its business in the ordinary course and implement its restructuring measures in collaboration with UBS.
>
> * * *
>
> * * *
>
> Axel P. Lehmann said: "Given recent extraordinary and unprecedented circumstances, the announced merger represents the best available outcome. This has been an extremely challenging time for Credit Suisse and while the team has worked tirelessly to address many significant legacy issues and execute on its new strategy, we are forced to reach a solution today that provides a durable outcome."

~~90.~~204. As reported by *CNBC* that day, Credit Suisse AT1 Bondholders would "see investments worth 16 billion Swiss francs ($17 billion) become worthless" as a result of AT1 Bonds being written down to zero in connection with the Merger. *CNBC* also quoted Goldman Sachs' credit strategists as advising that the decision "can be interpreted as an effective subordination of AT1 bondholders to shareholders" and "represents the largest loss ever inflicted to AT1 investors since the birth of the asset class post-global financial crisis[.]"

~~91.~~205. On this news, Credit Suisse's Series DD33 AT1 Bond price fell $20.530, or 83.21%, to close at $4.143 on March 20, 2023; Credit Suisse's Series BZ62 AT1 Bond price fell $25.468, or 88.1%, to close at $3.441 on March 20, 2023; and Credit Suisse's Series CV40 AT1 Bond price fell $21.422, or 86.15%, to close at $3.443 on March 20, 2023.

~~92.~~206. The disclosures of Defendants' fraud alleged herein caused a sharp decline in the market value of Credit Suisse's AT1 Bonds, ultimately culminating in the eventual write-down of all Credit Suisse AT1 Bonds to a value of ***zero***, damaging investors in these bonds.

207. Defendants' prior misrepresentations and omissions also concealed Credit Suisse's true risk of collapse. Contrary to Defendants' Class Period statements touting the strength of Credit Suisse's capital position, CS AG's CET1 ratio was only staying above the regulatory minimum thanks to the application of a regulatory filter, which was reported in a way that was "hardly comprehensible to outsiders." Further, unbeknownst to the market, Credit Suisse's dire capital and liquidity position forced FINMA to increase its supervision of the group, including requiring weekly meetings with Credit Suisse top management and urging Credit Suisse to make "concrete plans" to prepare for a merger in the event outflows continued. In a series of letters treated with the utmost confidentiality by the Swiss government, FINMA pressed Defendants again and again to implement realistic plans to stabilize the Group in the event of another incident, which was all

but inevitable due to the public's lack of confidence in Credit Suisse. Yet, when another incident occurred, there was only one solution capable of preventing a total meltdown of Credit Suisse, and with it, the global economy—a merger with rival UBS.

208. Throughout the Class Period, if Defendants had fully and truthfully disclosed Credit Suisse's true financial condition of the company, and that their capital/liquidity position could not withstand further negative market events or news, investors would have arrived at a valuation of its securities that more accurately reflected the risk the Company was not as financially healthy as represented and was facing the risk of ultimate failure. But, throughout the Class Period, Credit Suisse "always wanted to present the image of a solid bank." PInC Report at 245. As a result, Credit Suisse investors did not learn of the Company's true financial condition until Defendants announced its forced merger with UBS.

209. The timing and magnitude of Credit Suisse's securities price rise and decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changes in market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct

~~93.~~210. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's AT1 Bonds, Plaintiff and other Class members have suffered significant losses and damages. The economic loss (*i.e.*, damages) suffered by Plaintiff and other members of the Class, was a direct result of the truth about Defendants' misrepresentations and omissions being revealed to investors, and the subsequent, significant decline in the value of Credit Suisse securities was also the direct result of the truth about Defendants' misrepresentations and omissions being revealed to the market.

## VIII. PwC's Participation in the Fraud

94. After an evaluation and selection process beginning in 2018, Credit Suisse shareholders at the Annual General Meeting of Shareholders on April 30, 2020 voted to approve the Board of Directors' proposal that PwC should succeed the Company's prior auditor, KPMG AG ("KPMG"), and PwC's appointment became effective for the fiscal year ended December 31, 2020.

95. SOX requires publicly traded companies, like Credit Suisse, to file audited financial statements. Independent auditors like PwC audit public companies to determine whether the companies' financial statements were prepared in accordance with GAAP. Although some auditor's reports are referred to as "opinions," these reports are not subjective opinions in the ordinary sense of the word, but rather a specific type of attestation about whether financial statements do or do not comply with U.S. generally accepted accounting principles ("GAAP"). If it is determined that financial statements do not comply with GAAP, the company may be required to restate its financial statements.

96. While independent auditors are paid for their services, their obligation is not to their client(s). Rather, independent auditors serve the important function of "public watchdog," with a "public responsibility transcending any employment relationship with the client."[21] "The independent auditor's obligation to serve the public interest assures that the integrity of the securities markets will be preserved." *Id.* The Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation created by SOX to oversee the audits of public companies, is

[21] *United States v. Marino*, 654 F.3d 310, 323 (2d Cir. 2011) (citing *United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984)).

responsible for establishing generally accepted auditing standards, professional standards to which auditors are required to adhere.

97. The PCAOB also inspects a number of registered accounting firms each year in order to assess, drive improvement in, and communicate audit quality. The lists of which firms, areas, and/or audits will be inspected are not public information, as this would allow firms to take additional measures to shore up their audits for that year, and potentially minimize work in other, non-inspection years.

98. In 2018, the year Credit Suisse initially made the decision to switch auditors, the SEC charged six public accountants with leaking confidential PCAOB data to KPMG from 2015-2017. The Co-Director of the SEC's Enforcement Decision Division likened this misconduct to "stealing the exam . . . in an effort to interfere with the PCAOB's ability to detect audit deficiencies at KPMG." The U.S. Attorney's Office for the Southern District of New York also brought criminal charges against the six accountants. Court filings in that case revealed that Credit Suisse was on the list of KPMG clients to be inspected in 2016.[22] Though it was eventually dropped from the inspection roster, court filings showed KPMG was concerned that issues found in previous investigations of Credit Suisse, specifically related to cash flows, still existed, and performed a series of "stealth reviews" of the bank's 2016 audit to ensure that, if these issues came up, the audit would be clean. *Id.* These statements indicated that such care was not taken during those years for which KPMG did not expect a PCAOB inspection. As such, when PwC took on the mantle of Credit Suisse's auditor, it inherited several known issues, signaling the need to take special care.

[22] Francine McKenna, "Anatomy of a failure: Credit Suisse, PwC, and KPMG, too," *The Dig*, May 28, 2023, available at https://thedig.substack.com/p/anatomy-of-a-failure-credit-suisse.

~~99. Nevertheless, PwC stated, in letters attached to each of Credit Suisse's Interim Reports on Form 6-K during the Class Period, that it was "not aware of any material modifications that should be made" to bring the interim report in conformity with GAAP; that the information included from the previous year's balance sheet "is fairly stated, in all material respects"; and that it had conducted its review in accordance with PCAOB standards. PwC also stated, in a letter attached to the 2021 20-F, that the financial statement "present[ed] fairly, in all material respects, the financial position the Group as of December 31, 2021 and 2020" and that Credit Suisse had maintained "effective internal control over financial reporting as of December 31, 2021."~~

~~100. In the same 2021 20-F, however, Credit Suisse stated that it had "identified accounting issues" that required it to revise (not restate) its financial statements for the years ending December 31, 2020, and December 31, 2019, but that these issues were "not material individually or in aggregate," a determination Credit Suisse later represented was blessed by PwC. Specifically, the Company stated that the issues were with the "netting treatment relating to the presentation of a limited population of certain securities lending and borrowing activities" resulting in the "balance sheet and cash flow positions for both assets and liabilities relating to these activities were understated." Separately, the Company identified issues with "consolidated statements of cash flows share-based compensation expenses, net"; "expanded the elimination of non-cash exchange rate movements related to certain operating, investing and financing activities"; and "the presentation of certain cash flow hedges were reclassified."~~

## ~~IX.~~ VII. SCIENTER ALLEGATIONS

211. Throughout the Class Period, the Individual Defendants touted the sufficiency of Credit Suisse's risk management and control governance and the strength of its internal controls over financial reporting, touted Credit Suisse's financial condition, and downplayed the

significance and extent of customer and/or asset outflows, all while in possession of contradictory information. Accordingly, Defendants knew or recklessly disregarded that their Class Period statements were materially false or misleading when made. The Individual Defendants also had significant financial motives to commit fraud, reaping millions of dollars in compensation throughout the Class Period.

**A. The PInC Report Supports a Strong Inference of Scienter**

212. The PInC Report contains numerous facts demonstrating Defendants knew or recklessly disregarded ongoing critical issues with Credit Suisse's financial condition, including its capital and liquidity, throughout the Class Period. The PInC Report laid blame for Credit Suisse's collapse directly at management's feet.

213. FINMA sent yearly assessment letters to Credit Suisse, in which it "repeatedly raised various issues with CS." PInC Report Summary at 6. From at least 2015 onwards, FINMA requested "that CS should proactively and transparently report to it on major regulatory developments," but Credit Suisse "failed to comply." *Id*. FINMA also: (i) "expressed doubts regarding the sustainability of the bank's strategy and, in particular, its remuneration policy," (ii) "drew CS's attention to the risks associated with the numerous changes in the Executive Board" including "gaps in the anti-money laundering system and in decentralised risk control," (iii) "repeatedly voiced its concerns that CS was not growing its equity organically but rather through injections of capital and financing from other subsidiaries," and (iv) "regularly imposed additional requirements on CS and almost annually demanded improvements in the reporting of its equity and liquidity situation." *Id*. The PInC Report notes, despite these facts, "CS made little progress." *Id*. Additionally, FINMA conducted eleven enforcement proceedings against Credit Suisse from 2012-2022 and eight enforcement proceedings against members of Credit Suisse's Executive Board, five of which were still pending at the time the PInC Report was published in 2024. *Id*. at

8. Based on these facts, "the PInC finds it incomprehensible that, despite the bank's many transgressions, no causal responsibility could be established for the relevant misconduct." *Id*.

214. With regards to ELA, the PInC Report found: "CS would have had sufficient opportunity to make the necessary preparations for drawing a larger amount of ELA but, according to the information available to the PInC, it did not do so." PInC Report Summary at 8. Particularly, "CS refrained from drawing on ELA funds on three occasions between October and December 2022, partly due to the potential stigmatising effect of having to report receiving ELA." *Id*. Defendant Lehmann also stopped the Swiss Government from conduct any discussion of creating a legal basis for a public liquidity backstop in November 2022 due to concerns about market perception. PInC Report at 245. And when it finally became inevitable that the Group would need to take ELA or collapse, "it was already clear at that time that this aid in the form of cash would not be enough, as Credit Suisse had not prepared well enough and was therefore unable to fully exploit the potential of the ELA." PInC Report at 300.

215. Swiss authorities began discussing "Credit Suisse's delicate situation" as early as May 2022 (PInC Report at 184), and beginning in July 2022, several months into the Class Period, FINMA stepped up its supervision of Credit Suisse and "exerted greater pressure on CS to improve its contingency plan in response to the structural loss situation." PInC Report Summary at 12. "From August, it met with the bank's CEO and Chairman of the Board of Directors for weekly status updates on the range of measures being implemented in parallel." *Id*. "From September, weekly high-level meetings were held with CS senior management to examine strategic and operational developments." *Id*. Additionally, the SNB "began carrying out daily liquidity monitoring with CS from June 2022," and, in autumn 2022, "stepped up its preparations for

granting of ELA by asking CS to identify further assets that could serve as collateral for the SNB for possible use of ELA." PInC Report Summary at 12-13.

216. In early October 2022, CS AG's liquidity buffers fell below regulatory requirements; however, Credit Suisse neglected to inform FINMA, despite a duty to do so. FINMA "sharply criticiz[ed]" Credit Suisse for this concealment and required Credit Suisse executives begin participating in "daily conference calls on the liquidity and refinancing situation." PInC Report at 217. According to FINMA, Credit Suisse was "struggling to assess the efficiency of its own measures and produce reliable scenario analyses and forecasts for capital outflows." *Id.* at 220. FINMA brought the "glaring shortcomings in access to information" to the Credit Suisse Board of Directors and management, "criticizing Credit Suisse for its lack of due diligence (incomplete documentation, often submitted late, after several reminders, or not at all)." *Id.*

217. In late October 2022, "FDF and the Chairman of the SNB's Governing Board initiated so-called non-meetings with the Chairman of the Board of Directors of CS" in order to "expedite efforts to find a solution with CS in a non-formal setting." PInC Report Summary at 14-15. Also in October 2022, "the willingness of UBS to take over CS was already clarified at a non-meeting with the Chairman of the Board of Directors of UBS." *Id.* at 15. And on November 1, 2022, "both the head of the FDF and Chairman of the SNB's Governing Board had asked the Chairman of the Board of Directors of CS to take the necessary steps in preparation for [selling of the bank]." PInC Report Summary at 14. Despite Defendants' knowledge, or reckless disregard, of these facts, on October 27, 2022, Credit Suisse announced a new strategy, proclaimed to have "achieved significant progress and clear results" with regards to risk management, and stated that outflows had "stabilized" to much lower levels. The possibility of a takeover was not discussed at

all by Defendants in Credit Suisse's October or November SEC filings, much less the imminent possibility of a takeover by UBS.

218. On December 21, 2022, the members of Credit Suisse's Audit Committee assured FINMA that they would "give priority to preparing the sale"; however, they noted Lehmann "attached little importance" to the idea of a sale, which he referred to as "Plan Z." *Id*. at 222. On December 22, 2022, "FINMA notified the CFC that it had instructed CS to develop a short- and medium-term sale scenario by early January so that it would be prepared for an emergency sale of the bank." PInC Report Summary at 16. In a non-meeting with the Chairman of the Board of Directors of Credit Suisse on December 29, 2022, "FINMA made clear demands that CS complete preparations for a sale by early January," including producing a shortlist of potential buyers and establishing a virtual data room to facilitate due diligence. *Id*. At this meeting, "all those present" agreed that Defendant Lehmann "appears optimistic, and sometimes even overly optimistic…. it has become clear that the chairman of the board of directors of Credit Suisse is underestimating and ***embellishing the situation, particularly to create an impression of security***." PInC Report at 241 "In early January, CS provided FINMA with a shortlist of four potential buyers and in mid-January confirmed that the required data room had been prepared." *Id*. Even with these measures in place, Credit Suisse still made positive statements about its capital, liquidity, and the execution of its strategic plan on February 9, 2023.

219. On March 15, 2023, the same day that both Defendants Lehmann and Körner made positive statements regarding the state of Credit Suisse, authorities realized urgent measures were needed to prevent Credit Suisse from being liquidated and set up a crisis unit at FDF headquarters. PInC Report Summary at 18. This same day, just hours after assuring investors that State assistance was "not a topic," Credit Suisse applied for ELA. PInC Report Summary at 19. On March 15,

2023, "The authorities found Credit Suisse still very optimistic, and the bank's representatives were said to have shown a great lack of judgment that day. The authorities, for their part, reportedly made it clear to the bank that the sale to UBS is the intended solution and that Credit Suisse must prepare accordingly." PInC Report at 298. However, Credit Suisse continued to refuse UBS access to its virtual data room, leading the Chairman of UBS to "assume[] that Credit Suisse was intentionally delaying the work." *Id*. at 307. When Credit Suisse told FINMA it intended to use the ELA it requested on March 15 to repurchase certain AT1 bonds, FINMA replied "that Credit Suisse had not understood the gravity of the situation," and "the bank's behavior was very problematic." PInC Report at 310. However, the PInC found "Credit Suisse would have gone bankrupt on Friday [March 17] if the Swiss authorities had not found a solution by Friday evening." PInC Report at 328.

220. Numerous facts also point to the fact that Defendants knowingly or recklessly concealed CS AG's capital issues from the public. For example, FINMA collaborated with Credit Suisse and Credit Suisse's auditors to set "audit strategies" each year, and over the years, "the parent company's capital requirements" was repeatedly classified as "high" or "very high" risk, and yet, changes were not made to lower the risk. PInC Report at 178. In October 2022, Credit Suisse also attempted to conceal its true CET1 ratio by rebooking certain foreign assets to domestic assets, thereby lowering their risk weights, and by requesting that FINMA allow it to use an inappropriate valuation method for its portfolio that would not "accurately reflect the economic value" of the holdings. Birchler Report at 13, PInC Report at 213.

## B. The SEC Inquiry Into Credit Suisse's Financial Reporting Supports a Strong Inference of Scienter

221. On March 12, 2023, Credit Suisse responded to a nine-month long inquiry from the SEC into the sufficiency of its financial reporting, stating that it "note[d] the Staff's concerns, and

have now reassessed our position" and would report a material weakness in its internal control over financial reporting. Significantly, the Company stated: "***We acknowledge that the control deficiencies remained un-remediated for several years.***"

222. The SEC's inquiry began in July 2022, although the Company did not disclose it until March 9, 2023, and, even then, falsely characterized it as a "last minute request" that it had received the evening before, in order to justify the delay in publication of its 2022 Annual Report. The letters themselves, as well as the fact that Credit Suisse had been communicating with the SEC for ***eight months*** leading up to the "last minute request" was not revealed until April 11, 2023—after Credit Suisse had already collapsed and announced its merger with UBS. The inquiry stemmed from Credit Suisse's disclosure in its 20-F for FY 2021 that "[i]n connection with ongoing internal control processes, the Group identified accounting issues," but that because they were not considered "material," it would not need to restate its financial statements.

223. The SEC's July 15, 2022, comment letter asked whether the "accounting issues" resulted from "control deficiencies," and "[i]n light of your accounting issues and resulting revisions, as well as the various changes that have taken place during 2021 with regards to processes, procedures, organizational and business structure, and senior management, ***please provide us with your analysis supporting your conclusion that there were no material changes to ICFR***." (Emphasis added). The SEC's comments could not have come as a surprise to Defendants, as FINMA, the FCA, and Credit Suisse's own management had been criticizing the Group's control environment for years. *See* CS-Diabat_00203076 (May 23, 2022, FINMA Assessment Letter, [redacted]); CS-Diabat_00033142 (SOX Program Director states, [redacted]

[redacted]

224. What followed was a lengthy exchange of correspondence back and forth between the Company and the SEC, during which the Company tried to justify its position that the identified errors were not material, and the SEC pushed back. This process culminated in the Company's March 12, 2023, admission and disclosure of a material weakness in its internal controls. Specifically, Credit Suisse stated: "We will report that we have, and have had, a material weakness in internal control over financial reporting as it relates to COSO Principle 7" and "management has concluded that there was a material weakness in the Group's internal control over financial reporting as of December 31, 2021 and which continued as of December 31, 2022, related to COSO Principle 17. Specifically, management's severity assessment of certain control deficiencies did not sufficiently consider the magnitude of the potential misstatement that could result, but rather considered the actual error amongst other qualitative considerations for determining the potential impact and severity of a deficiency." COSO Principle 7 is: "Identifies and analyzes risks." COSO Principle 17 is: "Evaluates and communicates deficiencies." FINMA [redacted] *See, e.g.*, CS-Diabat_00203081 [redacted] CS-Diabat_00203080 [redacted]

225. As the correspondence with the SEC was ongoing, and despite knowledge of the correspondence, the Company and its executives were providing the market with quarterly financial results and strategy updates, (*supra* ¶118 (July 27, 2022); ¶128 (October 27, 2022); ¶135 (November 2, 2022); ¶141 (November 23, 2022); ¶154 (February 9, 2023)); Defendant Lehmann was saying that "the main indicators of the bank's financial stability were strong," *supra*. ¶147 (December 2, 2022), and that the Bank was "definitely stable," *supra* ¶152 (December 5, 2022); and Defendant Körner was stating that the Bank had a "robust balance sheet" and was "executing on [its] transformation from a position of strength," *supra* ¶156 (February 9, 2023). And Defendants Körner and Joshi executed SOX certifications attached to the 2022 20-F which stated: "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrants as of, and for, the periods presented in this report."

226. The maintenance of effective ICFR is an essential duty of senior management of a corporation, particularly the Chief Financial Officer and Chief Executive Officer, in order to ensure that the information reported in the company's financial statements is accurate and does not contain any material misstatement. As Credit Suisse said in its 2022 Annual Report, "The management of the Group is responsible for establishing and maintaining adequate internal control over financial reporting. The Group's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with US GAAP." 2022 Annual Report, at 257. In the "Report of Independent Registered Public Accounting Firm" prepared by PwC AG and attached to Credit Suisse's 2022 Annual Report, PwC AG adds onto Credit Suisse's ICFR definition:

> A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

2022 Annual Report at 258-I.

227. PwC explains in a publicly available pamphlet, "Internal Control are often an area of focus for investors, creditors, shareholders and Board members, among other stakeholders, when ensuring that the organisation provides accurate financial reporting which shows its state of operations." *See* "Internal Control over Financial Reporting (ICFR): Driving governance through effective financial reporting," *PricewaterhouseCoopers*. The pamphlet explains that this is especially true in light of situations such as the 2002 collapse of Enron, the 2008 global financial crisis, and the 2016 global oil price slump. A key function of ICFR is to "introduce new practices to assess the risks facing the businesses and having sound Internal Control to mitigate those risks." Continuing to revise and maintain effective ICFR is a crucial foundation for a company like Credit Suisse in light of the pre-Class Period scandals. The fact that the SEC was questioning the ICFR put the Company on notice that further assessment and revisions to Credit Suisse's ICFR were necessary. This is particularly true for Defendants Lehmann, Körner, and Joshi, who were specifically brought in to adequately assess risk after the failures of their predecessors. Likewise, Defendants' touting of new risk-reduction plans and strategies to investors while omitting mention of the SEC's concerns was highly material and misleading.

**C. The Timing of Defendants' Statements Supports an Inference of Scienter**

228. The temporal proximity of certain of Defendants' misstatements and omissions to the revelation of the truth about said statements supports an inference of scienter.

229. First, just months separated the announcement of Credit Suisse's results and strategy update in October 2022 and the forced merger between Credit Suisse and UBS in March 2023. And only one month passed between the February 9, 2023, pre-announcement of Credit Suisse's 2022 annual results and the announcement on March 9, 2023, that Credit Suisse would be delaying the release of its annual report due to a late-night request by the SEC, followed by the revelation just days later that Credit Suisse had a material weakness in its ICFR. Likewise, just 28 days passed between Credit Suisse's February 13, 2023, letter to the SEC, in which it claimed the Company's ICFR were effective, and its March 12, 2023, letter to the SEC in which it admitted acknowledged ICFR deficiencies to the SEC, admitting that "the control deficiencies [had] remained unremediated for several years."

230. On October 27, 2022, and even later, on October 31, 2022, Defendant Körner represented that outflows had "stabilized," and even "reverse[d]." One day later, on November 1, 2022, Defendant Körner approved triggering the third and final level of Credit Suisse's Contingency Funding Plan. And just one day after that, on November 2, 2022, Defendants revealed that outflows had slowed "to much lower levels" but had not yet reversed.

231. Defendant Lehmann said state aid was "not a topic" on March 15, 2023, the same day the Company applied to access up to CHF 50 billion in state aid.

232. But perhaps the strongest example of temporal proximity is the fact that Defendants continued to make positive statements about Credit Suisse's capital, liquidity, and plans for the future during the week of March 13, 2023, as Credit Suisse was on the brink of collapse, after

Defendant Lehmann admitted to knowing that turnaround would not be possible, and at a time when Credit Suisse was knee-deep (if not deeper) in negotiations with UBS about the merger.

### D. The Individual Defendants' Admissions Support a Strong Inference of Scienter

233. On April 4, 2023, at the Company's final annual general meeting of shareholders, Defendant Lehmann admitted that the Company's risk management and controls were deficient, and it had failed to rectify the problems. Specifically, Defendant Lehmann conceded:

> We needed a comprehensive strategic and cultural transformation. The business model had to be fundamentally overhauled and changed. It was also clear that there were unhealthy developments, errant behaviors, and wrong incentive systems. That there were transactions that should not have been allowed to play out. That we needed to work in many areas not only on structures, but also on mentalities and culture. That is what we wanted to rectify.

* * *

> The period from October to March was not long enough. One legacy issue after another had already seen trust eroded – and with it, patience dwindled. At that, we failed. It was too late.

* * *

> We failed to stem the impact of legacy scandals, and counter negative headlines with positive facts in order to rebuild the lost confidence.

234. In these same remarks, Lehmann admitted that he knew a turnaround would not be possible as of "the beginning of the fateful week," *i.e.*, March 13, 2023. However, he and other Defendants continued to make positive statements about Credit Suisse, including at a conference on March 15, 2023, and in a media release on March 16, 2023.

235. Thereafter, Defendant Körner gave his remarks, conceding that "the bank had been ***significantly weakened by the strong outflows in October 2022***," and that it had been "***particularly vulnerable at the time***" when Silicon Valley Bank and Signature Banks collapsed [March 10 and March 12, 2023, respectively]. (Emphasis added).

236. On April 24, 2023, Credit Suisse revealed in its final, 1Q23 Earnings Release: "In the second half of March 2023, Credit Suisse experienced significant withdrawals of cash deposits as well as non-renewal of maturing time deposits. Customer deposits declined by CHF 67 billion in 1Q23."

237. Recent statements by UBS regarding its post-merger review of Credit Suisse further support a strong inference of scienter. On August 31, 2023, in a UBS earnings call, Sergio Ermotti, the CEO of UBS, made remarks regarding "our assessment of Credit Suisse as of March 19." He explained that UBS had done an "in-depth analysis" and an "extremely thorough review, and had concluded, in relevant part:

> It was not just a matter of liquidity drying up. ***Credit Suisse's business model and business mix was deeply flawed and its reputation severely damaged. With its structural lack of underlying profitability, unsustainable capital allocation, and negative revenue and costs prospects, the bank was no longer in a position to continue on its own.*** This is clearly visible from the year-to-date losses Credit Suisse reported today, a culmination of the bank's two loss-making years.

238. That same day, in an interview on *CNBC International TV*, Ermotti stated that "our analysis has proven that the business model was not viable any longer . . . the business model was not sustainable any longer and needs to be restructured." Ermotti also stated, with respect to elements of Credit Suisse's "culture" that needed to be addressed in connection with the integration, "[t]he most important one is risk discipline, risk/reward discipline . . . some people [at Credit Suisse] were not really probably behaving in the best interest of clients and the bank.

### E. The Individual Defendants' High-Level Positions and Access to Non-Public Information Contrary to Their Public Statements Support a Strong Inference of Scienter

239. As the Individual Defendants conceded both before, during, and after the Class Period, Credit Suisse's risk management and internal controls were severely lacking, and massive customer and asset outflows eventually prompted the Swiss government to intervene and pressure

the Company's merger with UBS. That the alleged misrepresentations and omissions go to the core of Credit Suisse's ability to operate as a going concern bolster the inference of scienter.

240. The Individual Defendants were all high-level corporate insiders, each of whom—by virtue of his high-level position—directly participated in the management of the Company, was directly involved in the day-to-day operations of Credit Suisse at the highest levels, was directly or indirectly involved in the oversight or implementation of the Company's risk management procedures/policies and internal controls over financial reporting, and was privy to confidential information concerning the Company and its business, operations, practices, financial statements, and financial condition, including the misstatements alleged herein. Defendants received daily updates regarding liquidity and customer outflows. See, e.g., CS-Diabat_00080083 [redacted] CS-Diabat_00089853 [redacted] Because of the Individual Defendants' positions, they possessed the power and authority to, and did, control and monitor the contents of Credit Suisse's SEC filings, press releases, presentations, and other public statements during the Class Period made and disseminated to investors, securities analysts, money and portfolio managers and institutional investors (*i.e.*, the market), and/or approved or ratified these statements. Defendants Körner and Joshi signed and/or certified the Company's 2022 Annual Report filed on Form 20-F with the SEC, and the Individual Defendants regularly issued releases and spoke about the Company's business and operations. Accordingly, each of the Individual Defendants bears responsibility for the accuracy of the SEC filings, press releases, and other public statements detailed herein, and is primarily liable for the false and misleading statements and omissions and wrongful conduct pleaded herein.

### F. The Core Operations Doctrine Further Supports a Strong Inference of Scienter

241. A financial institution's CET1 ratio is one of its most significant financial metrics, especially after the 2008 financial crisis, as it is used determine the financial institution's ability to withstand financial distress. Numerous international and regional regulations are in place to ensure globally significant financial institutions are sufficiently capitalized. CS AG was Credit Suisse's primary subsidiary, and the parent of Credit Suisse's four operating divisions. The "capital situation" of CS AG was a frequent topic of correspondence between CS and FINMA. CS AG's CET1 ratio was mentioned in quarterly and annual financial reports during the Class Period, was the subject of questions from analysts during earnings calls, and was frequently discussed by analysts in their reports. Given their high-level positions in Credit Suisse, it would be highly reckless (at best) if any of the Individual Defendants did not know the truth about CS AG's capitalization and the effects of the regulatory filter on CS AG's CET1 ratio. Put simply, a bank cannot fulfill its primary purposes without sufficient capital to fund its operations.

242. Further, Credit Suisse's Form 20-F for FY 2020 revealed that, of its overall net revenues of CHF 22.4 billion for 2020, CHF 13.6 billion, or nearly 61%, were derived from its Wealth Management-related businesses. As such, it would be highly reckless (at best) if the Individual Defendants did not know the truth about the financial condition—and persistent customer outflows—of that business unit.

243. That the alleged misrepresentations and omissions go to the core of Credit Suisse's business and viability bolster the inference of scienter attributable to the Individual Defendants.

### G. The Individual Defendants and Other High-Level Credit Suisse Personnel Had Both Motive and Opportunity to Commit Fraud

244. Throughout the Class Period, the Individual Defendants were engaged in desperate efforts to save Credit Suisse from self-inflicted wounds, so they were motivated to misleadingly

put as positive a face on their efforts as possible at the expense of investors—even right up to the verge of the Company's collapse. On at least three occasions during the Class Period, Credit Suisse refused to accept emergency liquidity assistance, not because it wasn't needed, but because Credit Suisse did "not want to send any negative signals to the market," or "wanted to present the image of a solid bank."

245. After shepherding Credit Suisse through a year of unprecedented failure, the 2022 Compensation Report filed with the 2022 Annual report on March 14, 2023, revealed that aggregate Executive Board compensation in 2022 totaled approximately ***CHF 32.22 million*** (approximately USD $35.33 million), while Defendant Körner's compensation was approximately ***CHF 2.3 million*** (approximately USD $2.52 million), Defendant Mathers' compensation was approximately ***CHF 4.3 million*** (approximately USD $4.72 million). Defendant Lehmann's compensation was approximately ***CHF 3.2 million*** (approximately USD $3.5 million), Defendant Joshi's compensation was approximately ***CHF 1.2 million*** (approximately USD $1.32 million) (in addition to a CHF 6.97 million one-time signing bonus awarded in 1Q23), and total compensation awarded to the Board of Directors was approximately ***CHF 10.4 million*** (approximately USD $11.4 million). Total compensation awarded to Material Risk Takers and Controllers, who in 2022 totaled 1,577 Credit Suisse employees, amounted to approximately ***CHF 1.514 billion*** (approximately ***USD $1.653 billion***)

246. Credit Suisse's generous compensation structure provided a strong motivation for the Individual Defendants and for the Company itself (through the actions of the Individual Defendants as well as the Company's many bankers who were consistently rewarded) to ignore red flags and continue the fraud throughout the Class Period.

247. Additionally, the 2022 Annual Report—filed just days before the Credit Suisse collapsed—stated that, in February 2023, "the Compensation Committee granted a one-time Transformation Award to approximately 500 employees globally who hold senior leadership positions and other talent identified as being critical to the 'New Credit Suisse' strategy." Subject to a shareholder vote at the 2023 Annual General Meeting, this "Transformation Award" would also be extended to the Executive Board—including the Defendants Körner and Joshi. Unlike the awards to management, which would only vest if the share price exceeded CHF 3.82 as of December 31, 2025, the Executive Board Transformation Award (which was worth up to ***CHF 70 million***) was set for 100% vesting in 2025, regardless of the performance of the Company. As such, the Credit Suisse Executive Board and Management had a direct motivation to make Credit Suisse's new strategy, as announced on October 27, 2022, seem as successful as possible.

248. The FINMA Report found that "high variable remuneration in loss-making years" and "inadequate influence of misconduct and risk behaviour on individual remuneration" "encouraged an inappropriate risk culture over the past decade." FINMA Report at 49. Moreover, the FINMA Report revealed that "[n]umerous bank-internal and supervisory audits and bank internal and FINMA investigations" found "the moral hazards arising from the remuneration system" contributed to the many scandals the Company was involved in leading up to the nearcollapse. FINMA Report at 52. Further, in contrast to the "pay-for-performance culture" management publicly touted, "development of variable remuneration at CS primarily followed the developments in the market, with business performance only playing a secondary role." FINMA Report at 49.

249. An expert report by Professors Harald Hau and Jean-Charles Rochet regarding Credit Suisse's financial situation, commissioned by the PInC, explained that while performance

bonuses can "play a very useful role if they contribute to the distribution of earnings risk between shareholders and employees," at Credit Suisse, "performance bonuses were decoupled from economic profits and therefore effectively a cost factor that jeopardized the survival of the bank." Hau Report at 15. The Hau Report found:

> During the period from 2011 to 2022, the bank substantially and continually ***destroyed a total of CHF 34 billion of shareholder equity while rewarding bank managers with cumulative performance bonuses of CHF 40 billion***. This large-scale redistribution of shareholder assets to the bank managers indicates a failure of the Board of Directors to properly take shareholders' interests into account. A long-term failure of Credit Suisse at the capital market seemed inevitable given such conditions.

Hau Report at 4 (Emphasis added).

> UBS Chairman Colm Kelleher explained that, after the takeover, UBS had found similarly: Many executives were compensated largely in cash. With a relatively small amount of deferred stock. These were completely bogus incentive compensation packages. But frankly, in parts of Credit Suisse's investment bank, there were cowboys who were only thinking about their own interests. We saw that some of the deals they were making made no sense for the bank.[23]

### H. Corporate Scienter is Established

250. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

251. The scienter of the Individual Defendants and other employees and agents of the Company, including individual Credit Suisse bankers who profited handsomely during the Class Period, is similarly imputed to the Company under *respondeat superior* and agency principles.

---

[23] Christian Kolbe, "At Credit Suisse, there were cowboys who only thought about their own interests," *Blick*, Oct. 1, 2024.

## VIII. PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

252. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the scheme or any of the allegedly materially false and misleading statements pleaded herein. Many of the statements were regarding present or past events or were mixed statements of past/present and future conditions—and thus were not forward-looking. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

253. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## IX. THE 2022 ANNUAL REPORT OMITTED MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN UNDER ITEM 5 OF FORM 20-F

254. Part I, Item 5(d) of Form 20-F requires registrants to:

> [I]dentify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

255. "The disclosure requirements for Item 5 of Form 20-F (Operating and Financial Review and Prospects) are substantively comparable to the MD&A requirements under Item 303 of Regulation S-K."[24]

256. In a 1989 Interpretive Release,[25] the SEC describes the purposes of the MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

257. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

258. Accordingly, Credit Suisse had an affirmative obligation to disclose facts in the 2022 Annual Report filed on Forms 20-F required by Item 5 of Form 20-F and Item 303 of

---

[24] SEC Final Rule Release No. 33-10890, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, Nov. 19, 2020, at 91; see also Willard v. UP Fintech Holding Ltd., 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021).

[25] Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures, Release No. 6835 (May 18, 1989).

Regulation S-K, including information regarding known trends, uncertainties, or events, including, but not limited to, the fact that the Company was experiencing significant and unusual customer and/or asset outflows throughout the Class Period.

## X. THE PRESUMPTION OF RELIANCE

259. Plaintiff and other members of the Class are entitled to a presumption of reliance on Defendants' material misrepresentations, deceptive devices, and fraudulent scheme pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period, Defendants did the following:

a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b) the omissions and misrepresentations were material;

c) Credit Suisse's AT1 Bonds were traded in an efficient market in the U.S.;

d) Credit Suisse's AT1 Bonds were liquid and traded with moderate to heavy volume in domestic transactions in the U.S. during the Class Period, as evidenced by, *inter alia*, FINRA's TRACE data;[26]

e) the Company was covered by multiple analysts;

f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's AT1 Bonds; and

g) Plaintiff and members of the Class purchased, acquired, and/or sold Credit Suisse AT1 Bonds in domestic transactions in the U.S. between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

---

[26] As discussed further at ¶¶4 and 44, *supra*, the The TRACE system indicates that, during the Class Period, the total U.S. trading volume of the Series DD33, BZ62, and CV40 AT1 Bonds that Plaintiff purchased exceeded ***$1.2 billion***. *See* Financial Industry Regulatory Authority (FINRA) Trade Reporting and Compliance Engine (TRACE), via Bloomberg Finance L.P. This represents merely a subset of the various AT1 Bonds that were traded by the Class during the Class Period, meaning that the total domestic trading volume for all AT1 Bonds during the Class Period is even larger.

260. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

261. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

101. During the Class Period, Defendants had both the motive and opportunity to commit fraud. The sheer scale of Credit Suisse's internal control and compliance failures and resulting withdrawals of client funds, including the intense alarm this raised among investors and the market, were a forefront and critical concern for Defendants during the Class Period. This is exhibited by the fact that Defendants – all top Company management (apart from PwC which, nonetheless, had intimate knowledge of and access to Credit Suisse's financial condition) – assured investors through various statements in multiple interviews and public filings that these compliance and internal control failures were being scrutinized and remediated, that customer outflows had either stopped or reversed, and that the Company was mitigating the resulting liquidity crisis through a capital raise of billions of francs. All these statements were made even as Defendants knew that they had failed to implement meaningful changes to Credit Suisse's risk management and/or control governance procedures and/or policies, and that large customer outflows had not in fact stopped or reversed, but had actually continued through year end 2022, with Credit Suisse experiencing customer outflows of ***110.5 billion Swiss francs*** in the final three months of 2022, a figure which far exceeded market expectations.

102. Accordingly, Defendants, including PwC, which purported to audit Credit Suisse's financial statements and reports during the Class Period, had actual knowledge of the misleading

nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on the Company's AT1 Bond investors during the Class Period, ultimately culminating in Credit Suisse's takeover by UBS and the subsequent write-down in those bonds to a value of zero.

262. PLAINTIFF'S 234. Alternatively, Defendants corrupted the market for Credit Suisse securities through a course of conduct that misled the market as to the value of Credit Suisse securities. To the extent that these Defendants disrupted the integrity of the market for Credit Suisse securities, Plaintiff and members of the Class are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI. CONTROL PERSON ALLEGATIONS

263. The Individual Defendants, by virtue of their high-level and controlling positions at Credit Suisse, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the actions, individually and in concert, of these individuals.

264. Defendant Lehmann, in his role as Chairman of the Board of Directors, Defendants Gottstein and Körner, in the role as CEO, and Defendants Mathers and Joshi, in the role as CFO, were participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased or otherwise acquired Credit Suisse securities during the Class Period.

The scheme/course of conduct deceived the investing public regarding Credit Suisse's business, operations, financial condition, and the intrinsic value of Credit Suisse's securities, and caused Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse securities at artificially inflated prices.

265. The Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, and financial condition, so that the market prices of Credit Suisse's securities would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period. Defendants were also under a continuing duty to update and/or correct any false or misleading statements alleged herein.

266. The Individual Defendants, because of their positions of control and authority, were able to and did control the content of the Company's SEC filings, press releases, and other public statements issued by or on behalf of Credit Suisse during the Class Period. Each would have been provided with copies of at least some of the statements made in the SEC filings other public statements at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

## ~~X.~~XII. CLASS ACTION ALLEGATIONS

~~103.~~267. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Credit Suisse AT1 Bonds in a domestic transaction in the U.S. during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all

relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

~~104.~~268. ~~The~~As this Court has previously found, the members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Credit Suisse AT1 Bonds were actively traded in the U.S., as FINRA's TRACE data reflects. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

~~105.~~269. As this Court has previously found, Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

~~106.~~270. Als this Court has previously found, Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

~~107.~~271. ~~Common~~As this Court has previously found, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Credit Suisse;

c)

d)c) whether the Individual Defendants caused Credit Suisse to issue false and misleading financial statements during the Class Period;

e)

f)d)whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

g)

h)e) whether the prices of Credit Suisse's AT1 Bonds during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

i)f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

108.272. AAs this Court has previously found, a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

109.273. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

j)a)Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

k)a) the omissions and misrepresentations were material;

l)a)Credit Suisse's AT1 Bonds were traded in an efficient market in the U.S.;

m)a) Credit Suisse's AT1 Bonds were liquid and traded with moderate to heavy volume in domestic transactions in the U.S. during the Class Period, as evidenced by, *inter alia*, FINRA's TRACE data;[27]

n)a) the Company was covered by multiple analysts;

o)a) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's AT1 Bonds; and

p)a) Plaintiff and members of the Class purchased, acquired, and/or sold Credit Suisse AT1 Bonds in domestic transactions in the U.S. between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

110.1. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

111.1. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.XIII. COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

112.274. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

[27] As discussed further at ¶¶4 and 44, *supra*, the The TRACE system indicates that, during the Class Period, the total U.S. trading volume of the Series DD33, BZ62, and CV40 AT1 Bonds that Plaintiff purchased exceeded ***$1.2 billion***. *See* Financial Industry Regulatory Authority (FINRA) Trade Reporting and Compliance Engine (TRACE), via Bloomberg Finance L.P. This represents merely a subset of the various AT1 Bonds that were traded by the Class during the Class Period, meaning that the total domestic trading volume for all AT1 Bonds during the Class Period is even larger.

~~113.~~275. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

~~114.~~276. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Suisse AT1 Bonds; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Credit Suisse AT1 Bonds at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

~~115.~~277. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Credit Suisse AT1 Bonds. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Credit Suisse's finances and business prospects.

116.278. - By virtue of their positions at Credit Suisse, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

117.279. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Credit Suisse, the Individual Defendants had knowledge of the details of Credit Suisse's internal affairs.

118.280. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Credit Suisse. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Credit Suisse's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Credit Suisse AT1 Bonds was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Credit Suisse's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or

otherwise acquired Credit Suisse AT1 Bonds in domestic transactions in the U.S. at artificially inflated prices and relied upon the price of the AT1 Bonds, the integrity of the market for the AT1 Bonds, and/or upon statements disseminated by Defendants, and were damaged thereby.

~~119.~~281. During the Class Period, Credit Suisse AT1 Bonds were traded in an active and efficient market in the U.S. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Credit Suisse AT1 Bonds in domestic transactions in the U.S. at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said AT1 Bonds, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Credit Suisse AT1 Bonds was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Credit Suisse AT1 Bonds declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

~~120.~~282. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

~~121.~~283. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and/or sales of the Company's AT1 Bonds in domestic transactions in the U.S. during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## ~~XII.~~XIV. COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

~~122.~~284. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

~~123.~~285. During the Class Period, the Individual Defendants participated in the operation and management of Credit Suisse, and conducted and participated, directly and indirectly, in the conduct of Credit Suisse's business affairs. Because of their senior positions, they knew the adverse non-public information about Credit Suisse's misstatement of income and expenses and false financial statements.

~~124.~~286. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Credit Suisse's financial condition and results of operations, and to correct promptly any public statements issued by Credit Suisse which had become materially false or misleading.

~~125.~~287. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Credit Suisse disseminated in the marketplace during the Class Period concerning Credit Suisse's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Credit Suisse to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Credit Suisse within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Credit Suisse AT1 Bonds.

~~126.~~288. Each of the Individual Defendants, therefore, acted as a controlling person of Credit Suisse. By reason of their senior management positions and/or being directors of Credit Suisse, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Credit Suisse to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Credit Suisse and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

~~127.~~289. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Credit Suisse.

## ~~XIII.~~XV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants and relief as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## ~~XIV.~~XVI. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: ~~October 20, 2023~~June 12, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Brian Calandra*
Brian Calandra
Jeremy A. Lieberman

~~Jeremy A. Lieberman~~
~~J. Alexander Hood II~~
~~Thomas H. Przybylowski~~
~~James M. LoPiano~~
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
~~jalieberman~~
bcalandra@pomlaw.com
~~ahood~~jalieberman@pomlaw.com
~~tprzybylowski@pomlaw.com~~
~~jlopiano@pomlaw.com~~

~~BRONSTEIN, GEWIRTZ & GROSSMAN, LLC~~
~~Peretz Bronstein~~
~~60 East 42nd Street, Suite 4600~~
~~New York, New York 10165~~
~~Telephone: (212) 697-6484~~
~~Facsimile: (212) 697-7296~~
~~peretz@bgandg.com~~

*Attorneys for Lead Plaintiff Core Capital and the Class*