UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

In re: CREDIT SUISSE SECURITIES
FRAUD CLASS ACTIONS                                      23-cv-9287 (CM)
                                                         23-cv-5874 (CM)
This matter relates to:

      Both *Diabat* and *Core Capital*

———————————————————————————— x

**DECISION AND ORDER DENYING PWC'S MOTION TO DISMISS, GRANTING IN
PART AND DENYING IN PART THE CS DEFENDANTS' MOTION TO DISMISS,
GRANTING DIABAT'S MOTION TO CERTIFY A CLASS, AND GRANTING IN PART
AND DENYING IN PART THE CS DEFENDANTS' MOTION TO CONSOLIDATE**

McMahon, J.:

      Defendants PricewaterhouseCoopers AG ("PWC"), Axel P. Lehmann, Ulrich Körner,

Dixit Joshi, and António Horta-Osório (the "Individual Defendants") and Credit Suisse Group AG

("Credit Suisse," and together with the Individual Defendants, the "CS Defendants") have moved

separately to dismiss an action, filed by Core Capital Partners, Ltd. ("Core Capital"). The CS

Defendants have moved in the alternative to consolidate Core Capital's action, *Core Capital v.

Credit Suisse, et al.*, 23-cv-9287 (S.D.N.Y.), with the parallel class action *Diabat v. Credit Suisse

Grp. AG*, 23-cv-5874 (S.D.N.Y.), in which a lead plaintiff has already been chosen.[1] Separately,

in that parallel case against Credit Suisse and individual defendants Joshi, Körner, and Lehmann,

Plaintiff Ali Diabat has moved to certify a class of persons or entities who purchased or otherwise

acquired Credit Suisse securities in domestic transactions.

---

[1] Diabat's action was brought by a purported class of investors alleging that Credit Suisse and its affiliates committed
securities fraud in the lead up to the bank's March 2023 collapse. The Court assumes familiarity with the facts of that
case, which are discussed at length in its comprehensive September 19, 2024 order granting in part and denying in
part the defendants' motions to dismiss. *See Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502 (S.D.N.Y. Sept. 19,
2024) (*Diabat I*).

I will decide these pending motions together for purposes of judicial efficiency.

PWC's Motion to Dismiss is DENIED AS MOOT, since Core Capital voluntarily discontinued its case as against PWC. The CS Defendants' Motion to Dismiss is GRANTED IN PART AND DENIED IN PART. Diabat's Motion to Certify a Class is GRANTED. The CS Defendants' Motion to Consolidate is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

On March 8, 2023, Plaintiff Patrick Calhoun was the first plaintiff of many to file a federal securities class action complaint against Credit Suisse and several individual defendants in connection with the bank's March 2023 collapse. *See* Complaint, *Calhoun v. Credit Suisse*, No. 1:23-cv-06023 (S.D.N.Y. Mar. 8, 2023), ECF No. 1. Calhoun's complaint proposed a class of plaintiffs consisting of "all persons and entities other than Defendants that purchased or otherwise acquired Credit Suisse securities between December 1, 2022 and February 17, 2023." *Id*. ¶ 1. Over the next few months, multiple plaintiffs – including Core Capital and Diabat – moved to be appointed as the lead plaintiff in a consolidated class action. *See* Diabat Motion to Appoint Lead Plaintiff, *Calhoun v. Credit Suisse*, No. 1:23-cv-06023 (S.D.N.Y. May 8, 2023), ECF No. 16; Core Capital Motion to Appoint Lead Plaintiff, No. 1:23-cv-06023 (S.D.N.Y. May 8, 2023), ECF No. 19. Two weeks later, Core Capital amended its motion and moved instead to be appointment as Lead Plaintiff on behalf of the "Bond Investor Class," which it defined as separate from a proposed "ADS Investor Class." Core Capital Memorandum in Support, at 1, No. 1:23-cv-06023 (S.D.N.Y. May 22, 2023), ECF No. 25.

On September 7, 2023, I held a hearing at which I selected Diabat as the lead plaintiff of the consolidated action. *See* Transcript of Sept. 7, 2023 Hearing at 10-14, Diab. Dkt. No. 58.[2] During the hearing, I acknowledged that, of the lead plaintiff applicants, Core Capital had the largest interest in, not just the Credit Suisse bonds, but all Credit Suisse securities, and was entitled to the rebuttable presumption that it should represent a class of all security holders. *See* Transcript of Sept. 7, 2023 Hearing, at 9-11. However, Diabat rebutted this presumption by showing that Core Capital was likely subject to unique defenses. Diabat argued, *inter alia*, the specific Credit Suisse bonds that Core Capital owned (the "AT1 Bonds") were fully written down by directive of the Swiss Financial Market Supervisory Authority before the end of the alleged class period. *See id.* at 13. As a result, I rejected Core Capital's bid to serve as lead plaintiff in favor of Diabat's bid to serve as lead plaintiff of the broader securities class. *See id.* at 16-17.

Diabat filed an amended complaint in the combined action on October 5, 2023. (Diab. Dkt. No. 65). He defined the class he sought to represent broadly, as "persons or entities who purchased or otherwise acquired Credit Suisse securities in domestic transactions." (Diab. Dkt. No. 65 ¶ 2).

Defendants moved to dismiss the complaint, and I granted in part and denied in part that motion on September 19, 2024. After overcoming an attempt by another plaintiff to be substituted as lead plaintiff, (Diab. Dkt. No. 121), Diabat moved to certify the pleaded class on December 13, 2024, (Diab. Dkt. No. 126). In his class certification motion, Diabat narrowed the list of CS Securities at issue in his class to "(i) Credit Suisse American Depository Shares, (ii) seven Credit Suisse notes [specifically the LAE3 Notes, the AC5 Notes, the AF8 Notes, the L2E0 Notes, the

---

[2] As this opinion predominately addresses motions brought in *Core Capital v. Credit Suisse, et al.*, 23-cv-9287 (S.D.N.Y.), references to "Dkt. No. X" will refer to the docket in that case. References to the docket in *Diabat v. Credit Suisse, et al.* (23-cv-5874), will be written "Diab. Dkt. No. X."

L2G5 Notes, the L2K6 Notes, and the L2M2 Notes], and (iii) Credit Suisse options on the CS ADSs." (Diab. Dkt. No. 127, at 1 n.1) (internal definitions omitted).

Shortly after Diabat filed his amended complaint, Core Capital commenced its parallel action by filing an initial complaint on October 20, 2023. Core Capital claims it filed this complaint because Diabat, "appeared to have abandoned claims regarding the AT1 bonds," (Dkt. No. 32), when his amended complaint failed "to allege any AT1 Bond losses or make any reference to the bonds in his amended complaint," (Dkt. No. 30, at 3). Core Capital took this position notwithstanding the breadth of the class pleaded in the Amended Complaint. While at the time its position was arguable, it became inarguable once Diabat filed his motion for class certification (*see infra* pg. 23).

On January 18, 2024, I so ordered a joint stipulation to stay Defendants' obligation to respond to Core Capital's complaint until the resolution of various outstanding motions in other Credit Suisse lawsuits. (Dkt. No. 18). After those motions were decided, the parties were directed to brief a motion to dismiss Core Capital's complaint, as well as Diabat's motion for class certification.

This opinion will dispose of all outstanding motions in both the *Diabat* and *Core Capital* actions.

## DISCUSSION

### I.    PWC's Motion to Dismiss

Before briefing on the Core Capital motions to dismiss began, Core Capital filed a Notice of Voluntary Dismissal, pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, dismissing Defendant PWC from the action without prejudice. (Dkt. No. 24). Notwithstanding the voluntary dismissal, PWC filed a motion to dismiss Core Capital's Complaint and an

accompanying 15-page brief a week later. (Dkt. No. 25). PWC acknowledged Core Capital's voluntary dismissal, but elected to spend its time on the brief "to comply with the Court's September 25 order [setting forth the parties' briefing schedule] (Dkt. 19), as the notice has been referred to and remains pending before the Court." (Dkt. No. 25, at 2 n.1).

Voluntary dismissal under FRCP 41(a)(1)(A)(i) does not require a judge's endorsement and, unlike dismissal under FRCP 41(a)(1)(A)(ii), does not need to be "signed by all parties who have appeared" as long as it is filed before the "opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A)(i). That was the case here.

I do not know why PWC (more specifically its counsel) spent a not-insignificant amount of attorney time and client money drafting and filing a motion that was moot on arrival – as opposed to writing a letter to the court to ask if such a motion was necessary. PWC has already been voluntarily dismissed from Core Capital's action, without prejudice, pursuant to Core Capital's October 11, 2024 voluntary dismissal under Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure. No effort has been made to reassert claims against PWC, so there is no reason to address the merits of its motion to dismiss. The Clerk of Court is directed to terminate PWC as a party to Core Capital's action.

## II.    The CS Defendants' Motion to Dismiss Plaintiff Core Capital's 10(b)-5 Claim

Deciding the motion to dismiss Core Capital's complaint evokes a sense of "déjà vu all over again."[3] However, in anticipation of the duplicative work that these parallel Credit Suisse cases would likely entail, I endeavored to streamline the process, directing the parties to keep their briefs short by making "references to the court's decision in *Diabat [I]* . . . in place of lengthy arguments for why particular claims and/or particular defendants should be dismissed from this

---

[3] Allen Barra, *Yogi Berra: Eternal Yankee* xxxiv (W. W. Norton & Company 2009).

action." (Dkt. No. 19, at 2). As to one key issue, I explained in the order, "To the extent that Plaintiff alleges in the Core Capital complaint that specific statements made by Defendants were false and misleading, the court is going to rule in this case in exactly the same manner as I did in *Diabat [I]*." (*Id*.). That was because, in *Diabat I*, the court had analyzed some 81 statements and 4 SOX Certifications for sufficiency of pleading falsity; there was no need to redo that rather extensive analysis to the extent that Core Capital is relying on the same statements.

Defendants Thomas Gottstein and David R. Mathers have not appeared in Core Capital's case. The CS Defendants, in their memorandum of law, explain that "Defendants Thomas Gottstein and David R. Mathers have not been served with the Complaint," adding that the "Court has previously dismissed claims against unserved defendants where, as the CS Defendants anticipate will be the case here, 'the Court's holdings . . . necessarily establish the inadequacy of the Complaint as to them.'" (Dkt. No. 28 at 1, n.1) (quoting *Stevenson v. Thornburgh*, 2024 WL 645187, at *45 (S.D.N.Y. Feb. 14, 2024) (McMahon, J.)). In its Opposition Brief, Core Capital specifies that its use of the term "Defendants" applies to "(i) Credit Suisse Group AG . . . , (ii) Axel P. Lehmann, (iii) Ulrich Körner, and (iv) Dixit Joshi," noting that "The Court has dismissed claims against Defendants Thomas Gottstein, David R. Mathers, and António Horta-Osório, and, reserving all rights, including appellate rights, Core Capital does not dispute that ruling here." (Dkt. No. 130, at 1 n.1).

It is clear that Core Capital has no intention of prosecuting its case against Defendants Gottstein, Mathers, and Horta-Osório, so the claims against these three defendants are DISMISSED *sua sponte*.

### a. Misstatements/Omissions (Falsity)

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321-23 (2007). The heightened pleading requirements are set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the "PSLRA"). Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b).

Rule 9(b) requires plaintiffs, when alleging fraud or mistake, to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" – scienter, or intent "to deceive, manipulate, or defraud" – with respect to each statement or omission. *Id.*; *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324).

In *Diabat I* this court analyzed a total of 81 statements and 4 SOX Certifications that were alleged to be false and misleading. After painstaking analysis, I concluded that just 11 of those

statements and 2 of the SOX Certifications were actionable as potentially false and misleading statements under the federal securities laws.

Defendants describe Plaintiff Core Capital's Complaint as alleging "25 total misstatements," of which "four were allegedly made by PwC." (Dkt. No. 28, at 13). "Of the remaining 21 statements, 15 are materially identical to, or encompassed within, alleged misstatements that this Court held in *Diabat* were inactionable." Core Capital does not challenge that assessment. There is no basis to stray from that ruling here; none of those 15 statements is actionable.

This leaves six statements attributable to CS and the CS Defendants. As to five of them, "This Court ruled that the remaining five alleged misstatements in this case were potentially actionable (at least as a matter of pleading) in *Diabat*."[4] (*Id*., at 13-15). I have no basis to change my mind on that issue, either; so the motion to dismiss Core Capital's complaint is denied insofar as it pleads that these statements – located at paragraphs 65, 66-67, 68-69, 74-75, and 76 of the Complaint – are false and misleading in violation of the federal securities laws. I am unpersuaded by the CS Defendants' argument – the very argument I rejected in *Diabat I* – that these five statements should be deemed not actionable because they are nothing more than "puzzle pleading." (Dkt. No. 28, at 11-12).

This leaves exactly one statement that was not discussed and disposed of in *Diabat I*, because it is not pleaded in Diabat's complaint. That statement is a February 18, 2021 CS press release. (Compl. ¶ 46). The press release quotes Thomas Gottstein as saying "Despite a challenging environment for societies and economies in 2020, we saw a strong underlying performance across

---

[4] Although it takes some selective mathematics to get to these numbers, they appear to tie together if one treats the following paragraph ranges in the Complaint as representative of one "statement" each: ¶¶ 60-61; 66-67; 68-69; and 74-75. (*See* Dkt. Nos. 28, at 13-15; 30, at 11). I will follow this shorthand for simplicity's sake.

Wealth Management and Investment Banking, while addressing historic issues. We remained focused on serving our clients around the globe and on delivering value to our shareholders. The steady execution of the strategic initiatives we announced last July supports our growth agenda and allows for further investment in our businesses. Looking forward into 2021 and beyond, we aim to further accelerate growth in Wealth Management and deliver sustainable returns in Investment Banking. We remain strongly committed to positioning Credit Suisse as a leader in sustainability and driving digitalization and automation to generate positive operating leverage. I would like to thank all our employees for their outstanding commitment and loyalty." (*Id.*)

Defendants' principal argument for why this statement should be deemed inactionable is again that it qualifies as "puzzle pleading" – in that Core Capital "leaves the reader to guess exactly what in the . . . statement is false or misleading and why." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 2020 WL 4937461, at *3 (S.D.N.Y. Aug. 24, 2020), *aff'd sub nom. Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021). I cannot say there is no merit whatever to that argument. However, the issue is easily disposed of on the merits. The statement is not actionable because this court held, in *Diabat I*, that no statement made prior to October 2022 was actionable. As this press release was released in 2021, it falls squarely within that ruling. Core Capital concedes as much: "This Court held [in *Diabat I*] that all alleged misstatement prior to October 2022 were not actionable." (Dkt. No. 30, at 11 n.7).

Core Capital can, therefore, proceed against the remaining CS Defendants – Credit Suisse Group AG, Axel P. Lehmann, Ulrich Körner, and Dixit Joshi – on the theory that the five statements identified at ¶¶ 65, 66-67, 68-69, 74-75, and 76 in its Complaint sufficiently plead falsity under Section 10(b) and Rule 10b-5 to survive a motion to dismiss. Of course, stating a

claim does not mean that either Diabat or Core Capital will ultimately prevail in proving any violation of the federal securities laws.

### b. Scienter

To state a valid claim under Section 10(b) and Rule 10b-5, a plaintiff must plead with particularity facts that give rise to a strong inference "that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 323 (internal quotations omitted). "Under the heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324). "To apply this standard, this Court must 'take into account plausible opposing inferences' and must consider 'plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.' The inference of scienter 'must be more than merely "reasonable" or "permissible"— it must be cogent and compelling, thus strong in light of other explanations.'" *Schiro v. Cemex, S.A.B. de C.V.*, 396 F.Supp.3d 283, 300 (S.D.N.Y. 2019) (quoting *Tellabs*, 551 U.S. at 323-24).

Diabat dedicated over 60 paragraphs and 20 pages to its scienter allegations against the defendants in that case. I sifted from those 60 paragraphs one scienter allegation that I found deserving of a "hard look:" Credit Suisse's back-and-forth correspondence with the SEC concerning potential Internal Control over Financial Reporting ("ICFR") issues. *See Diabat I* at **142-45.[5] Although it was a close call, I decided that the reference to the SEC Correspondence "nudge[d] his claim across the line from conceivable to plausible." *Id.* at *145.

---

[5] I also relied on Diabat's invocation of the core operations doctrine as a "supplementary" fact supporting scienter. *See Diabat I*, at *145.

Since Core Capital's Complaint incorporates Diabat's by reference, I must also conclude that the CS Defendants cannot obtain dismissal of Core Capital's case on the basis of its failure to plead scienter – weak though that pleading be, it is sufficient for the moment.

### c. Loss Causation

"Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020). But "corrective disclosure" and "materialization of risk" are not "fundamentally different pathways for proving loss causation," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016); "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus," *id.* at 262.

Core Capital's complaint alleges five corrective disclosures or materializations of risk, (Compl. ¶¶ 72; 81; 83; 85; 87-88), but its brief "does not challenge [this Court's] holdings . . . that the corrective disclosures and concealed risks alleged to have materialized on November 23, 2022 (¶72) and March 15, 2023 (¶85) are not actionable," and "given that the Court held in [*Diabat*] that revelations about depositor outflows were not corrective disclosures . . . it effectively ruled that the February 20, 2023 *Reuters* article [(¶81)] was not a corrective disclosure." (Dkt. No. 130, at 14 n.9). Instead, it focuses on two alleged revelations: (i) the March 14, 2023 filing of Credit Suisse's Form 20-F, which revealed problems with the Company's ICFR and the corresponding issues in its 2021 Annual Report and prior quarter financial certifications; and (ii) the March 19-20, 2023 announcement that Credit Suisse would be merged into UBS and that "[t]he extraordinary

[Swiss] government support [for the Merger] will trigger a complete write-down of the nominal value of all AT1 debt of Credit Suisse." (*See* Compl. ¶¶ 83; 87).

In *Diabat I*, I premised my decision to allow Diabat to proceed past the pleading stage on one set of corrective disclosures: statements made in connection with the March 14, 2023 release of Credit Suisse's 2022 20-F. *See Diabat I*, at **471-72. I held that the portions of these disclosures revealing problems with Credit Suisse's ICFR and the corresponding issues in its 2021 Annual Report and prior quarter financial certifications were sufficiently corrective of previous alleged misstatements to get Diabat across the loss causation threshold. *Id*. I separately held that Diabat had plausibly alleged loss causation under a materialization of the risk theory. *Id.*, at **475-80. I elaborated on this in my subsequent October 24, 2024 decision, explaining that, while the September 19 decision "held that Diabat had sufficiently alleged that the March 14 public filing of the 2022 Annual Report constituted a corrective disclosure and a materialization of a concealed risk . . . . The decision did not address whether the class period ended on that date, or whether anything occurred after that date that represented a further materialization of a concealed risk." *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4566372, at *2 (S.D.N.Y. Oct. 24, 2024) ("*Diabat II*").

The CS Defendants make two arguments for why Core Capital fails to plead loss causation as a result of the March 14 and March 19 revelations.

*First*, they urge that the March 14 corrective disclosure does not support Core Capital's claims because of the unique circumstances surrounding the subsequent write-down order that reduced the value of the AT1 Bonds to zero. The CS Defendants argue that – with the relevant measure of damages in a securities case being "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct," *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972) – "Plaintiff both

received and **would have** received nothing irrespective of the alleged fraud because it did not sell any AT1 bonds prior to FINMA's write-down directive." (Dkt. No. 31, at 7) (internal citations omitted) (emphasis in original). Under the CS Defendants' theory, since Core Capital did not sell during the period between March 14 and the March 19 write-down, the write-down washed away any actionable losses. This argument presupposes that the write-down was not itself an effect of the fraud and would have occurred regardless.

*Second*, the CS Defendants contend that the write-down order cannot represent the materialization of a concealed risk, because the information released concerning the bank's downturn in the lead up to March 19 would have made a reasonable AT1 Bondholder aware of the substantial likelihood of the write-down. (*See id*. at 7-8). Defendants argue that, "Given these 'substantial indicia of risk already in the public domain,' and given that Plaintiff has not alleged 'facts sufficient to apportion [its alleged] losses between the [allegedly] disclosed and concealed portions of the risk,' Plaintiff has failed to adequately plead loss causation." (*Id*. at 8) (quoting *In re New Energy Systems Securities Litigation*, 66 F. Supp. 3d 401, 406 (S.D.N.Y. 2014)). I note that the CS Defendants selectively quote from *New Energy*, in which the court explained that in circumstances when there are substantial indicia of risk already in the public domain, a plaintiff must allege *either* facts sufficient to apportion its alleged losses *or* "facts sufficient to support an inference that it was defendants' fraud — rather than other salient factors — that proximately caused plaintiff's loss." *In re New Energy*, 66 F. Supp. 3d at 406.

Both of these arguments hinge on Defendants' assumption that Core Capital did not and could not plausibly allege that the write-down was a downstream consequence of the alleged fraud instead of being an independent, intervening event. But in the Complaint, Core Capital alleges exactly this, writing that the "disclosures of Defendants' fraud . . . caused a sharp decline in the

market value of Credit Suisse's AT1 Bonds, ultimately culminating in the eventual write-down of all Credit Suisse AT1 Bonds to a value of ***zero***. (Compl. ¶ 37) (emphasis in original). As Core Capital notes in its Opposition Brief, I found such a chain of events plausibly pleaded in *Diabat II. Diabat II*, at *2. So too here.

The CS Defendants further argue that Core Capital cannot plausibly allege loss causation under a materialization of the risk theory because the company had technically disclosed the risk of a write-down "if FINMA determines that doing so is an essential requirement to prevent [CS] from becoming insolvent or if the Swiss government provides an irrevocable commitment of extraordinary support to avoid CS's insolvency." (Dkt. No. 28, at 10) (internal citations omitted). It is indeed true that this risk was disclosed numerous times – in the Information Memorandum for each of the series of bonds that Core Capital alleges it bought. However, mere disclosure of the possibility of that risk does not immunize Credit Suisse from "the *likelihood* of [the write-down's being] within the zone of risk concealed by defendants' alleged misrepresentations." *In re Omega Healthcare Inv'rs Sec. Litig.*, 563 F. Supp. 3d 259, 268-69 (S.D.N.Y. 2021) (emphasis added).

At this stage in the litigation "where the question, at bottom, is one of intervening events— a consideration properly analyzed under proximate cause—the chain of causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).

For these reasons I will not dismiss Core Capital's complaint on a 12(b)(6) motion. Which is not to say that the complaint will survive discovery. It well may not. But it lives today.

### III.    The CS Defendants' Motion to Dismiss Core Capital's Section 20(a) Claim

We turn, next, to Core Capital's claim against the Individual Defendants under Section 20(a) of the Exchange Act. This Section holds liable any persons who "control" those found primarily liable under the Exchange Act – in our case, Credit Suisse. 15 U.S.C. § 78t(a).

Here, the Complaint plausibly alleges an underlying violation of the securities laws as to the remaining Individual Defendants Joshi, Körner, and Lehmann. Core Capital has also sufficiently pled that the Individual Defendants, "had the power to direct the actions of, and exercised the same to cause, Credit Suisse to engage in the unlawful acts and conduct complained of herein." (Compl. ¶ 125). Accordingly, Core Capital's Section 20(a) claim will not be dismissed against those three Individual Defendants. It is co-terminus with the viable claims against CS itself.

## IV.    Diabat's Motion to Certify a Class

Plaintiff Diabat's Amended Complaint brought an action on behalf of a proposed class comprised of "persons or entities who purchased or otherwise acquired Credit Suisse securities in domestic transactions." (Diab. Dkt. No. 65 ¶ 2). Although his Motion to Certify a Class does not official amend this class definition, he specifies in his motion that the "CS Securities encompassed by the proposed Class consist of (i) Credit Suisse American Depository Shares, (ii) seven Credit Suisse notes, and (iii) Credit Suisse options on the CS ADSs," adding that, "The specific CS Notes are listed in the Expert Report of Matthew D. Cain, Ph.D." (Diab. Dkt. No. 127, at 1 n.1) (internal definitions omitted). In other words, Core Capital correctly surmised that Diabat was not pressing claims on behalf of the AT1 Bondholders; "none of the CS Notes—i.e., the only debt securities for which class certification is sought—are AT1 bonds." (Dkt. No. 32 at 2). Notwithstanding the breadth of the pleading in his Amended Complaint, Diabat's Motion to Certify a Class clearly demonstrates that he has chosen a class that does not include the AT1 Bondholders.

**a. Rule 23(a)**

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). When confronted with a motion for class certification, the court must first determine whether the requirements of Rule 23(a) are met; that is (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *General Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 330 (1980).

Defendants do not dispute that Plaintiff Diabat has satisfied the numerosity and commonality requirements. Accordingly, there is no reason to engage in an extensive discussion of those factors. "Numerosity may be presumed when a class consists of forty or more [members]," *In re Bank of Am. Corp. Sec., Deriv. & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012), and "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." Diabat has adequately established numerosity by reference to the hundreds of millions of CS ADSs that were actively traded on the New York Stock Exchange every week, the millions of dollars of CS Notes outstanding, and millions of CS Options contracts traded during the Class Period. (Diab. Dkt. No. 127, at 5).

Further, in a securities class action, the Supreme Court has noted that "The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tele. Co. of the Sw. v. Falcon*, 457 U.S. at 157 n.13. Although Defendants challenged Diabat's representation on typicality grounds but not on commonality, Diabat easily satisfies both.

16

Defendants focus their argument on the fact that Diabat "made no Class Period purchases before the first corrective disclosure" and "As a consequence, Plaintiff is subject to the unique defense that he did not (and logically could not have) relied on the ICFR statements." (Diab. Dkt. No. 130, at 2). However, I have previously held, and hold again today, that the fact that a plaintiff purchased securities after the market became aware of some corrective information does not render him an atypical class member, especially where there is no evidence that Diabat was aware of any ongoing, publicly undisclosed fraud or that he purchased the stock with anything other than public information. *See Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *10 (S.D.N.Y. Jan. 26, 2021).

Finally, Defendants challenge Diabat's adequacy, as an investor in CS ADSs, to represent the CS Noteholders, because on March 20, 2023 – the trading day following Credit Suisse's absorption into UBS – the CS ADSs experienced a price decline, while the CS Notes experienced a price increase. Defendants claim that this incongruity will lead the CS Noteholders to ignore or seek to discount any events or disclosures on March 19 or 20. I am assured that Diabat, and his experienced securities counsel, will adequately represent the class for two reasons: (1) concerns that different class members would be motivated to argue that their respective securities "were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification," *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2022 WL 1078460, at *3 (S.D.N.Y. Apr. 11, 2022); and (2) as Diabat explains, it is inconceivable that any plaintiff in the *Credit Suisse securities litigation* would ignore what I have previously called, "the ultimate materialization of the risk [that] occurred when CS was forcibly merged into UBS and so ceased to exist." (Diab. Dkt. No. 121, at 5). This is not a reasonable concern, and there is no other reason to believe that Diabat and his counsel would not be adequate representatives of the class.

17

### b.  Rule 23(b)(3)

Beyond the Rule 23(a) requirements, certification of the class must also be deemed appropriate under one of the three Rule 23(b) subcategories.  *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010). Plaintiff Diabat moves to certify the proposed putative class under 23(b)(3).

To certify a class for damages under Rule 23(b)(3), a court must find "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Among other factors, the court must consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id*. "While predominance requires a more rigorous showing than does commonality or typicality, it does not require a plaintiff to show that there are no individual issues," and instead, "in determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 236 (S.D.N.Y. 2012) (internal citations omitted).

With respect to Rule 23(b)(3), Defendants have three main arguments: (1) Plaintiff fails to establish that damages are capable of measurement on a class-wide basis; (2) the ICFR statements had no impact on the price of CS Securities; and (3) Plaintiff fails to establish CS Options and Notes traded in an efficient market. I address these arguments in turn.

I begin by noting that despite the numerous consolidated actions in, lengthy opinions in, and overall scope of the Credit Suisse cases, they are, at their core, straightforward securities fraud class actions. A plaintiff alleges that defendants concealed the financial condition of a company, events occurred and statements were made that revealed the true condition of the company, and investors – of all stripes – suffered. Diabat's expert, Dr. Matthew Cain, has proposed a damages methodology that is criticized by Defendants' expert, Dr. Mark Garmaise, as "generic" and as one which, "fails to account for various distinctive factors in this matter." (Garmaise Report ¶ 12). Although Defendants' Opposition Brief attempts to underscore the difficulties in capturing damages resulting from the "historic" nature of the Credit Suisse / UBS merger, (Diab. Dkt. No. 130, at 5), an "historic" merger does not an "historic" securities fraud case make, and there is no reason to believe that damages cannot be calculated via typical techniques like the standard out-of-pocket methodology that Dr. Cain employs.

The Supreme Court's holding in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) does not alter my analysis of these issues. The Second Circuit has repeatedly expressed its understanding that the plaintiffs' damages model in *Comcast* fell short of establishing that damages were capable of measurement on a class-wide basis only "because the sole theory of liability that the district court determined was common in that antitrust action, overbuilder competition, was a theory of liability that the plaintiffs' model indisputably failed to measure when determining the damages for that injury." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (internal citations omitted). The Circuit has further specified that *Comcast* "held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015). The contours of this case, while historic in some ways,

do not exhibit the sort of disconnect that was at issue in *Comcast*. It is for the same reason that Diabat has established that Dr. Cain's methodology will have no trouble accounting for inflation with respect to the CS Options and addressing how the alleged fraud impacted the values of the CS Notes.

Defendants claim that Diabat has failed to demonstrate the requisite price impact of the ICFR statements.[6] The so-called *Basic* presumption is an indirect proxy for demonstrating "price impact," i.e., that the defendants' fraudulent misstatements affected the price at which the plaintiff purchased his shares. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281 (2014). Under the now-familiar standard of *Basic v. Levinson*, 485 U.S. 224, 248 n.27 (1988), the Supreme Court held that reliance may be presumed where (i) the alleged misrepresentations were publicly known, (ii) the stock traded in an efficient market, and (iii) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed - thereby obviating the need to demonstrate reliance on an individualized basis. Although "defendants may rebut the *Basic* presumption at class certification by showing that an alleged misrepresentation did not actually affect the market price of the stock," *Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*, 594 U.S. 113, 119 (2021), Defendants have not done so here, for the reasons explained in Dr. Cain's reports and Diabat's Reply Brief. (*See* Dkt. No. 134, at 3-6).

Finally, with respect to the CS Options and Notes, I find that Diabat has more than sufficiently demonstrated efficiency of the respective markets. "In general, '[t]he market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to

---

[6] The connection between Credit Suisse's ICFR and the materialization of risk impacting investors is discussed in detail at *Diabat I* at \*\*475-81.

information affecting that price.'" *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (quoting *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988)). "Option traders and other traders of securities aside from the shares of stock themselves may use the fraud-on-the-market presumption of reliance absent special circumstances compelling a different result." *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 99 (D. Conn. 2006). Defendants' references to Dr. Cain's ignoring some "academic literature" and failing to individually analyze market efficiency as to each option are unavailing. (Diab. Dkt. No. 130, at 18-19).

Regarding the CS Notes, I disagree with Defendants that Diabat and Dr. Cain have failed to correctly apply Factors 1 and 5 under the test set out in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the "*Cammer* factors"). As to *Cammer* Factor 1 – pertaining to "average weekly trading volume" – the fact that two of the seven CS Notes fell slightly below *Cammer's* 1% "substantial presumption" of efficiency is not the smoking gun that Defendants claim it to be. As my late colleague Judge Baer explained in the case *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011), "even if a presumption based on 1% trading volume is not triggered, [an expert can show] that trading in the Bonds was active," because "the *Cammer* presumption applied to stock trades, whereas the type of bonds at issue in this case trade 'relatively infrequently' in general." *Id*. at *4. I agree with Judge Baer that, "A turnover rate below the 1% threshold established in *Cammer* for the stock market does not, without more, defeat a finding of an efficient bond market." *Id*. As to *Cammer* Factor 5 – pertaining to "a cause and effect relationship between company disclosures and resulting movements in stock price" – Dr. Garmaise's report does little to refute the results of Dr. Cain's event studies for each of the CS

Bonds, and Dr. Cain's selection of event dates and "pooling" approach are not "facially insufficient." (Diab. Dkt. No. 130, at 19).

Based on the above analysis, Plaintiff Diabat has established that common questions of law and fact predominate over individualized ones in his case. Defendants appear to concede the issue of superiority – as they should – because Courts have long recognized that class actions are a desirable means for resolving claims based on securities laws.

With Diabat's class action having been certified – a class that does not include Core Capital and the other AT1 Bondholders – we move to the CS Defendants' motion to consolidate Core Capital's action into Diabat's.

### V.    The CS Defendants' Motion to Consolidate Diabat's Case and Core Capital's Case

The CS Defendants have filed a separate motion that urged this Court to consolidate Core Capital's action with Diabat's pending and parallel class action. (*See* Dkt. No. 28, at 5). The CS Defendants' motion to consolidate Core Capital's case with Diabat's is DENIED with respect to turning this into a single lawsuit, but is GRANTED for the administrative purpose of consolidating discovery and other pre-trial matters. We will consider whether to consolidate the two cases for trial at a later date.

Pursuant to Federal Rule of Civil Procedure 42(a), a court may consolidate actions if they involve "common issues of law or fact." Fed. R. Civ. P. 42(a). District courts have "broad discretion" in determining the propriety of consolidation, and consolidation is typically appropriate in the context of securities class actions when complaints are "based on the same 'public statements and reports,'" *Weiss v. Friedman, Billings, Ramsey Group, Inc.*, 2006 WL 197036, *1 (S.D.N.Y. Jan. 25, 2006) (citations omitted), and the "[d]ifferences in causes of action, defendants, or the

class period . . . do not outweigh the interests of judicial economy served by consolidation," *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. Jan. 17, 2007), *reconsidered on other grounds sub nom. In re IMAX Sec. Litig.*, 2009 WL 1905033 (S.D.N.Y. June 29, 2009). The CS Defendants contend that Core Capital's action and Diabat's parallel class action should be consolidated because they arise out of the same facts and circumstances.

Core Capital agrees that its case raises similar if not identical issues to Diabat's action, but argues that consolidation would prejudice the AT1 Bondholders because Diabat has now "abandoned" their claims. (Dkt. No. 30, at 3). In his Memorandum of Law in Support of his Motion to Certify a Class, Diabat states that the securities "encompassed by the proposed Class consist of (i) Credit Suisse American Depository Shares, (ii) seven Credit Suisse notes, and (iii) Credit Suisse options on the CS ADSs." (Diab. Dkt. No. 127, at 1 n.1) (internal definitions omitted). The memo also refers to specific CS Notes listed in an expert report, but as Core Capital helpfully demonstrates through a chart included in its December 17, 2024 letter, "none of the CS Notes— i.e., the only debt securities for which class certification is sought—are AT1 bonds." (Dkt. No. 32 at 2). It is fair to say, and the CS Defendants appear to concede, (*see* Dkt. No. 33, at 1), that Diabat has chosen not to pursue claims on behalf of the AT1 Bondholders.

The CS Defendants argue that this is not a problem. They rely principally on *In re Bank of America Corp. Securities, Derivative and Employment Retirement Income Security Act (ERISA) Litigation*, 2010 WL 1438980 (S.D.N.Y. Apr. 9, 2010) ("*BOFA I*"), and a subsequent decision in the same case, *In re Bank of America Corp. Securities, Derivative and Employment Retirement Income Security Act (ERISA) Litigation*, 2011 WL 4538428 (S.D.N.Y. Sept. 29, 2011) ("*BOFA II*"). In those cases, after a court had chosen a lead plaintiff in a consolidated securities class action, a new set of plaintiffs filed securities class actions on behalf of options holders and bond holders

against substantially similar defendants. *BOFA I* at *1. The defendants and lead plaintiff in the original action opposed the new plaintiffs' motions to lead their respective actions and sought to consolidate the cases. But the new plaintiffs argued that they and similarly situated persons would not be properly represented in the parallel action because the existing lead plaintiff had elected not to sue on behalf of options holders or bond holders. *Id.* at *2.

In the initial decision on the consolidation motion, Judge Chin concluded that all of the actions should be consolidated, because (i) the new actions arose out of the same facts and circumstances and raised the same issues of facts and law; (ii) the designated lead plaintiff is empowered by the PSLRA to control the management of the litigation and decide what claims to assert on behalf of the class; (iii) the lead plaintiff advised that it was still assessing whether to bring claims on behalf of the additional class members; and (iv) the new plaintiffs would be free to pursue their claims as individual cases instead of continuing by way of a class action. *Id*.

While Core Capital acknowledges that its action "raises 'similar if not identical issues' to the [*Diabat*] securities class action," (Dkt. No. 30, at 3), it contends *BOFA I* is distinguishable because in that case the lead plaintiff "was still assessing whether to bring claims on behalf of the additional class members" when Judge Chin decided to consolidate the parallel class actions. *BOFA I*, at *2. Although Judge Castel, in a subsequent decision, continued to disallow the maintenance of a parallel class action – despite the fact that the lead plaintiff had by then affirmatively abandoned the claims asserted by the parallel class, *see BOFA II*, at *2 – lead plaintiff in *BOFA II* was himself instrumental in opposing the parallel class action. By contrast, Diabat has made no attempt, in either of these cases, to oppose Core Capital's pursuit of the AT1 Bondholder claims that he has abandoned.

Core Capital also argues that consolidating the class actions risks prejudicing the AT1 Bondholders because the Exchange Act's statutes of limitation and repose continue to run. In Plaintiff Core Capital's lead case, *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 293 F.R.D. 483 (S.D.N.Y. 2013) ("*NOET*"), the Court severed a purported subclass out from a consolidated class action after the lead plaintiff decided not to pursue the purported subclass's claims. In that case, Judge Koeltl relied heavily on a similar statute of limitations argument and distinguished cases like *BOFA* for failing to adequately consider prejudice. Since Core Capital brings claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, (Dkt. No. 1, at ¶ 1), the applicable time restrictions on Core Capital's ability to bring claims under that Act include a two-year statute of limitations and a five-year statute of repose. *See* 28 U.S.C. § 1658(b). The Act's five-year statute of repose is not subject to equitable tolling, *see In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *11 (S.D.N.Y. Aug. 30, 2018), and although the two-year statute of limitations can be equitably tolled by the filing of a class action, *see Ca. Pub. Emples. Ret. Sys. v. Caboto-Gruppo Intesa BCI (In re WorldCom Sec. Litig.)*, 496 F.3d 245, 255 (2d Cir. 2007), "when a consolidated class action complaint redefines a class more narrowly than the prior individual complaints, and no longer asserts claims on behalf of a portion of the consolidated class, the statute of limitations is no longer tolled under *American Pipe* for the 'abandoned' subclass." *NOET* at 487. The parties have not briefed, and I will not today decide, when exactly the two-year statute of limitations began to run against the AT1 Bondholders – whether it be Diabat's October 5, 2023 amended complaint or his December 13, 2024 Motion to Certify a Class – but for the purpose of this decision, it is enough to find that the statute has likely begun to run again.

My exercise of discretion over whether to consolidate related class actions requires a balancing of the PSLRA's interest in "empower[ing] one or several investors with a major stake

in the litigation to exercise control over the litigation as a whole," *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 n.13 (2d Cir. 2004), against the potential prejudice that the AT1 Bondholders could face from consolidation. *See Kaplan*, 240 F.R.D. at 91. In this case, the potential prejudice that the AT1 Bondholders could face from being saddled with a lead plaintiff who has already abandoned them outweighs any yet-to-be-seen interest by Diabat in preventing Core Capital from picking up the claims he has dropped. The PSLRA was designed for administrative ease but I refuse to use it to disenfranchise claimants whose claims have already been abandoned by a lead plaintiff in the original action.

That said, these cases should be handled as one from an administrative perspective.

## VI.    Further Proceedings

The two class actions are hereby administratively consolidated for purposes of discovery and other pre-trial matters (although separate summary judgment motions will have to be filed in each action). The caption of the cases going forward should read:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————— x

In re: CREDIT SUISSE SECURITIES FRAUD
CLASS ACTIONS

This matter relates to:                                                    [Dkt. No. X]

       [*Diabat* /
       *Core Capital* /
       Both *Diabat* and *Core Capital*]
———————————————————————— x

Unless a paper is filed in "both cases," it should be filed only under the relevant docket number.

The CS Securities encompassed by Diabat's class include the following (i) Credit Suisse American Depository Shares, (ii) seven Credit Suisse notes – specifically the following notes

identified in the Cain Report: the LAE3 Notes, the AC5 Notes, the AF8 Notes, the L2E0 Notes, the L2G5 Notes, the L2K6 Notes, and the L2M2 Notes, and (iii) Credit Suisse options on the CS ADSs. I reiterate, the AT1 Bonds (Series DD33, Series BZ62, and Series CV40) were not included in Diabat's Motion to Certify a Class or its exhibits, and are the holders of such bonds are not included in his class definition.

Because Core Capital's case will exist as a parallel class action to Diabat's, the AT1 Bondholder class needs to be represented by a lead plaintiff. As discussed above, I concluded at the September 7, 2023 lead plaintiff hearing that Core Capital had the largest interest in, not just the AT1 Bonds, but all Credit Suisse securities. Although I concluded that Diabat rebutted the presumption that Core Capital should represent a class of all securities holders, that presumption was not and could not have been rebutted with respect to a class consisting of just AT1 Bondholders. As the 60-day period applicable to all then-pleaded claims (which is to say, applicable to holders of all CS securities) ran eons ago, *see* 15 U.S.C. § 78u-4(a)(3)(II), and since no one with larger holdings of AT1 Bonds applied to become lead plaintiff during the 60-day period, Core Capital automatically becomes the lead plaintiff of its proposed class of AT1 Bondholders.

It now must move for class certification. Class discovery must conclude by August 22, 2025. Plaintiff Core Capital must move for class certification by September 19, 2025. Responsive papers are due October 10, 2025. Reply papers are due October 24, 2025.

## CONCLUSION

For the foregoing reasons, PWC's motion is DENIED as moot, the CS Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Diabat's Motion to Certify a Class is GRANTED. The CS Defendants' motion to consolidate Core Capital's case with Diabat's is

GRANTED only to the extent of consolidating the two separate cases for all pre-trial matters, and is otherwise DENIED at this time.

This constitutes the written decision and order of the court. The Clerk of Court is respectfully directed to terminate PWC, Thomas Gottstein, David R. Mathers, and António Horta-Osório as parties, terminate the motions at Dkt. Nos. 25, 27, and Diab. Dkt. No. 126, and consolidate Core Capital's case, *Core Capital v. Credit Suisse, et al.*, 23-cv-9287 (S.D.N.Y.), administratively with *Diabat v. Credit Suisse Grp. AG*, 23-cv-5874 (S.D.N.Y.) for the conduct of all pre-trial matters (*see supra* pg. 26).

Dated: July 7, 2025

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

28